**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES KLUPPELBERG, | ) | |
| | ) | |
| Plaintiff, | ) | 13 cv 3963 |
| | ) | |
| v. | ) | JUDGE LEFKOW |
| | ) | |
| JON BURGE et al., | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

**PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION TO BAR THE EXPERT TESTIMONY OF DR. RUSSELL OGLE**

## Introduction

Plaintiff has alleged that he was wrongfully convicted of an arson and related six-person murder that he did not commit. The fire at issue occurred in 1984; at that time, the police closed their investigation as a non-criminal matter, finding that neither the cause nor origin could be determined, and that there was no evidence the fire was an arson. It was not until nearly four years later when a jailhouse snitch named Duane Glassco was arrested on unrelated charges and looking to avoid jail time that the detectives "cracked the case": Glassco pointed the finger at Plaintiff, giving testimony that he observed Plaintiff going back and forth to the house at 4448 S. Hermitage where the fire occurred from an attic window; Plaintiff was then viciously beaten into giving a false confession; and finally, the Defendants sought out a second opinion on the origin and cause of the Hermitage fire from a then-non-operational Office of Fire Investigation ("OFI"), which fabricated an opinion that the fire was an arson.

In this litigation, a jury will have to determine, among other things: whether there was an arson or whether the fire resulted from some other cause; whether Plaintiff's confession was coerced and false; and whether Glassco's assertions about what he saw on the night of the fire are true. To assist in making those determinations, Plaintiff hired Dr. Russell Ogle. Dr. Ogle is a chemical engineer with expertise in fire dynamics and fire investigations. Dr. Ogle has provided six opinions: that (1) the origin and cause of the fire cannot be determined; (2) that OFI investigator Pat Burns' determination of the origin of the fire was incorrect; (3) that Burns relied on bogus interpretations of burn patterns to make his cause determination and that those patterns were known to be bogus at the time; (4) that Burns' determination of the cause of the fire was incorrect, and that Burns failed to consider alternative causes of the fire; (5) that based on aerial photographs, Glassco's testimony was physically impossible because he could not see from the attic window to the back door of 4448 S. Hermitage; and (6) that the "facts" contained in Plaintiff's confession are not consistent with what

was scientifically possible, based on principles of flashover and contemporaneous accounts of the fire from firefighter Lt. Ennis.

The Defendants contest only Opinions five and six. According to the Defendants, Dr. Ogle is not qualified to opine about aerial photographs refuting Glassco's testimony or, in the alternative, no qualifications are necessary because a jury can analyze those photographs for itself. Likewise, as to Opinion six, the Defendants allege that a jury can determine whether Plaintiff's confession was scientifically impossible without expert testimony, and that Dr. Ogle's opinion should be stricken because he did not credit an unsigned hearsay note written four years after the fire. None of those contentions have merit, and Dr. Ogle should be permitted to testify as to each of his Opinions.

### Factual Background

As noted above, Plaintiff was wrongfully arrested, prosecuted and convicted of a fire at 4448 S. Hermitage ("Hermitage fire"), which killed six people. The building at 4448 S. Hermitage was a three-story structure: The first floor was unoccupied; the second floor was where the six victims lived; and the third floor was occupied by another family, all of whom safely escaped.

The Chicago Fire Department ("CFD") and Chicago Police Department ("CPD") responded to the fire. According to CFD Lt. Ennis, by the time he arrived at the scene the entire rear of the house was on fire. Lt. Ennis went into the first floor apartment but exited when he saw a fireball rolling toward him. Ex. B, Urbon Supp. 3/26/84 at 3. Lt. Ennis "then learned that a mother and five children were trapped in the second floor apartment" and attempted unsuccessfully to climb the front stairs; the building then collapsed *Id.*; *see also* Ex. C, Rolston Supp. 1/18/88, at 4.

In March 1984, due to the extensive burning and destruction of the building at 4448 S. Hermitage, CPD's Bomb and Arson Unit found that the cause and origin of the fire could not be determined. *See* Ex. B, Urbon Supp. 3/26/84 at 3. Area 3 closed the investigation as non-criminal, apparent accidental fire deaths. *See* Ex. D, Tuider Supp. at 1, 3.

Nearly four years later, Duane Glassco was arrested on unrelated charges. He and Plaintiff did not get along. Glassco testified that one month after his arrest, in December 1987, he spoke to the police about the Hermitage fire. Glassco alleged that he saw Plaintiff going back and forth to the back door of 4448 S. Hermitage on the night of the fire from an attic window at 1748 W. 45th Street.

In January 1988, after Glassco spoke to the police, Plaintiff was arrested and beaten into giving a false confession. According to that confession, Plaintiff went into the first floor apartment, which was unlocked, and "gathered papers and other material and piled them in the front room of the apartment and then ignited the pile with a cigarette lighter." Ex. E, Rolston Supp. 1/13/88. Based on that coerced confession, Plaintiff was arrested and prosecuted. While the court suppressed Plaintiff's confession as being the "obvious" by-product of police misconduct, the Defendants have held it up in this litigation as the lodestar of their defense. That is, that Plaintiff is guilty of the arson and so he suffered neither constitutional injury nor damages as a result of his wrongful conviction.

## Standard

Under Fed. R. Evid. ("Rule") 702, "the rejection of expert testimony is the exception rather than the rule," Rule 702 (Advisory Note, 2000 amends.), and the Rule's inquiry is a "flexible one" focusing on an expert's principles and methodology, not his conclusions. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 594-95 (1993). Factual questions about an expert's opinions are for the jury because they go to weight of testimony and not admissibility. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718-19 (7th Cir. 2000). Rather than exclusion, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595.

## I.    Dr. Ogle's Expert Opinion That it was Physically Impossible for Glassco to see the Back Door at 4448 S. Hermitage is Admissible

Based on his analysis of aerial photographs, Dr. Ogle has opined that it would have been physically impossible for Glassco to have seen the back door of 4448 S. Hermitage from the attic

window at 1748 W. 45th Street. The Defendants argue inconsistently that either that Dr. Ogle is not qualified to offer this opinion and has not done the calculations necessary to render it; or that a jury can reach the same conclusion by looking at the photographs. None of these arguments have merit.

### A. Dr. Ogle is Qualified to Render His Opinion

Dr. Ogle is a chemical engineer with two decades of experience investigating fires; he has investigated the cause and origin of hundreds of fires. *See* Ex. F, Ogle Dep. at 9, 34; Ex. A, Ogle Report, at 2. In addition, from 1991 to 1995, Dr. Ogle was an environmental consultant. *Id.* As both a fire investigator and consultant, Dr. Ogle has utilized and interpreted aerial photography. *See* Ex. F, Ogle Dep. at 105-07, 321-24. For example, as an environmental consultant, Dr. Ogle would analyze aerial photographs for evidence of contamination, comparing aerial photographs with the local topography. *See* Ex. A, Ogle Report, at 2; Ex. F, Ogle Dep. at 105-06. Similarly, as part of his investigation into the cause and origin of fires, Dr. Ogle examines aerial photographs of buildings to document pre-fire conditions and to substantiate reports and statements of witnesses. Ex. F, Ogle Dep. at 321-24. Indeed, NFPA 921 – the gold standard for fire investigations – requires as much. *See* Ex. G, NFPA 921 (2014) 16.2.6.11, 16.2.6.12, 18.3.3.1. For example, NFPA 921 explains that "pre-fire conditions of the structure should be determined to the extent practicable . . . ." *Id.* at 18.3.3.1. That can be done by referencing "aerial photography" or "[s]atellite images . . . ." *Id.* Similarly, NFPA 921 requires that the fire investigator "collect data that can support or refute the witness statements" about the fire. *Id.* at 18.3.3.15; *see also id.* at 14.1.2.1.

Given this extensive background, there can be no legitimate dispute that Dr. Ogle is qualified to testify about the aerial photographs that refute Glassco's testimony about the cause and origin of the fire. *See Pulse Engr., Inc. v. Travelers Indem. Co.*, 1:06-CV-1237-LJMJMS, 2009 WL 6361497, at *4-*5 (S.D. Ind. Sept. 22, 2009) (finding that where expert had "interpreted aerial photographs as part of his environmental practice for over 20 years," qualified to opine). As Rule

702 explains, an expert witness may be qualified by "knowledge, skill, experience, training or education." Dr. Ogle has the relevant knowledge, skill and experience to analyze Glassco's testimony using aerial photography: such analysis has been an integral part of the work he has conducted for decades. *See Sunnyside Timber LLC v. Barnes*, No. 6:09-01458, 2013 WL 5656121, at *2 (W.D. La. Oct. 15, 2013) ("Powell's testimony as an expert in forestry and logging is not at issue. Rather, plaintiffs' contend that Powell is not qualified in aerial photography. Powell merely uses aerial photography as a means to render his opinion. This is not a proper basis to exclude his testimony under *Daubert*.").

The Defendants do not cite any case law in support of their argument that Dr. Ogle is unqualified, but instead simply contend that because Dr. Ogle does not have any certifications, does not belong to any societies, has not received formal training and has not participated in legislative or regulatory proceedings relating to aerial photography, he is not qualified. None of those arguments – which go to the weight, not the admissibility of the proposed testimony – are sufficient to carry the day. "There is no requirement that an expert hold any particular credentials to give expert opinion testimony." *Holmes v. Godinez*, 311 F.R.D. 177, 210 (N.D. Ill. 2015). Indeed, the courts have repeatedly rejected the litmus tests that the Defendants seek to impose here. *See, e.g., Cage v. City of Chicago*, 979 F. Supp. 2d 787, 823-24 (N.D. Ill. 2013) (defendants free to address on cross-examination fact that expert "is not a member of ASCLD-LAB, and has never received a certificate, license [or] degree . . . recognizing his ability to opine on whether another crime laboratory practices are in compliance with nationally accepted standards" but refusing to exclude on this basis); *Holmes*, 311 F.R.D. at 211 ("As to her opinions related to prison security, her experience here may be less obvious, but we can reasonably infer that her work developing and implementing ADA compliance programs required consideration of and interaction with prison security and safety measures."); *Smith v. Warden, Ross Correctional Instn.*, No. 2:14-cv-02018, 2015 WL 7180921, at *7 (S.D. Ohio Nov. 16, 2015) ("Neither special education nor certification is necessary to confer expert status . . . .").

### B.  Dr. Ogle's Methodology Was Reliable

The Defendants also argue that Opinion five is not reliable because Dr. Ogle failed to perform mathematical calculations about the height or length of the buildings at issue. But Dr. Ogle applied the scientific method, and he explained why conducting mathematical calculations was unnecessary. (Nonetheless, he did make estimates at his deposition, which further proved his point.) As such, there is no merit to the Defendants' claim.

The district court has wide latitude in determining how to measure the reliability of an expert's testimony and whether the testimony is in fact reliable. *See Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). There is no requirement that either mathematical or other hands-on testing be conducted. *Gaskin v. Sharp Elecs. Corp*, No. 2:05-CV-303, 2007 WL 2572397, at *6 (N.D. Ind. Aug. 31, 2007) *clarified on denial of reconsideration*, No. 2:05-CV-303, 2007 WL 2746876 (N.D. Ind. Sept. 18, 2007). Rather, the "key inquiry is . . . whether the expert is testifying with the same standards of intellectual rigor demanded in their professional work." *Id.* (internal citation and quotation omitted).

Here, Dr. Ogle testified that he applied the scientific method and the principles identified in NFPA 921 to his interpretation of aerial photographs, and in particular, to test his hypothesis that Glassco could not see Plaintiff walking back and forth to the back door of 4448 S. Hermitage because of the obstruction from the building at 4450 S. Hermitage. Ex. F, Ogle Dep. at 215-226, 298-304. To that end, Dr. Ogle explained that he carefully reconstructed the pre-fire conditions of the buildings at issue. To do so, he identified the relevant buildings from aerial photographs that were taken before the Hermitage fire, and then used those photographs to create sketches of the lengths of 4448 S. Hermitage, 4450 S. Hermitage and the other buildings on the street. *See* Ex. A, Ogle Report at Figures 5-9; Ex. F, Ogle Dep. at 220, 224-26. Dr. Ogle also determined the relative elevations of the buildings using the aerial photographs, photographs of 1748 W. 45th Street, witness statements and testimony. He found that 1748 W. 45th Street was a two-story building and that 4448

S. Hermitage and 4450 S. Hermitage were three-story buildings of roughly the same elevation. Ex. F, Ogle Dep. at 220, 302. At his deposition, upon questioning by opposing counsel, Dr. Ogle further estimated the relevant heights of the buildings: Based on typical construction for a two-story building, he opined that the attic window that Glassco looked out of at 1748 W. 45th Street would be between 12 and 16 feet above ground. *Id.* at 299-300. Dr. Ogle likewise estimated the height of 4448 S. Hermitage and 4450 S. Hermitage (both of which were destroyed in or after the fire) to be 26 to 36 feet by referencing scaled dimensions of adjacent buildings. *Id.* at 300-01. Synthesizing all of the data described above, Dr. Ogle then opined that Glassco could not see the back door to 4448 S. Hermitage because his view would be blocked by 4450 S. Hermitage. Ex. A, Ogle Report at 12-17; Ex. F, Ogle Dep. at 304.

The Defendants primary contention is that Dr. Ogle's methods are not reliable because he has not done any mathematical calculations. But as Dr. Ogle has explained, making precise calculations of the relevant heights and lengths of the buildings would be an unnecessary exercise in trigonometry. Ex. F, Ogle Dep. at 222. His analysis is "not a calculation. It's reasoning based on sound scientific principles" that Glassco's view would be obstructed by the building at 4450 S. Hermitage and that "[s]olid bodies do not allow visible light to pass through." *Id.* at 224. To reach this conclusion, Dr. Ogle used the scientific method and principles codified in NFPA 921 and accepted in fire science, all of which are reliable. *Cf. City of Gary v. Shafer*, No. 2:07-CV-56-PRC, 2009 WL 1605136, at *6 (N.D. Ind. June 2, 2009) ("Therefore, Mr. Vandeven's review of sample analysis and agency reports, as well as review of aerial photographs was a valid methodology . . . ."); *AllState Ins. Co. v. Maytag Corp.*, No. 98 C 1462, 1999 WL 203349, at *4-*5 (N.D. Ill. March 30, 1999) (rejecting argument that opinion on fire origin should be barred because expert did no testing).

The Defendants' citation to *Bourrelle v. Crown Equip. Corp.*, 220 F.3d 532 (7th Cir. 2000) does not change this calculus. As an initial matter, the proponents of the expert testimony in that case

acknowledged that the expert "may not have satisfied the specific factors delineated in *Daubert*" but argued that the expert had met "enough reliability factors to render his opinion admissible." *Id.* at 537. Moreover, the expert's opinion in *Bourelle* involved a proposed alternative design without conducting testing, where the courts have repeatedly found that "[t]esting is important" because it is part of the industry standard. *Cummins v. Lyle Indus.*, 93 F.3d 362, 369 (7th Cir. 1996); *see also Bourrelle*, 220 F.3d at 535, 537-38; *Lott v. ITW Food Equip Group LLC*, No. 10 CV 1686, 2013 WL 3728581, at *16-*18 (N.D. Ill. July 15, 2013) (distinguishing *Bourrelle*).

The instant case faces none of the same limitations at issue in *Bourrelle*. Far from conceding that Dr. Ogle's opinion does not meet *Daubert*'s reliability standard, Plaintiff has argued that it comports with scientific method and the generally accepted practices in Dr. Ogle's fields. *See Gaskin*, 2007 WL 2572397, at *6 (finding that with regard to fire investigation, no tests are required to comport with industry standards). Likewise, this is not an alternative design case and the Defendants have "not explained why th[e] level of testing [that they demand] should be necessary here, or what one would expect to find from the testing" that Dr. Ogle has not already found from his meticulous analysis and diagramming. *AllState Ins. Co.*, 1999 WL 203349, at *5.

**C. Dr. Ogle's Opinion is Helpful**

Finally, the Defendants argue that Dr. Ogle's Opinion five should be stricken because it would not be helpful to the jury. According to the Defendants – and in tension with their claims that Dr. Ogle is neither qualified nor has he used exacting enough methodology – no expert opinion is necessary to assist the jury in interpreting the aerial photographs. That contention lacks merit.

As noted above, the jury is going to have to determine whether Glassco is credibly reporting what he saw Plaintiff do on the night of the fire. One tool that can assist the jury in making that determination is expert testimony about whether it is physically possible for Glassco to have seen what he says that he saw. Dr. Ogle's scientific assessment of the aerial photographs fills that role.

The courts have repeatedly found that expert testimony regarding aerial photographs is helpful to a jury and outside the ken of a layperson. *See, e.g.*, *NutraSweet Co. v. X-L Engr. Co.*, 227 F.3d 776, 788-89 (7th Cir. 2000) (finding that the interpretation of aerial photographs is a well-accepted technique); *United States v. Trejo*, 501 F.2d 138, 143 (9th Cir. 1974) ("[T]he comprehensive examination of aerial photographs, and other similar scientific and technical evaluations, are obviously within the realm of permissibly expert testimony."). As Dr. Ogle explained, simply looking at an aerial photograph would not convey the same information that he has provided. To reach his conclusion, just as NFPA 921 guides, Dr. Ogle reconstructed the pre-fire scene by identifying the relevant buildings from the aerial photograph, determining their relative elevation and assessing their length and then testing his hypothesis that Glassco could not see from the attic window to the back door of 4448 S. Hermitage. Ex. F, Ogle Dep. at 224-26 (explaining that "half of my job is not about solving differential equations. Half of my job is about making sure that we're working with a faithful, accurate representation of reality. And that's the pains that we took to create that opinion. It's understanding the size of the buildings, their height, and the relative location of Mr. Glassco and the target area that he supposedly sees with Mr. Kluppelberg in entering the building.").

To argue that Dr. Ogle's opinion is "common sense," the Defendants have taken a quote out of context from Dr. Ogle's deposition. Ex. F, Ogle Dep. at 222 (when asked if calculations were necessary, Dr. Ogle stated "No. I think that this rises almost to the level of common sense."). "The fact that [Dr. Ogle] uttered the phrase 'common sense' during his deposition does not take his opinions outside the purview of expert testimony." *Cage*, 979 F. Supp. 2d at 826. In fact, during that same deposition, Dr. Ogle testified at length about why his expertise is necessary for interpretation of the aerial photographs. *See* Ex. F, Ogle Dep. at 222-26.

Nor are the Defendants any more successful in their invocation of this Court's opinion in *Jones v. Union Pacific R.R. Co.*, No. 12 C 771, 2015 WL 5252958, at *8-*9 (N.D. Ill. Sept. 8, 2015). *Jones*

did not deal with the interpretation of aerial photographs. Rather, this Court found that proposed expert testimony about ordinary photographs and locomotive video was "not based in scientific or specialized knowledge and would not assist the jury" anymore than simply looking at the photographs or video. *Id.* at *9. By contrast, at issue here are aerial photographs that without context provide a juror with little to no information to help analyze Glassco's testimony:



City_Klupp 27864 (cropped to show relevant area).

In our case, Dr. Ogle has specialized knowledge in interpreting aerial photographs as it is something he is both required to do as a fire investigator and that he did as an environmental consultant. He therefore brings to this opinion the application of the scientific method and his particular expertise. There is no persuasive reason to bar him from doing so here.

## II. Dr. Ogle's Expert Opinion That Plaintiff's Confession is Scientifically Impossible is Admissible

In addition to challenging Opinion five, the Defendants also contest the admissibility of Opinion six, in which Dr. Ogle opines that the facts contained in Plaintiff's confession are inconsistent with science. The Defendants argue that this Opinion is both unreliable and unhelpful to the jury. For all of the reasons stated below, neither contention is successful.

### A. Dr. Ogle's Opinion is Rooted in the Evidence in the Record and is Reliable

Dr. Ogle has explained that if Lt. Ennis' observations about the Hermitage fire are credited, then Plaintiff's confession is physically impossible. The Defendants dispute the reliability of this opinion because, according to the Defendants, Dr. Ogle failed to credit an unsigned General Progress Report ("GPR") from January 16, 1988. That argument, however, falls flat.

There are three documents that allegedly memorialize Lt. Ennis' observations of the Hermitage fire. First, there is Detective Urbon's March 1984 supplementary report. Urbon explains that when Lt. Ennis arrived at the fire, the rear was completely engulfed in flames. *See* Ex. B, Urbon Supp. 3/26/84 at 3. Lt. Ennis "went into the living room of the first floor apartment and at that time observed a fireball in the kitchen rolling toward the front of the house and exited out the front." *Id.* Lt. Ennis "then learned that a mother and five children were trapped in the second floor apartment and he attempted to climb the front stairs but was stopped before he got a fourth of the way up the stairs. The rest of the building then became involved in fire and collapsed." *Id.*

Second, there is an unsigned January 16, 1988 GPR. *See* Ex. H, GPR 1/16/88.[1] That GPR, states that "it was determined from Lt. Ennis that the living room he was referring to was in the apartment where the victims lived and that the level below was completely engulfed in flames." *Id.*

Third, there is a January 18, 1988 supplementary report by Defendant Rolston. Ex. C, Rolston Supp. 1/18/88, at 4. According to that report, Lt. Ennis "stated in summary that the fire was on the first floor near the front when he arrived on the scene; he attempted to rescue children on the second floor but was driven back by flames and heat." *Id.* It does not mention anything about

---

[1]     Although the author of the January 16 GPR did not sign his or her name, a supervisor "Sandow" did sign off on it. Sandow is the same supervisor that signed off on Defendant Rolston's January 18, 1988 Supplementary Report, suggesting that the unsigned GPR was likely written by either Rolston (who has blocked discovery into the issue by taking the Fifth in response to questions about the fire) or Schmitz -- the two detectives from Bomb and Arson investigating Plaintiff's case. *See* Ex. C, Rolston Supp. 1/18/88; Ex. H, GPR 1/16/88. As such, the fact that the later supplementary report by Rolston and Schmitz does not include the information in the GPR renders that content even more suspect.

the first floor being completely engulfed in flames, or that Urbon's initial account of Lt. Ennis' observations was erroneous, or off by a floor. *Id.* Rather, consistent with Urbon's report, it states that the fire was on the first floor toward the front (*i.e.*, the fireball in the kitchen rolling toward the front) and that Lt. Ennis attempted to rescue the children on the second floor but was driven back by heat and flames (*i.e.*, he learned that the victims were trapped on the second floor but was stopped before he could climb the stairs to get to them).[2]

The Defendants argue that Dr. Ogle's expert opinion fails to take into account Lt. Ennis' revised observations memorialized in the January 16 GPR and therefore, his opinion is unreliable. This is not the type of argument that ordinarily justifies relief under *Daubert*. Experts are "entitled to base [their] opinions on assumptions contrary to defendants' view of the evidence, provided that there is sufficient support for those assumptions in the record (which there is)." *Jones*, 2015 WL 5252958, at *8. Stated differently, Dr. Ogle was permitted to credit certain evidence – Urbon's and Rolston's supplementary reports – and discount others in reaching his conclusions. *See Cage*, 979 F. Supp. 2d at 828 ("For example, the fact that Keel reviewed some portions of Fish's trial testimony and ignored others that arguably belie his conclusions is not a basis for exclusion."). Indeed, "[w]hen facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the [Rule] on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Fed. R. Evid. 702, advisory committee's note (2000 amends.). Rather, the Defendants will have the opportunity to highlight on cross-examination that Dr. Ogle's theory relies on Urbon's and Rolston's reports, and an opportunity to prove that assumption is incorrect; but exclusion on that basis is unwarranted. *See Walker v. Soo Line R. Co.,* 208 F.3d 581, 586-87 (7th Cir. 2000). That is particularly true because in his rebuttal report, Dr. Ogle provided a sound explanation

_____

[2]    It is worth noting that both Urbon's supplementary report and Rolston's supplementary report use the same numbering for the floors: the fire was on the first floor and the victims were on the second floor.

for why he discounted the unsigned GPR and credited the other two reports. *See* Ex. I, Ogle Rebuttal at 10-14 (explaining that the account in the GPR is not consistent with Urbon's report or deposition, or the surviving victim's observations; and that it defies logic that Lt. Ennis would leave the second floor without trying to rescue anyone, and go to the third floor to rescue individuals who already escaped).

Nothing in the Defendants' citation to *Barber v. United Airlines*, 17 Fed. Appx. 433 (7th Cir. 2001), *LeClercq v. The Lockformer Co.*, No. 00 C 7164, 2005 WL 1162979 (N.D. Ill. April 28, 2005) or *Muzzey v. Kerr- McGee Chem. Corp.*, 921 F. Supp. 511 (N.D. Ill. 1996) warrants barring Dr. Ogle's opinion. In *Barber*, the plaintiff did not challenge the district court's finding that his expert's opinions failed to satisfy *Daubert* because of his selective use of data. *Barber*, 17 Fed. Appx. at 437. As such, the Seventh Circuit upheld the exclusion, reiterating that the expert cherry-picked facts without explanation – including rejecting objective, undisputed evidence of weather conditions – to reach his conclusions. *See also Scott v. Chuhak & Tecson, P.C.*, No. 09 C 6858, 2011 WL 4462915, at *5 (N.D. Ill. Sept. 26, 2011) ("[A]n expert opinion cannot be based on facts that are contradicted by undisputed evidence. He may, however, rely on his client's version of any disputed facts.").[3] Similarly, in *LeClercq*, the proffered expert failed to consider "17 effluent samples . . . [that] reflect non-detects for TCE, PCE and TCA" – contaminants that the expert was opining about in his hydrogeological analysis. *LeClercq*, 2005 WL 1162979, at *4. The expert testified that he was aware of the data but disregarded it without explanation. *Id.* Finally, in *Muzzey*, the experts admitted that they relied on "untrustworthy data" in reaching their conclusions. *Muzzey*, 921 F. Supp. at 519.

By contrast, here, Dr. Ogle has not rejected any objective data regarding Lt. Ennis' observations, but instead renders an opinion that credits as its predicate assumption Lt. Ennis'

---

[3] In addition, per Circuit Rule 32.1(d), no unpublished order of the Seventh Circuit issued before January 1, 2007 should be cited except to support a claim of preclusion or to establish the law of the case from an earlier appeal in the same proceeding. As such, *Barber* cannot provide binding precedent.

contemporaneous account, which happens to be both the most logical and most consistent with the other witness observations. Moreover, unlike *LeClercq*, Dr. Ogle is not conducting a chemical analysis that requires including the universe of samples for its reliability. Instead, like many other experts (e.g., police practices), he is simply crediting one version of Lt. Ennis' account over the other and creating an opinion based on that assumption.[4] Last, in contrast to *Muzzey*, Dr. Ogle is not relying on "untrustworthy" data, but instead is reviewing and basing his opinion on police reports just as any other fire investigator in his field would.

**B.     Dr. Ogle's Opinion Requires an Understanding of Fire Dynamics**

Finally, the Defendants argue that Dr. Ogle's expert opinion on the scientific validity of Plaintiff's confession will not be helpful to a jury because his findings are common sense or, in the alternative, credibility determinations outside the purview of expert testimony. But the average juror does not understand fire dynamics and Dr. Ogle is not making credibility determinations.

As an initial matter, Dr. Ogle's testimony about the scientific impossibility of Plaintiff's confession is helpful to a jury. A jury is going to examine the veracity of Plaintiff's confession – *e.g.,* in assessing whether there was probable cause to prosecute Plaintiff for Plaintiff's malicious prosecution claim or whether the Defendants conspired to violate his constitutional rights, and in determining whether Plaintiff is innocent for purposes of damages. One way a confession can be tested is by analyzing whether the facts in that confession are physically possible. Dr. Ogle's opinion provides insight into that analysis.

The Defendants claim that Dr. Ogle's opinion about Plaintiff's confession is common sense. But that is far from true. As Dr. Ogle has explained, crediting Lt. Ennis' account, the rear of the house was completely involved by the time he arrived. Ex. B, Urbon Supp. at 3. If, as Plaintiff's

---

[4]     The irony in the Defendants' argument is that their expert has relied on the information in the GPR to the exclusion of that contained in Urbon's and Rolston's reports to reach the opposite conclusion.

confession attests, the fire started in the living room, which is in the front of the house,[5] then for the rear to have been completely engulfed in flames, the fire would have had to have achieved flashover. Ex. A, Ogle Report at 18. If the fire had achieved flashover, then Lt. Ennis would not have been able to enter the living room because it also would have flashed over and been filled with fire. *Id.* But Lt. Ennis was able to do so, thus rendering Plaintiff's confession scientifically impossible. *Id.*

Because this opinion requires understanding how fires work in general and how flashover works in particular, Dr. Ogle's opinion cannot be dismissed as "common sense." For that reason, Defendants' citations to *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001), *Bucker v. Sam's Club, Inc.*, 75 F.3d 290, 293-94 (7th Cir. 1996) and *Cooper v. City of Chicago Heights*, No. 09 C 3452, 2011 WL 2116394, at *5 (N.D. Ill. May 27, 2011) are inapposite.[6]

In the alternative, the Defendants argue that Dr. Ogle's opinion is not helpful to the jury because he is simply making a credibility determination about Lt. Ennis and Plaintiff's confession. To the extent that the Defendants are simply recycling their contention described above – that by crediting the information provided by Lt. Ennis in the two supplementary reports and discounting the information in the unsigned note, Dr. Ogle is making credibility determinations – that argument should be rejected for all the reasons explained *supra*. In the alternative, if the Defendants are arguing that Dr. Ogle's opinion is based on nothing more than his decision about who to believe, his findings – based on fire dynamics and flashover as described above – flatly refute such a claim.

### Conclusion

For all of the reasons stated above, the Defendants' motion to bar should be denied.

---

[5]      The surviving victim testified that the living room was in the front of each of the three apartments at 4448 S. Hermitage. *See* Ex. J, Lupercio Dep. at 20-35 and Exhibit 1 to deposition.
[6]      Indeed, in both *Buckner* and *Cooper*, the courts did not even rule on whether the substance of the proposed opinion was "common sense" because it failed for other reasons. *Bucker*, 75 F.3d at 293-94 (finding no evidence linking the accident to any negligence on the part of Sam's Club); *Cooper*, 2011 WL 2116394, at *5 (expert opinion not admissible because expert could not connect her analysis of two national studies to the issues in the specific case).

**RESPECTFULLY SUBMITTED,**

/s/ Gayle Horn
*One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Gayle Horn
Roshna Bala Keen
Sarah Grusin
LOEVY & LOEVY
312 N. May St., Suite 100
Chicago, IL 60607
(312) 243-5900

## CERTIFICATE OF SERVICE

I, Gayle Horn, an attorney, certify that on March 2, 2016 I filed a copy of the foregoing Response via the Court's electronic filing system and thereby served a copy on all counsel of record.

/s/ Gayle Horn