*Kluppelberg v. Burge, et al.*
Case No. 13 CV 3963
Our File No. 13-3050

# DEFENDANTS' RESPONSE TO PLAINTIFF'S MIL NO. 40 EXHIBIT A-2 (REDACTED)

# Replacing Dkt. 500-4

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 21, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

## 15. Speaking Engagements and Donations.

W&S36. 6/1/12. Email from Roger Mansour to Steven Mills. I read your article "Freed prisoner greets a changed world," Chicago Tribune, 6/1. I am a missionary and used to do chaplain work at CCJ. I would like Kluppelberg to contact me.

W&S184. 6/1/12. Email from Steven Mills to Graham Gerst. Your piece today really saddened me. If I wanted to send Kluppelberg some money to help him while he tries to start a new life, do you have any recommendation on how to get it to him?

W&S28. 6/2/12. Email from Art Nicol to Karl Leonard. I am a seasoned veteran of the issues inherent in transitioning from a fear-based culture of restricted opportunities and violence such as prison to freedom-based culture of open opportunities such as the US has the potential to offer. I want to help you and others who are assisting Kluppelberg to adjust to the new world in which he finds himself so that he does not drift back into prison. I am stepping forth to welcome him as a friend and an asset to this society. We need him to share with others all he has learned in the past 25 years of prison life and what he will learn in the coming years about adjusting to life beyond prison.

W&S29. Is it possible for you to transmit my offer of help to your client so that he might pray about it and contact me if he so chooses? He deserves to know himself as a hero after years of being labeled a lowlife loser.

W&S189. 6/3/12. Email from Paul Froehlich to Leonard. Congratulations on exonerating Kluppelberg! Ending that miscarriage of justice after a quarter-century is quite an accomplishment. Your client obviously needs a hand, and my wife and I are willing to help. We have an extra room in our house and are willing to put him up as our guest. I'm a retired state representative who served on the Prison Reform Committee in the House and a volunteer with the Prison Ministry at Willow Creek Church.

W&S25. 6/4/12. Email from Michael Becker to Leonard. If I send a check directly to Kluppelberg it will violate my desire for anonymity. If I were to send a check payable to your firm, could you send it on?

W&S27. 6/4/12. Email from Art Nicol to Leonard. Thanks again for all the ways you are assisting Kluppelberg. I hope that justice for him includes having sound opportunities to share his story in ways that generate income for him without his feeling exploited once again by our media.

W&S35. 6/4/12. Email from Steven Mills to Leonard. I'm glad James is doing well. Has he found a place to stay?

Cavanaugh 076

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois  60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 21, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

6/4/12.  Email from Leonard to Steven Mills.  He has several offers on places to stay. Everybody from the Salvation Army, to acquaintances, to perfect strangers have offered him a bed.  At this point he is still trying to figure out what is best.

W&S23.  6/5/12.  Email from Paul Swanson to Leonard.  I am an architect and real estate developer reading the paper about this poor guy James.  I don't know where to send a check so if you would get back to me.

W&S14.  6/6/12.  Email from Scott Kluth to Leonard.  I just did a donation to help Jim get back on his feet for a few months but am happy to do more if the need is there.

W&S12.  6/7/12.  Email from Leonard to Graham Gerst.  I represent Kluppelberg, the wrongfully convicted man released from prison last week.  Thank you for your interest in helping him.  We have created a website, jameskluppelberg.com, where you can learn more about his story and make a contribution.

6/7/12.  Email from Leonard to Gerst.  I just sent the donation.  Kudos to you for a worthwhile pro bono effort.

NIU 6.  4/4/13.  "Life after Incarceration" panel at NIU student center.  Kluppelberg, recently found innocent and exonerated after serving over 24 years in prison for murder and arson, will share his story and discuss the work of the Exoneration Project.

W&S5697.  12/25/12.  Email from James Kluppelberg to Leonard et al.  This is what I'm calling my first Christmas.  I am a free man after 25 years of wrongfully being in prison.  I have had so much to learn since my release.  The world has changed so much.  I have had many wonderful people help me learn again, from my son, who has taught me much, to my daughter Sarah who has kept me grounded.  I have been blessed with meeting my 3 granddaughters, 2 of whom I live with.  They brighten my every day.  Then there is REDACTED my daughter-in-law.  She has helped me learn again how to interact with people in general.  There is also Rena, my friend of 15 years, she stood behind me when few did, has believed in my innocence almost from the day we met.  There is my new friend Dorothy whom I met this summer, she not only has become a great friend but has provided me with some vital work and been supportive in my quest for a job.  For a guy who thought he was fairly smart I have had to learn so much in the last 6 months.  A very special thank you to all the hard-working attorneys who worked long hours to see justice done and me freed.

UIC05.  4/15/13.  U of I expense report for Kluppelberg.  4/10/13: lecturer and panelist for the Reform of the Chicago Police event.  Reported expense: $500.

4019.  2/5/14.  Email from Gayle Horn, Loevy & Loevy to Reuven Fenton.  I talked to James and he is happy to speak with you and be a part of your book.

22

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 21, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

2/10/14. Email from Reuven Fenton to Gayle Horn. James and I started the interview today. He's a great guy.

UOFC3. 4/21/15. Correspondence from U of C to law firm. The University located the following items that appear responsive to your subpoena: Recording of 2/26/13 "Clinic in Action" panel discussion at which James was a speaker; Flyer regarding the 2/26/13 panel discussion. The 2/26/13 recording is available at the following web address: www.law.uchicago.edu/audio/exonproj022613.

23

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 21, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

## 16. Trial Transcripts and Other Reports of Proceedings.

Report of Proceedings, People v. Kluppelberg, 7/13/89.

1128.   *Prosecution opening statement.*   On 3/24/84 there lived two families at 4448 S. Hermitage. The Lupercio family lived on the 2nd floor. You will be hearing from the surviving husband who lived there with his wife and 5 children.

1129.   In the earlier morning hours of 3/24 a fire occurred which had its cause and origin on the 1st floor rear of that building. It spread throughout the entire building resulting in the death of Elva Lupercio and her 5 children. You will be hearing from Duane Glassco, and although he does have a criminal background and has entered into a plea agreement with the prosecution, he will tell you about Kluppelberg.

1130.   He will tell you that he has known Kluppelberg for some time. That at the time of the fire he was residing in the same building as Kluppelberg. In the evening hours of 3/23 he was there. He was drinking that night. At various points during the night he saw Kluppelberg leaves the residence. He saw him leave from the rear of the building, go up to a light post, disconnect the wires in the light post. Over the course of the night he saw the defendant leave from the rear of the dwelling.

1131.   At the time is making these observations he's in the attic apartment. He was able to see clearly. He saw the defendant go to the rear of 4448 S. Hermitage with what appeared to be a stack of newspapers. Around 4 AM, when this fire occurred, he saw the defendant enter the rear of that building, after he had picked up a brown bag by a garbage can. He then saw the defendant come rushing out of that building, which eventually caught fire.

1132.   Glassco asked Kluppelberg, did you set that fire, and defendant says nothing. It is only later that the defendant admits that he indeed set the fire.

1133.   *Opening statement by the defense.*   The evidence will show that the witness at the time of the offense, Duane, was on a substance called tic, LSD. He was in no condition to have seen anything.

1134.   Evidence will show, aside from his prior background, that Glassco has motive beyond saving his jail time. That motive is one of the people present at the time of this offense, Dawn Gramont, had been living with Duane and had a child by him. On the night that she delivered that child, she dumped Duane for the defendant. A situation which will give Duane motive and bias against the defendant. I would submit that the State will not be able to establish that this was, in fact, arson.

1135.   Much less establish this was an arson that the defendant had anything to do with.

24

**Cavanaugh 079**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois  60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 21, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

1153.   *Examination of Francis Burns.*

I'm commanding officer of the Office of Fire Investigation of the CFD.

1156.   I'm certified by the State Fire Marshall's offices as fire investigator and arson investigator, also as an instructor in cause and origin.

1158.   I have never testified when I said it wasn't an arson.

1160.   On 3/24/89 I went to the fire scene at 4448 S. Hermitage.  We were conducting a class of 25 newly appointed fire investigators.

1161.   I was one of the instructors.

1162.   We examined the debris for observer indicators that would tell us where the fire originated.  We noticed there was a large shiny alligatoring which would indicate a fast spreading fire.

1163.   We found that the majority of the fire was confined to the back of the structure.  We found unusual burn patterns where the fire had burned through the floor at the back end of the building.

1167.   The building was totally destroyed.

1182.   We excluded all of the accidental causes for this fire.  Based on examining burn pattern normally found in arson fires, my opinion was this fire was a result of arson.

1183.   To sustain a fire of this volume, something had to have been applied.  Something had to be brought in, an accelerant or newspapers or rags or some combustible material to spread the fire.  My opinion is something was brought into this structure and ignited to cause this fire.  The origin was at the rear section some 6-10' into the structure on the 1st floor.

1188.   I projected my opinion on the burn patterns.  Regarding if any tests were conducted, we let the police handle that.

1189.   I don't know if that was done in this case.

1190.   There was a burn through pattern on the floor which is normally associated when an accelerant is used.

1192.   My statement that there may have been an accelerant is based strictly on the burn pattern.

25

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 21, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

1194.   I determined in my opinion, based on fire pattern, that this was a homicide and arson.

1223.   *Testimony by the medical examiner, Dr. Choi.* I changed the manner of death [in the examinations from the fire] from accidental to homicide on 2/4/88.

1224.   *Statement by the defense.* In this case we have had an alleged confession, it was suppressed based on physical brutality to the defendant. I anticipate the answer of the doctor is going to be he learned from police officers that there had been a statement.

1225.   He gave a contrary opinion at a prior time and did nothing on his own to change that opinion.

1228.   *Continued testimony by the medical examiner.* The fire investigation was done by the police and I'm very dependent upon this information. Initially, my information was accidental occurrence. The case was determined as of 1/26/88 as arson.

1229.   On 2/3/88 I spoke with the State's Attorney that they had determined the case was arson and therefore considered homicide.

1231.   My medical opinion was then based on a police report I read given to me by Det. Foley.

Report of Proceedings, People v. Kluppelberg, 7/14/89.

433.   *Testimony of Dawn Gramont.*

434.   On 3/23/84 I was living around the corner from 4448 Hermitage with my 3 children and Kluppelberg. Duane and Michelle were spending a few nights there.

437.   The 3 children are Duane's. I have a 4th child now. The father is Kluppelberg. He wasn't home on 3/23/84.

438.   He returned between 7 and 8 PM.

439.   He turned out the light in the street by our house. He always turned that light on and off. He disconnected the wires. Then he came back in the house.

440.   He left the house again. I don't remember exactly when.

441.   He left ~ an hour to an hour and a half before the fire started. He was gone 5-10 min.

26

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 21, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

442.  We had sex and then we were playing cards. There was a fire we noticed out the window. Kluppelberg or Duane noticed it, both of them. They went to the window. We continued to play cards.

449.  I didn't follow Kluppelberg out of the house to see where he was going. I didn't follow him to 4448 S. Hermitage.

450.  I didn't ever see him looking in the rear of that building.

451.  When he came back he didn't smell of smoke. I don't remember him saying, I have an instinct that there's going to be a fire.

452.  I didn't ever hear him say he started the fire and the reason was he was angry with me.

454.  I testified before the grand jury in 1/88.

455.  I told them I had followed Kluppelberg out of the building.

470.  I testified that he left the apartment ~4 times during the evening.

471.  I said I followed him to a light pole directly behind 4448 S. Hermitage where he climbed the pole and cut the power. That's a different light pole than the one I earlier testified to. I said on the 2nd time that he left he also went to that light pole. I testified that the 3rd time he left he went to the rear of the apartment building at 4448 S. Hermitage and was looking through the back door.

472.  I testified that he then returned to the apartment. I testified that the 4th time he left I didn't follow him because he said he was going to his mother's house a few blocks away. I testified that he returned ~15 min. later. I don't recall that I testified that his clothes smelled like smoke. I'm not sure if I remember testifying that he said he had an instinct there was going to be a fire.

473.  I testified that he said there would be a fire near the light pole where he had been earlier. I said that about 10 min. later I heard the fire engines.

474.  I testified that Kluppelberg admitted he started the fire.

475.  I testified before the grand jury because my children's and my life were threatened by a police officer.

476.  Before I got into the grand jury room, when I was in the state's attorney's office there was an officer who threatened me and hit me. I don't remember his name. When I testified before the grand jury I wasn't testifying to the truth.

27

**Cavanaugh 082**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 21, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

477.   I was told what to say by this police officer.  I made a report to the Office of Professional Standards of the CPD.

480.   Duane was with me most of the day before the fire.  We were partying and doing drugs, tic.  It's a hallucinogenic drug.  We used it almost every hour on the hour all through the day and night.  Kluppelberg was not taking drugs.

481.   He doesn't use drugs.  In the evening Duane went up to the attic periodically to get more drugs and came back down.  He spent just a few minutes up there.  We were also drinking.  Duane was drinking.  Regarding how much, at least 1-2 cases of beer between 3 people.

482.   We did drink hard liquor.  It started from the time we woke up that day and ended when the PD came to the house to get us out.  I saw Duane use the tic at least 7-8 times.

483.   Kluppelberg went out about an hour and a half before the fire.  He never went out after that until the police got us out.  We were playing cards, myself, Duane, Michelle, and Kluppelberg.

484.   When James left the house he was gone 5-10 min.  He wasn't carrying anything when he left.  The building that burned was 4-5 houses down from us.  There are at least 3-4 houses between that building and us.

485.   I'm not able to see 4448 S. Hermitage from the attic window.

487.   My relationship with Duane ended 2/16/84.  I had met Kluppelberg and we were messing around.  I went into labor with his kid and Duane found out and that night me and Duane split and Kluppelberg moved in.

496.   *Examination of Duane Glassco.*

497.   On 11/18/87 I was convicted of burglary and theft.  On 7/24/86 and 8/3/84 I was convicted of burglary.

498.   I have a case pending, a petition for violation of probation.  With respect to that, I entered into an agreement with an ASA on 1/17/89.  That in exchange for my truthful testimony against Kluppelberg in [this case] the ASA would recommend on my petition for violation of probation 3 years time considered served.

499.   I met Kluppelberg about a year before 3/24/84, and he was also going with my son's mother, Dawn.

Cavanaugh 083

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 21, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

501.  In the late evening of 3/23/84, my 3 sons, Dawn, Kluppelberg, Michelle, Donnie Brittainn, Roy Cooper and myself were in the residence on 45th St. We were drinking and snorting cocaine. I didn't consume any tic that day. I was using cocaine.

502.  I used about a half gram that night. Between us, we went through a case and a half of beer.

503.  In the late evening I saw Kluppelberg leave the residence between 10 and 10:30.

506.  He went to the front of the house to cut the streetlight off because it was shining in the kids' bedroom. He then returned. He left a 2nd time around 11, 11:30. I was in the attic.

507.  As far as I know, he took a walk because he wasn't gone too long.

509.  When I went back to the window Kluppelberg was in a yard 2 doors away, the house that caught on fire.

510.  I could see from the back of 4448 S. Hermitage to the garage. You can see the whole yard from the window.

511.  Kluppelberg was standing in the yard. He walked back and forth through the gangway 2 or 3 times, then left. He returned home.

512.  He left again, I don't know what time.

514.  I went to the window of the attic. I saw Kluppelberg in the yard again at 4448 S. Hermitage. He walked toward the front of the building.

515.  He was out of my sight for about a minute, then came back to the back by the garage. He opened the door to 4448 S. Hermitage. He stood there a couple minutes and then entered the building. He was in the building 5-10 min., then exited, walked to the alley, then walked back and entered the building carrying a bundle in his arms.

516.  It looked like a bundle of newspapers. He was in the building at that time ~3-4 min.

517.  I saw him come out. He wasn't carrying anything. He came back home. I asked what are you doing and he ignored me and walked into him and Dawn's room and started rummaging through there. I saw him leave again around 4 AM.

518.  Then it dawned on me about the light that was shining into the back window.

519.  Then I went to the window and I saw Kluppelberg walking back and forth again through the gangway of 4448 S. Hermitage. Then he walked to the alley and grabbed a bag by a

29

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 21, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

     garbage can and went back toward the house. He entered through the back door again, was in there 5-6 min. then exited and started running home.

520.    When he returned I asked him what he did and the only thing he did was smile at me. Then he walked into his bedroom. About 10 min. after that we started smelling smoke.

522.    I asked Kluppelberg if he did it and he didn't say nothing. I had another conversation with him concerning the fire while it was still going on.

523.    I asked him if he did it and he told me to shut my mouth or else. Then I stated to him I know you did it and I asked him why. He said, You know how I am when I feel like I'm losing someone, I do stupid things. At first I didn't know what he was talking about and then it was told to me that he and Dawn were arguing about me.

531.    From the attic window there was nothing to stop my view of the rear 1st floor door at 4448 S. Hermitage.

534.    Dawn started going with Kluppelberg before my 3rd son was born, within a week or so of that. I didn't ever tell her, after 3/24/84, that I was going to get even with him.

544.    I first told the police about this in 12/87. I was in jail at the time.

544.    I talked to my lawyer first before talking to the State.

546.    I was in jail for burglary, theft and violation of probation.

548.    I talked to the state's attorney in 1/88.

562.    *Statement by the Court.* This court is satisfied that the fire was arson.

563.    The critical question is whether there is evidence sufficient to prove that Kluppelberg was responsible for that arson. Gramont, during questioning before the grand jury, placed the burden of this arson on Kluppelberg, indicating that he had admitted it to her.

564.    She testified today that that testimony was a result of threats. I did not find her testimony here today credible at all. I'm basing that on my observations of her demeanor and the way she responded to questions.

565.    The court has weighed heavily the issue of Glassco's credibility. He is a convicted felon pending a hearing on a violation of probation. He hopes to receive consideration for his testimony today. In my observation of him as he testified, my assessment of his demeanor and all those intangible things a trier of fact considers in determining the issue

30

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 21, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

of credibility, he came out a lot better than Dawn did, particularly if I consider his testimony in relationship to the photographs that have been entered into testimony.

566.    Whether it could reasonably be concluded that he could have seen what he testified here today was critical in my determination of the ultimate question in this case. I think the Exhibits will bear out that Glassco was correct when he said there was nothing obscuring his vision.

567.    I'm satisfied that based on the testimony and the position of the light poles depicted in the Exhibits that Glassco could have had enough light to see what he said he saw.

568.    I was struck with the fact that Glassco's testimony that he observed the defendant carrying a bundle reminded the court of things said by Burns about how fires are set.

569.    I cannot ignore Glassco's testimony concerning what the defendant did and did not say when he put the question to him as to whether he started this fire. There is no testimony that says I saw the defendant torch 4448 S. Hermitage. Evidence in this case as to that discrete act is circumstantial.

570.    I do not feel there is any evidence upon which to base a finding that the defendant had the specific intent to kill those individuals.

571.    As to the remaining counts in the indictment, there is a finding of guilty.


Motion for Cause for Substitution of Judges, 12/11/89.

1373.    Defense attorney Weinberg: I have filed a formal request to withdraw. I am now an adversary to my client and my client is an adversary to me.

1374.    Kluppelberg: The reason I asked for the public defender was that I am not a lawyer. I did the amount I could manage to get the motion filed due to the conflict between me and Weinberg.

1375.    The Court: The public defender will be made available to you. I will relax the procedure to make sure you get before this Court all the reasons you have for deciding that Judge Morgan cannot be a fair judge on your sentencing hearing.

1378.    Kluppelberg: I would like an attorney.

1379.    The Court: Weinberg is present. He will assist you in whatever you might need in terms of questions you have of him. There is a motion pending for him to withdraw which I will not rule upon and I am not going to delay the hearing. Rather than have a potential

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 21, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

conflict based upon the complaint filed by the defendant against Weinberg, I'm going to allow Kluppelberg to have the assistance of the public defender in proceeding with this motion which he filed pro se.

1380.  The Court: Mr. Kluppelberg, do you wish to call a witness?

Kluppelberg: It has been brought to my attention that Your Honor signed the warrant against me at the time of my bonding out of the county jail on 10/8/89.

1381.  It's also been brought to my attention that on the day I filed the SOJ before Judge Morgan you had counsel with her in chambers. I have made comments as to my feelings toward your possible prejudice and am asking that you recuse yourself.

1382.  The Court: Request denied.

*Kluppelberg calls witness Bonnie Kluppelberg.*

Bonnie: I'm your wife. I was in Judge Morgan's courtroom 11/15/89.

1383.  I remember the defendant attempting to speak with the judge.

1384.  I remember the Court saying, you may not speak, I am speaking. The judge was getting very upset. The defendant asked again to speak. The judge said she was tired of your antics. I don't know what antics she was referring to. It could have been the fact that you had gotten out of jail, that you had said you wanted a new lawyer and she said that he was perfectly professional and she wouldn't allow you to even talk.

1385.  The defendant asked the judge for an opportunity to present evidence in a motion that he had filed. The judge said that he was very professional, that she's known him for a long time and she's sure he took care of everything. The judge said something to the effect, Kluppelberg, one of the reasons you are here today is because of your antics after my finding of guilty. She was very upset. She yelled, she knew her duties, that you did not have to tell her her job.

1386.  I didn't at any point see the defendant raise his voice or get disrespectful to the court. On 1/13/88 at the closing of the first day of trial I heard Judge Morgan off the record make comments as to the defendant's case. She was leaving the next day on vacation. The clerk said, you're going to have a nice vacation, and she said, definitely, because this case is over, I'm not to think about it after tomorrow because I'm not going to ruin my vacation.

1387.  I called Marshall's office and told him this lady was very biased because she's already made up her mind before she heard any evidence. He said not to worry about it.

32

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 21, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

1392.    The defendant had an opportunity to speak with Morgan only inasmuch as she would let him talk, then she would shut him down.

1393.    I heard the judge say that as far as she was concerned the trial was over. I didn't hear her say that she was going to find the defendant guilty.

1394.    My husband wants to have a jury trial in order to decide whether he should receive the death penalty.

1395.    He definitely does not want Judge Morgan to decide whether he should receive the death penalty.

1396.    When Judge Morgan stated that the trial is over, it sounded to me like her decision was made. This was the first day of trial.

1400.    *Testimony by Delores Kluppelberg.*

1401.    I'm the mother of the defendant. I was in court on 11/15/89. On that day the defendant attempted to remove his attorney. Judge Morgan said she has seen nothing wrong with Weinberg, that she had known him professionally and personally for a long time and that he had conducted himself properly in her opinion.

1402.    During the trial when the State rested their case Morgan said she wanted to take a break to look at some pictures, came back and found a verdict of guilty, and there was no defense presented more closing argument. His lawyer just sat there.

1403.    Weinberg did not move to stop the judge from reading her verdict. The defendant was expecting defense witnesses to be called.

1405.    I observed Judge Morgan yelling at the defendant. The defendant didn't ever become disrespectful to her.

1423.    The Court: I do not find the statement of 11/13 to indicate any prejudice on the part of Judge Morgan. I read the transcript and not only did she tell you, Kluppelberg, that she was speaking and you shouldn't interrupt, but she told Weinberg the same thing. We have to tell you when you can talk, when you can't. That is our job.

1424.    I will not second-guess on Judge Morgan's rulings as to whether Weinberg should be removed from this case. There was nothing in this record to suggest that judge Morgan was prejudiced against you during that hearing with regard to whether Weinberg should remain as your counsel.

33

Cavanaugh 088

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 21, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

1425.   Judge Morgan may have to rule on certain posttrial motions but the ultimate issue as to penalty in this case is going to be resolved by a jury.

1426.   What I'm hearing is that your family and you are dissatisfied because you lost. Your motion for substitution of judges for cause will be denied.

Continuance of Motion for Cause for Substitution of Judges, 12/11/89.

1443.   Weinberg: I filed a motion to withdraw as counsel for Kluppelberg. Kluppelberg has filed a complaint with the ARDC.

1444.   I can no longer communicate with him. I feel by filing that he breaches the lawyer client privilege.

1448.   The Court: I'm not going to rule today. Because you are the attorney who tried the case a new attorney would need a great deal of time to become familiar in order to litigate the post trial matters, principally the presentence hearing.

1449.   I'm going to appoint a public defender without allowing you to withdraw:

1451.   The role of the judge in a death penalty hearing in which the jury is going to make those decisions is greatly reduced. By the same token the role of the attorney and his knowledge of the case becomes amplified.

1452.   Weinberg: I will cooperate with Kluppelberg's attorney, the public defender, and make myself and my file available.

Report of Proceedings, Sentencing Hearing, 3/21/90.

1715.   Prosecution: The evidence brought forth at trial and which has now been stipulated to and made part of the record of this death penalty hearing is that the Defendant does qualify under the Multiple Murder and Felony Murder.

1718.   Defense: I believe the evidence does not show that Kluppelberg intended to kill anyone. It clearly doesn't show he intended to kill more than one person. There is no evidence that he knew anybody lived in the building. State's evidence indicates that the first floor was vacant which would go contrary to any intention to kill anybody.

1720.   The Court: The fact that the first floor was vacant, it would be impossible to leap from there to an assumption that the Defendant had no knowledge that people lived there. Witnesses talked about how long the Defendant lived there. I think the Court could infer

34

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 21, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

familiarity with the neighborhood. There is no doubt that the Defendant can be found eligible for the death penalty.

*Testimony is presented regarding Kluppelberg's previous arrests for possession of ammunition and burglaries and his bonding out of CCJ.*

<u>Death Penalty Hearing in Aggravation and Mitigation, 3/22/90.</u>

10741.   *Closing argument in aggravation.*   The defendant's 5 convictions for burglary and attempt burglary show him to be a very deliberate person who is doing what he wants when it suits him and to satisfy his needs.

10742.   You have the evidence of the defendant's absence from CCJ. He manipulated the situation to where he could pay a bond and walk out of the jail.

10744.   You have the evidence of the bench trial, the defendant's actions in causing loss of life, the serious crime of arson.

10749.   *Closing argument in mitigation.*

10750.   I ask that the Court take into consideration that new evidence was brought forth. In the trial, the State brought forth no evidence that there was an intent to kill on the part of Kluppelberg.

10752.   On his burglary convictions, Kluppelberg admitted his guilt. He went to the penitentiary. His entire stay while incarcerated is absent any disciplinary action.

10758.   *Rebuttal closing argument.*   The mitigation can be summarized in 3 categories. One is that people have said this man was a good boy in prison, worked hard, didn't get into trouble. Second, people testified that he's a hard worker.

10759.   Third, people said he's good with children. The court has to decide whether that evidence is sufficient to preclude the imposition of the death penalty.

10753.   The aggravating factors are the defendant's conduct caused serious harm. He has a h/o criminal activity.

10767.   The Court: There is a tremendous amount of aggravation in this case based on the unspeakable tragedy that took 6 lives in which the defendant has been found guilty. The defendant does have 5 prior felony convictions. The question becomes what mitigation is present.

35

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 21, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

10768.    The court can make inferences from both documentary and testimonial evidence and is compelled to consider what potential this 25-yo man has for rehabilitation. The 5 previous convictions were not crimes of violence.

10769.    From the presentence investigation, Kluppelberg's background in terms of family life could be characterized as troubled and unstable. On the other side, I look at the enormity of the loss of life this case involves. The fact he has managed to lead a fairly conforming life in prison, and that when he chooses to work at a job, he does it well, is working in mitigation. I also see manipulativeness demonstrated by some of the evidence in aggravation.

10770.    The court could not find a basis to say that over time Kluppelberg might not come to be a citizen that we would not have to fear to have on our streets again. I balance that against the fact that the victims in this case would never be on our streets again.

10772.    This court cannot find that there are no mitigating factors sufficient to preclude the imposition of the death penalty and declines to impose the death penalty.

10775.    The defendant is sentenced to life imprisonment with no opportunity for parole.


Report of Proceedings, Petition for Certificate of Innocence, 7/9/13.

687.    Court: Both experts say that the cause and origin [of the fire] is undetermined.

*Examination of Kluppelberg.*

698.    I'm employed at Metal Matic.

699.    I started there in April. I'm a material handler. I live with my fiancée. Before that I lived with my son.

700.    I was released from Menard 5/31/12 when my postconviction petition was granted and the State vacated the charges.

706.    From the attic windows [of the house where he lived at the time of the fire] it was possible to see the building at 4448 S. Hermitage, the roof line and part of the 3rd floor. It wasn't possible to see the 1st or 2nd floor because the view was blocked by the building next to it.

707.    Exhibit 2 is an aerial photograph that reflects how the neighborhood looked on 3/24/84.

Cavanaugh 091

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 21, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

711.   From the house where I lived it's possible to see the rear portion of the yard at 4448 S. Hermitage.

713.   You weren't able to see the back door at 4448 S. Hermitage from where I lived.

714.   On the day of the fire I get home around 7, 8 o'clock that night.

715.   Dawn, Duane and Michelle were drinking and snorting what I assumed was tic. Dawn and I started arguing about the fact that the kids were in soiled diapers and the house was a mess.

716.   Then I went for a walk to cool off. I was gone maybe 15, 20 min.

717.   I got the kids to bed and started arguing again with Dawn.

718.   I left again, what around the neighborhood for 20 min. or so.

719.   I believe I left the house 3 times that night. I disconnected the streetlight in front of our house because it shined inside the house.

722.   I didn't disconnect any streetlights on Hermitage or in the alley.

725.   I didn't start the fire at 4448 S. Hermitage. I didn't go into the house on Hermitage on the night of the fire. I didn't tell Duane or Dawn that I started the fire.

742.   It wasn't possible to see somebody entering the back door at 4448 S. Hermitage from the attic window or to see the inner part of the backyard nearer to the back door.

750.   Attorney for Kluppelberg: Duane testified in 1989 that on repeated instances he saw Kluppelberg open the back door to 4448 S. Hermitage. That could not have happened. The line of sight was such that you could not see from [the attic window] to the back door of 4448 S. Hermitage.

753.   The arson expert, Mr. Ogle, didn't just say that the cause and origin of the fire couldn't be determined. He says, "A fire of this size and duration requires a fuel load substantially greater than the fuel load provided by a gallon of gasoline or an armload of newspaper." Duane testified that Kluppelberg had an armload of newspapers that he brought to the back door at 4448 S. Hermitage starting the fire.

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 21, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

Continued Report of Proceedings, Petition for Certificate of Innocence, 7/29/13.

664.    Attorney for the Petitioner: The point that both expert reports speak to is that there is zero evidence of arson. At the very least, it's unclear how this fire began and as Dr. Ogle said in his report, there is no physical evidence indicating it was an incendiary fire. That's agreed to by both experts.

665.    There was some testing for accelerants done at the time of the fire and there were none found. When Kluppelberg says he's innocent, there is no evidence that has been provided by the State that explains how he could even have started this fire given what science tells us about how it began.

667.    There is no way that Duane could have seen what he said he saw. That portion of his testimony is clearly false. He is equally incredible on his claims about the confession.

Continued Report of Proceedings, Petition for Certificate of Innocence, 8/5/13.

601.    Court: I found Kluppelberg's testimony to be credible and unimpeached.

602.    After looking at the aerial map, there is no question as to this key fact: It was absolutely impossible to see the rear door of 4448 S. Hermitage from 1748 W. 45th St.

603.    The Petitioner's fire expert's ultimate opinion was that the cause and origin of the fire cannot be determined. He also offered his opinion that a fire of this size and duration required substantially greater fuel load than that provided by a gallon of gasoline or an armload of newspaper.

606.    Ultimately I find that Gramont's trial testimony does help the Petitioner despite the issue of her recantation of her grand jury testimony.

610.    After review of the entire record up to this point I find that a terrible injustice was done to Kluppelberg. I find it is more likely than not that he did not start this fire. His certificate of innocence is hereby granted.

Report of Proceedings, Motion to Suppress Confession, 11/9/88.

815.    *Examination of John L Schmitz.*

I'm a CPD detective in the bomb and arson section.

816.    On 1/12/88 I investigated 2 car fires that occurred on 12/24/87.

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 21, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

817.  Kluppelberg was placed under arrest and had his Miranda rights given to him by Det. Rolston.

824.  Kluppelberg agreed to make a statement without having an attorney present. No one struck him during the time we were taking the statement.

825.  We talked to him for ~3 hours. Then we called and requested an ASA.

826.  We explained to the ASA that Kluppelberg had made an admission in regard to the fires.

829.  Neither I nor anyone in my presence beat Kluppelberg, caused him severe injury, or treated him in an abusive fashion.

830.  We didn't exercise physical or mental coercion over him. At one point he did become emotional and started to cry.

832.  We didn't tell Kluppelberg he was coming to the police station with us one way or another. He went voluntarily.

833.  Kluppelberg as a security guard is the one who called in the arson. We asked him to come with us to discuss the automobile fires he had reported.

839.  Upon being placed under arrest, he made this confession at 9 PM. We called the ASA at ~11:30, 12 PM. In addition to admitting to setting the automobiles on fire, he also admitted having set numerous other fires dating back to when he was a child.

840.  That would include the fire in 1984 where several people were killed. He told us that after 9 o'clock.

841.  He was crying during the interview ~ between 9 and 9:30. I don't recall if he placed a phone call at ~ 2 AM.

842.  He wasn't crying or hysterical while speaking on the phone that I recall.

843.  After making the call he would not give a written statement. At that time he was not chained to a wall. After the ASA approved felony charges of arson for the automobiles, while we were preparing our paperwork, Kluppelberg was handcuffed to the wall in the interview room. He did not urinate on himself. He was afforded the opportunity to go to the bathroom.

844.  I never placed him on the floor and kicked and punched him in the kidneys. The ASA arrived at ~12:30 AM. Kluppelberg made an oral statement to him.

39

**Cavanaugh 094**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 21, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

845.  The ASA gave him permission to make a call. Regarding if prior to that he made any calls other than one at 7:30, I believe may have received an additional call. Once the ASA let him make the call, the questioning ceased.

848.  *Examination of Det. Leonard Rolston.*

I'm employed by the CPD Bomb and Arson Squad.

850.  At 9 PM I advised Kluppelberg that he was under arrest and read him his Miranda rights.

856.  He agreed to talk to us without an attorney present. He gave a statement.

857.  Neither I nor anyone in my presence ever struck him.

858.  We didn't make any threats if he refused to cooperate.

861.  No one ever caused Kluppelberg any severe injury or treated him in an abusive manner.

862.  No one exercised any coercion on him whatsoever. At 4 AM he was allowed to make a call. I was present and I spoke on the phone.

863.  Weinberg was on the other end of the line. After this conversation with Weinberg there wasn't any more questioning of Kluppelberg.

864.  We had a conversation with Kluppelberg from 7 or 7:30 until 9 o'clock. One of the reasons he was there was to view photographs to give us a description of the person he claimed was a possible offender in these car fires. He wasn't a suspect at 6:30.

865.  We didn't call him a liar at any point prior to 9 o'clock. I asked him to take a lie detector test.

866.  I accompanied him to the polygraph section.

867.  He didn't take a lie detector test. He was then taken back upstairs and questioned. Prior to 9 o'clock he made several calls.

868.  At 9 o'clock I guess you could say he was under arrest. He was a suspect and being detained. I mirandized him after he gave us a statement.

869.  Regarding how long after he refused a polygraph we arrested him, it was after he give us another story as to what happened on the night the cars were burned. At ~9 he was under arrest and we continued questioning him until 12:30, 12. It was about 9:30 or 9:45 that

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 21, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

he cried. Regarding if we continued questioning him, it was more a rambling conversation held by Kluppelberg than questioning.

870. We didn't place him on the floor and kick and punch him in the kidneys, back.

872. I had no knowledge as to these other fires he was admitting to. I let him talk as much as he wanted. He also mentioned a number of other crimes besides arsons. He told me spontaneously he started the car fires because he wanted to keep his job.

873. Without specific questioning, he admitted to starting the fire that killed 6 people.

875. Sometime prior to 4 AM most of the questioning ceased. However, we were still carrying on conversations with him over other incidents in his life that he was expressing.

876. Regarding if he made calls between 12:30 and 4 AM, he was receiving messages over his beeper and making calls. At no time during questioning was he handcuffed.

877. He was chained to the wall in the interrogation room after charges had been approved and we started the paperwork, sometime after 3:30 or 4 AM.

880. *Examination of ASA Larry Axelrood.*

881. I arrived at the police station at ~12:30 AM on the 13th and met with Schmitz, Rolston and Kluppelberg.

883. When I walked into the room, Kluppelberg was not handcuffed.

885. He agreed to give me a statement. I talked with him for over 2 hours. He made numerous calls while I was with him.

886. He wasn't handcuffed. I didn't see anyone cause any harm to him. He didn't c/o any injuries officers had done to him. He never c/o being forced to give this statement. He didn't make any request for medical attention. The only injuries I saw were some old scars on his wrist that he informed me were from previous suicide attempts.

887. I had asked if he would reduce his statement to writing and he said he wasn't sure, he wanted to talk to his girlfriend. He told me he was calling her.

888. He came back and said, I talked with my girlfriend and my lawyer said that I can't talk with you anymore. That was the end of my talking to him. I asked him how he had been treated when the detectives were out of the room. He said he was treated fine. After the questioning stopped, he thanked me for being professional and treating him with respect. He said, "Everybody has treated me well."

41

**Cavanaugh 096**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 21, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

890.    The police advised me Kluppelberg was arrested for arson of 2 motor vehicles and that he had made a statement relative to an arson/homicide.

891.    I took a statement only pertaining to the homicide.

892.    I was talking to him for over 2 hours. Regarding how many sentences I placed in the report relative to what he told me, 9 or 10. In those I didn't mention the vehicle arsons.

894.    In the report I have one phone call mentioned, the one he made to Fitzpatrick. In that conversation he said he spoke to Weinberg. I don't recall him receiving a call.

895.    The call in my report was made between 3:30 and 4 AM.

896.    Probably half the time he was with me alone.

910.    *Examination of Francis Gerard Huber.*

911.    I'm employed by CCDOC, assigned to Division Five. On 1/14/88 I had occasion to see Kluppelberg as a prisoner in CCDOC.

912.    He was c/o pains in his back. I examined his back. He had bruises on both sides of his lower back in the kidney area. He c/o urinating blood.

915.    *Examination of Marshall Weinberg.*

917.    At ~ 2:15 AM on 1/13/88 I received a call from Bonnie Fitzpatrick.

918.    She placed me on a 3-way conversation with Kluppelberg. He was incoherent, hysterical. He was crying. I had to calm him down before I could understand what he was saying.

920.    I told him he should say nothing further to the police or ASA.

921.    On the 14th I went in the lockup to see him.

922.    He pulled up his shirt. I saw bruises on his lower back, kidney area.

923.    I requested the court to send him to the CCJ hospital for treatment, which the court did. The bruises were large hematomas, scientifically, in the lower side and back area above the buttocks but below the rib cage. They were on both sides.

924.    I'm representing Kluppelberg. He was interrogated by police both on the 13th and at Area Three as well, from what he told me.

42

**Cavanaugh 097**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 21, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

925.    I don't know where Kluppelberg was from the early morning of the 13th until I saw him in court on the 14th.

927.    *Examination of Bonnie Fitzpatrick.*

929.    About an hour before Kluppelberg was picked up we were in bed together. I didn't notice any unusual marks on his body.

930.    I saw him on the 13th between 4 and 6 PM. He was in the lockup at 11th and State.

931.    His arms were swollen and bruised. He showed me his back where it was swollen and black and blue.

932.    The bruises were on his lower back. I'm the defendant's wife.

Continued Report of Proceedings, Motion to Suppress Confession, 11/15/88.

939.    *Examination of James Kluppelberg.*

941.    The officers told me I was coming to the police station with them one way or another. I was put next to the police vehicle at which time they searched me, took my beeper, keys, wallet and a work knife that I had.

942.    I was then placed in a squad car, about 6:30, 7 PM and taken to 11th and State. When I got to the police station they told me they wanted me to make a statement as to what I saw the night of the automobile fires.

943.    Then they told me they wanted me to take a polygraph. I attempted to contact my lawyer but he wasn't in. I told the officers [I would take the polygraph] because I wanted to go home. The waiver stated I was going to be asked questions about homicides from 1984. I asked what they were trying to do and Schmitz got violent and slammed me up against the wall and put cuffs on me and dragged me back upstairs.

944.    Back in the interview room they told me they knew I killed 6 people 4 years ago, that I started the fire. They told me they had an eyewitness. They told me I was going to sign a confession. I told them I wanted to contact my lawyer. They told me I was going to confess, at which point they started beating me. I was handcuffed behind my back. They laid me facedown on the floor and started punching me in my back and using their heels in the back kidney area. Both officers did that. This was ~ 9 PM and at about 11 o'clock they stopped.

**Cavanaugh 098**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 21, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

945.    When they stopped, I told them I did it, in those words. I didn't go into details. At 11 PM they chained me to a wall and that's the last I saw of them until they came back with the ASA. They told me if I told the ASA what had taken place that he would take their side because he was working with them, and that an accident would befall me if I told on him [sic].

946.    I was too afraid to tell the ASA that I had been beaten by the officers. The ASA treated me well. I briefly made a statement to the ASA. The officers were sitting there. Thanks to the ASA I got a chance to use the phone in the early morning hours of the 13th. The officers didn't let me use the phone again after 9 PM.

947.    [Fitzpatrick] put me in touch with my lawyer who advised me not to say anything more and not to sign anything. I told my lawyer at that time that I had been beaten. I appeared in court the morning of the 14th.

948.    My fiancée visited me at 11th and State. I showed her the bruises. The morning I was in court I was directed by the judge to have medical attention. When I came into the jail after night court on the 13th I advised the paramedics that I had been beaten and needed to see a doctor. I eventually saw a doctor Jan. 21 or 22.

949.    Prior to that I didn't see any medical personnel other than the paramedic. I didn't make my statement to the police and ASA of my own free will.

951.    Out of fear I told the ASA I was feeling all right. I was never alone with the ASA.

952.    On the 13th when I went into CCJ there was a paramedic. He didn't send me to the hospital. He said he would sign me up for sick call.

953.    He told me I wasn't an emergency case.

971.    Court: The heart of the motion is that the defendant was mistreated by the police and therefore gave the statement involuntarily.

972.    It is not clear in the record and from Exhibit #2 that this defendant had some type of injuries. The person he made this report was never called as a witness. He put in here that the defendant had these bruises and I won't speculate that they were old or new. But there is no question that there were bruises.

973.    In any event, we cannot have statements that are the result of mistreatment by the police. Accordingly, I will sustain your motion.

974.    The court is suppressing any statements made by the defendant to the officers as well as to the ASA. It is obvious the defendant was mistreated by the police.

44

# Cavanaugh & Associates

# APPENDIX I

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| REVIEWER: | Aimée St. Pierre, M.D. |
| C&A DICTATION NUMBER: | 3073 |
| C&A FILE NAME: | James Kluppelberg v. Jon Burge, et al. |
| BRIEF CITATION: | Kluppelberg v. Burge |
| COURT NUMBER: | 13 CV 3693 |
| ATTORNEY NAME: | Elizabeth A. Ekl/Jaclyn L. McAndrew |
| ATTORNEY TELEPHONE: | 630.735.3370/630.735.3317 |

## TABLE OF CONTENTS

1. ARDC Complaint Against Attorney Weinberg .................................................... 2

2. Response of Attorney Weinberg to ARDC Complaint ............................................ 2

3. Bibb County Sheriff's Office Records ............................................................ 3

4. CCSAO Investigative Report, Michelle Brittain .................................................. 3

5. Court Services Department Internal Affairs Division Report ..................................... 3

6. Chicago Police Department Reports ............................................................... 4

7. CCSAO Investigative Report, Duane Glassco ................................................... 10

8. CCSAO Investigative Report, Dawn Gramont .................................................. 12

9. Presentence Investigation Report by George William Savarese, PhD, ACSW ................. 14

10. Affidavits of James Kluppelberg .................................................................. 18

11. Kluppelberg's Statement to Office of Professional Standards .................................. 20

12. Pre-Sentence Investigation Report, Cook County Adult Probation Dept ....................... 23

13. Pro Se Motion for a Murder Task Force Attorney ............................................... 24

14. Pro Se Motion for Substitution of Judge for Cause ............................................. 25

15. Pro Se Petition for Re-Hearing ................................................................... 26

16. Expert Testimony by Kluppelberg, Larry Gillard v. City of Chicago, 3/22/13 ................. 38

17. Report of Terry A. Kupers, M.D., M.S.P. ........................................................ 46

Cavanaugh 100

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

## 1. ARDC Complaint Against Attorney Weinberg.

2059.    11/27/89. All that Weinberg has done wrong has been put in a motion before Judge Morgan who would not allow me to present my evidence. I have also filed a complaint against Morgan. I'm being forced to use an attorney by this judge that does not want to be on this case any longer nor do I wish to have him on this case.

2060.    If some kind of help is not gotten by 12/4/89 I'm going to face the death penalty hearing without the benefit of a proper attorney.

## 2. Response of Attorney Weinberg to ARDC Complaint.

5752.    1/18/90. Kluppelberg has been my client for several years. I represented him on a murder case wherein he was found guilty and also represented him when he pled guilty to 5 counts of burglary. In the case of which he complains, I have represented him throughout motions and trial. I filed a motion to suppress his confession to the arson murder of a mother and 5 children. It was heard before Judge Collins, who suppressed the confession. The case was transferred to Judge Morgan when Collins retired. There were motions argued before Morgan and eventually a bench trial wherein the defendant was found guilty. Kluppelberg was advised at all times as to my strategy in trial and in every instance concurred with me. It appears the only reason for this complaint is that the trial court found him guilty.

5753.    Before sentencing, Kluppelberg escaped from CCJ. After his recapture, he did not want to be sentenced by Morgan and has been doing everything in his power to delay sentencing and create stronger grounds for appeal. He has told me several times that this complaint and his attempt to remove me from the case were only ploys to accomplish this and that he did not intend to harm me in any way. Kluppelberg is a very clever man and a master manipulator.

2

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

### 3. Bibb County Sheriff's Office Records.

*This is a record indicating that Kluppelberg was briefly incarcerated in GA on hold for return to CCJ.*

### 4. CCSAO Investigative Report, Michelle Brittain.

1560.    10/28/11. Brittain related that on the night of the fire she was in the apartment at 1748 W. 45th St. with her brother Donnie, Kluppelberg, Duane, and Dawn. They were doing drugs and partying. An hour or so before the fire Kluppelberg left the apartment and shortly came back. When he came back he announced he had put out the city light just north of the building.

1561.    Sometime after he left and returned to announce he had put out the alley light. Brittain and Duane went to an upstairs bedroom. Later Kluppelberg came up and told them there was a fire a few doors down.

Brittain stated that Duane and Kluppelberg had issues over Dawn. Duane and Dawn had two children together.

She stated that Duane never told her he got a deal for testifying against Kluppelberg. She acknowledged that her affidavit stated Duane could not see into the yard and to the back door of 4448 S. Hermitage. When advised that from the 2nd floor window, the alley and yard would have been visible though the back door would not have been, Brittain stated she didn't know the alley and yard were visible from the 2nd floor window, adding that she did not recall there was a 2nd floor window.

### 5. Court Services Department Internal Affairs Division Report.

468.    10/20/89. Interview of Kluppelberg at CCDOC. He was questioned as to alleged illegal activities of Deputy Anderson who was assigned to courtroom 302 at 26th and California. He admitted that Anderson was paid money in exchange for arranging visits between Kluppelberg and his wife. His wife would usually pay Anderson $20-100 in cash per visit, however, on occasion the price was $150. Kluppelberg was able to visit his wife on almost every court appearance. When he had a long time between scheduled court appearances, Anderson would "special him up to court" so he could have private contact with his wife. The visits would take place in the jury room.

3

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

## 6. Chicago Police Department Reports.

559.   3/24/84.  Supplementary report.

562.   3/25/84.  At the scene, a citizen informed police that while watching the fire she overheard a male youth inform his mother that he and a friend has set this fire and the one earlier.  The citizen stated that at that time the mother told him not to say anything more.  The youth was later identified as Richard Shields.  He stated that he was recalling a TV news item that stated a woman was seen running through the yard carrying a gasoline can just after a fire occurred the previous day on Marshfield.  He said he was saying that perhaps the woman who started that fire may have also started this fire.  He denied any involvement in any fire.  His mother was interviewed separately and gave basically the same account of the incident as her son.

564.   3/30/84.  Supplementary report.

565.   Due to the extensive burning and collapse of the building, the cause and origin of the fire could not be determined.  What is known from witness accounts is that the fire originated in the rear of the building.  Examination of the basement indicated that the fire did not originate there since the burning is less than the rest of the building.

568.   4/5/84.  Supplementary report by O'Donnell.

569.   An anonymous tip stated that Kluppelberg was responsible for the fire, that he was seen going in and out of the house before the fire.  It further stated he was seen cutting the cords to the streetlights.  Kluppelberg was placed under arrest in regard to a stop order issued for armed robbery.  After being transported to Area 3 he was advised of his rights.  He admitted cutting the wires for the streetlight.

570.   He stated that it was shining into his window while he was sleeping.  He stated he used wire cutters to cut the wires.  He then went to sleep.  This was about 3 hours before the fire.  He stated he was alerted to the fire by fire personnel who evacuated the apartment in which he was staying with his girlfriend Dawn.  Dawn stated that Kluppelberg was sleeping at the time of the fire.  Kluppelberg refused to take a polygraph.  He was being held over at Area 3 pending a lineup on the armed robbery.  At this time there is not any evidence to indicate that he was responsible for the fire.

571.   4/10/84.  Supplementary report by Allen.  Officer was sent to Holy Cross Church to see Mary Quinn in regard to a threatening letter.  She related that Oscar Siller was an injured victim of a fire at 4448 S. Hermitage.  On 4/7 he received a letter in Spanish.  Quinn translated it to say: Oscar, paint yourself in the color of your land.  The organization does not forgive the lives of the 6 dead.  You are responsible.  You are going to be made dead.

4

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

572.  We are going to send immigration on you. Rip up the letter because you're in trouble because you opened it. Don't say anything to anyone.

Mrs. Siller gave the letter to the priest who gave it to Quinn who notified police.

573.  4/14/84. Supplementary report by Tuider.

575.  Results from samples of debris that were taken from the scene were returned from the lab. They showed negative for any accelerant. Based on the above facts it is requested that this incident be classified as closed, apparent accidental fire deaths.

576.  1/17/88. Supplementary report by Rolston and Schmitz. During the investigation of the arsons of 2 automobiles it was ascertained that Kluppelberg had been employed as a security guard for the parking lot where the arsons took place and had been working the night of the car fires. He was subsequently arrested and charged with 2 counts of arson. During questioning he admitted to starting a large number of fires since age 9.

577.  After being given Miranda warnings he admitted to starting fires in the area where he resided (1748 W. 45th St.) in 1984. He stated he started the fires by igniting available combustible materials with matches or a cigarette lighter. He stated he was very sexually active and when frustrated sexually he often randomly started fires. He sometimes started fires while out walking his dog at night.

An anonymous tip was received in 1984 naming Kluppelberg as a suspect in the fire at 4448 S. Hermitage. It mentioned that Kluppelberg was observed going in and out of the building prior to the fire and that he was observed disconnecting streetlights prior to the fire. Because of this information and the fact that Kluppelberg had already admitted that he had started numerous other fires in that area in 1984, he was specifically questioned regarding this fire. After waving his Miranda rights, Kluppelberg made an oral admission to starting the fire at 4448 S. Hermitage on 3/24/84. This admission was made to the undersigned detectives and ASA Larry Axelrood on 1/12/88.

Kluppelberg in summary stated that on the night of this incident he was staying with a girlfriend, Dawn, in her apartment at 1748 W. 45th St. He stated that he got into an argument with Dawn which resulted in her telling him to leave. He went to a parked car by the apartment and tried to sleep but felt too angry and frustrated. He got out of the car and disconnected a streetlight nearby. He walked into the alley of the 4400 block of Hermitage and into the rear of 4448 S. Hermitage on the first floor. He walked around the vacant apartment and gathered papers and other material and piled them in the front room and ignited the pile with a cigarette lighter. He watched the fire burn for a while and then walked back to Dawn's apartment. When describing the fire as he left it, Kluppelberg took off his shirt and spread it out indicating the approximate size of the fire. He did not call the fire department. He went back to Dawn's apartment and sat at the

**Cavanaugh 104**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

kitchen table and waited until he heard fire trucks. He, Dawn, and the people visiting then went to look at the fire. He stated that when he found out that 6 people died in the fire he became very worried and did not talk to any of his friends about it.

578. 1/18/88. Supplementary report by Rolston and Schmitz.

579. Kluppelberg has admitted he intentionally started the fire at 4448 S. Hermitage.

Glassco stated that on the night of the fire Kluppelberg complains about the streetlight being too bright and goes out and disconnects it with pliers. He then goes into the alley and disconnects the alley light. (There is a streetlight directly in front of 1748 W. 45th St. and an alley light directly behind 4448 S. Hermitage.) Glassco sees Kluppelberg walking in the alley. A short while later, he notices the building burning and Kluppelberg comes back into the apartment with a big grin on his face. Glassco asks Kluppelberg if he has started another fire and Kluppelberg doesn't answer.

580. Glassco stated that the entire group believed Kluppelberg started the fire. He stated that Kluppelberg often started garbage cans on fire and worked for a board-up service and used to start fires in order to obtain business.

Dawn stated that on the night of the fire she had been drinking and got into an argument with Kluppelberg. He had wanted to have sex and she refused. He then left and shut off the streetlights. She stated he later came back and told everyone there was a fire. She always believed that he had started the fire because he was always starting garbage cans on fire and starting fires to get board-up business. Although Kluppelberg never discussed this particular fire with her, she overheard conversations between him and some of his friends about fires he had started.

Michelle Brittain stated she remembers Kluppelberg leaving the apartment and later returning. A few minutes later she heard fire engines. She stated to Kluppelberg: You act like you started that fire, and he just smiled at her. She didn't remember the streetlights being off or on.

Don Brittain stated that during the night Kluppelberg left the apartment once or twice and was carrying pliers. He couldn't remember if the streetlights were out. He remembered that Dawn and Kluppelberg had an argument earlier. He stated after Kluppelberg reentered the apartment, he waited about 10 min. and walked to the kitchen window and pulled back the curtains telling everyone, there's a fire.

582. Bonnie Fitzpatrick stated that she is Kluppelberg's live-in girlfriend. She stated she knows he "has a problem" but that he never discussed the fire at 4448 S. Hermitage.

6

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

Delores Kluppelberg stated she knows her son has a problem but she never considered him to be a fire starter. She said although their family trailer had a fire that Kluppelberg stated he had started, she did not think he could do such a thing.

583. 1/24/88. Supplementary report by Foley and Rusnak.

584. Dawn related she had not told all of the facts regarding this incident. She stated she and Kluppelberg became involved in an argument over his wife and marital status. She stated every time he would argue with her or any other female he would go set a fire or fires or would steal something to relieve the pressure of the situation. She added that at ~2000/2100 hrs. on 3/23 Kluppelberg left the apartment and she followed him as she thought he was going to set a fire. She followed him to the utility pole in the alley. He climbed the pole and was manipulating the wires and eventually the light was extinguished. He was at the pole possibly 5 min. and then returned to the apartment. She and Kluppelberg continued to argue over sex and his wife. At ~2300 hrs. he left again and she again followed him to the same pole and he again climbed it and was doing something to the wire. He stated that the pole for another 5 min. and again returned to the apartment. Gramont then confronted him about why he went to the pole and he responded it was none of her business. At ~0100 hrs. on 3/24 Kluppelberg again left and she again followed him as she thought he was definitely going to start a fire as the argument between them had not decreased. This time he went to the rear door of the building that had burned and she saw him looking in. She then returned to the apartment. She did not see him start any fire but thought that somehow he had started the fire from the utility pole.

585. The argument continued and Kluppelberg then stated he was going to stay at his mother's house. He left. ~10-15 min. later he returned and smelled strongly of smoke and his clothing was dirty. On his arrival at the apartment Kluppelberg stated, "I have an instinct there is going to be a fire." At this point Gramont heard the fire engines. She confronted Kluppelberg and he then stated he had set the fire. She continued to accuse him of setting the fire and he continued to say he had. They were watching the fire and during this time Kluppelberg was soliciting for the board-up of the damaged buildings.

Gramont stated she overheard Glassco asking why Kluppelberg started the fire and Kluppelberg replied that the reason was he was angry at Dawn.

Gramont related that several weeks after the fire she and Kluppelberg were arguing and she asked, "Why did you set the fire that killed all those children," to which Kluppelberg responded, "I didn't set that building on fire I lit the one next door and that caught the kids' building on fire." The subject was never brought up again until Gramont was visiting Kluppelberg at the East Moline Jail. Kluppelberg stated he had set the fire where the kids were killed and the reason was that he was angry at Gramont, Donna his wife, and another girl, Kathy Meagher.

7

Cavanaugh 106

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

587.   1/30/88. Supplementary report by Foley and Kelly.

592.   Glassco related that Dawn and Kluppelberg were arguing throughout the evening and into the night. At ~ 2330 hrs. he observed Kluppelberg disconnect the streetlight in front of Dawn's house and then return to the house. Kluppelberg left the house a 2nd time ~1 hour later and at that time took a stack of newspapers ~1' high into the rear of 4448 S. Hermitage. Kluppelberg remained in the house for 10-15 min. He then returned to Dawn's house. Glassco said he had a perfect view of the rear of 4448 as he was in Dawn's attic and the window faces toward the rear of 4448. At 0330-0400 he was again looking out the attic window and saw Kluppelberg enter the rear of 4448 carrying a paper bag with something in it. Kluppelberg remained in 4448 for 15-20 min. and then runs out of the house back to Dawn's house. Glassco stated he saw Kluppelberg take the paper bag from next to the garbage can across the alley from 4448. He stated that when Kluppelberg came back to Dawn's house he smelled from smoke and his clothes were dirty and had bits of paper and debris on them. He asked Kluppelberg if he had set the fire and Kluppelberg stated he had and for Glassco to keep his mouth shut. When they were watching the fire Glassco saw Kluppelberg handing out business cards soliciting for board-up business. He has seen Kluppelberg hand out business cards at other fires that he had set.

593.   Glassco and Kluppelberg went back to Dawn's house and were watching the fire. Glassco asked Kluppelberg if he had set the fire to which Kluppelberg replied that he had and that Glassco had better keep his mouth shut. Sometime later that morning Glassco again asked Kluppelberg why he started the fire and Kluppelberg told him he set it for no particular reason. Kluppelberg went on to say that he liked seeing fire trucks and was mad at Dawn and anytime he was mad at someone he starts a fire. He then told Glassco he set the fire because he felt like starting a fire. Glassco stated that within a week after the fire he asked Kluppelberg if he felt bad that so many people died in the fire and Kluppelberg said he did not and that the people should have gotten out of the building before the flames spread to their apartment.

3169.   1/22/88. Supplementary report by Schmitz and Rolston.

3170.   Incident: arson by fire, Sentra automobile and Ford Mustang automobile. Examination revealed burn patterns originating on the interiors of both automobiles.

3171.   Kluppelberg was contacted by telephone and asked come into Bomb & Arson for interview concerning these fires and the male black subject he reported seeing in the garage. Kluppelberg stated that his car was broken and he had to do some plumbing work for his mother. Detectives met with Kluppelberg and asked him to come accompany them to Bomb and Arson office. In summary he stated that on the day of the fire he was in the parking garage when he saw an unknown black male wearing a green

8

**Cavanaugh 107**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

army jacket and gym shoes looking into cars; he said he was looking for a friend. Kluppelberg said he told him he was trespassing and to leave.

3172.   While in the lobby of the building, Kluppelberg smelled smoke. He saw cars on fire in the garage. He called CFD. He again saw the same black male run from the 2nd car that had burned.

Due to discrepancies in Kluppelberg's statement to original officers and reporting officers, he was asked to take a polygraph. He refused. He waived his Miranda rights. He then admitted he had set 2 cars at 820 W. Belle Plaine on fire using his cigarette lighter. He stated he set them on fire because he wanted to keep his job as a security guard and that by discovering the fires he would be able to show his employer that he was alert and attentive. During questioning he also admitted to starting a fire that occurred in 1984 and is being investigated. ASA approved 2 charges of arson.

596.   2/2/89. Supplementary report by Kelly and Foley. In 3/88 Thomas Brittain was being held in CCJ and Kluppelberg was also being detained there. Brittain asked Kluppelberg about the 6 murders from the fire. Kluppelberg told him that he had been with his ex-girlfriend, Dawn, when they had gotten into an argument. He left and went into 4448 S. Hermitage to see if he could steal anything. He said he lit a piece of newspaper to use as a torch for some light. He threw the lit paper on the floor and left. Kluppelberg claimed the fire had been an accident. Brittain indicated that he did not believe the fire had been an accident to which Kluppelberg responded, "Well, the house looked abandoned." Brittain related that Kluppelberg told him that he had started cars on fire while working as a security guard to make it look as if the parking lot he was working needed more security.

1171-84.   *Handwritten notes by various officers which were the basis for the final reports are included in this file.*

9

**Cavanaugh 108**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

## 7.  CCSAO Investigative Report, Duane Glassco.

5825.    6/23/10.  A postconviction petition has been filed on Kluppelberg's behalf based in part on an affidavit signed by Glassco.  It states that some of the testimony he provided at trial was not true.

In an interview on 6/23/10, Glassco related that he told the truth about what he saw when he testified in court.

5826.    Glassco said he signed an affidavit that recanted his court testimony in this case.  When asked if the information in the affidavit was true, he said no.  Regarding why he signed the affidavit, he stated that while in prison he was visited by people representing Kluppelberg several times.  He said when they visited his life was put in danger as other inmates thought he was a snitch.  He believed that by telling the people representing Kluppelberg what they wanted to hear they would stop visiting him.  He recalled that the lawyer he dealt with was Gayle but could not remember her last name.

He described his relationship with Kluppelberg as very close at one time.  They would commit burglaries and other crimes together.  He stated Kluppelberg sometimes started fires to cover his burglaries.  Over time the relationship deteriorated.  At one point they were in CCJ together and Kluppelberg threatened to kill him.  He said Kluppelberg also attempted to kill him one time over proceeds from a crime by arranging an auto accident when Glassco was a passenger in a car.

Glassco said that he told the truth to the detectives and ASA.  He remarked that he was aware there was an issue with an aerial photograph regarding what he could or could not see from his vantage point.

5822.    9/13/10.  Investigators met with Glassco.

5823.    He reviewed the 6/23/10 interview report and said it accurately represented the interview.

Glassco was presented with a copy of his affidavit.  He stated there were numerous inaccuracies in it.  He said, "I told them what they wanted to hear so they would quit coming to the prison, bothering me and jeopardizing my safety."  He continued that attorney Gayle "twisted my words."  He made a notation on paragraph #4 of the affidavit. He also said that nobody told him what to say at the trial and that he did not say what he did just to get out of his own case.  He stated he did not get a special deal from the State. He stated attorney Gayle is playing "semantics" when she said I got a "deal."  Glassco then reviewed each paragraph of his affidavit and pointed out inaccuracies as the ASA made notations on the document.

10

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

When asked why he said Kluppelberg went into the house through the back door carrying papers knowing it was not possible to make that observation from his vantage point, he stated he "assumed" Kluppelberg went in the back door with the papers.

5824. He made his assumption because he saw Kluppelberg walking toward the back door carrying papers, because he returned without the papers, and because of Kluppelberg's later remarks about the fire.

Glassco stated he recalled being in the State's Attorney's office prior to trial and an unknown individual he believed to be a Sheriff's Investigator showed him aerial photos of the house and immediate area before the fire. He stated the unknown individual told him it was impossible to see Kluppelberg enter the house from Glassco's vantage point. Glassco stated the unknown person told him he better stick to his story about seeing Kluppelberg enter the house. Glassco is certain that the unknown individual was not one of the detectives assigned to the investigation or an ASA on the case.

11

**Cavanaugh 110**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

## 8. CCSAO Investigative Report, Dawn Gramont.

1563.    11/21/11. An affidavit by Gramont states that she lied when she testified at the grand jury because she was hit and threatened by police. It stated that Glassco told her he lied on the witness stand when he testified.

On 11/21/11 investigators met with Gramont in her room at the nursing facility. She stated she was not in pain or under the influence of any medicine.

1564.    She said at the time of the fire she was in a relationship with Kluppelberg though he was married. Previously she had a relationship with Glassco and had 3 children by him.

At some point in the evening before the fire she recalled Kluppelberg entering the residence screaming and got into an argument with her. During the course of the argument she told him to go back to his wife. He left. He returned about an hour later and said there was a fire.

She stated she tried to talk to Kluppelberg about the fire but he would always tell her to "drop it." It was her recollection that there were a lot of little fires in the neighborhood whenever Kluppelberg got mad about something.

1565.    She said many times after the Hermitage fire when they got into an argument, Kluppelberg would threaten to burn her and her kids out. She said, "I lived in fear of that man." She said often he would return home after going to the scene of a fire to pass out board-up service cards and he always smelled of smoke but "not like he was standing around just watching."

Gramont recalled that at some point during the investigation she was hit on the hand with a flashlight by one of the police involved in the case.

It was her recollection that when she testified at trial she was high.

She said Glassco always said he knew Kluppelberg set the fire but never told her how he knew. She recalled him saying something to the effect of you know in your heart he set that fire. Gramont recalled Kluppelberg's mother or sisters told her how he would set fires when he was a kid. She recalled that Bonnie Fitzpatrick said she knew Kluppelberg set the Hermitage fire. Fitzpatrick told her that one time Kluppelberg was cutting himself when he blurted it out.

1566.    Gramont added that she thought Kluppelberg believed the Hermitage St. building was abandoned.

12

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

Gramont recalled telling detectives Kluppelberg was sleeping at the time of the fire. She said that statement was false. Regarding why she lied, she stated she was trying to cover for Kluppelberg. She stated she could only recall telling detectives about lights because Kluppelberg was always shutting off street lights. She remembered telling detectives that he told everyone there was a fire next door and that she overheard Kluppelberg talking about fires he set. She didn't remember telling detectives that he was always setting garbage cans on fire or starting fires for his business.

Gramont didn't remember following Kluppelberg out of the apartment but did remember going outside to see what he was doing as she was worried he might set their garbage cans on fire. She commented that he would probably have set her residence on fire if the kids were not there. She was unsure about following him to the utility pole and watching him go to the rear door of the building that burned.

1567. She said she "could have" made those statements to the detectives. She didn't recall arguing with Kluppelberg about what he was doing at the utility pole but again "could have" made that statement to the detectives. She did not remember saying anything about thinking the fire started from the utility pole. At this point she commented that she was "sure" she did not see Kluppelberg go to the back door of the building that burned.

She remembered telling detectives that when Kluppelberg returned to the house, shortly before they were aware of the fire, he said something like the fire department is going to be here or there is going to be a fire down the block. She said Kluppelberg never told her on the night of the fire that he set it. Regarding that she told detectives that she confronted him more than once about starting the fire and he admitted more than once that he had, she stated that "probably" did not happen. She stated Kluppelberg "probably" did not admit to starting the fire.

She remembered watching the fire and observing Kluppelberg passing out business cards soliciting work for his board-up service. She did not recall a conversation between Kluppelberg and Glassco or telling detectives about such a conversation. Regarding telling detectives that a few weeks after the fire she again confronted Kluppelberg, accusing him of setting the fire, and he admitted starting a fire but said it was the house next door, Gramont responded that she "did not think" that conversation happened at all.

1568. Gramont stated she didn't recall telling detectives that during a visit with Kluppelberg at East Moline Jail he admitted that he set the Hermitage St. fire.

When it was pointed out that although 25+ years had passed she seemed to clearly remember some things after refreshing her memory with reports but had a problem remembering others, Gramont replied that at the time of the fire she was doing drugs and drinking.

13

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

## 9. Presentence Investigation Report by George William Savarese, PhD, ACSW.

2296. 3/21/90. The following were interviewed personally or by telephone: James Kluppelberg; Delores Kluppelberg, mother; Vicki Kluppelberg, sister; Ersie Reed, mother-in-law, Ronald Reed, Jr., brother-in-law; Bonnie Kluppelberg, wife; Donna Kluppelberg, ex-wife; Dawn Gramont, ex-girlfriend; Barbi Richardson, ex-girlfriend; Terrina Davis, friend of the family; Margaret Rodriguez, friend of the family; Shirley Durrant, friend of the family; Sgt. Rosario, Division 5 Supervisor, CCJ; Ofc. William Weglars Division 5 correctional officer, CCJ;

2297. Fr. George O'Keefe, Division 5 Chaplain, CCJ; Isaac West, Correctional Counselor II, Metro Work Release; Willie Dodd, Correctional Residence Counselor, Metro Work Release; Edward Yancy, Instructor/Supervisor, East Moline CC; Tim Boyer, Attorney for Jennings Realty Co.; Howard Berglund, Pres. of Jennings Realty Co.; Margaret Benner, Secretary for AAA Board-Up Co.; Ronald Reed, Owner of Standard Construction Co.; Grace Thomas, Community Outreach Worker for Mercy Hospital; Mary Ann Ridley, previous Director of Child Abuse Prevention Project, Mercy Hospital; Dr. Keith Knapp, physician for the Kluppelberg family.

Records reviewed: Juvenile Protection Agency, intake summary; Medical Records, U of I Hospital; Medical Records, Mercy Hospital; Intake Assessment, Mercy Hospital; Transcript, Chicago City-Wide College; Registration Card, Chicago Public Schools; Prisoner's Data Sheets, CCJ;

2298. Medical Records, Cermak Health Services; "Orders Entered," Cook County Court; Motion for a Murder Task Force Attorney; Supplementary Police Reports; Client's notes related to the case; Motion in Limine; Motion to Quash Arrest and Suppress Evidence; Transcript of Grand Jury Testimony, 1/27/88; Subpoena for Ofc. Frank Huber; Answers to Discovery, 7/15/88 & 3/14/88; Motion for Pretrial Discovery; Motion for Substitution of Judge; Statement of Gramont, 2/3/88; Indictment for Murder, Arson, Attempt Murder; OPS Complaint by Gramont; Police Rap Sheet; Notification of Charges/Allegations re: Gramont, OPS; Arrest Report; General Progress Reports, CPD; Report of Postmortem Examination; Petition for Violation of Probation and Warrant; Police Rap Sheets for Glassco; Fire Report, CFD; Hospitalization Case Report; Death Investigation Report; Judicial Inquiry Board acknowledgment letter, 12/1/89; ARDC acknowledgment letter, 12/1/89; Motion in Arrest of Judgment; Letter by client to Judicial Inquiry Board; Letter by client to Chief Judge Fitzgerald; Motion for a New Trial; Supplement Motion for a New Trial; Letters by client to wife from CCJ; photographs of client; cards written by client to wife; letters by client's ex-girlfriend to client; newspaper accounts of offense; report card, Chicago Public Schools; letter of recommendation from John Pilas; marriage certificate for client's 1st marriage; work contract for client's construction company.

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois  60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

2299.  Kluppelberg's mother was 19 when he was born out of wedlock to a man who was married to another woman at the time.  His birth was difficult, 2 weeks late, 56 hrs in labor and 4.5 hrs in delivery.  Over the next 13 years his mother became pregnant 20 times but delivered only 5 children.  Before James' birth his mother was diagnosed as having DM and cervical CA and advised to have a hysterectomy.  She refused until after having her last child.  3 months after James was born, his natural father left leaving James without a father for the first 3 years of his life.  James has never met his natural father.  James was the oldest of 3 sisters and a brother.

2300.  When James was 3, his mother met Ronald Kluppelberg whom she married and who adopted James.  Delores divorced Ronald when James was 10 and lived with another man until James was 16.  After they split up, Dolores began seeing a black man who now lives with the family.  Between each man whom she would live with or marry, Delores would date other men who would stay at the house as well.

James' mother describes his adoptive father as an unruly alcoholic whom she had to "police" at all times.  She explained that there was no physical abuse toward James, it was more that he was just ignored.

2301.  The image displayed by James' mother was of an extremely possessive, domineering and jealous woman.  James describes the relationship in idealized terms, however.  He states, "She was always asking me to do things or help out around the house."  James' 1st wife, Donna, describes the biggest influence on his life as his mother's possessiveness mixed with her coldness.

2303.  From several accounts, James' mother was not only aware of his criminal activities but in some cases condoned his behavior by accepting some of the stolen merchandise or cash herself.

James, his mother, and several others deny sexual and physical abuse in the home.

2304.  In 1980 the family was referred to a program to prevent child abuse.  A community outreach worker, Grace Thomas, spent considerable time with the family over the following year.  She describes the family atmosphere as "impossible."  They were living in an abandoned building.  James was struggling with problems in school and in the neighborhood.  The stepfather was an alcoholic.  The mother was drinking, too.  James said he couldn't stay in school because he needed a job to take care of the family.  The final report stated, "The oldest son, James (14) sleeps in the same bed as his mother and is frequently absent from school.  He inflicts injuries on himself so that he can stay home from school."

2309.  James' attendance at school was good up to 7th and 8th grades.  "This is when I began to stay home and help my mother with my sisters."  In 8th grade he missed 67 days of class.

Cavanaugh 114

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

During that year, he injured his small finger while playing ball, crushing it in the rollers of a fence gate. He required several hospitalizations for the injury. Reports from both Mercy Hospital and JPA indicate, however, that he purposely damaged the finger several times after receiving treatment in order to stay out of school. The finger was amputated many years later.

2310.   After his 1st sexual experience at 16, James became very promiscuous over the following year. He states he would sometimes sleep with 2 or 3 different women in a day. "Sex was just a social activity. It was like playing ball." During this time he met Donna whom he married after knowing her for 4 weeks in a combined ceremony with his mother marrying another man. During his marriage, James continued to sleep with many other women, most of whom were older and knew his wife. This behavior continued up until 1988, when on his own with his 2nd wife, he sought counseling.

2312.   James' h/o shoplifting and later h/o robbery began to escalate at about age 18. He states, "Before I was arrested I was stealing from laundromats, small businesses and jewelry stores. My interests were turning toward currency exchanges and banks." He rationalized his behavior in terms of the types of victims he would target. "I would only steal from businesses, never private homes."

In 1982 it was determined by the court that James involuntarily killed a man who was attacking his mother and then turned to attack him. He was found not guilty. Aside from this incident, there is no h/o violence in his past. In 1988, he was convicted with the current offense.

In 1984 he was arrested for burglary and sentenced to 5 years in prison. He states, "The penitentiary actually helped me. It was rehabilitative. When I came out I have never robbed again."

2313.   He made an exceptionally good adjustment to life in prison. Everyone interviewed agreed that his behavior was exemplary. In the last year of his sentence he was assigned to work release. His experience there continued to be exemplary. In 1987 he was released on parole.

2314.   While in prison, Donna, his 1st wife, divorced him. During work release he secured a job with Standard Construction Co. where he met Bonnie, the daughter of the owner.

James was arrested on 1/13/88 for the current offense.

2315.   Summary and recommendations. Numerous psychological and social stressors from childhood through adulthood have left behind a legacy of irrational ideas, misperceptions, inappropriate expectations and coping skills, wrong meanings assigned to life situations, and misplaced priorities which have led to nonconstructive approaches to living. James'

16

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

attitude about himself can be summarized by very low self-esteem, limited coping skills for dealing with frustration and life's demands, and a tremendous fear of abandonment. He can be regarded as having borderline personality disorder.

2316. His perceptions about the world and others include unstable, demanding, domineering, guilt-producing relationships, where expectations were confusing if not contradictory. His approach to life is to insulate himself from his fear of abandonment by entering into a series of negative and superficial relationships. At the same time he has resorted to self-destructive behaviors which have manifested in his criminal activities.

There still shines through in James many positive qualities and aspects of his behavior which must be considered. He has attempted in the best way he was able to put his life together. He has managed to instill in others confidence in his abilities as a worker, has acquired work skills to support himself and his family, and has earned the respect of many who have known him as a gentle and sensitive person. There is no malicious violence in his background. He has made a successful adjustment to the structured life in prison. He earned his GED. He has recognized that there were problems underlying his actions. Before his arrest, he had begun to seek psychological counseling.

In light of the facts outlined in this report it is my wish that the court will see fit to invoke the minimum sentence allowable by law.

17

Cavanaugh 116

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

## 10. Affidavits of James Kluppelberg.

1079.    9/9/02.  On 11/11/88, after court, I informed my attorney that I wanted a jury trial and
wished to testify.  He told me he would not let me testify and was not going to pick a jury
because there was no need for one and he had everything under control.

On 3/28/89, after court, I again told my attorney that I wanted to testify and wanted a jury
trial.  He told me he would not let me testify and my case was before a new judge
(Morgan) and he was not putting my case in front of a jury because he knew the judge
and there was no need for a jury trial.

On 5/12 and 5/18/89 I asked my attorney again for jury trial and told him I wanted to
testify and he again told me I was not going to take the stand and he was not going to
pick a jury.

1080.    Between March and July 1989, during ~6 telephone conversations with my attorney, I
repeatedly asked to be allowed to testify and that I felt better if I had a jury trial [sic] to
which he consistently replied that I should not worry, he had everything covered, the
judge was not going to convict me, he wasn't going to pick a jury, and I was not going to
testify.

On 7/13/89 before the start of my trial, my attorney told me to sign a jury waiver and I
told him I wanted a jury trial to which he responded that he was not going to pick a jury,
that he was my attorney and I should trust him.  He said it was either his way or he was
going to withdraw and leave me in the hands of a public defender.  Out of fear of being
left in the hands of an attorney who didn't know anything about my case, I signed the jury
waiver.

On 7/14/89, after Glassco testified, I begged my attorney to allow me to testify because
Glassco had lied.  I was told I could not take the stand, "end of subject."  After Glassco's
testimony, the State rested.  My attorney then argued for a directed verdict, which the
court denied.  My attorney then rested.  I asked what he was doing.  He told me to be
quiet and not to worry.

If my attorney had allowed me to testify I would have told the court: I was not involved
and do not know anything about the 4448 S. Hermitage fire.

1081.    I never told Glassco that I do crazy things when I feel I'm losing someone.  When I
returned to the cottage from visiting my mother I had an argument with Dawn because
the kids were not being cared for, the house was a mess, and Dawn and Duane were
doing drugs and drinking.  After the argument, I took the dog outside for about 10 min.
When I returned, I fed the kids and put them to bed, then cleaned the cottage while Duane

18

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

and Dawn were still doing drugs and drinking. I tried to talk with Dawn and we got into another argument so I left and went to the light pole in front of the cottage and disconnected the wires to turn it off. I did this every night because the light illuminated the kids' sleeping room. Then I stayed outside for maybe 5 min. because I didn't wish to continue arguing with Dawn.

1082.    When I came back in, Dawn and I went into the bedroom and made up. We were in the bedroom about 45 min. We came out and played cards. We stopped when the police came and told us to get out because of the fire. A few days after the fire, police picked me up and took me to Area 3 for an interview about the fire. I was there about ½ hour and released. I was never contacted or questioned again about the fire until I was arrested and beaten by police in 1/88.

I never met or talked with my attorney in a private setting where we could discuss my case without the presence of others.

1083.    The only time I attorney ever talked to me was when he visited me in the bullpen or when I called him from the monitored phones at CCJ. During every visit in the bullpen there were at least 5-15 other defendants present. My talks with my attorney never lasted more than a few minutes. I never saw my attorney take notes during our conversations. He never told me how he was going to proceed with my case or what evidence he was planning to present. Not once did he inform me of my constitutional right to testify.

1079.    9/10/02. *This document is essentially the same as the affidavit dated 9/9/02, summarized above.*

5840.    9/21/99. *This is essentially the same as the affidavit dated 9/9/02, as summarized above.*

4446.    10/15/02. In 12/89 while I was in CCJ Weinberg came to visit me for the first time. At this meeting he turned over what he said were all my records concerning the case. In this file I came across a report by Det. Urbon dated 3/26/84. In this report he wrote that due to total collapse of the building, Cause and Origin could not be found. He went on to state that the burn pattern found could be accounted for due to the upper floors collapsing onto the lower floors. He stated that the fire was not extremely hot because there was no beading of the copper wiring.

1577.    7/6/12. In 1990 was convicted of setting a fire that killed 6 people. I am innocent of these crimes. I in no way contributed to the fire at 4440 S. Hermitage. I have no knowledge about how the fire started. I was not at 4448 S. Hermitage the night the fire occurred. I have never been inside that building. I never confessed to Glassco that I set the fire or had anything to do with it. On 5/30/12 the court vacated my sentence and conviction. On 5/31/12, I was released from prison.

19

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

## 11. Kluppelberg's Statement to Office of Professional Standards.

3257.  9/13/89. Statement taken at CCJ.

3258.  Regarding what occurred on 1/12/88, Schmitz and Rolston left messages on my answering machine about 10 days before that they wanted to question me about 2 automobile fires that occurred where I was working as a part-time security guard. When I returned their call the told me they wanted me to view photographs to possibly put a name to the face I saw in the garage that night. On 1/12 they told me on the phone that they would bring the photographs to my jobsite. I asked for the photos and they said, no, you're coming to the station. They said that I was going with them one way or another.

3259.  My fiancée said that since I wasn't under arrest, she would drive me down. They said no, he's coming with us, and pushed me out the door. Before they put me in the car, one searched me and took my pager, wallet, keys, work knife. I believed at this time that I was under arrest by the way they did this. I was not Mirandized. We arrived at 11th and State ~6:30 PM. My fiancée had followed us there but she was stopped on the 1st floor. They took me to the 10th floor to an interview cubicle. I asked if they could please hurry and get the photographs, that I had a lot of work to do. They said there were no photographs and asked why did I start the fire. I denied any involvement with the automobile arson. They told me they had a witness who saw me do it. They left and when they returned they said they wanted me to take a polygraph. I said I wasn't going to without a lawyer present or without being able to contact one. At about 8:30 PM they allowed me to place a call to my lawyer's house. He wasn't home. They said I wasn't going home until I took the polygraph. I said I'd take it so I could go home. Schmitz took me to the 5th floor, I think. The examiner put a waiver in front of me and I saw that I was going to be questioned about a fire that occurred at 4448 S. Hermitage on 3/24/84.

3260.  I told the examiner I wasn't going to sign it because this wasn't what I was told I was going to be questioned about. Schmitz returned and told me he was tired of this bullshit and threw me up against the wall, handcuffed me behind my back. I told him the cuffs were extremely tight and asked him to loosen them. He told me it was too fucking bad and took me to the elevator. When it arrived, he pushed me into the corner. When we got back to the 10th floor he told his partner I wouldn't take the test. They asked why I killed those 6 people. I told them I didn't know what they were talking about. Schmitz went to strike me, but Rolston stopped him. Then Schmitz stormed out of the room. Rolston became the good cop. He started telling me how his partner is a Vietnam vet, has flashbacks, is getting divorced, was unstable, and that I should talk to him before his partner gets back. I told him I had nothing to do with the incident. Schmitz came back and they both left for a couple minutes. When they came back they told me an ASA was coming and I was going to give him a full confession. I told them I didn't have anything

20

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

to do with it and asked if I could recontact my lawyer. Schmitz was behind me and kicked the chair out from under me. He rolled me onto my stomach on the ground.

3261. Rolston held me down while Schmitz started beating me in my lower back area. I yelled for help but nobody came. This went on and off for 3 or 4 hours. Every time they asked if I had anything to tell them, I said no, and they continued again. It got to the point where I urinated on myself. At this point, the beating stopped. I told them that I did what they were accusing me of but I did this to stop them from beating me. They left me alone. A short while after, the ASA came in, Axelrood. I told him what the officers told me to tell him. Prior to the ASA arriving the officers instructed me as to what I was to say and told me if I didn't say what they wanted me to, they were going to beat me again and I could possibly become an accident as an escaping prisoner. At one point when Rolston left the room, Schmitz took out his automatic and told me it was a unique weapon, a .45 double-action that could be fired just like a revolver. I asked the ASA if I could phone my fiancée. I called my mother's house and they made a 3-way call to my lawyer. He told me to tell the ASA that I didn't wish to talk anymore. I told this to the ASA and he left.

3262. 2-3 hours after the ASA left, Schmitz and Rolston took me to the men's lockup and told me they were charging me for the automobile arson.

3263. I was taken for the polygraph between 8:45 and 9 PM. No one was present when Schmitz threw me against the wall and handcuffed me. While Schmitz was beating me, Rolston was holding me down with his hands, sometimes had his foot on my back. At some point it went on so long I became delirious.

3264. Schmitz repeatedly struck me with his hand, I believe his fist, in my lower back. Regarding why I waited until 8/18/89 to register my complaint, my lawyer told me he would handle it and he never handled it. He kept telling me to wait until after trial. Then nothing happened. That was in July. And he told me it was senseless.

3265. When the ASA arrived they had unhandcuffed me and I was sitting in a chair. The officers never gave me Miranda rights. As a result of the incident I ended up with a UTI, some type of nerve disorder in my back which causes chronic pain and I'm taking pain medication TID. I didn't have any visible injuries at the time of the ASA's visit to the interview room because my shirt was covering the bruises. I didn't tell the ASA that I had been beaten by the officers for fear that it would continue. They were in and out when I talked with the ASA. My fiancée visited on the afternoon of the 13th and viewed my bruises. When my lawyer saw the bruises on the 14th I told him I also had blood in my urine. The lawyer told the judge that I had sustained a beating and requested medical attention.

Cavanaugh 120

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

3266.    The judge ordered that I was to be taken to Cermak Hospital. I was never taken. When I came to receiving here, a paramedic looked at me and said he didn't see any injuries. Then a female officer looked at me. She saw the bruises on my back. She went back to the paramedic and he put that down but I didn't get treatment. It took 10 days before I got treatment.

22

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| DATE OF RECORD REVIEW: | August 25, 2015 |
|---|---|
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

## 12. Pre-Sentence Investigation Report, Cook County Adult Probation Dept.

2092.   8/25/89. Date of offense: 3/24/84. Date arrested: 1/27/88. No bond.

2093.   Criminal history.

1/14/85. Attempt burglary (2 counts); burglary (2 counts); possession of burglary tools. Disposition: 5 years IDOC.

2094.   Pending charges: arson; murder/arson.

2095.   Defendant states he attended Harrison HS and completed junior year. States he was expelled by the principal 2 months prior to graduation. Obtained GED at Lincoln College while incarcerated. Attended City Wide College for a semester in fall 1986.

States he is self-employed as a contractor. Previously employed at Chicago Standard Decorating 8/86-4/87. Also employed at McDonald's for a short time in 7/86.

No military record.

Primarily raised by mother. States mother always had a male around that served as a father figure. States a few of her male friends tried to sexually abuse him but he was always able to deter them.

2096.   Never physically or emotionally abused by mother. States he never wanted for anything.

Defendant seemed extremely upset at the outcome of his trial. He is denying any involvement in the offense and was shocked that he was found guilty. He is quite confident that he will win his appeal.

Married Bonnie Fitzpatrick 8/16/88. Previously married to Donna Maca 9/11/82, divorced 7/87. They had one child, Samantha, who lives with her mother. Also fathered a son with Dawn Gramont, James Kluppelberg, who lives with Dawn.

States he is currently suffering from severe back injuries 2° beating from Chicago police. Also suffers from asthma.

2097.   Never treated on inpt basis for any psychological problems. Treated on outpt basis by psychiatrist in 1988 at Mercy Medical Center. States he has a problem being faithful to his mate.

Denies ETOH/drug usage past or present.

23

**Cavanaugh 122**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

## 13. Pro Se Motion for a Murder Task Force Attorney.

4736.  11/15/89.  *There is a notation that this motion was denied 11/15/89.*

My attorney did not provide proper defense services prior to, during or after trial.

Weinberg was given $5000 as a retainer and I was told that certain services for my defense would be done but they were not. Not once in the 21 months prior to trial did he come to see me in CCJ to prepare a defense on my behalf. Prior to trial I asked him to obtain photos from inside 1748 W. 45th St. toward the rear of 4448 S. Hermitage to show what Glassco claims to have seen was virtually impossible, but this was not done.

4737.  Prior to trial I asked Weinberg to hire an investigator to research the file due to the fact that CPD had closed the incident as an accident, noncriminal, on 4/14/84, but this was not done. Prior to trial Weinberg was asked to interview two Chicago police officers that could have added valuable evidence in favor of the defense but this was not done.

Prior to trial Judge Collins stated that since Gramont's grand jury testimony was lost, the State would have to produce questions for her in regard to it. I asked Weinberg for a copy of this but he said he didn't receive anything. Now after trial he states he'll try to get it to me if he can find it. I should have been entitled to all discovery that my attorney was given prior to trial.

4738.  I asked Weinberg to put certain evidence into trial but he ignored me and did nothing. He chose to rest without putting on any defense, without my knowledge or approval. When Your Honor started to read a verdict, Weinberg did not remind you that the defense was not granted a closing and even when Your Honor was done reading the verdict, Weinberg sat there and did nothing.

As of this date I still have not received a copy of the PSI.

After trial Weinberg put in a motion for new trial. I had asked that certain things be added to this motion but even though Weinberg said he would do this, he still has not added them.

4739.  In a 3-way conversation on 11/9/89 that my sister made to Weinberg, he stated that he was tired of my case and if I wanted to be my own attorney to just tell the judge and he would gladly resign.

24

**Cavanaugh 123**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

## 14. Pro Se Motion for Substitution of Judge for Cause.

2047.   12/4/89.  In support thereof, defendant states:

Defendant was found guilty of 18 counts of Homicide, First Degree, after a bench trial presided over by Judge Morgan.  Defendant now seeks a Substitution of Judges in this Cause for purposes of Hearing of Post-Trial Motions and Sentencing.  Defendant believes that for the indicated reasons and other reasons to be more fully argued at the Hearing on this Motion, that the Judge is so prejudiced against him as to preclude fairness and impartiality in the proceedings.

Defendant's wife has affirmed and will testify that on 7/13/89 she heard the Judge make statements indicative of a prejudicial attitude toward defendant.

2048.   Defendant currently is testifying on a bribery investigation focused on a bailiff that works with said Judge, thereby causing the Judge to have a prejudicial attitude toward defendant.

Defendant was previously released from CCJ on a counterfeited bond.  Said release and subsequent media coverage resulted in Judge Morgan's apparent (see transcript of proceedings of most recent court appearances) displeasure with and prejudice toward defendant.  Judge Morgan stated she would not allow a defendant anymore of his "antics," although she did not indicate what antics she was referring to, thereby indicating a highly prejudicial attitude toward defendant.

This is of tantamount importance in so much as the State is seeking the imposition of the death penalty.

2051.   Affidavit of Bonnie Kluppelberg.  On 7/13/89 I was present for Kluppelberg's trial before Judge Morgan.  After the proceedings the clerk and the Judge were having a conversation which I overheard.  The context was the clerk asking the Judge if she was going to have a nice vacation.  The Judge replied that she was because as far as she was concerned this trial was over.  She was not going to think about it while she was on vacation.  7/13 was the first day of court proceedings.

I believe Judge Morgan didn't give the defendant a fair trial and is prejudiced against him.  She failed to allow the defense attorney to give a closing argument.

2052.   On the 2nd day of proceedings, she heard the remainder of witnesses and the State's closing argument.  Recess was called and after recess she proceeded to give the verdict immediately.  Defense counsel did not make a closing argument at any time.

25

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

DATE OF RECORD REVIEW:      August 25, 2015
C&A DICTATION NUMBER:      3073
BRIEF CITATION:      Kluppelberg v. Burge

### 15. Pro Se Petition for Re-Hearing.

4280.   Now comes Petitioner Kluppelberg, pro se, requesting that this court grant his plea for a rehearing in the cause People v. Kluppelberg. Petitioner filed a timely appeal of his dismissal of his Post-Conviction Petition from the Circuit Court of Cook County. On 12/29/06, this Court affirmed the decision of the Circuit Court.

4281.   Statement of facts. On 3/24/84, Elva Lupercio and her 5 children died as a result of a fire at 4448 S. Hermitage. CPD investigated the fire and sent samples of debris for analysis. The Bomb and Arson Unit issued a report that stated they were unable to enter the building to conduct a cause and origin examination because of the complete burning and collapse of the building. Det. Rolston classified the fire of undetermined origin and the case was closed in summer 1984. Det. Tuider authored a supplementary report approved on 4/18/84 in which he included there was "no evidence of arson as of this writing." He reported that Bomb and Arson Unit personnel stated they had "no idea as to the cause of the fire." Samples of debris from the scene were "negative for any accelerant," and a canvas of the neighborhood uncovered no evidence of foul play.

4282.   Tuider concluded, "Based on the above stated facts it is requested that this incident be classified as closed, apparent accidental fire deaths." The medical examiner classified the manner of deaths as accidents in 11/84.

In 12/87 Kluppelberg reported 2 car fires to police while working as a security guard. Police brought him to the Bomb and Arson office to look at photos for the person he saw running from the scene. One detective who interviewed Kluppelberg, Rolston, had investigated the fire at 4448 S. Hermitage. At some point during the interview, Kluppelberg incriminated himself regarding the car fires and the 4448 S. Hermitage fire. He was arrested that night.

Pretrial hearings on the Motion to Suppress Statement and Motion in Limine. At a pretrial hearing on a motion to suppress statement before Judge Collins the defense presented evidence that after Kluppelberg's interview with the police, he had bruises on his lower back. He had also complained to the deputy sheriff that he was urinating blood and not feeling well. Although detectives who interviewed Kluppelberg denied injuring him, the court found "it was obvious" that he was mistreated by police and sustained the motion.

Defense counsel also filed a motion in limine to exclude the testimony of Gramont, Glassco and Brittain as the fruits of the illegally obtained statement, which was heard by Judge Morgan. At the hearing, Rolston testified that when he initially questioned Kluppelberg about the car fires on 1/12/88 he was not investigating the fire at 4448 S. Hermitage.

26

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

4283.   As he was taking notes, he noted the names Duane and Dawn and "Michelle's brother." In 1984, the police reports referenced Dawn Gramont and Duane Glassco.

Tuider, an Area 3 homicide detective, testified that he authored a supplementary report on the Hermitage fire on 4/14/84. According to the report, the fire was classified as "closed apparent accidental" and the investigation was closed in 1984. Tuider indicated in the report that the matter was "closed non-criminal." The report stated the building was "completely destroyed by the fire" and that there was "no evidence of arson as of this writing." He reported that he had a conversation with the Bomb and Arson Unit personnel at the scene who at that time had "no idea as to the cause and origin of the fire." After canvas of the neighborhood was conducted, there was no indication of foul play. Tuider also reported that samples of debris from the scene tested negative for any accelerant. The incident was classified as closed, apparent accidental fire deaths.

The court ruled that the police knew of Gramont and Glassco before Kluppelberg's statement was illegally obtained and denied the motion as to them, but granted the motion as to Brittain.

4284.   The Trial. During opening statements, trial counsel argued that the State could not prove that an arson occurred or that Kluppelberg set the fire. To prove the fire was an arson, the State presented expert testimony of Ofc. Burns of the Office of Fire Investigation of the CFD. He wasn't part of the official investigation of the fire because at the time of the fire, the CPD conducted cause and origin determinations. Burns went to the scene to conduct a training exercise for a class of newly appointed fire investigators.

Burns testified that when he arrived on the scene he examined the debris. He noticed a large, shiny "alligatoring," which he asserted indicated a fast spreading fire. He testified that the majority of the fire had been confined to the back of the building and burn patterns indicated that it burned down through the floorboards. The area that was burnt through the floor to the basement was located in the center rear section of the building. He noted that the wreckage did not reveal anything that might have caused the fire. It was his opinion that the fire originated 6-10' inside the rear section of the building and was an arson. It was his opinion that someone brought something into the building and applied an accelerant, newspapers, or rags to spread the fire.

4285.   He did not conduct any tests at the scene and was not aware of any had been done to find traces of accelerants. He went to the scene just as an exercise for the benefit of the trainees. Although he believed the fire was an arson that resulted in homicide, he made no report of his findings or conclusions.

The State presented the testimony of Gramont. On 3/24/84 she lived with Kluppelberg at 1748 W. 45th St. in a 4 room cottage with an attic, around the corner from 4448 S.

27

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

Hermitage. Glassco, her ex-boyfriend, and his fiancée, Michelle Brittain, were temporarily staying in the attic.

On 3/23/84, Gramont woke up around 1 PM and spent the day drinking, doing hallucinogenic drugs, cleaning the house, taking the children to the park. At some point Kluppelberg, who did not use drugs, went to his wife's house. He returned at 7 or 8 PM. Gramont and Kluppelberg argued throughout the night.

4286.   Kluppelberg left to turn off a streetlight in front of the cottage by disconnecting wires at the base of the pole, which he did routinely because the light interfered with their TV reception. He returned and made dinner for the children. About an hour and a half before the fire, he left and was gone for 5 or 10 min. When he returned, he and Gramont had sex and then played cards with Glassco and Brittain. While playing cards they noticed the fire through the kitchen window.

Gramont's testimony at trial conflicted with her grand jury testimony. There she had testified that Kluppelberg left the cottage a total of 4 times on the night of the fire. The 1st time, she followed him and saw him climb a lamppost to cut the power to the streetlight behind 4448 S. Hermitage. She followed him the 2nd time he left and he went to the pole again. The 3rd time he left, she followed him to the rear of 4448 S. Hermitage where he looked through the back door into the 1st floor apartment. She didn't follow him the 4th time he left. He returned about 15 min. later and said he had "an instinct" that there would be a fire near the light pole where he had been earlier. About 10 min. later, they heard fire engines. She also told the grand jury that Kluppelberg admitted that he started the fire.

Gramont explained that she lied to the grand jury because a police officer had struck her and threatened her and her children. The day of her grand jury testimony, and again a few days later, she filed a complaint with OPS against the officer who had threatened her.

4287.   She testified that 4448 S. Hermitage was not visible from the attic window of the cottage.

Glassco testified that he had been convicted of burglary 3 times and theft once. At the time of trial, a petition for violation of probation was pending against him. In exchange for his testimony, the State agreed to recommend a sentence of 3 years in prison with time considered served.

On 3/23/84, during the late evening hours, Glassco was in the attic with Brittain and 3 friends, using cocaine and drinking beer. They drank about a case and a half of beer during the night and Glassco, with 2 of the others, used about ½ g of cocaine. According to Glassco, Kluppelberg left at 10 or 10:30 PM. From a window in the attic, he saw Kluppelberg turn out the streetlight by pulling out its wires. Kluppelberg left again at 11 or 11:30 PM. From the attic window, Glassco saw him go into the alley a few houses

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

away. He saw Kluppelberg in the backyard of 4448 S. Hermitage. Glassco claimed he could see the entire yard and the back door of the building and that nothing obstructed his view. He saw Kluppelberg in the yard, walking back and forth through the gangway. Kluppelberg returned to the cottage. When Glassco asked him what was wrong, he smiled and went into the bedroom.

4288.     According to Glassco, Kluppelberg went outside again sometime later. When Glassco went back to the attic, there was not as much light coming in through the window. After using more cocaine, he went to the window because he needed some air. He saw Kluppelberg in the backyard of 4448 S. Hermitage walking to the front of the building. Kluppelberg was out of his sight for less than a minute, then appeared again by the garage at 4448 S. Hermitage. Glassco testified that Kluppelberg walked to the rear of 4448 S. Hermitage, where he opened a screen door, waited, and then entered the building. He stayed inside 5-10 min. and then left. He returned to the building, carrying a bundle of newspapers. After 3 or 4 min., he came out without the newspapers and returned to the cottage. Glassco asked him if he were "ripping the place off," but Kluppelberg ignored him.

At 3:45 or 4 AM Glassco went to get more beer and saw Kluppelberg leave the cottage for the 4th time. In the attic, as Glassco drank and partied with his friends, he began to wonder what had happened to the light that usually came in through the window. He went to the window and noticed that the alley light was out and also saw Kluppelberg walking back and forth to the gangway at 4448 S. Hermitage. According to Glassco, Kluppelberg went to the alley, grabbed a bag, and entered the building through the back door. 5 or 6 min. later, he came out. He returned to the cottage. 10 min. later, Glassco and the others smelled smoke. They heard fire trucks and saw that 4448 S. Hermitage was on fire. Glassco testified that he asked Kluppelberg later that morning why he started the fire, and Kluppelberg told him to shut his mouth, "or else."

4289.     According to Glassco, Kluppelberg told him, "You know how I am when I feel I'm losing someone, I do stupid things."

During Glassco's direct examination, he identified exhibits which included photographs of the cottage and empty lots where the buildings at 4448 and 4450 S. Hermitage were located. According to Glassco, the rear of 4448 S. Hermitage extended beyond the building at 4450. Glassco marked Exhibit 33, a photograph of an empty lot, to depict where he claimed to have seen Kluppelberg enter 4448 S. Hermitage.

On cross-examination, Glassco denied telling the grand jury that Kluppelberg climbed a streetlight and cut the power line, but was impeached by his grand jury testimony. He explained that he and Gramont were in a relationship, but were broken up by 3/24. He was aware that Gramont was involved with Kluppelberg within a week of the birth of Gramont and Glassco's 3rd son. He denied telling Gramont that he was going to get even

29

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

with Kluppelberg because of his relationship with her. He stated he did not arrive at the cottage until 7:30 or 8 PM on 3/23. He never told police in 1984 what he claimed to have seen from the attic window. He first talked to police about Kluppelberg after he consulted with his attorney when he was incarcerated for burglary in 12/87.

After the State rested, the defense moved for a finding of not guilty, which the court denied. The defense rested without presenting any evidence.

4290.   Without a hearing closing argument, the court found Kluppelberg guilty of 6 counts of murder and 3 counts of arson. The court stated that the question of whether Glassco could see what he testified to have seen was "critical in my determination of the ultimate question in this case."

Post-trial Motion and Sentencing. After the trial, the court granted Weinberg's motion to withdraw from the case, which was based on Kluppelberg filing an ARDC complaint against him. The court appointed the public defender to represent Kluppelberg. At the hearing on the post-trial motion, counsel argued that trial counsel was ineffective for failing to investigate and present evidence that would have established the impossibility of Glassco seeing the back of 4448 S. Hermitage. In support of the motion, counsel presented 2 witnesses, Petrosus and Cerevic, who testified that they had, on occasions before the fire, looked out the attic window of the cottage at 1748 W. 45th St. and could not see 4448 S. Hermitage because the building at 4450 S. Hermitage blocked the view.

4291.   Public defender Brosnan and 2 other members of the public defender's office went to the scene of the fire on 3/15/90. At 4448 and 4450 S. Hermitage there were only empty lots but Brosnan found lines of cement in the ground that he believed to be the remains of the foundations of the buildings. The foundation lines of 4450 S. Hermitage were about the same length of the building at 4446 S. Hermitage. On defense Exhibit 9, a photograph of the vacant lot at 4448 S. Hermitage, Brosnan circled the area where he found cement. After taking the photo, he went to the attic window of the cottage at 1748 W. 45th St. From the attic window, he took a photograph, defense Exhibit 5, which showed an investigator standing on the far corner of the cement line at 4450 S. Hermitage and investigators standing on cement line of 4448 S. Hermitage.

Gramont testified that the attic window was boarded up at the time of the fire. She gave this information to Kluppelberg's trial counsel before the trial but he did not ask her about it during her trial testimony.

4292.   After hearing argument on the motion, the court found that nothing would have alerted trial counsel to the need for further investigation and the evidence presented at the hearing on the motion for a new trial was contradictory evidence, not new evidence. The court denied the motion for a new trial. The court found Kluppelberg eligible for the death penalty but found sufficient mitigation to preclude its imposition. The court

30

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

sentenced Kluppelberg to life imprisonment on the murder counts and 14 years imprisonment on the arson counts.

Direct Appeal. On direct appeal Kluppelberg argued that the trial court erred when it denied the motion for new trial; reversible error occurred when the court allowed Gramont and Glassco to testify because the testimony was not attenuated from the illegality of his statement and not inevitably discoverable; his rights to due process and to confront witnesses were violated; the court erred by not allowing certain defense exhibits into evidence at the motion for new trial; he was denied a fair trial by the State's failure to present the grand jury testimony it used to impeach Gramont; his pro se motion for substitution of judge should have been granted; he was not proven guilty beyond a reasonable doubt; and he was denied his rights to due process and a fair trial because the trial judge made material mistakes of fact. The Appellate Court affirmed Kluppelberg's conviction and sentence.

4293.   Post-Conviction Proceedings. Kluppelberg next filed a pro se post-conviction petition in which he raised a number of allegations. The public defender was assigned the case. The State filed a motion to dismiss. The public defender filed a supplemental petition which alleged that Kluppelberg was denied his constitutional right to a jury trial because trial counsel refused to allow him to proceed before a jury; he was denied his constitutional right to testify because trial counsel refused to let him testify; and he was denied his right to effective assistance of counsel because counsel did not communicate with him and did not impeach the State's evidence regarding the cause of the fire.

At the hearing on the State's motion to dismiss before Judge Coghlan, counsel argued that trial counsel knew of 2 officers from the CPD who had investigated the fire and determined it was an accident but did not call these witnesses during the trial. Post-conviction counsel did not have a copy of transcripts of the witnesses' pretrial testimony or another report he referenced, even though he informed the court that he relied on them to support the petition. He did attach the Bomb and Arson Unit's cause and origin report to the petition, which established that the reporting detective was unable to conduct a cause and origin examination because the damage to the building had been too extensive. The court found that there was no evidence presented that showed the fire was classified as accidental, that all issues were or could have been raised on direct appeal, the record reflected a valid jury waiver, and trial counsel was not ineffective based on the Appellate Court's finding on direct appeal. The court granted the State's motion to dismiss. Kluppelberg filed a timely notice of appeal.

4294.   On review, the Appellate Court reversed the dismissal of Kluppelberg's post-conviction petition. It found that post-conviction counsel's representation fell below the level of assistance required by Supreme Court Rule 651(c) because post-conviction counsel failed to attach to the amended petition a police report or transcripts contained in the record that he relied on or an affidavit to support the allegation that trial counsel was ineffective for

31

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

failing to rebut evidence that the fire was an arson, and because post-conviction counsel failing to allege appellate counsel's ineffectiveness for failing to raise the issue of trial counsel's ineffectiveness with respect to this issue on direct appeal.

When the case was remanded, post-conviction counsel Miller filed a supplemental petition for post-conviction relief along with a 651(c) certificate. The supplemental petition raised the following allegations: 1. Counsel was ineffective for failing to impeach the State's arson witness with Bomb and Arson and police report stating the fire was an accident and that the cause and origin could not be determined; 2. Post-trial counsel was ineffective for failing to argue trial counsel's ineffectiveness for failing to introduce the impeachment evidence; 3. Appellate counsel was ineffective for failing to argue that trial counsel and post-trial counsel were ineffective for failing to introduce the impeachment evidence; 4. Kluppelberg was denied his constitutional right to testify because his attorney never informed him of this right; 5. Trial counsel failed to communicate properly with him regarding his case; 6. Trial counsel refused to follow his decision to have a jury trial and threatened to withdraw if he insisted on a jury trial. Among the exhibits attached to the petition were the Bomb and Arson Unit report, the Area 3 Supplementary Report, and Rolston and Tuider's testimony at the hearing on the motion in limine.

4295.    The State filed a motion to dismiss in which it argued that Burns' testimony would not have been impeached by the reports and transcripts and that trial counsel's and post-trial counsel's decisions not to impeach Burns was a matter of trial strategy. The State asserted that appellate counsel was not ineffective because the underlying claims of trial counsel and post-trial counsel's ineffectiveness lacked merit. Regarding the constitutional violations involving Kluppelberg's right to a jury trial and to testify, the State argued that the record showed a valid jury waiver and waiver of his right to testify. It also argued that the appellate court's decision on direct appeal in which it found trial counsel was not ineffective refuted the claim that trial counsel did not properly communicate with Kluppelberg.

At the hearing on the State's motion to dismiss before Judge Jones, the court found that the information from the Bomb and Arson report was inconclusive and would not have impeached Burns' opinion that the cause of the fire was arson. The court also found that the information in the Area 3 supplementary report were opinions of a homicide investigator who is not qualified to give expert opinions and would not impeach Burns' testimony that the cause of the fire was arson. The court found that the information in the Area 3 supplementary report that samples of debris tested negative for accelerant was insignificant because Burns testified that some accelerants do not leave residue. The court concluded that neither trial counsel nor post-trial counsel was ineffective for failing to impeach Burns. The court also rejected the claim that appellate counsel was ineffective for not raising trial counsel's and post-conviction counsel's ineffectiveness.

Cavanaugh 131

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

4296.  Regarding Kluppelberg's claim that he was denied his right to a jury trial because his attorney threatened to withdraw if he insisted on a jury, the court found that Kluppelberg had hired his attorney and could have fired him or hired another attorney or the public defender could have been appointed to represent him. The court referred to the transcript of Kluppelberg's jury waiver as well as other references by the parties that the trial would be a bench trial at which times Kluppelberg did not indicate that he wanted a jury trial. The court found that the record showed that Kluppelberg's claim that he did not know he had a right to testify was refuted by the record, and his decision not to testify was a well reasoned one done after consultation after his attorney. The court further found that the record refuted Kluppelberg's claim that trial counsel did not properly communicate with him, and referred to a pretrial colloquy between the court and Kluppelberg in trial counsel's absence in which Kluppelberg stated that he had not been able to talk to trial counsel but trusted his judgment. The court allowed the State's motion to dismiss. Kluppelberg filed a timely notice of appeal.

4297.  In support of this Petition the Petitioner makes the following arguments:

1. The decision of this court to agree with the ruling made by the Circuit Court to dismiss the Petitioner's post-conviction petition at the 2nd stage without an evidentiary hearing was in error.

A. The Circuit Court erred in dismissing the Petitioner's Post-Conviction Petition at the 2nd stage when said court ruled that Tuider was not qualified to give testimony in the case. It is the belief of the Petitioner that Circuit Court did not fully understand the role of the CPD concerning fires between 1975 in 1984. During this time CPD was the sole investigative body assigned to investigate the cause and origin of fires within the city.

B. Tuider was officially assigned to investigate the fire at 4448 S. Hermitage. Unlike what is stated in the ruling by the Circuit Court, he did not just listen to what Jenkins said. He conducted a full investigation of his own.

4298.  Several days after the fire lab reports show that debris taken for testing were negative for any signs of accelerants.

C. Tuider was not just a homicide detective who was not qualified to make such a finding. He was assigned to determine if there was foul play involved. He along with others found none. That is why this case was closed as a noncriminal matter.

4299.  Why is it when the PD findings are not what the State wishes that they are suddenly no longer considered qualified to testify?

33

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

2. CPD was the investigative body for fires in the city from 1975-3/31/84. On 3/24/84 Burns was at the scene solely as an observer with a training class. His opinion was not based on any reports, notes, or scientific testing.

A. If Burns was convinced that this fire was a result of arson, why did he not inform anyone? If he was assigned to the fire or not, he had not only a legal but a moral obligation to see that it was investigated and classified as an arson. He did nothing to ensure this happening. Could it be that at the time of the fire even Burns believed this to be a tragic accident with no foul play involved?

4300. B. If Petitioner's trial counsel had done a proper job, he would have investigated the foregoing question, as Burns stated throughout his testimony this was a training exercise. If Petitioner's trial counsel had interviewed and presented at trial the officials assigned to investigate the fire, Judge Morgan would have been given a complete account of all the evidence, not just the version of the State's Attorney.

C. Why is it that with all the officials assigned to investigate this tragic accident did the State choose to use the one person who was there as an observer with a training class, who took no notes, filed no reports, did no testing. Could it be that he was the only person the State could use? Every other official assigned to this fire stated that it was an accident, even the medical examiner classified the deaths as accidental. The State chose Burns based solely on the fact that they could mold his version of events to match the perjured testimony of Glassco and the grand jury testimony of Gramont that by her own admission was false.

4301. The court must take notice that had any official assigned to this fire found foul play, the State would not have hesitated to call them as a witness.

D. From 1975-3/31/84, it was the CPD on whom the State relied to obtain its convictions in matters of arson. They were found qualified to testify when it was in favor of the State, so why now does the State protest when the testimony will prove a crime did not happen? Would the State have this court believe that if the CPD stated that this fire was arson, they would be fighting to have that testimony stricken?

3. The Petitioner's trial counsel was grossly unprepared to go to trial, a fact vividly brought to light by the fact that trial counsel rested with no defense at the end of the State's case.

4302. Although the Petitioner concedes that at times it is sound trial tactic to not present a defense, this cannot be considered such a case. This is a case where the Petitioner's life hung in the balance. The State's case was never put to a true adversarial test.

34

Cavanaugh 133

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

4. Without an evidentiary hearing the Circuit Court was not fully informed to what would have qualified Tuider to give testimony. The Circuit Court ruling under the belief that because these are police officers they are not qualified to testify could not be further from the truth.

5. Petitioner requests that this court re-examine its ruling concerning Jenkins in light of the following. The statement made by this court that Jenkins reached no conclusion is an error. By his own report he stated that the cause and origin could not be determined due to the complete destruction of the building. This point is extremely important because Burns claims to have done what no other official assigned to the investigation could do, that is conduct a cause and origin examination of the building.

4303. This is a critical question that should have been presented to Judge Morgan who stated in her verdict that the threshold question was if the fire was accidental arson. Had Morgan been given this information there is a strong chance the outcome would have been different. Jenkins' report shows that he conducted interviews and found nothing to indicate foul play, so to say that his report reached no conclusions is in error.

6. Petitioner contends that this court misunderstood the testimony of Glassco and Gramont to have supported the testimony of Burns. Morgan stated she first had to decide if the fire was a result of arson, and stated that there was nothing the contradicted the testimony of Burns. From her verdict, it's clear that Morgan used nothing but the testimony of Burns to decide if this fire was arson. To contend that the testimony of Glassco, a man with several felony convictions was paid by the State's attorney's office with his freedom to commit perjury in this matter, who currently stands convicted of sexual abuse of a child, along with the grand jury testimony by Gramont, that in a sworn statement she states she was forced to commit perjury, supported the testimony of Burns is in error.

4304. If anything the nonfactual testimony by Burns gives support to the other two, not them giving support to his testimony. The Petitioner contends that the testimony of Burns should be reviewed on its own since the claims made by Petitioner are strictly based on the fact that Burns' testimony is nonfactual and does not prove arson beyond a reasonable doubt.

A. There are extreme conflicts in the testimony between Gramont and Glassco such as when Gramont is said to follow the Petitioner out of the home, why is it that Glassco never sees her, only claims to have seen the Petitioner? Glassco claims that when Petitioner left the home he would go downstairs and talk with Gramont. How did this happen, was she able to be in two places at once?

4305. 7. Petitioner strongly disagrees with the ruling of this court where it concluded that because of the Petitioner's statements made the night he was arrested [sic]. The statement

35

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

in question was derived from a brutal beating at the hands of the arresting officers that not only caused Petitioner to urinate upon himself while undergoing the beating but Petitioner's urine also contained visible blood for weeks after the beating. Because of the treatment by the police the night the statement was illegally obtained Petitioner had severe bruising weeks after the beating. No reasonable court would have allowed the statement to be used at trial after it had been ruled inadmissible on the grounds that it had been obtained by way of a brutal beating. Without Petitioner being given the chance to testify, there is no way of knowing what impact his testimony would have had at trial.

A. Petitioner contends that for this court to state that no reasonable attorney would have presented the Petitioner's testimony is to embark on a fact-finding mission. Because to state this conclusion was reached because of the contradictory testimony of Gramont and Glassco, the Petitioner should have been given the same accord to have his credibility viewed and ruled upon. Petitioner believes his credibility was far better than theirs.

4306. Petitioner has never used drugs or drink alcohol, never been found to have given false statements to the court, never been paid by the State's Attorney's office with his freedom in exchange for his testimony, never violated probation, has never even been on probation, never had motive to walk into court and commit perjury because of personal feelings, all of which plagued the credibility of Glassco. Regarding problems with Gramont's credibility, here was a woman who gave 2 extremely different testimonies and signed a statement stating she committed perjury at the grand jury in this matter. The petitioner should be given the chance to testify on his own behalf and confront his accusers.

8. The court did not fully explore the basis under which the Petitioner signed the jury waiver. As the court noted itself by quoting the dialogue at the time the jury waiver was tendered, it is Petitioner's trial counsel who admonished the Petitioner of his rights concerning a jury trial. It was the duty of the Judge to explore further what transpired between trial counsel and the Petitioner to ensure his rights were protected and this did not happen. This court must see that this was a scared, unknowing Petitioner, who was pressured by trial counsel to waive a right he did not wish to waive.

4307. 9. Petitioner contends that to be held accountable for not asserting a right he did not know he had is a violation of his constitutional rights. Petitioner did not know of his constitutional right to testify while the trial was proceeding, it was not until after his trial had concluded.

A. At no time did the Judge admonish Petitioner of his right to testify, never once did the trial judge even inquire if Petitioner wished to testify.

36

Cavanaugh 135

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

B. Petitioner's trial counsel did not merely advise against Petitioner testifying but expressly told Petitioner he could not testify. Trial counsel not only failed Petitioner but violated Petitioner's constitutional rights.

10. To say that the record contradicts Petitioner's claim that trial counsel was ineffective for not communicating with him is grossly taken out of context by this court. The only calls between Petitioner and counsel were over monitored lines from within CCJ. This does not fall under the context of privileged communication by any means.

4308. *This is a duplicate of p.4307. A page of the original document is missing.*

4309. ... counsel was grossly negligent, ineffective, incompetent and in violation of Petitioner's constitutional right to counsel. A defendant does not just need to be afforded a few quick monitored words with his trial counsel from time to time during court dates where only a few minutes are spent to obtain a continuance.

11. Petitioner strongly disagrees when the court concludes that the Circuit Court did not enter a finding of fact in its ruling, but rather a legal one. The record in this matter is not clear and incomplete, nothing in it shows what would have or would not have qualified Tuider or Jenkins to give testimony in this matter. If fully explored, not only will the testimony of these two officers change the outcome of the trial, but it would be based in fact, not opinion, have the foundation of sound investigative tactics. Petitioner begs the court to remember the testimony of Burns was his opinion, void of any investigative foundation.

37

**Cavanaugh 136**