*Kluppelberg v. Burge, et al.*
Case No. 13 CV 3963
Our File No. 13-3050

# DEFENDANTS' RESPONSE TO PLAINTIFF'S MIL NO. 40 EXHIBIT A-3 (REDACTED)

# Replacing Dkt. 500-5

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

## 16. Expert Testimony by Kluppelberg, Larry Gillard v. City of Chicago, 3/22/13.

8789. I was last employed 1/12/88. I haven't ever worked as an expert witness or consultant before. In this case I was hired by Loevy & Loevy.

8790. My fee is $250/hr. I haven't been doing any work for Loevy & Loevy other than this. Regarding any other income, I do home repair, handyman jobs.

8791. I was approached to give an expert report in this case in 8/12.

8792. *Reference is made to Exhibit 1.* This is my agreement to serve as an expert witness for Loevy & Loevy.

8794. I don't have any training in psychology or psychiatry or medicine or social work. I dictated this report about my experiences and time in prison.

8795. I've never met Gillard. I don't have any knowledge of his personal experiences in prison. *Reference is made to Exhibit 2, report.* It's 11 pages. I charged for 2 hours of work for dictating this.

8796. I haven't been compensated for my time in prison. I'm seeking compensation from the State.

8797. I have to get my certificate of innocence before I can get paid by the State. Loevy & Loevy are representing me pro bono in that regard.

8798. I thought about seeking compensation from another source having to do with my incarceration.

8799. I retained Loevy & Loevy for that lawsuit. There is an agreement for payment to them from any money that might come in from the lawsuit.

8801. I was writing this expert report to give insight into the conditions of IDOC during the time I served, my observations of what it was like for not only normal functioning inmates but those that appear to have mental disabilities. Regarding who I think has a better understanding of the damages to Gillard, him or me, I can't speak for him.

8802. I can only speak to what I have observed. For my case, I would be better to speak about my damages than a person who served around the same period of time. I'm not trying to say in this document that my experiences mean that everyone had the same experiences. I spent time in prison 1985-87.

Cavanaugh 137

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

8803.    It was a burglary charge. I pled guilty. I spent that time processing at Joliet, then transferred to Logan CC. From there I was sent to a work camp for a while, sent back to Logan, then transferred to East Moline, then to work release.

8804.    I'm not claiming I suffered from a mental illness before going to prison. I didn't receive any mental health treatment in prison. I don't currently suffer from any mental illness. This report is based on my memory of my experiences in prison.

8805.    Regarding that I worked for the Menard psych facility, I worked in the maintenance department for 4 years, sometimes in the psych facility. It was whenever we were required to repair something.

8806.    I was repairing things in different parts of the prison. I wasn't involved in the mental health care being done at the Menard psych facility. I didn't review any records regarding the mental health facility. I have opinions on how the psych facility was run when it comes to providing mental health care based on my observations. At times I think people fell through the cracks and got overlooked.

8807.    I can't say anything specifically about Gillard. In the report I say, Most inmates' time in prison would be spent in their cells. Regarding if I'm saying every inmate had the same experience of living in their cells, I'm saying that in a maximum security setting, the only way you're out of your cell is if you're eating, on a job assignment, at recreation or a religious service, on a visit or healthcare pass. Most inmates spend most of the time in their cells because recreation is limited, there are very few job assignments, and very seldom do people get visits.

8808.    I'm not saying that means all inmates, it means most.

8809.    I'm not saying this happened to Gillard.

8810.    I'm not saying the 1st stint I spent in prison made it easier for my 2nd stint. It didn't affect my ability to tolerate or survive in prison. It's two totally different situations. Part of it is because one is for a crime I committed and one for a crime I did commit. The other is the environment. One was a low medium-minimum facility vs. a maximum facility.

8811.    Prior to 4/96, the maximum-security institutions were controlled by street gangs. In 4/96, an inmate was shot and killed in Pontiac by a staff member, caused a statewide lockdown of all facilities, at which point there were wide sweeping changes made to the IDOC.

8812    I was in solitary confinement once, in Menard 8/94-2/95. That was for discipline infraction, contraband.

39

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

8813.   The contraband was a weapon. That was the only infraction I was ever found guilty of. The others I was found not guilty and they were dismissed.

8814.   The weapon was a homemade knife. I didn't ever talk with any of the people in the Menard psych unit. The way I created my report was to think about things that happened in my experience and dictate them, have them typed, and sign it. I'm sure there are other people that spend time in prison who could do the same thing. I don't know if there are many that have as much detail as I have due to the fact that I was assigned almost my entire incarceration [sic] which provided me a unique insight into the workings of DOC, by my various assignments.

8815.   Regarding that anyone who went to prison could do the same technique I did, dictate it, what they remember, what it meant to them, I'm sure each individual is capable of doing that. It would not have the detail as to the inner workings of the DOC that I possess because not many people have that type of knowledge.

8816.   Regarding if every individual's experience in prison could be different, to a certain degree there is differences but there's a lot of similarities in the fact that you're all in the same place, eat the same food, are around the same people. There's some differences, no two of them are exactly alike. I'm not an expert in what happened to Gillard or his damages.

8818.   I'm not holding myself out as a mental health or social work expert. My report reflects my opinion on what life in IDOC was like for inmates in the '80s and '90s based on my experiences and observations as an inmate during that time period.

8820.   The TV shows I've seen or the popular culture perceptions of prison I've seen are not accurate. Some shows portray inmates having all these privileges and freedoms, some portray it as an upbeat atmosphere. The cell sizes are exaggerated, things that inmates are allowed to have in their cells are exaggerated. I have no opinion on damages that Gillard suffered.

8821.   I don't view my expert report in this case as connected to the litigation I'm pursuing in my own matter. Regarding the weapons infraction I received in 1994, at that time, it was a necessity to have something to protect yourself. My cell was shaken down due to the fact that the person I was living with was part of an organization. He was holding the weapons for that organization. He saw an opportunity to obtain a transfer to a medium security facility. He told them the weapons were in the cell, that they were mine. They found the weapons, gave him his transfer, and put me in segregation for 6 months.

8823.   The assignments I was privileged to have during my incarceration gave me access to parts of the institution that the average inmate would not have. Other assignments gave me access to knowledge of how the administration works. The average inmate did not have these things. So I have a unique insight into those aspects. The report has to do

Cavanaugh 139

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

with my experience of being in prison, how I lived, my communication to the outside world, the food, fighting, gangs, things of that nature.

8825.    I worked in maintenance 3/90-6/94. Regarding how that affected my understanding of the conditions of cells, gangs and institutions, weapons, yard and recreation time, we were given access virtually to everywhere in the institution because wherever something needed to be fixed, that's where we were sent.

8826.    I worked in a general construction crew, which meant we did a little bit of everything. It gave me access to everything within the cells and the office buildings, administration buildings, hospital, boiler house, commissary. I worked in the commissary in Stateville from 4/04-9/12.

8827.    I was assigned to the print shop. I had interactions with all the forms, all the administrative procedures. I had a lot more interaction with inmates working the commissary because I would see people from various cell houses, where the average inmate would only see people from his cell house.

8828.    Because of my work in these various positions I have a greater understanding and expertise of how IDOC operated and how inmates lived because of my additional contact with the institution and inmates.

Exhibit 2. Expert Report of James Kluppelberg.

7323.    I spent over 22 years in IDOC for crimes I did not commit. In the years 1990-2012 as well as time spent in prison on an unrelated case 1985-87 I became intimately familiar with how IDOC functions and what life is like for inmates. This report reflects my opinion on what life in IDOC was like for inmates in institutions including Menard, Stateville, and Joliet, who served time in the 1980s and '90s. Because of my work in various positions while incarcerated, including long-term positions such as accounting clerk, data entry, working in the print shop, law clerk, maintenance and commissary, I gained expertise in how IDOC and the Menard psych facility operated.

Institutional experience. 1985-87 I spent time in Joliet, Logan CC, and East Moline CC. In 1990 I was sent to Menard CC where I served 4/90-5/98. I was sent back to Joliet CC 5/98-1/02. I then served in Stateville 1/02-9/11. In 9/11 I was transferred to Menard where I served until I was released in 5/12. I have never met Larry Gillard.

7324.    Joliet CC processing and transfers. Before 1996, processing at Joliet was controlled by prison gangs. If you identified yourself as a member of the same gang as the inmates who worked in processing, you could be given a cell of your choosing near other gang members. Gang members controlled which inmates got jobs while waiting to finish

41

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

processing. These jobs weren't paid, but at least you got out of your cell during the day. Gangs started recruiting people during processing, telling new inmates that they needed to join a gang for protection.

Every time we were transferred between institutions we were sent on buses supervised by guards with guns. We would be cuffed to another inmate and the cuffs would be attached to a chain that ran through the center of the seating. Every time we arrived at a new institution we would go through processing—strip searches, body cavity searches, receiving new clothes, getting assigned a new cell.

Living in a cell. Most of inmates' time is spent in their cell. At Menard, Joliet and Stateville, inmates shared a cell with another person. Cells are small, about 5' wide, 9' deep, 8-10' tall. They include metal bunks, a toilet and sink. There is no real room to move around.

7325. None of the maximum-security facilities had air conditioning, so summer could be very hard. People had to do things like take off all their clothes, put wet towels on themselves, or rely on the guards to pass out ice when they were willing to do that. In the winter, the lower cell houses were cold because the prisons were designed for heat to rise to the top through a forced air system. People had to put on extra clothes or buy extra blankets at commissary if they could afford it.

There are always issues with cellmate compatibility. Most guys have constant violence with their cellmates. Sometimes this violence is reported, most times not. People were seriously injured or even killed by cellmates while I was at Menard and Stateville. It was common to hear fighting in other cells.

Before 1996, gangs also controlled the cell assignment system. If you were a member of a gang or could pay the gang, you got assigned to a cell. Otherwise you often had to get beaten up and go to segregation. Gangs controlled who got to live where.

Gang control over institutions. Before 1996 IDOC maximum-security institutions were run by various gangs.

7326. Each cell house had a chain of command. The superintendent would hold meetings in the morning with gang chiefs, with the gang chiefs telling the superintendents what they wanted. The guards let the gangs run the cell house.

Yard and recreation time. Recreation time was a volatile situation with a lot of violence. Before 1996 the yard was a battle zone. You had to associate on the yard with the organization you were affiliated with. People carried weapons. Even things like basketball would be one organization's team playing another. If you were not affiliated

Cavanaugh 141

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

with a gang you would have to watch your back. Inmates got to go to the yard several times a week and it was often stressful to be outside with everyone else.

Weapons. Before 1996 weapons were common in IDOC. Primarily the gangs had weapons because if you weren't a member of a gang and used a weapon against someone who was, you were going to get yourself killed or at least put in administrative segregation. Many inmates were armed. The prevalent weapon was knives. Some people used magazines to create homemade body armor to avoid getting stabbed. Several people were murdered before 1996 at Menard.

Before 1996 the idea that you would be safe in administrative segregation or protective custody was a joke. If gangs wanted to kill you they could do that anywhere in the prison.

7327. Communication. The only way to communicate with the outside world was by getting visits, writing letters, or using the telephone. Not being able to communicate with family and friends contributed to inmates' stress. Before 1996 IDOC would give people 3 envelopes a week to write letters. Any letters beyond that had to come from buying envelopes at commissary. The telephone was very expensive, inmates had to make collect calls that the recipient had to pay for. The phone was the only way to get in touch with family quickly because the lag time on mail was incredible. In addition, gangs controlled the phones before 1996 and you had to buy phone time from them to use it. The officer would let the gang control the phone. This made it very hard for people who were not in a gang or had no money to use the telephone.

7328. Food and commissary. Before 1996 Joliet had privately catered food but Stateville and Menard did not. If inmates got really unsatisfied with meals, there would be riots. Eating at Stateville and Menard was like eating fast food every meal. If inmates had money they could use it at the commissary. The commissary sold food, clothing, toiletries and entertainment items like walkmans and radios. If an inmate didn't have a job they would only get $10/month. The prisons would pass out a bar of soap a week and maybe toothpaste every 2 weeks and if inmates wanted any other toiletries they had to buy them at commissary.

Living in prison. The prevailing attitude was to wake up every day praying that you would survive, would not be stabbed by another inmate or shot and killed by guards, not be put in a position where you had to harm someone else to protect yourself. The stress of life in prison is difficult to explain. Inmates always had to be aware of what was going on and what was out of the ordinary. Inmates' senses become heightened. Inmates would only sleep a few hours a night because the slightest sound out of the ordinary would wake you up. Inmates became accustomed to sleeping through the constant yelling and loud noises and music but would wake up if you heard someone brushing past your door.

43

Cavanaugh 142

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

7329. There were unmistakable sounds that would freeze everyone in the tracks, like the sound of a shotgun being chambered at the other end of the cell house. The stress is monumental because your mortality is always an issue. You could be forced into a fight and know that the guard would start shooting, not really caring who started it. You realized how vulnerable you are and live every minute knowing that something terrible could happen at any time.

You have to constantly deal with a culture of violence. People were stabbed playing cards. They were killed or hurt over little things like the mistaken belief that an inmate had taken someone's clothes. They would be killed and put back in their bed to be discovered whenever. People would be beaten so badly it was hard to tell they were human because their bodies were so swollen. People were beaten to death by their cellmates and some guards would laugh and just listen to what was happening without intervening. There were sometimes riots where 30-40 inmates would beat and stab each other. These kinds of events could be started by something as simple as someone bumping into someone.

The culture of violence did not come just from other inmates but from guards too. They controlled your life and used violence to intimidate inmates. Many guards enjoyed intimidating inmates.

7330. For example, the guards used dogs for narcotics control. During shakedowns inmates would be in line and be moved through an area. Dog handlers would measure how much leash to give a dog so if the dog rushed the inmates they would get almost to the inmates but not quite. Inmates would see the dog coming and if by reflex they stepped away outside of the line, guards would use that as an excuse to hit or shove the inmate.

There are many psychological stressors even outside of what is happening at the prison. There is knowing that you are not able to help your family. Having family members get sick or die and being unable to do anything for them or even attend the funeral is really difficult, as is just being away from people that you care about.

In prison everything about your life is controlled by someone else. When you enter and leave your cell, when you eat, when you shower, when you go on the yard. Guards bring meals whenever they want to if the prison was on lockdown. You were at their mercy about when you could go on visits, get healthcare, go to the law library. It is beyond frustrating having to rely on someone else who could decide if they felt like allowing you to shower.

7331. All of this is much harder as an innocent person. You live constantly knowing that you have been locked up as an innocent person but people treat you like you are guilty. I tried to associate with other people who I also believed were innocent. The hardest thing

44

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

for innocent inmates is to see the minutes ticking by and realize that every minute was time you can never get back. Inmates watch families grow up through photographs.

It is harder as an innocent person to form social relationships because innocent people do not fit the profile of the average inmate. In addition, prison doesn't help you have trust for other people.

Inmates with mental health problems. Even before 1996 there were inmates in GP with mental health issues. There were only a few mental health providers at each institution. Inmates with mental health issues would be shunned by other inmates. They were taken advantage of by other inmates who would try to get them to buy them things at commissary or otherwise take their money. The institution did not do much to protect these inmates. Gangs preyed on these people. People frequently did not want to share a cell with someone with mental health problems and would beat up inmates with these problems so they could change their cell assignment.

7332. Inmates with mental health problems were precluded from work because they were considered 'a danger. Jobs were important because it meant you could leave your cell, shower every day, interact with other people, and have structure and normalcy in your life. They also meant you got money to spend at commissary. Inmates with mental health issues couldn't get those things.

Inmates with mental health issues had no confidentiality. Inmates could see which cells nurses went to in order to pass out medication and saw people lining up in medication lines to go to the health care unit.

Menard psych unit. For the first few years at Menard I frequently performed maintenance in the psych unit. At the time it was a separate facility. The inmates I saw wandering around the psych unit yard during recreation seemed to have no control over their bodies. I saw a few who were coherent enough to talk. There were buzzers and bells that sounded on the yard, at which time everyone would line up to take medication.

I also spent time inside the psych unit. Cells were smaller than in the Menard CC and had high ceilings.

45

Cavanaugh 144

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

## 17. Report of Terry A. Kupers, M.D., M.S.P.

1.    I'm a board-certified psychiatrist, Institute Professor at the Wright Institute, Distinguished Life Fellow of the APA and an expert on correctional mental health issues. I have testified >2000 times in state and federal court about psychiatric effects of jail and prison conditions and the quality of correctional management and mental health treatment, and have served as a consultant to the US DOJ and Human Rights Watch. I am author of Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About It (Jossey-Bass/Wiley, 1988), co-editor of Prison Masculinities (Temple Univ. Press, 2001) and contributing editor of Correctional Mental Health Report.

I have served as consultant in several jail departments of mental health and was recently the monitor of the Presley v. Epps consent decree (federal court) in MS involving prisoners with mental illness in isolated confinement. I was recipient of the Exemplary Psychiatrist Award presented by NAMI in 2005 and the William Rossiter Award at the annual meeting of the Forensic Mental Health Association of CA, 3/18/09.

I have been retained to assess the effects of Kluppelberg's experiences in the criminal justice system. My fees are $225/hr for all work except testimony and $450/hr for depositions and trial.

I reviewed: Second Amended Complaint; records from IDOC; medical records from Kluppelberg's post release treatment; Kluppelberg's expert report from Gillard v. City of Chicago; PSI by Dr. George Savarese; police reports by Rolston regarding Kluppelberg's confession;

2.    Ruling on motion to suppress confession; Ruling on certificate of innocence; depositions of Kluppelberg, James Kluppelberg, Jr., Sarah Ann Brobst. On 7/17/15 I met with Kluppelberg for 4 hours.

Summary of case. Kluppelberg was convicted of arson-murder in 1989 after having been beaten by police and falsely confessing to the crime for which he was entirely innocent. The fire occurred 3/24/84 and 6 people died. The case was originally closed with no person charged but reopened nearly 4 years later. He was convicted and sentenced to life in prison. He served 24 years in IDOC and was released in 2012 when the State moved to dismiss all charges.

Childhood and life prior to prison. Kluppelberg is currently 50 yo. His birth followed a difficult, long labor because his mother had health problems. He is 1st born, has 3 sisters and a brother with the same mother but different fathers. Soon after his birth, his father left. He has had no contact with him and for his 1st 3 years did not have a father. His mother met Ronald Kluppelberg when he was somewhat older than 3 and Ronald

46

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

eventually adopted him. His mother left Ronald when he was 10. He remembers his stepfather as nice, not physically abusive, but they never related much. After his mother left Ronald, there were 2 other men she lived with in the family home, both for several years. In the late 1970s she began living with the stepfather who would be the father of his brother. Kluppelberg had a complicated relationship with his mother. She intermittently seemed to ignore him (the notion that he slept in the same bed with her until age 14 is false). There was very little discipline in the home. When Kluppelberg began stealing candy and cigarettes in his early teens, his mother seems to have known and done nothing.

3.  She accepted the cigarettes he stole. It is likely he stole to help her out of her stark poverty. He told me that he swore that if he got caught he would quit stealing and in fact he was caught (8/84, sentenced to 5 years). He stayed true to his resolve never to steal again. There were no further criminal charges until he was arrested for the arson-murder.

In 1980, when Kluppelberg was 14 or 15, an outreach worker began working with the family (Kluppelberg's 2-yo brother fell from a 2nd story window, an investigation occurred and there were no charges). At the time the family was living in a rundown building. His mother and stepfather were both drinking, apparently stepfather had alcohol addiction. James assumed responsibility for taking care of the family. His environment clearly would have affected his education and well-being at the time.

Kluppelberg grew up in a very dysfunctional family but in addition lived in a very rough neighborhood. He went to school up to senior year by which time he increasingly stayed home to help his mother. He received a GED in prison in 1985. Many family members and friends point out how intelligent he is. At 17, having dropped out of high school, he was unable to find employment. He married Donna, his mother married her partner the same day, and Donna moved into the family home with him and his mother. The marriage was strained and the couple broke up while Donna was pregnant with Kluppelberg's daughter, Samantha.

4.  In 1985 Kluppelberg was convicted of burglary sentenced to 5 years. He served 18 months and worked as a student aide in math and social studies classes in the prison. His supervisor and instructor at East Moline CC, Yancy, wrote: "He did a fine job. Very intelligent. No difficulties at all. He anticipated what I would need before I even asked for it. Sometimes if I had other things to do, James would run my class for me. The other students liked him." In 1987 Kluppelberg was released on parole from the work-release program.

His marriage with Donna had ended. After release Kluppelberg went to work for various construction and remodeling companies, acquired skills and did very good work. He began dating the daughter of the remodeling company where he was working, Bonnie. The owner supported their getting married and offered to sell the company to them

47

**Cavanaugh 146**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

feeling Kluppelberg could make a success of it because he was "very conscientious. He was always there and honest. A very good worker." Before the plan could be effected, on 1/13/88, Kluppelberg was arrested for the arson/murder.

Arrest and jail experience. Kluppelberg was arrested in 1/88. According to him as well as the judge's ruling on the motion to suppress, he was beaten by police, kicked while lying on the floor, and a false confession was extracted. He was so badly beaten that he was urinating blood and had to be taken to the doctor, who diagnosed trauma to his lower back and kidneys. The confession was suppressed because the court opined it was "obvious" that Kluppelberg was "mistreated by the police." His ex-girlfriend, Dawn Gramont (mother of his son) was also beaten (she told Kluppelberg she had been hit multiple times on the side of the head) by police to give a false witness report implicating him, but after falsely testifying at the grand jury she filed a complaint with OPS. He stood trial in 1989 and was wrongfully convicted and sentenced to life in prison.

5.    A woman had been arrested for setting another fire near the one Kluppelberg was charged with setting, just a few hours earlier, and she was convicted. However, this fact was withheld from Kluppelberg's attorney. Filings by Kluppelberg indicate there was exculpatory evidence that was not shared with his attorney.

Kluppelberg was sentenced to 6 natural life sentences. He was totally at a loss emotionally. He had also been facing a possible death penalty. The judge who found him guilty said there was no evidence that he intended to harm anyone yet found him guilty of first-degree murder which requires specific intent. He remains confused because her verdict made no sense, yet he had to spend a quarter of a century in prison. The absurdity of all this is devastating to him.

He was in CCJ 1/88-3/90. He describes the first 5 days in jail as "horrific." The arson was in the papers and a mother and her children were killed, so other prisoners had an issue with him. Once some of the prisoners came at him menacingly. He told them he hadn't committed the crime and showed them the bruises from the beatings he had received at the hands of the police and they backed off. He spent the first 10-12 days in jail without medical treatment. He was scared because there was blood in his urine and he didn't have medical attention so he worried the injuries could be serious, because other prisoners stigmatized him and threatened him, and because he was facing serious prison time. He could not urinate without pain and could not eat. He was terrified nobody would believe him and scared of what would happen to him next. He could not sleep until he became totally exhausted and then his sleep was short and not sound. He was not attacked by other prisoners or officers but was constantly terrified that he would be. He told me: "Going to court, they get you up at 4 AM, move you from one bullpen to another, sit you in court all day and then it's back to jail, it can be 8 or 9 at night.

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

6.      I was always in pain, always very scared." He got severe diarrhea the days before each court date. Still, he tells me: "I kept hope alive that the justice system would get it right and figure out I was innocent. But the truth was I was kidnapped and locked up for something I didn't do. They didn't care about the fact they had got it wrong. It took 20 years for somebody to finally listen to me that I was innocent."

Prison experience. In "Expert Report of James Kluppelberg" he summarizes his prison experience from 1990-2012. All of the places where he was incarcerated were maximum-security because of the seriousness of his conviction offense.

When at Joliet he was in his cell all day long waiting for classification. He was there a month for processing. He was at Menard 1990-98. For a while he worked in maintenance and in that capacity he saw the psych unit. He was never a mental health patient himself. He tells me that from 1990-96 the institution was chaotic. The gangs ran everything. Violence level was "off the charts." The institution was always on lockdown. After 1996, IDOC locked everything down for a year. He was locked down from 4/96-11/96 and then released from his cell to do his job while most other prisoners remained on lockdown.

7.      During lockdowns prisoners are essentially in solitary confinement (they can speak through the bars to prisoners in neighboring cells) without any disciplinary infraction and conditions are equivalent to or worse than conditions in solitary confinement segregation units (the lack of exercise and noise level can be worse than in Administrative Segregation or the Security Housing Unit). Prisoners call lockdowns group punishment because most of the prisoners on lockdown were not involved in the crime that set off the lockdown. This adds to the sense of unfairness about the way prisoners are treated.

During lockdown at Menard in 1996 the temperature was often in the 100's. He explains: "You lay in bed all day and try to survive." He had a cellmate and no cell fights. He read everything he could get a hold of. "You do anything you can to keep from going crazy – you sleep a lot, but you can only sleep so much." He saw people become mentally unstable. "You try not to acknowledge their mental breakdown, because if you make the situation real then you open up the possibility of it happening to you. You lose a sense of time, night and day. There was a lot of violence, cellmates attacking each other. Seeing it all around me made me afraid of losing control of my emotions. I didn't want to become institutionalized, didn't want to let prison change who I was as a person. In a lot of ways I failed at that. For example, my marriage failed because I became very defensive and got angry a lot." He married Bonnie in 1988 while still in jail and they broke up in 2000. "There were a lot of reasons the marriage didn't work, I like to think we would have made it had I not been in prison, and we are friends today; she knew I was innocent."

49

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

8.    There is a term in criminology literature, "prisonization." Craig Haney ["The Psychological Impact of Incarceration: Implications for Postprison Adjustment," in Travis & M. Waul, Eds., Prisoners Once Removed, Washington DC: The Urban Institute Press, 2003, pp.33-65] describes it thus: "Prisonization involves incorporation of the norms of prison life into one's thinking, feeling and acting... the longer persons are incarcerated the more significant is the nature of their institutional transformation." There is loss of identity as one becomes an anonymous prisoner known by a number. Clothing choices are vastly restricted, grooming is proscribed, there are rules governing just about every aspect of existence and officers who surveil, give orders, control one's life and mete punishments on a regular basis. As a general rule, the more one is subject to prisonization, the more difficulty one has adjusting back to life in the community after release. When Kluppelberg tells me he does not want to become "institutionalized," I think this is what he means.

After Menard, he was at Joliet 1998-2002. He describes it as "not a lot different." It is a smaller prison with somewhat less violence. He had prison jobs, sometimes simply mopping floors. He was involved in very little violence and no real fights. He repaired radios and headphones, and that was a valuable service so other prisoners left him alone. Even though he was successful in avoiding fights he still was afraid of violence every day and became hypervigilant and suspicious of his fellow prisoners.

He was at Stateville 2002-11. He describes it as another large facility with a younger population. He worked in the commissary, then the printshop. Throughout his years in prison he was housed mostly in a cell with one cellmate. Prisoners did not choose the cellmates and always have to worry they will be housed with a dangerous person and be attacked while sleeping.

9.    For the final 8 years at Stateville he had the same cellmate, a good guy who is now a friend even though still in prison.

He was transferred back to Menard in 2011 and remained there until released in 5/12. It was an entirely changed institution and he could not get a job. He was miserable. He had kidney stones as well as other medical problems. He describes it as his worst time in prison. He only left his cell to shower, eat, or go to the yard once or twice a week for 2 hours. He was always on lockdown and only went to the yard 10 times in the whole time he was there. He spent most of the time idle in his cell.

In all the prisons, the cells were very small, ~5x9'. Gangs controlled the cell assignments and a lot else. Prisons were crowded. Beatings were frequent, he witnessed much. He heard a murder taking place but didn't see it. He felt the guards didn't care about him or the other inmates, which made it all the more frightening. Many inmates were armed. Knives were present and even if you tried to get sent to Administrative Segregation to have a cell to yourself and be safe, the gangs could send someone to hurt you there.

50

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

Prisoners were permitted 3 envelopes/week for letters until 1996. Gangs controlled who could use the phones.

In his deposition Kluppelberg is asked, "Is there any particular incident that happened while you were incarcerated that stands out more than others?" He answered: "The guy that was a friend of mine that was c/o chest pain, went to the health care unit, they told him he had gas, sent him back and 2 hours later he was dead of a heart attack.

10.  The kid that was supposed to be released in a few weeks that was in a cell with a person that said don't put this person in the cell with me, and the guy proceeded to beat him to death over the course of several hours of this kid screaming for help and staff doing nothing. I have seen people brutally beaten. I've seen officers being rushed to the health care unit that have been stabbed or beaten themselves. I've experienced people who have lost loved ones, I've lost loved ones myself. There are many, many things that over the course of a quarter of a century I can state were disturbing."

In his expert report Kluppelberg wrote: "The prevailing attitude in prison was to wake up every day praying that you would survive, would not be stabbed by another inmate or shot and killed by the guards, not be put in a position where you had to harm someone else to protect yourself. The stress level in prison is difficult to explain. Prisoners always had to be aware of what was going on and what was out of the ordinary. Inmates would only sleep a few hours a night because the slightest sound out of the ordinary would wake you up. Inmates became accustomed to sleeping through the constant yelling and loud noises and music but would wake up if you heard someone brushing past your door. There were unmistakable signs that would freeze everyone in the tracks, like the sound of a shotgun being chambered at the other end of the cell house. The stress is monumental because your mortality is always an issue. You could be forced into a fight and know that the guard would start shooting, not really caring who started it. You realize how vulnerable you are and you live every minute knowing that something terrible could happen to you at any time." He goes on to describe severe violence on almost a daily basis with guards ignoring the prisoners who were harming each other or guards would jump in and start beating or shooting prisoners.

11.  Kluppelberg told me: "If two guys were fighting, staff would show up in force and basically beat up the guys who were fighting. I remember an instance where 2 guys were fighting with an officer with a shotgun on a catwalk. The guards started shooting and hit some other staff. Between 1990-96 there was never a time longer than 20 days when guards didn't fire shots." He had minor wounds due to indirect damage or shrapnel from guards shooting prisoners near him. He saw many prisoners who were shot by mistake by a guard with a rifle 250 yards away. "The day I found out I was going to be released I had them take me to my cell and lock it, I didn't want to get killed before getting out. On the day of my release they put me in a bullpen at 7 AM and I wasn't released until 1 PM. I was terrified the whole time I would be attacked."

51

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

There are unwritten rules in prison, e.g., the prison code that requires one to act tough, not show feelings, hide weakness and neediness, not talk to officers, and never snitch. I have written about the way the prison code and institutional dynamics reinforce the most toxic aspects of masculinity and ill prepare an individual for successful reintegration into family and community upon release [Kupers, T, "Toxic Masculinity as a Barrier to Mental Health Treatment in Prison," J. of Clinical Psychology, 61, 6, 2005, pp.713-24]. Then there is the shame of being a criminal and the harsh treatment that is reserved for criminals in prison, all the more difficult to bear if one has been falsely accused and convicted.

12. The problems Kluppelberg encountered in prison were worsened by the crowding of the prisons in those years. With cuts to rehab programs, there was little for prisoners to do. It is well known that prison crowding and relative idleness lead to greater rates of violence, psychiatric breakdown and suicide [Paulus, PB, et al. (1978) Death Rates, Psychiatric Commitments, Blood Pressure, and Perceived Crowding as a Function of Institutional Crowding. *Environmental Psychology and Nonverbal Behavior*, 3, 107-17; Thornberry T and Call J (1983) Constitutional Challenges to Prison Overcrowding: the scientific evidence of harmful effects. *Hastings Law Journal*, 35, 313-53]. Large prisons like the ones where Kluppelberg was incarcerated are a set up for widespread violence.

When asked how he stayed out of trouble with the gangs he told me: "The gangs gave me deference because my sister was married to a gang leader, so they watched out for me." He was never associated in any way with the gangs. It is remarkable and to his credit that he stayed out of trouble with the gangs, didn't get into fights, received relatively few disciplinary write-ups (it's practically impossible to avoid tickets for disciplinary infractions in a tough maximum-security men's prison), was not victimized sexually, and survived with his wits intact.

Kluppelberg spent 6 months in punitive segregation because contraband knives were found in his cell. They belonged to an ex-cellmate who was gang affiliated. The hearing officer gave him only 6 months in solitary because he had some sympathy for his situation. In segregation, cells are smaller still, with 2 prisoners. He was in segregation when he heard the murder a few cells away.

13. Solitary confinement is very damaging to prisoners. Prominent symptoms in emotionally stable prisoners caused by solitary confinement include severe anxiety, insomnia, disordered thought process, paranoid delusions, insomnia, problems concentrating, memory problems, mounting anger, fear that the anger will get out of control and the prisoner will get into further trouble, despair, and all too often suicide [Kupers, T., "Isolated Confinement: Effective Method for Behavior Change or Punishment for Punishment's Sake?" in The Routledge Handbook of International Crime and Justice Studies, Eds. B. Arrigo & H. Bersot, Oxford: Routledge, pp.213-32]. Kluppelberg avers experiencing many of the well-known symptoms of solitary confinement during the 6

52

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

months he was in administrative segregation and the time he was on lockdown. He remembers it being very painful, remembers being very anxious and not able to sleep, could not concentrate and did little reading, and became angry and agitated.

14.  Kluppelberg admits when he did something to warrant punishment. For example, once he had a cooler in his cell. While prisoners were passing things back and forth on a line in front of his cell, a package was passed that he was told to put in his cooler and then pass on later. There was a syringe in that package and officers found it. He had nothing to do with the syringe. He was disciplined for possessing the contraband with loss of "good time." When he was in punitive segregation his Grade was C, the lowest. After he was released from segregation in 1/95 he regained an A Grade within months and retained it until his release in 2012. He had a couple subsequent disciplinary write-ups, one was dismissed and the other was minor.

15.  The experience of being innocent and in prison. In his expert report Kluppelberg discusses the issue of innocence. "All of this is much harder as an innocent person. You live knowing that you have been locked up as an innocent person but people treat you like you are guilty. I tried to associate with other people who I also believed were innocent. The hardest thing is to look at the clock, see the minutes ticking by and realize that every minute was time you can never get back. It is harder as an innocent person to form social relationships because innocent people do not fit the profile of the average inmate. In addition, prison does not help you have trust for other people."

Kluppelberg told me he felt a lot of anger about the unfair conviction and that people who were sworn to help him, especially police and prosecutors, instead of trying to get at the truth, tried to support his conviction at any cost. It angers him that more and more exculpatory evidence is being discovered, even to this day. Eventually he decided to not let the anger ruin his life. "I can't change what they did to me but what I can do is live my life the best way I can from this time forward." However, he wants to hold people who fraudulently prosecuted him accountable.

16.  Life in the community after release. Kluppelberg left prison with no money, no home and nowhere to go. After few days his son offered to take him in. He moved to Crown Point where his son lived. He lived there for 13 months, then moved to a small house 3 blocks from his son. He had trouble renting because he had no rental history. The couple who own the house he rents listened to his story and have become supportive friends.

He tells me that even though he is innocent with a prison record it is impossible to get quality work. Even if a potential employer accepts the fact of his innocence, he is 50 yo with no work experience. After release, he worked as a machine assistant until 7/13 when he got a job as maintenance coordinator for a senior residence. He injured a knee and had surgery in fall 2004. While recovering, he found a job near his house doing the same kind of work. He worked there 10/14-12/14 when there was a change of

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

management and he was terminated. He has been unemployed since, applying for ~100 jobs but never even getting an interview. He writes about his prison experience in his resume. One potential employer told him, "We don't hire convicted murderers," in spite of his telling her he was falsely convicted. His conclusion is that employers don't want to hire people who have served time in prison, even if they are innocent. His age and lack of employment record make the situation worse. He has to take lower-level jobs, at lower pay, than his skill set qualifies him for.

He described an encounter where he got pulled over for his traffic stop, had an unremarkable exchange with the police officer, but after going to his car, the officer came back with his hand on his gun because he pulled up Kluppelberg's prison record.

17.    His lengthy prison sentence has affected his ability to sleep or rest. He doesn't sleep, is up until 2 or 3 AM, then back up at 6. He is afraid to go to sleep, can't "stop his brain from running." He worries about how he will pay bills. He believes he will not get any Social Security.

For entertainment, he goes to car races but hasn't been to one for a year. He explains it is hard to sit still, he has to be constantly moving. "I can only do this interview because it serves a purpose. I can't watch TV or movies because I don't feel I have any security. My children shouldn't be burdened with taking care of me because the State took my life."

He has had a few romantic relationships since his release but struggles to open up emotionally and shuts down in certain social situations. There was a woman with whom he had a correspondence relationship with 16 or 18 years ago. They became friends. After he got out of prison they dated for little while. "But she could not deal with my talking to the press and had problems with my grandchildren, so we broke up."

He helps his landlord do maintenance work on his properties. He feels he has been robbed. "I came out of prison with 4 grandchildren who never met me until I was released. I have 3 children I didn't interact with while they were growing up."

Kluppelberg's son, James, testifies that his 1st memory of his father was visiting him at age 4 or 5 at Menard. At age 7 his mom told him his father was imprisoned for murdering 6 people. She finally told him when she was in a nursing home that she believed his father was innocent. His stepmother, Bonnie, when he was 14, went back and forth about whether his father was guilty or innocent, depending on whether her relationship with his father was good or bad at the time. He cut off relations with his father at age 14, not seeing him for several years.

18.    Kluppelberg's mother passed away, as well as his stepfather and uncle, while he was incarcerated, and that was very painful and sad. "My sisters have lives and children I had

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

never met. It was like being put in a time chamber and let loose 25 years later, my body beat up, with health problems, and the whole world has passed you by. There are no programs for people like me, I am considered a throw away. You go into survival mode, try not to think about what's happening outside. You don't know anything about a computer or cell phone. I didn't know how to negotiate buying a ticket and getting on a plane. Cars have changed so much, I can't work on one today. Since I had a life sentence they assumed I would never be released so they spent the minimum attention on me because they would rather rehabilitate someone who would be released. I couldn't get a class or industrial job in prison because of my life sentence so I received no training for work I could do in the community. Life has passed me by."

There was no preparation for release, he was told he would be released the next day. Because he no longer had a conviction, he did not get gate money. If an employer hires a convicted felon, he gets a tax credit, but because Kluppelberg is no longer a convicted felon, there isn't one. He received $214,000 from the state.

Kluppelberg's daughter, Sarah, reports during her deposition that since his release she has visited her father a few times and talks to him on the phone several times/months. She avers that he has been to 2 events, a basketball game and a car racing event. Other than that, he doesn't participate in activities. He doesn't exercise, has carpal tunnel in both arms, with surgery for that in 2014. He injured his knee in 2014. She stated: "Shortly after he got out he was very reserved, not very social, almost like frozen in time to where he didn't know how to react around people.

19. The longer he was out, the more it progressed into being a father again, being a grandfather for the 1st time. He had a lot of trouble trusting people. He was very leery if there were large groups of people. He was always on alert. Anything that went on in the vicinity, he was paying attention to it." She further reports that he was overprotective of her and other women in the family, uncertain how to respond to others including his own grandchild. He remained "reserved" for around a year after his release. He would not join in conversations, would not smile, and even when listening in conversations would be looking around to see if there was any danger. She asked about his being reserved and he told her it was from being in prison where you cannot trust anyone.

Kluppelberg's son describes a long period of alienation from his father while he was behind bars and then after his release they became connected and he describes Kluppelberg as great at being a grandfather. He testifies that his father has had a rough time adjusting to being back in the community. "He has a hard time being in public places with a lot of people. He feels a little anxiety, too much going on. If we are out in public, he doesn't like to be touched, which is prison lifestyle." The son describes his dad's trouble sleeping since being released. Asked about his dad's experience in prison, he avers not talking about it much.

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

DATE OF RECORD REVIEW:    August 25, 2015
C&A DICTATION NUMBER:     3073
BRIEF CITATION:           Kluppelberg v. Burge

20.  Kluppelberg stated: "If I had not been arrested I would have done the remodeling business. With my work habits and skills, I would have been successful and I would have been a dedicated father. People have told me how well I have adjusted after a long incarceration. I would probably not have gone to college but I would have a very secure future. My marriage to Bonnie would have worked out and we would be very happy with children and grandchildren." At this time, he wants to start his own business. "I want to work. I would do home repairs." He tells me, while quite obviously in a lot of pain: "I have been out for over 2 years and they are still holding a noose over me."

Current emotional difficulties. Kluppelberg is impressively resilient and well-adjusted considering the dreadful traumas and injuries he has been forced to endure. He is not resentful. He is able to work but is unemployed because of circumstances related to having a hole in his employment record, a prison record, and no social support services to help him find decent work. He is proud of the fact that he has quickly mastered the technology—computers, iPhones, etc.—that only evolved during his time away. He is a dedicated father and grandfather in spite of the huge loss of history with his kids and grandkids.

But he suffers with much anxiety. His pulse goes up, but he doesn't think he has real panic attacks. He has a hard time being around crowds, he thinks because in prison you always looked at everyone as a threat. For a year after release he couldn't go to a restaurant without putting his back to a wall. He says, when anxious, "I give off a message, stay away from me, I'm dangerous. You do that to keep people away."

21.  He has nightmares, 2 or 3 a week, and then intervals of a week or two without any. When he has a nightmare he often wakes and feels he is still in prison. Often the nightmares are about the beating after his arrest, he actually feels like he is being held down. He thinks some of what he experiences is re-living when awake, always about the arrest and beating or violence he witnessed in prison. When asked if he has flashbacks, he becomes uncertain. He says he often hears a sound or smell something that reminds him of the police interrogation or prison. He often has a sudden memory of a specific moment in prison or being beaten and looks around to make sure there is nobody around who wants to hurt him.

"I'm trying my best to get out and do things, and I have some success, some failure." He feels he is closed off emotionally since the arrest and prison experience. It is hard for him to relax. He tells me this interview is very difficult for him, he is being forced to remember that his mother died while he was incarcerated, that he couldn't protect his family, or he thinks about prisoners he left behind who don't belong there. "There's a survivor factor, they are as innocent as I am, why did I get out and not them?" He has trouble expressing and sharing feelings, only since being in prison and learning to act tough to avoid attack. He's trying very hard to be open with his children, but with people he knows less well, he is very closed off.

56

**Cavanaugh 155**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

He gets depressed a lot but does not let people see that. It happens when he is alone at night, trying to go to sleep. He feels it's partly related to concerns about the future, his ability to take care of himself and his kids and grandkids. He tells me: "I have cried more in the last 6 months than I have in the last 2 decades.

22.     He worries about the fact that he can no longer maintain the persona of a tough guy. "I'm starting to lose my ability to continue being closed off. Now more and more of my feelings leak out. For example, I cry easily. I see a romantic couple and get overwhelmed with sadness I don't have that. I never saw my children at their sports events or proms or graduations."

When asked about startle response, he tells me that if someone comes close he will spin around and look menacingly at them. He thinks this response is gradually waning but still a problem. He avers being suspicious of strangers. He locks everything, doors, windows, etc. He checks the locks multiple times before going to bed. He feels this is irrational but still needs to do it. He constantly looks at people suspiciously and wonders if they are dangerous.

Mental health or medical treatment. Since release Kluppelberg has had no psychiatric treatment, has not been suicidal, and has not been prescribed psychotropic meds. He did not participate in mental health treatment while incarcerated. He thinks he would benefit from psychotherapy. He has not used illicit drugs nor consumed alcohol to excess.

Part of the reason Kluppelberg avoids psychotherapy is an unstated belief that "real men" do not expose their feelings and vulnerabilities. While this tendency affects most men, prison has the effect of making the tough guy persona more intense and more rigid.

23.     Other observations. Kluppelberg is somewhat overweight, has a shaved head, short mustache and beard and is well spoken. He evidences no hallucinations no delusions. He is very articulate, evidences a crisp intelligence, has excellent general knowledge and good judgment. There is a moderate amount of depressed affect, expressed appropriately, but no SI nor intent. He is obviously in pain as he tells the story of his arrest and incarceration. He is thoughtful and does not exaggerate. He is impressively un-resentful and clearly very kind to the significant others in his life. Cognition and memory are quite intact.

Discussion and opinions. Kluppelberg suffered severe traumas including a beating at the hands of police where he would reasonably fear for his life, suffered countless traumas in violent prisons, and lost nearly 25 years of his life in the community from age 23-47. These are the years when individuals become educated, develop careers, and have families. All these things were destroyed by his arrest, trial and incarceration. Besides the pain, suffering and psychological damage of the arrest, trial and years behind bars, Kluppelberg also lost the emotional and psychological growth that would have occurred

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
· Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

in the normal course of adulthood. He experienced the pain and suffering of a brutal beating at the hands of the police, an unfair trial, and a very hard life in prison including being near or threatened with death on quite a few occasions and spending time in solitary confinement in lockdown.

He lost the most important years of his life, was robbed of the opportunity to accumulate years of successful work and financial remuneration and self-satisfaction and pride that people get from gainful employment and a career, lost the opportunity to raise his children and be present for his grandchildren, and was unable to attend funerals and comfort survivors for a quarter of a century. As a result, he is financially deprived, has no retirement resources, feels terrible that he has not been productive, and is very pained by the loss of all those years of family life.

24.    This contributes to his feelings of frustration and poses practical barriers to his overall psychological recovery.

He does not exaggerate his pain nor his symptoms, in fact, tends to downplay them. He expresses himself with sincerity while talking about the pain and suffering he has experienced. His reports are internally consistent, consistent with what I know about the criminal justice system, life in prison, and consistent with the reports of others who know him and what is reported in the documents I reviewed. His reports of emotional problems and disabilities are consistent with my clinical understanding of trauma and its sequelae and the psychological effects of wrongful conviction and a long prison sentence, and his mental status is consistent with his reported symptoms. Thus I have considered the possibility of malingering and ruled it out.

While he was eventually declared innocent and released, Kluppelberg was massively damaged by the experience and the damage is long-lasting. The memories of what happened, the actual deprivations and losses that accumulated over the years of his incarceration, are not reversible and will be with him until he dies.

a.  Kluppelberg lives a very constricted life, there are many places he will not go and people he will not associate with because of the emotional problems caused by his false conviction and time behind bars. Innocent individuals, including Kluppelberg, tend to suppress the resentment about the unfair punishment and meanwhile find they are suppressing other feelings as well until they become quite emotionally constricted.

25.    b.  Kluppelberg has severe and disabling emotional problems that can be directly attributed to his arrest, conviction, and 24 years behind bars. These include nightmares and reliving experiences related to the beating by police and prison scenarios. He experiences irritability, anxiety when encountering strangers, the police or any potentially threatening situation. He has problems sleeping, problems with trust, hyperawareness and reactivity, hesitation to go places that remind him of dangerous places in prison, a

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

need to see an entire room if he is to be comfortable sitting down to a meal, a tendency to isolate or be less social than prior to incarceration, constricted emotional range related to his need to suppress troubling emotions such as anger and resentment about his wrongful incarceration, and sadness that arises at inexplicable times.

c. The obstacles he experiences to developing a sustainable romantic relationship are directly attributable to defense mechanisms he honed in order to survive in jail and prison and now cannot entirely rid himself of even though he is aware of them and would like very much to change them.

d. Kluppelberg feels his possibilities in the workplace are very limited. He could not participate in rehab programs in prison because of his life sentence. Even though exonerated, employers are unlikely to hire him and he is hesitant to even apply, not wanting to encounter another failure. His expectations are very much diminished because of the lost years and stigma. His prospects for working career are very slim for objective reasons such as his age and health, and for subjective reasons such as his damaged self-esteem and lowered expectations.

e. There is little in the way of play and enjoyment in Kluppelberg's life. Everything is very serious, beginning with his hyperawareness of his environment and the possibility of danger.

f. Freud described mental health has the capacity to love, work, and play. I have described problems in all 3 areas in Kluppelberg's current life, all directly emanating from his beating, wrongful conviction, and years in prison.

26. Kluppelberg's current emotional problems were caused by the trauma inflicted by the arrest, beating, wrongful conviction, and time in prison. It's clear there had been earlier traumas. But a clear picture emerges in his h/o of symptoms that arose only when he was behind bars, and nightmares and reliving experiences that refer directly to experiences he had behind bars. It is the traumas connected with the arrest, beating by police, conviction and 24 years of prison that are the root of the vast majority of Kluppelberg's current emotional difficulties and dysfunction.

Kluppelberg experienced a significant number of events that qualify as requisite traumas according to DSM IV or V, including the arrest, the beating at the hands of police, a faulty trial, crowded and harsh prison conditions, harsh isolation in administrative segregation and during lockdowns, and the constant threat of assaults and fights in custody. He reports a number of symptoms typically associated with PTSD. These include intrusive symptoms such as anxiety, recurring nightmares and memories of the arrest and prison, a sense that he is back in prison or reliving the experience.

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 25, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

27. They include constrictive symptoms such as his dampened emotional state and avoidance of events where there are crowds in closed spaces. They include hyperarousal symptoms such as anxiety and a strong startle response and hyperawareness of his environment.

Kluppelberg suffers from PTSD, severe and chronic. In spite of a clear clinical picture for PTSD, he seems to be functioning, so the symptoms are not entirely debilitating. The causative traumas are severe and life-threatening and it is only because of his remarkable resilience and will to move forward with his life that he is not totally disabled. There is much loss and sadness in his presentation and history but he does not qualify for DSM IV diagnosis of MDD. I assign no diagnosis on Axis II.

I entirely r/o the diagnosis of antisocial PD. He did steal as an adolescent but it was related to the selfless need to take care of his mother and family. Antisocial PD is frequently overdiagnosed in individuals who serve time in prison. The commission of crimes is far from sufficient for diagnosing antisocial PD. Only 15-30% of prisoners actually qualify for diagnosis of antisocial PD. Kluppelberg is clearly not callous, he is capable of empathy and empathic relationships, is not impulsive, not manipulative, and clearly able to pursue long-term goals. These and other character traits make him clearly ineligible for diagnosis of antisocial PD.

Severe and lasting damage has been wrought by the arrest, conviction and years of wrongful incarceration. The loss of a quarter century of life in the community, the opportunity to raise his children, evolve a marriage, and develop fulfilling work are large and permanent losses. Kluppelberg's pain and suffering go far beyond the disability described in cases of PTSD.

28. It is clear that had he not been arrested, beaten, convicted and sent to prison, Kluppelberg would have been given the opportunity to improve his personal and professional life and live a quality life, and in my opinion, he would have succeeded. After his prior release from IDOC in 1987 he married Bonnie, began working, and had not been involved with crime. He had turned a corner and was achieving stability in his life. He had great potential.

Kluppelberg does need mental health treatment, vocational counseling and training, help achieving his dream of starting a remodeling business, and financial assistance to compensate for the difficulty he has in finding gainful employment.

29-40. CV.

41. Depositions and Court Testimony in past 4 years.

# Cavanaugh & Associates

# APPENDIX 1

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| REVIEWER: | Aimée St. Pierre, M.D. |
| C&A DICTATION NUMBER: | 3073 |
| C&A FILE NAME: | James Kluppelberg v. Jon Burge, et al. |
| BRIEF CITATION: | Kluppelberg v. Burge |
| COURT NUMBER: | 13 CV 3693 |
| ATTORNEY NAME: | Elizabeth A. Ekl/Jaclyn L. McAndrew |
| ATTORNEY TELEPHONE: | 630.735.3370/630.735.3317 |

## TABLE OF CONTENTS

1. Deposition of Larry G. Axelrood, JD, 2/3/15 .................................................................. 2

2. Deposition of Michelle Brittain, 1/14/15 .................................................................... 11

3. Confidential Deposition of Michelle Brittain, 1/14/15 ............................................ 19

3. Deposition of Sarah Ann Brobst, 2/24/15 ................................................................. 21

4. Deposition of Michael Duffin, 5/20/14 ...................................................................... 37

5. Deposition of Duane Glassco, 7/18/14 ...................................................................... 41

6. Deposition of Francis Huber, 4/29/15 ....................................................................... 52

7. Deposition of Bonnie Kluppelberg Hileman, 5/14/15 ........................................... 56

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

---

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

---

## 1. Deposition of Larry G. Axelrood, JD, 2/3/15.

6.  I'm a circuit judge in the Law Division at the Daley Center

7.  I came there in 7/14. I was an associate judge prior to that.

8.  8/89-2005 I was in private practice.

9.  11/85-8/89 I was an ASA.

10. I was assigned to felony review in 1/88.

11. I was still an ASA in 11/88. I remember testifying as a witness in a criminal case involving Kluppelberg.

13. *Reference is made to Exhibit 2.* This is a document I prepared in 1/88.

14. It concerns the oral statement of Kluppelberg. I had a conversation that lasted 2 hours. This is a summary.

15. *Reference is made to Exhibit 3.* The lead page is the outside of a jacket felony review file.

16. The writing on there, starting with 1/13. Then NBC, I'm guessing would be night bond court, FPC would be finding probable cause. I don't know if that G means there was a finding of probable cause granted. Bond was set at $25,000, advised of a trial in absentia. This would be the outside jacket of a car fire if this was pertaining to Kluppelberg. Going to p.43, that is the contents of the felony review jacket, and this indicates it's an arson. This would have to do with one or more of the car fires.

17. At the top it says, "start time," and then it may be 12:55 AM or 12:35 AM and a finish time, 4:03 AM, 4:09 AM. It's too faint, I can't read it. There's a date, 1/13/88. Then it's one defendant, number of victim/witnesses, one. After that, charges, it's arson. I wrote it as an oral statement taken 1/13/88. It looks like 1 AM. Statement of witnesses would be me, Rolston, Schmitz.

18. Then it indicates, advised of rights, stated he started the car fires so he could discover them and prove to his boss that he was a good security guard. Below that you have the RD number, an internal numbering system for the CPD. The place of arrest was 1121 S. State. Arresting officers were Rolston and Schmitz, and Rolston was listed as the investigator. Below that there's a date for the incident, 12/24/87 at 1:40 AM. Then it

2

**Cavanaugh 161**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

says "on day, time, and location the defendant was being questioned about 2 separate car fires in the parking lot of the building where he was working as a security guard.

19. After giving conflicting statements, he was advised of his Miranda rights, which he waived, and then admitted that he set the fires to make him look good to his boss." I don't know where I got that information. Kluppelberg admitted in my presence that he had set the fires to make him look good to his boss.

21. Then there's the next event, he was to go to court the next morning.

22. I approved the charge of arson against Kluppelberg. I checked personal, it means I was physically present for this case.

23. This was in connection with the car fire. Turning to p.45, this would be for the next case at 820 W. Belle Plaine. The charge is arson. He gave the same statement for both car fires. You have one arrest for two incidents.

24. There were two cars at the same location that was subject to the arson.

25. At the bottom it has the next event, which is that he would go for a preliminary hearing the following morning and that I was sending it from felony review and that this was personal, meaning I was present.

26. From Exhibit 3 it's fair to conclude I approved two charges of arson in connection with the car fires against Kluppelberg.

27. I don't know who Rolston is other than I interacted with him in 1/88.

28. I have not had a conversation with Kluppelberg.

29. I have an independent recollection of this event. I have a vivid memory of meeting Kluppelberg. I don't have a vivid memory of meeting Rolston and Schmitz. I met with them before I met Kluppelberg and they briefed me.

30. One of the reasons I remember this is because my interaction with them was not satisfying. My conversation with them was lacking in the detail I normally would want. I don't remember if they apprised me at a minimum that he had confessed to murder. I just remember that I wanted more information and didn't get it.

31. I distinctly remember that after introducing myself and advising Kluppelberg, I sat for a moment trying to figure out how to begin the conversation and finally said, So why am I here today? My recollection is that he started to tear up and dropped his head and told me he did something bad.

3

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

DATE OF RECORD REVIEW:      August 26, 2015
C&A DICTATION NUMBER:       3073
BRIEF CITATION:             Kluppelberg v. Burge

32.  I can't remember specifically when I was interacting with the police what information I felt I had not gotten other than before I went in to meet with Kluppelberg I wished I knew more about what was going on. If I was at an area to do a homicide case, I would expect to read police reports, expect to have a summary of what witnesses are available, what, if any physical evidence, would expect to know what the witnesses were saying, would probably be interviewing those witnesses before I would interview the defendant.

33.  I also would know a summary of what the defendant was saying. I remember there wasn't a lot to this and I was disappointed that I was going into interview somebody without more information. I didn't express to the police that this was not being treated like you usually treat murder cases. I never worked with them before and didn't know how they do their job. It was bomb and arson, which is a unit I was unfamiliar with.

34.  I don't remember specifically what the detectives told me Kluppelberg was saying. The police may have known that he was going to confess to homicide. They may have told me that he's talking about a fire because I would not normally be there for car fires, so they told me, in effect, there's something bigger here.

35.  I don't know where they were in their investigation. I don't remember specifically what they told me. I just remember leaving there thinking, that guy just gave up a 6 body homicide. I don't know if he had told them about it beforehand and they wanted me to see if I could get a court reporter. I don't know if he had confessed to them before I got there. I do know that the confession was suppressed. I don't know who obtained it originally, if he 1st did it with me or did it with the detectives and then repeated it with me.

37.  My recollection, if you are making me speculate, is that he confessed to them and they had me there because they wanted a witness, wanted to see if I could draw out the details, if I could reduce it to a court reported statement. My recollection is that they had a conversation with him and the only reason that I was there was because of the investigation as to the homicides. I would not have been there for the car fires. I believe that they told me that he said that he started those fires which killed the people.

38.  In the violent crime context I was used to, they would have had a conversation with an individual.

39.  That individual would have made a statement that would be considered an oral statement to the detectives. The felony review assistant would come out. They would be briefed on the oral statement, then the felony review assistant would also have the benefit of reading any police reports that were made, talk to any other witnesses that were available. In effect, do an investigation and be more prepared when they would go in.

4

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

40. They would not have called felony review upon arrest. Kluppelberg had scars on his wrist where he told me he had attempted suicide.

41. When I entered the room, after I introduced myself and advised him, there was a moment where I was not sure how to proceed.

42. I sat there for a little bit gathering my thoughts. I finally said, So tell me why I'm here today. When I said that to him, he began to tear up, not cry, but tear up, and then he dropped his head. I don't remember if at any point during my interactions with him he did cry.

43. I have no personal knowledge about his interactions with the police officers before I got there. I don't know if he was subjected to physical abuse before I got there. I didn't observe whether he had any marks underneath his clothes. I've been in a situation where I suspected a Chicago police officer might have used physical abuse.

47. During my interrogation of Kluppelberg the officers that had previously interrogated him were coming in and out of the room. I don't remember how frequently. That's not unusual.

51. Regarding if I made a decision after interacting with Kluppelberg as to whether there were going to be murder charges approved, to the best of my recollection, I made it a continuing investigation. He had told me that he lit the fire. Regarding if that was not enough to charge him with murder, my recollection is that this was something from a few years prior and you need witnesses. You can't do a statement only case.

52. Regarding that I could have approved murder charges based on his confession, you could do anything, but you want to do it right. There was no sense of urgency because he was being held for the car fires. So I would want them to do more work before I would approve charges. It wouldn't be accurate to say that I denied the approval of charges.

53. *Reference is made to Exhibit 4, statement of Rolston.*

54. *Reading from p.4:* "Although Kluppelberg in his confession had implicated himself in a multiple homicide in '84, the ASA, Axelrood, denied any charges regarding the homicides at that time, pending further corroboration." That isn't accurate. There are 3 categories in felony review. You either approve, reject, or a continuing investigation. My interpretation is I made the continuing investigation so they can locate witnesses in order to try and prove their case. I required them to do more work.

58. After I heard Kluppelberg allegedly confessed to this crime, I would have approved charges if I thought there was enough to satisfy jury beyond a reasonable doubt that he had committed the crime. Regarding why I didn't think there was enough, the fact that

5

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

the person confessed to a crime that occurred some years earlier, I require them to do the investigation.

60. *Reference is made to p.129 of Exhibit 1.* I didn't see anybody strike Kluppelberg or cause any physical harm to him.

61. I didn't strike him or cause any physical harm to him. He didn't c/o any physical injuries that any officers had done to him. He never c/o being forced to give this statement.

62. There weren't any requests made by him for medical attention while I was with him. The only injuries I saw were old scars on his wrists that he informed me were from previous attempts at suicide.

63. *Reference is made to p.132 of Exhibit 1.* "Question: Were you briefed by the police before you spoke with Kluppelberg, is that correct? Answer: That's correct. Question: Did police advise you that he was arrested for arson of a motor vehicle? Answer: I believe it was 2 motor vehicles. Question: They told that he also made a statement relative to an arson homicide? Answer: Correct, from 1984, I believe."

64. "In addition, I read various other reports and spoke with the detectives. After this initial conversation with Schmitz and Rolston, I interviewed the defendant."

65. Regarding the amount of information the detectives gave me, I don't really remember. I believe they told me that Kluppelberg had made a statement relative to an arson homicide. Based on Exhibit 2, I had the opportunity to read various other reports.

72. Kluppelberg did not express to me any c/o injuries or mistreatment. For some period of time I was interviewing him by myself. It was intermittently, there were periods of time where I would be with him for 10-20 min.

73. I don't recall anything that would have suggested he was in physical pain. He wasn't angry or combative during my interview. He was a gentleman to me. He later thanked me for being so professional with him.

74. I don't recall whether he also said that the detectives were professional to him. We had a conversation that he related to me what occurred and I asked whether he would like to get a court reporter or whether I should do a handwritten statement. We had reached an impasse because he wanted to talk to somebody, so I felt if I didn't let him use the phone it was going to be over. He went to make a call. I don't remember if he talked to his girlfriend or if his girlfriend talked to a lawyer or if the lawyer talked directly to him.

75. But he came back and told me in effect, on advice of his attorney, he was not going to answer any more questions. I terminated the interview.

6

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

---

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

---

76. There wasn't anything remarkable or unusual about his walk from the interview room to the telephone that I remember. I don't remember that his breathing was labored or that he was breathing heavily.

77. During our conversations he told me certain things, like when he would get in a fight with his girlfriend, he would go light a fire sometimes. When the detectives entered or exited the room I don't recall any changes in Kluppelberg's behavior or the way he was speaking.

79. I have no personal knowledge as to whether the detectives threatened Kluppelberg prior to the time I went into the room with him. I testified at the suppression hearing that I asked Kluppelberg several times whether he had been mistreated by the police.

80. He said he had been treated fine.

Exhibit 1. Transcript of testimony of Axelrood at Motion to Suppress Hearing. *Summarized in 8/21/15 record review, Section 16.*

Exhibit 2. Oral statement of James Kluppelberg.

1191. On 1/13/88 at ~12:30 AM I went to the Bomb and Arson unit at 1121 S. State St. When I arrived I read the reports of 2 separate car fires. In addition I read various other reports and spoke with the detectives. After this initial conversation with Schmitz and Rolston I interviewed the defendant, Kluppelberg.

About 1 AM I entered the interview room with detectives and introduced myself to Kluppelberg. I told him I was an ASA, working with the police. He stated he understood who I was. I then advised him of his constitutional rights. He said he understood each of his rights and wanted to speak with me.

He stated he felt very guilty because of something he did in 1984. He told me that when he gets upset after having a fight with his girlfriend he goes out and starts a fire. He told me on 3/24/84 he got into a fight with his girlfriend. After the fight he went for a walk in his neighborhood. While walking he disconnected the streetlight in front of 4448 S. Hermitage. He then went into a vacant 1st-floor apartment and started a pile of garbage on fire with his cigarette lighter in the front room of the apartment. He left via the rear door and walked down the alley to his home. After learning that 6 people had died in the fire he felt guilty.

I asked if he would like to tell these things to a court reporter who would transcribe his words exactly. At this point he asked if he could call his girlfriend. He used the phone in an adjacent room and had a private conversation. After the conversation he told me that

7

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

his girlfriend had put him in touch with a lawyer who told him not to talk with me anymore. At this point the interview was stopped.

As I was working on paperwork Kluppelberg asked to see me. I informed him that I could not talk with him anymore. He stated that he just wanted to thank me for being professional with him and treating him well.

Exhibit 3. Jacket felony review file. *Summarized in deposition above.*

Exhibit 4. 1/8/90. OPS interview of Rolston.

3323.     I wish to preface this statement by saying I am giving it under duress. I am only giving a statement because I know I must or I will be fired from my job. I would like to make an objection to the allegations being made and the delay of this investigation as the alleged incident reportedly occurred in 1/88 and I only received notification of those allegations on 12/31/89. The delay in making these charges and the ensuing investigation is prejudicial to me and indicates these allegations are suspect and non-credible.

On 1/12/88 I was assigned to the Bomb and Arson section, my partner was Schmitz.

3324.     Regarding what occurred on 1/12/88 surrounding my contact with Kluppelberg, Schmitz was assigned a couple of car fires. He asked me to hang around the office because Kluppelberg had an appointment to appear for an interview. When he was contacted by Schmitz by phone later that afternoon, Kluppelberg canceled the ointment. At that point, Schmitz asked me to accompany him to the location where Kluppelberg was fixing pipes, his mother's residence. His mother directed us to the rear of the building where I met Kluppelberg. Kluppelberg invited us inside his mother's apartment as it was quite cold out. We walked into the front room and I could barely hear myself think. There was a radio blasting and a television roaring. There were children running around screaming. There were a great many distractions and interruptions. I remember looking at Schmitz and saying we can't talk here. At that point, Schmitz explained that we would like him to either follow us in his vehicle or accompany us in our car to 1121 S. State where we could discuss his eyewitness accounts of these arsons and he could view our mug books of previous arson offenders.

3325.     He accompanied us to 1121 S. State. Once there we sat in the interview room and asked for his account of the circumstances surrounding the arsons at 820 W. Belle Plaine. During the course of this interview, several discrepancies appeared in his description of what transpired. During the course of this initial interview, we also received background information on Kluppelberg. Schmitz and I decided to ask if he would submit to a polygraph. When he answered in the affirmative we arranged for an appointment that night. When he was brought to the polygraph examiner's office, I spoke briefly with the examiner, then I left. A short time later I was informed that Kluppelberg had refused to

8

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

take the polygraph. We came back up to the 10th floor and interviewed him again. After pointing out more blatant inconsistencies, we placed him under arrest and Mirandized him. He subsequently confessed to a number of crimes, of which he is now convicted, a number of counts of homicide. After his initial oral confession, I notified my superior officers and Felony Review. They sent out ASA Axelrood.

3326.      Axelrood in my presence again read the Miranda warnings to Kluppelberg. He again acknowledged those warnings and waived his right to an attorney. He then gave a statement to Schmitz, myself and Axelrood. Axelrood after reviewing the case, approved 2 felony charges of arson regarding the car fires. Although Kluppelberg, in his confession, had implicated himself in a multiple homicide occurring in 1984, the ASA denied any charges regarding the homicides at that time, pending further corroboration. After the paperwork was completed, we transported Kluppelberg to Men's Central Detention. He was examined by lockup personnel and accepted as a person not needing or seeking medical attention.

     When we explained to Kluppelberg that we wanted him to come to 1121 S. State, he explained that he was working on a broken pipe and it would be an inconvenience but if it would help in our investigation he would accompany us. He didn't at any time state that he did not want to go to 1121 S. State.

3327.      In the interview room he requested to make a phone call, I don't recall the exact time. He was allowed to make several. I don't know who he called. He didn't at any time request to speak with an attorney. He arrived at our office around 1900-1930 hours.

     Polygraph examiner Stout and I discussed this case. During the time of the initial interview and the time I accompanied Kluppelberg to the polygraph section, Schmitz and I had obtained additional information as to Kluppelberg's background, personal history, portions of his criminal history and his possible involvement in questioning by other detectives in my unit on another case. That case was a multiple homicide/arson which occurred at 4448 S. Hermitage in 3/84.

3328.      During the course of the investigation of that fire and multiple deaths, Kluppelberg was arrested on a stop order for robbery, was questioned briefly regarding the fire, and subsequently released without any formal charging. In pursuing the original case report, I observed he was not asked to submit to a polygraph, even though his conduct and his statement to the detectives in 1984 was at the very least bizarre. Because of his actions that night, in 3/84, I discussed the circumstances of that case, the fire on S. Hermitage and the arsons on W. Belle Plaine, with the polygraph examiner. He explained that in polygraph exams it was normal procedure to ask questions regarding one incident. I explained I'd like him to ask questions regarding both. He said it was a little unusual but he didn't see any problem. He also said that in offering a waiver, because of the serious nature of the incident on Hermitage, that he would want to put down the Hermitage

9

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

address. I don't know why Kluppelberg changed his mind about taking the polygraph. Prior to taking him to the polygraph examiner's office, we didn't question Kluppelberg regarding the homicide/arson that occurred at 4448 S. Hermitage.

3329.　After Kluppelberg returned from the polygraph examiner's office I asked him to go over his description of the events that occurred on W. Belle Plaine. He asked why. I informed him of some of the facts Schmitz and I obtained such as we now knew he was a convicted felon, that he served prison time for burglary. We mentioned that he had taken a polygraph with his employer, the guard service, and had failed. We mentioned that he had told us he had no criminal background initially and then we found out different. We pointed out that he had given a very detailed description of a black arson offender in the Belle Plaine incident but had given Schmitz and myself only a vague description at best. I also pointed out as did Schmitz, that there were certain physical characteristics of the Belle Plaine address where Kluppelberg claimed he was at the time of the fires and it appeared to be a physical impossibility to discover a fire from where he was. After I explained this, I again asked him for an explanation regarding the car fires, especially the inconsistencies. After he gave another vague explanation, I told him that he was no longer just a witness but that he was now a suspect. I placed him under arrest and read him his Miranda warnings. Schmitz and I were present when he made his initial confession. He confessed to everything he had ever done in the world, from his first sexual encounter to his first burglaries to his first fires.

3330.　While Schmitz and I were doing paperwork, for security purposes, he was handcuffed to a shackle on the wall. Regarding if I had any physical contact with him, I escorted him to the bathroom and to the men's lockup. Schmitz didn't have any physical contact with him other than placing a handcuff on his wrist. I didn't observe any injuries on Kluppelberg, just old scars. He was never laying on the floor. The ASA arrived around MN or 12:30 on 1/13. Kluppelberg didn't at any time during questioning request to leave.

3331.　I didn't observe him injure himself in any way, however, he did show me scars of old injuries that he claimed were self-inflicted. I didn't hold him on the ground of the interview room with my hands and feet. I didn't observe my partner at any time strike Kluppelberg. I didn't threaten Kluppelberg by stating that he would be beaten again if he did not repeat his confession to the ASA. Regarding the homicides, he said he confessed because he felt guilty. He showed me old scars which he said were attempted suicides. He told me that the knowledge he had killed 5 children and their mother by burning them to death weighed on him. He confessed to the car fires after I pointed out to him what he said was not only improbable but impossible. Kluppelberg, aside from being a very nice person, is also a braggart, and once he began bragging about his sexual escapades, he began bragging about his crimes. I feel he confessed to the crimes because he felt the need to tell someone.

10

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

## 2. Deposition of Michelle Brittain, 1/14/15.

7.      I don't have any information that Kluppelberg set the fire at 4448 S. Hermitage. He never told me that he did. I haven't at any point believed that he did.

11.     At the time the fire took place I knew Kluppelberg. He was going with Dawn. I knew her through my boyfriend at the time, Duane Glassco.

12.     He and I had been dating for about a year at the time this fire took place.

13.     Regarding what Kluppelberg did for a living in 1984, he was a board-up person.

16.     I was at Dawn's house the night the fire happened. We were at a party. It was me, my brother, Duane, Kluppelberg, Dawn and I believe her sister.

17.     Everybody was using drugs except Kluppelberg. He didn't do drugs. They were doing acid. Drinking. I was using acid and drinking. Kluppelberg wasn't drinking. I haven't ever seen him do drugs or drink.

18.     Regarding who went out to put out a streetlamp, it was my brother, Duane, Kluppelberg. Pretty much all of us were standing out there when he put it out. There were throwing rocks at it. Somebody succeeded in hitting it.

19.     I remember Kluppelberg leaving the house that night. I don't know how many times, once, twice.

20.     I can't remember the 1st time. Everybody was in and out of the house that night. He was gone and he came back and it was quick.

21.     It was like he walked outside to get some fresh air and walked back in. He was out maybe 5 min. No one went with him that I remember. Everybody was going in and out to breathe. It was hot.

22.     I don't know where Kluppelberg went outside. I didn't actually see him leave.

24.     The first thing I remember about a fire is I heard them downstairs. My brother called up to me and we went down and he said there was a fire. We went outside to look at it. It was an inferno.

30.     There was a window at the back of Dawn's house on the 2nd floor. Regarding if I had looked out that window, no, they had white plastic on it for the winter months.

11

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

31. At the time I was at Dawn's house, there was no way you could have seen into 4448 S. Hermitage. I haven't ever seen the 2nd floor of that window at Dawn's house without plastic on it. But even if you did, you couldn't see anything because there was a garage right there.

32. The garage is almost as tall as her house. When I heard the commotion about a fire I went outside. We all did.

34. My brother, Duane and Kluppelberg took off toward the fire. I next saw them about 45 min. later.

37. When I came downstairs after I heard the commotion about the fire, Kluppelberg was saying there was a huge fire outside. He appeared like shocked at how big this fire was.

38. I don't remember another time prior to the fire that Kluppelberg went outside. It's possible he did. Regarding that I remember him being gone for about 5 min, I can't say he was gone gone, he could have been standing right out in front.

39. Prior to going outside to look at the fire he didn't say anything else to me about it. There wasn't ever a point where I saw him discussing the fire and smiling.

42. After I came back in after looking at the fire I didn't talk about it with Kluppelberg. There was a group conversation after we came back in about the fire. I didn't at any point during that conversation see Kluppelberg smiling.

43. At the point when we heard the commotion about the fire, Duane didn't look out any of the windows on the 2nd floor. I'm aware that Duane gave testimony at a criminal trial about this fire. I learned that he testified that from the 2nd floor window he could see into the yard and back door of the house that caught on fire.

44. That testimony wasn't true. I know because I was there that night and I know you can't see out that window and see that. Duane gave testimony in Kluppelberg's case that was untrue because he was getting ready to do some time. I know that because it was spoken about through Kluppelberg's wife Bonnie.

45. He was going to give the State information to get a deal. Bonnie told me that. I never talked with Duane about that. At the time that the fire happened, regarding the relationship between Duane and Kluppelberg, Kluppelberg was dating his baby's mother. They got along so he could see his kids but I don't think they were best buddies. There was some hate there.

46. Duane did not like him. He didn't like him around his kids. Duane wanted to take the kids away from Dawn.

12

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

47.  The night of the fire, I didn't see Kluppelberg passing out business cards.

50.  I told the police what I have told you about Kluppelberg leaving the house the night of the fire.

51.  I never told the police that the night of the fire I asked Kluppelberg if he started it. I never told them that I said to Kluppelberg, "you act like you started the fire." I didn't tell them that when I told him he was acting like he started the fire that he smiled at me. I never told them that he was trying to get board-up business the night of the fire or that I had information about him starting other fires.

52.  The police said that Kluppelberg was in jail before for starting fires. I knew nothing about him starting fires.

53.  I had quite a few interviews with the police about this fire where they told me that they thought that Kluppelberg has started it. The first was before he went to trial.

54.  *Reference is made to Exhibit 2.*

55.  *Reading from the Exhibit:* "[Michelle] remembers Kluppelberg leaving the apartment and then later returning. A few minutes later, she heard fire engines. Kluppelberg told the group that there was a fire. She looked outside and observed a fire at 4448 S. Hermitage. She stated to Kluppelberg: You act like you started that fire. Kluppelberg just smiled at her."

56.  "She stated that the fire was too big for Kluppelberg to have come into the house without seeing it. She also stated that on the night of the fire she thinks he tried to get some board-up business." That doesn't record information that I gave to the police about this case. He came in and told us about the fire. I didn't hear fire engines until afterwards. I didn't tell him that he was looking for board-up service.

57.  I didn't tell police that I stated to Kluppelberg, You act like you started that fire and he just smiled.

58.  That night I didn't ever ask Kluppelberg if he started the fire.

59.  *Reference is made to Exhibit 3, Affidavit of Michelle Brittain.*

62.  *Reading from the document:* "At Kluppelberg's trial, Duane testified that he could see from the 2nd floor window of 1748 W. 45th St. into the yard and to the back door of 4448 S. Hermitage. That testimony was false." It's true, it was false. "It is impossible for Duane to have seen into the yard into the back door of 4448 S. Hermitage because that view was blocked by the home at 4450 S. Hermitage. I believe Duane gave false

13

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois  60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

testimony because he wanted to get a deal on his pending case.  There was bad blood between Duane and Kluppelberg.

63.  No attorney for Kluppelberg ever talked to me about his case."  Those paragraphs are true.  I'm not sure if police interviewed me before or after Kluppelberg was arrested.

64.  I was interviewed by police before Kluppelberg went to trial quite a few times.

67-74.  *Section placed in confidential record.*

75.  In interviews with the police I discussed whether you can see the building where this fire took place from Dawn's house.  I discussed that with police before Kluppelberg's trial.  I discussed that you could not see it and there was no way Duane seen it.

76.  That's information I gave police before Kluppelberg went to trial.  Regarding the state's attorney, the State has been coming out for the last few years now insisting that you can see that.  I said, absolutely not.

77.  I talked with the state's attorney about this case before Kluppelberg went to trial.

78.  Before the criminal trial I told the state's attorney that you could not see from the 2nd floor window of Dawn's apartment to the back of the building that burned.

86.  No one was using cocaine at the time of the fire.

95.  Kluppelberg dated Kathy Meagher for a little while.

96.  I know Bonnie Kluppelberg.  She was a drug dealer.

98.  Kluppelberg sold drugs.  I bought them from him.  He sold acid.  Bonnie sold Coke.  Kluppelberg sold acid before the fire.  After the fire we lost contact.  Bonnie was trying to give me drugs to not testify at Kluppelberg's criminal trial.

99.  She wanted me to tell a bunch of lies.  I told her no.  But if I said that he was smiling at me and stuff – I do not remember.  And to speak with a clear head now, and I can remember that day like it was yesterday, no, he never did none of that.

101.  Regarding what lies Bonnie wanted me to testify to in Kluppelberg's criminal trial, not lies.  She just wanted me to say, what I'm telling you, that I didn't see nothing.  She kept bringing drugs around for us not to go to court.  When she realized that wasn't going to work, that's when she paid the guards to get him out.

14

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

102. She paid the guards in cocaine to get him out. I know because it was told to us by Kluppelberg's family. It could have been the mom or the oldest sister. They told us after it happened.

104. Bonnie didn't ever tell me that Kluppelberg set the fire at 4448 S. Hermitage. Kluppelberg hasn't ever lied to me that I know of.

105. I don't recall any of the people who were at Dawn's house arguing the night of the fire.

107. I was convicted of a DUI. I was arrested for battery but not convicted.

108. *Reference is made to Exhibit 3, affidavit.*

112. Regarding how these statements on Exhibit 3 came to be put on that paper, I think we talked on the phone. Regarding with whom I was speaking, I just had a triple bypass so I was not thinking clearly and heavily medicated.

113. The date of the affidavit was 5/21/08. I had my triple bypass in 7/14.

114. As you can see on here, and I know what I was talking about, you could not see that house. There was no way nobody seen nothing. My opinion, if he did it, absolutely not because the fire was just too enraged for the time period of him to be able to start the fire. *Reference is made to Exhibit 5.*

115. Regarding if I remember talking to ASA Brannigan on 10/28/11, I remember talking to a lot of people through the years.

119. I don't recall making the statement: "Brittain stated she did not know the alley and yard were visible from the 2nd floor window, adding that she did not recall there was a 2nd floor window." I disagree with that statement. I knew there was window and I knew that you could not see. I told them that from the beginning.

120-32. *Section placed in confidential record.*

133. I wasn't at Kluppelberg's criminal trial.

135. Glassco and Kluppelberg didn't like each other. They tolerated each other.

136. I don't know if Kluppelberg ever tried to kill Duane.

139. *Reading from Exhibit 3:* "At Kluppelberg's trial Duane testified that he could see from the 2nd floor window of 1748 W. 45th St. into the yard and to the back door of 4448. That testimony was false."

15

**Cavanaugh 174**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

140.  Regarding how I know what Duane testified to a trial, because you guys told me. Someone from your side came out to talk to me and told me that's what he had said and I said that was false. Regarding if I ever looked out the window in Dawn's 2nd floor apartment, I told you, you couldn't look out it.

141.  There was plastic on there. There was a blanket hanging over it. *Reading from Exhibit 3:* "It is impossible for Duane to have seen into the yard of into the back door of 4448 because that view was blocked by the home at 4450." Regarding how I could make that statement if I never looked out the window, because I have been all in through here. I hung around there.

142.  I haven't ever looked out the window in Dawn's 2nd floor apartment.

149.  I got a call from a person that said she was an attorney for Kluppelberg and that he was taking matters back to court. I told her I thought Duane was a liar, that there is no way he could have seen that. And I do not think Kluppelberg started that fire.

150.  Before I had this conversation with the attorney from Loevy & Loevy, I knew what Duane had testified to. I learned it from someone on your side. I kept saying that I did not want to go to court. The men kept telling me that I would have to go.

151.  This was 2 or 3 years ago.

152.  It wasn't around the time of Kluppelberg's criminal trial. He had already been released. All I know is Duane gave the State something that they wanted to hear in order for him to get lesser charges.

153.  It was all over the streets that he was turning State's evidence.

154.  How I knew that Duane had testified that he could see from the 2nd floor window, because when you guys came back to tell me that Kluppelberg was trying to get back out and take it back to court, I found that out. It was a private investigator. It was a guy who kept trying to tell me that he seen it and you can see it from out the window. They were trying to tell me that you can but I knew for a fact you could not.

161.  I talked with the state's attorneys about not being able to see parts of the house where the fire took place from Dawn's house before Kluppelberg's trial. I told that to more than one state's attorney.

164.  My memory was probably not clearer at the time that I gave testimony at the grand jury than it is today because I did a lot of drugs when I was younger. I have a much better memory today. I could tell you what I did 50 years ago in detail. But I can't remember names.

16

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

165.    I don't know if I was intoxicated at the time I gave my grand jury testimony. I partied a lot. But I do remember the night that I was there. I remember it to a T. I remember just about everything that happened that night. I don't know if I was on illegal drugs at the time I testified at the grand jury.

168.    I didn't tell the police anything about Kluppelberg's case that was false that I know of. I never thought he started the fire.

Exhibit 1.  Aerial photograph.

Exhibit 2.  1/18/88. CPD supplementary report by Rolston and Schmitz. *Summarized in 8/25/15 record review, Section #6.*

Exhibit 3.  5/21/08. Affidavit of Michelle Brittain.

1.    On the night of 3/23/84 I was present at 1748 W. 45th St. I remember being there with my brother Donnie, Kluppelberg, Glassco, and Gramont. At Kluppelberg's trial, Duane testified that he could see from the 2nd floor window of 1748 W. 45th St. into the yard and to the back door of 4448 S. Hermitage. That testimony was false. It is impossible for Duane to have seen into the yard of and to the back door of 4448 S. Hermitage because that view was blocked by the home at 4450 S. Hermitage. I believe Duane gave false testimony because he wanted to get a deal on his pending case. There was bad blood between Duane and Kluppelberg. They had a hate relationship. No attorney for Kluppelberg ever came and talked to me about his case.

Exhibit 4.  1/21/88. Grand jury testimony of Michelle Brittain.

7162.    On 3/24/84 at ~4 AM I was in an apartment at 1748 W. 45th St. Me, Dawn, Duane, Kluppelberg, Maradi, and Roy were present.

7163.    We were all in the kitchen. I observed Kluppelberg leave by himself shortly before 4 AM. He was gone 10-15 min. Then he returned to the kitchen. Within ~10 min. of his return, I heard fire engine sirens.

7164.    We all got up and looked out the kitchen window. I observed that the building at 4448 S. Hermitage was on fire. Everyone went outside to look at the fire. When we went outside the fire was at ~ the roof level of the building. That was within ~10 min. of Kluppelberg coming back to the apartment. The fire I saw would have been too far advanced for Kluppelberg not to have noticed it when he came back in.

7165.    After the fire I observed him passing out cards for a board-up service. It's my opinion that he was soliciting for that business. After the fire had been put out we returned to

17

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

Dawn's apartment.  I observed that Kluppelberg had a smile on his face when we returned to the apartment ~ an hour after the fire.  I said to him, "You look like you set the fire."

7166.    He replied, "You'll never know."  He had a smile on his face after he said this.

Exhibit 5.    CCSAO Investigative Report.  *Summarized in 8/25/15 record review, Section #4.*

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

3. **Confidential Deposition of Michelle Brittain, 1/14/15.**

4. *Reference is made to Exhibit 4, transcript of deponent's testimony before the grand jury.*

5. Regarding the question, "Did you observe Kluppelberg leave the apartment by himself shortly before 4 AM?" Answer: "Yes." I can't honestly say that's the testimony I gave.

6. I did see him leave. I don't know what time I saw Kluppelberg leave the apartment by himself.

7. Question: "At this time did Kluppelberg work for a fire board-up service? Answer: "Yes." Question: "After the fire did you observe him passing out cards for a fire board-up service?" Answer: "Yes."

8. If I did say that, I don't know why I said it, but I never seen him do that. I'm not sure why I would have answered yes, but I did not see that that night.

9. Question: "Did you observe that Kluppelberg had a smile on his face when he returned to the apartment ~ an hour after the fire?" Answer: "Yes." I don't really remember saying that. I mean they are saying I did so I did, but no, I didn't. I don't know why I would have told the grand jury that if it's not something that happened. They're saying I said that, I don't remember saying that. That never happened. There was never smile on his face.

10. Question: "When he had the smile on his face, that was after he passed out the board-up cards?" Answer: "Yes." Question: "Did you say to Kluppelberg, you look like you set the fire?" Answer: "Yes." Question: "Did he reply, You'll never know." Answer: "Yes." Question: "Did he have a smile on his face after he said this?"

11. Answer: "Uh-huh." That isn't the testimony I gave. Are you sure that mine wasn't mixed up with somebody else's? I don't remember giving that testimony.

13. I do remember I gave grand jury testimony. At that time Bonnie Kluppelberg had asked me to testify falsely and I refused.

14. Question: "Drawing your attention to 3/24/84, ~4 AM, were you present in an apartment at 1748 W. 45th St.?" Answer: "Yes." Did I tell him it was 4 o'clock in the morning, not that I remember.

15. Question: "Who was present that day in the apartment?" Answer: "Me, Dawn, Duane, Jim, Maradi, and Roy." I didn't give that answer. First of all, I don't know who that is.

19

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

16. I don't remember Roy being there. Question: "Did you observe Kluppelberg leave that apartment by himself shortly before 4 AM?"

17. Answer: "Yes." I don't recall that I was asked that question and gave that answer. Question: "Was he gone for ~10-15 min.?" Answer: "Yes." I don't recall that I was asked that question and gave that answer. Question: "After that 10-15 min., did he return to the kitchen of the apartment?" Answer: "Yes." I don't recall these questions being asked. Question: "Within ~10 min. of him returning to the apartment, did you hear the fire engine sirens?"

18. Answer: "Yes.". I don't know if I was asked that. But if I was, it wasn't yes, it was no. Because the FD didn't get there until we were already outside.. Question: "Did you observe that the apartment building at 4448 S. Hermitage was on fire?" Answer: "Yes."

19. I gave that answer.

20. Question: "When you saw this fire, what that was within ~10 min. of Kluppelberg coming back to the apartment?" Answer: "Yes." I don't recall if I was asked that question and gave that answer. Question: "Is it your opinion that the fire you saw would have been too far advanced for Kluppelberg not to have noticed it when he came back in the apartment?" Answer: "Uh-huh." I gave that answer.

22. Question: "Did you observe that Kluppelberg had a smile on his face when he returned to the apartment ~an hour after the fire?" Answer: "Yes." I don't recall that I was asked that question and gave that answer. Question: "When he had the smile on his face, that was after he had passed out the board-up cards?" Answer: "Yes."

23. I wasn't asked that question and didn't give that answer. Question: "Did you say to Kluppelberg, You look like you set the fire?" Answer: "Yes." I wasn't asked that question and didn't give that answer.

20

**Cavanaugh 179**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

**4. Deposition of Sarah Ann Brobst, 2/24/15.**

11.    I live in Amarillo, TX with my fiancé and my daughter.

16.    I was born [REDACTED] My mother's maiden name is Katherine Meagher.  My father is James Kluppelberg.

17.    I have 2 brothers, James Kluppelberg, Jr and Gregory Poole.  My sisters are Samantha Kluppelberg and Crystal Poole.  They are all half siblings.

18.    Samantha was born [REDACTED] James was born [REDACTED]  James' mother is Dawn Gramont.  Samantha's mother is Donna.

28.    My daughter [REDACTED] yo, born [REDACTED]

36.    When I was a child my grandmother had custody from between my 2nd and 3rd birthday.  She retained custody until I was 15 when I chose to go live with my mother.

41.    I have an associate's degree in business management.

44.    My mother told me that my father's name was James Kluppelberg.  She said he was either dead or in jail.  She said that because she didn't like him because he had gotten several women pregnant within a short amount of time.

45.    I wrote him a letter in 10/99.  I reached out to him first.  Because I wanted to know if my father wanted anything to do with me.  My Aunt Laura called Donna.  She said he was incarcerated and gave us the address.

47.    He wrote back.  He said, I was happy to hear from you.  I still have that letter.

48.    I started corresponding with him at that point.  We corresponded until he was released.  I would try to write once a week.  How often would vary depending on what was going on in my life.

49.    I'd say at least twice a month 1999-5/12 I would write to him.  I received correspondence from him usually at least once a week.  I kept probably 90% of his letters.  I currently have those.

51.    The first memory I have of spending time with my father is 7/4/12 when I was 27.  We met at a hotel in Fort Wayne.

Cavanaugh 180

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

52.     This is the first time I met my father and my brother. I was scared and nervous because I was meeting my father for the first time. I was nervous because what if he didn't like me. Regarding why I believed he may not like me, my own mother didn't. Why would he?

55.     At the 1st visit with my father, he was very standoffish, like he did know how to associate with people in a regular situation. He was very guarded. He didn't speak much. He didn't smile. He always stood with his back against the wall. When I went to give him a hug, he was very stiff and seemed like touching people and hugging were very unknown to him. That subsided probably about a year or so after him being out.

56.     Before seeing my father for the 1st time I knew he was convicted of setting a house on fire that killed 5 people.

57.     I know several of them were children. I saw reports where another person was questioned regarding the case. I got those reports from my father. I also got a copy of the affidavit that Duane wrote stating that he had lied under oath.

58.     All of this information I learned from my father during his imprisonment. In my opinion he didn't commit the arson. The basis of that opinion is the paperwork I read regarding the other woman being investigated for it. The fact of Duane lying under oath. The circumstances of his being arrested to begin with.

59.     That he was assaulted by police. That they had him finally to the point that he signed a confession that was dismissed. All of this information was provided to me by my father.

62.     I didn't ever learn about my father's prior murder charge in 1983.

63.     This is the first time I'm learning of it. I saw his background online and I saw 2 burglary charges. I didn't ever learn that he was charged for armed robbery in 1984.

64.     This is the first I'm learning of it. I know he was convicted of burglary. I'm aware of it from IDOC records.

65.     I looked him up on the IDOC website to see a picture of him, probably shortly after we started communicating. I didn't have much of a reaction to learning that he had 2 burglary convictions. Because they were in the past.

66.     I didn't ever learn of his prior auto arson charges in 1988. This is the first time I'm learning of it. I didn't ever learn that he escaped from CCJ in 1989.

67.     This is the first time I'm learning of it. Regarding my reaction to that, I can't imagine why he would do it. It doesn't strike me as the type of person he is. It doesn't change my opinion of the type of person he is.

22

Cavanaugh 181

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

68.  I don't have a reaction to the fact that he was charged with auto arson or armed robbery because I don't know if he actually did it.

69.  My reaction to learning that he was charged with murdering someone in 1983 is it's something I need to talk to him about. It doesn't change my opinion of him. He's still my father.

70.  My opinion of my father today is he is a generous man. He is caring. He will help anyone that needs it. He's a hard worker. Nothing about his criminal history changes that opinion. In about 2000 I spoke with him for the 1st time.

71.  It was a 30 min. conversation. He called collect. He paid for the call. I remember being excited to talk to him.

72.  I don't have any recollection of the conversation. I was just in awe the entire time.

75.  Regarding why I didn't visit him in prison, distance was one reason. And my aunt didn't want to go into a maximum security prison. I wanted to meet my father. I needed my aunt to go visit him until I was 18. I turned 18 in 11/02. Regarding why I didn't visit him from 11/02-5/12, I couldn't financially make the trip.

84.  Donna Kluppelberg visited my father in prison. I know it was a pretty regular basis.

86.  His mother died while he was in prison. James Jr might have visited in the early years. Samantha visited up through her teens. I don't know how often.

91.  I don't know why my mother chose not to speak with my father while he was in prison.

93.  My father told me that no one from his side of the family had been to visit him.

98.  My mother preferred that I didn't have any contact with my father. I didn't know my father existed until I wrote him. He told me that his relationship with my mother lasted 2 weeks. Regarding whether he was seeing anyone else at that time, it was kind of obvious. Dawn and my mother were best friends.

100.  My father informed me that he wasn't aware of my presence.

101.  Glassco testified against my father. He said that he saw my father go in and out of the building that was set on fire. I saw an affidavit from him.

102.  It stated that he was coerced to lie under oath in return for a lower sentence on charges he was facing.

23

Cavanaugh 182

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

103.  I don't know whether Glassco recanted portions of the affidavit where he said that he saw my father go into the building. It doesn't change my opinion as to whether my father is innocent because I have seen the documentation of the woman being interviewed. Disregarding Glassco's affidavit I still believe my father is innocent. This is the first time I learned that Glassco recanted his testimony.

104.  During his imprisonment my father sent me pictures and cards and a pair of earrings.

109.  I don't believe that my father has ever contacted my mother since his relationship with her in the early 1980s. My mother has never contacted my father since their relationship.

112.  In his correspondence he talked about how he passed time in prison. He worked when he wasn't on lockdown.

114.  He said he would pass the time during lockdown writing letters, reading, watching TV.

115.  He would get magazines on a regular basis.

118.  He told me he suffered from medical problems during his imprisonment. He was having chest pains at one point. He was having abdominal pains. There was a time he was urinating blood for several months.

119.  Based on his correspondence, I learned that he didn't get any medical treatment for his chest pains or abdominal pains or urinating blood.

120.  I believe he had jobs in prison. I don't know the specifics.

121.  I have about 90% of his letters. The other 10% have been lost through moves. My father or his attorneys never directed me to get rid of his letters. Based on my correspondence with him, he seemed caring. He was interested in what was going on in my life. He was regretful for not being able to be there to see me grow up.

122.  He seemed interested and caring because he would ask questions about what I was doing, simple everyday stuff he was interested in knowing.

129.  [In a phone call on the day of his release] my father talked about that on the way to the airport he'd gotten carsick several times from being in a moving vehicle for the 1st time in so long; that he was talking on a phone that could get email, he was truly amazed with that; dreading getting on the plane because of the motion sickness he had in the car; just that he was overwhelmed.

24

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

130. After his release I met with him on 7/4/12. Regarding if prior to his release I felt the justice system had failed him, the more I looked into it, the more I realized that the justice system has its flaws.

131. It's supposed to be innocent until proven guilty. In most cases, if they simply arrest you, it gives the impression that you are already guilty. Regarding if the justice system failed my father, not so much the justice system as the people involved in it; state's attorney, police officers, his own attorney. The state's attorney failed my father by keeping evidence out of the court's hands. Convincing Duane to testify to things that were untrue. This is based on information from my father that he received from his attorneys.

132. The police failed my father by assaulting him. I learned about the assault from my father.

134. Prior to 5/12 I didn't believe my father committed the crime.

135. It was difficult to be without a father growing up.

136. My mother kept him away from me until the time I corresponded with him in 11/99. As far as I'm aware, he didn't know I existed prior to 10/99.

137. It wouldn't change my opinion of my father to learn that he left Donna Kluppelberg 7½ months pregnant to take care of Dawn Gramont. Because what he did was his decision in the past. I've got my own past that I wouldn't want him to hold against me.

138. That doesn't change my opinion as to whether he's a caring person because we all do things in our younger age that we look back on and wish we could change.

141. I've had 9 or 10 visits with my father starting 7/4/12.

144. After 7/4/12 I next saw him 2/13.

145. He flew into Richmond and we drove to NC to spend a week at a beach house for my daughter's birthday. My Aunt Laura rented the house.

146. I next saw him at the Charlotte Innocence Conference in April or May 2013.

147. My father didn't speak at the conference.

148. He flew there. I don't know if anyone covered his travel expenses. The next time I saw him was June. We went to Crown Point.

149. I next saw him 8/13 in Crown Point.

25

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

151.    My next meeting with my father was in 2/14. He flew into Richmond again. We went to Nags Head again. My aunt and I paid for the house.

152.    Then I saw him in 6/14 in VA. My father and brother and his family came to see me get my diploma.

153.    The next visit was in Aug. My dad flew to VA and he drove with us to TX to move. He paid to fly out. The next visit was in 10/14.

155.    This visit makes 10. My father came to pick me up in Amarillo.

157.    I talk with my father on the phone probably 4-6 times/month. Regarding social activities he participates in since his release, he works. He's been to a basketball game once and a car race once.

158.    He doesn't attend any other social activities regularly that I know of. He doesn't regularly participate in any physical activities that I know of. Regarding any medical conditions, he's had carpal tunnel surgery on both arms.

159.    During his imprisonment he told me that his hands would go numb. I don't know if he received treatment for CTS in prison. Regarding other medical conditions, he hurt his knee at work in April or May 2014. I don't know if he had knee problems in prison. I don't believe he suffers from any other medical conditions.

160.    I don't know if he suffers from any mental disabilities. Shortly after he got out, he was very reserved, not very social, almost like he was frozen in time to where he did know how to react around people. Still had almost the mindset of an early 20-yo. The longer he was out, the more he progressed into assimilating to being a father, to being a grandfather for the first time. He had a lot of trouble trusting people, trusting strangers. He was very leery in social situations if there were large groups of people. He was always on alert. Anything that went on in the vicinity, he was paying attention to it, trying to look out for any what-ifs that could happen.

161.    Regarding how I know he had trust issues, if we were walking down the street, he was worried about people getting too close to me. He said, You never know what people are going to do. You can't trust them. When my daughter first met him and ran up to him to hug him, he wasn't sure how to react.

162.    He wouldn't let me or my brother's wife or any of the girls go out unescorted. When we were staying in the hotel, I'd have to go outside to smoke, he would go with me to make sure nobody was around. It took him at least a year to become less reserved. Regarding being reserved, he wouldn't join in in conversations. He never smiled. If someone was

26

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

---

DATE OF RECORD REVIEW:        August 26, 2015
C&A DICTATION NUMBER:         3073
BRIEF CITATION:               Kluppelberg v. Burge

---

speaking to him, he would listen, but you could tell that he was focusing on what was going on around where there might be some kind of issue might arise.

163.  He was always trying to focus on everything all at once and that kept him from being able to focus on what was right in front of him. I asked him about his reserved nature and he said this is how he became from being in prison. You can't trust anyone. Regarding if he eventually smiled, he'll quirk the side of his lip a tiny bit. But for an actual smile, you can't see it.

164.  Once he became more assimilated he joined in conversations. After his release he lived with my brother for a year and a half maybe.

165.  Then he moved 3 blocks away. He still resides there by himself. Renée Kilgore lived with him at that location. She and my father were dating for a short time.

166.  They were in contact while my father was in prison.

167.  It took him over a year to find employment, then it was with a temp service doing maintenance. I don't know how long he was with that service. I don't know if he had employment after that.

168.  He does work for his landlord, maintenance stuff. He applied for several jobs after his release.

170.  He told me it was difficult having 25 years of no work history, not many places were willing to look beyond that.

172.  I don't know if he has received any money from the State.

173.  He received donations after his release. I don't know how much. He went to some kind of fundraiser. He was given donations then.

174.  I highly doubt that my father has plans to author a book about his experiences in prison. Because he doesn't like talking about it.

175.  It would surprise me to learn that he has received money from a pending book deal.

176.  I sent him money once while he was in prison, $50, for his birthday to buy a new pair of boots. He didn't ask for new boots and he wasn't happy I sent it because he didn't want me spending my money on him.

177.  It would surprise me to learn that my father received over $100,000 as a result of receiving a certificate of innocence. That would surprise me because he still works his

27

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

butt off. Helping out when people need him to do stuff. He was doing maintenance work, then he hurt himself.

179. I know he works his butt off because whenever he gets a job he does it to the best of his ability, usually above and beyond what most people would do. I know that because he would tell me.

181. My father hasn't ever borrowed money from me.

182. He worked at a hotel in NM. I believe Renée managed it.

185. Regarding discussing his plans for the future, just that he's ready to move on with his life, ready for all this to be behind him. What he's trying to put behind them is the lawsuit, he'd like for it all to be done. I don't know what he plans to do after this lawsuit is completed.

186. I don't know if he's making attempts to seek employment. I haven't ever had a paternity test to find out whether he is, in fact, my father.

187. I have plans to do that eventually. I'm waiting because he doesn't want to do it because he says he's my father.

189. *References made to Exhibit 2.* This letter is my handwriting dated 2/5/00.

190. *Reading from Exhibit 2:* "I've had to lock up all your letters so my mom won't read them because she's spending a month here." I didn't want my mother to find these letters because she is vindictive.

191. She would probably destroy them. *Reference is made to Exhibit 3.* This is my handwriting dated 8/14/00 addressed to my father.

192. *Reading from Exhibit 3:* "The birth certificates came out fine. I just made up some birthdays." I don't recall if I made any changes to my birth certificate around 2000.

194. *Reference is made to Exhibit 4.* This is my handwriting, a letter to my father dated 8/17/00.

195. *Reading from Exhibit 4:* "Do all the letters I sent you get opened and read? I'm just wondering because I'm curious." I wasn't concerned. I just had to ask. I don't recall any conversations or correspondence with my father as to whether he was concerned his letters to me were being read by other people. *Reference is made to Exhibit 5.*

**Cavanaugh 187**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

196. This is my handwriting, a letter to my father 9/5/00. *Reading from Exhibit 5:* "From what my aunt says, Donna can't get my birth certificate. Only my grandma can. I don't even know my mom's address."

197. I believe this was just trying to get a copy of my birth certificate, not changing anything to it. I didn't have any conversations with my father where he wanted me to change my birth certificate to add his name as the father while he was incarcerated. Thereafter he informed me that he was taking the steps to have his name added to my birth certificate. I was excited. *Reference is made to Exhibit 6.*

198. This is a letter I sent to my father 10/17/00. *Reading from Exhibit 6:* REDACTED
REDACTED

199. It would not surprise me to learn that my father may have attempted suicide at a point in time. *Reading from Exhibit 6:* REDACTED
REDACTED

200. I don't remember if my father's incarceration had anything to do with leading me to REDACTED *Reference is made to Exhibit 7.* This is a letter to my father 3/5/01.

201. *Reading from Exhibit 7:* "The reason I was upset with you had nothing to do with the lawyer. My aunt told me that you had written her a letter telling her everything I told you in my letter about Todd and my plans." That was a lawyer assigned to me during my custody case with my mother.

202. *Reference is made to Exhibit 8.*

203. I wrote this letter to my father 6/30/05. *Reading from Exhibit 8:* "My dad walked me down the aisle and I cried before we even got to the end of it."

204. I was referring to my stepfather. He was my dad, not my father.

205. Father is biological. Dad is the person who was there. *Reference is made to Exhibit 9.*

206. It's a letter to my father dated 8/3/09. *Reading from Exhibit 9:* "I totally understand you being worried about being in the world after so long. All I can say is I'm here for you and anything I can do to help, I'm more than willing to do." I recall conversations with my father while he was in prison related to his concerns about getting out.

207. That was through correspondence. His concerns were assimilating back into the general population. Everything had changed so much in that length of time. *Reading from*

29

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

*Exhibit 9:* "As for where to go, I really can't answer that. You will have to look at all your options, see who all is left in Chicago or if you even want to be there."

208.   I don't remember if he had any concerns about going back to Chicago after his release. He had no idea where to move after his release.

209.   *Reference is made to Exhibit 10.* That's a letter I sent to my father on 8/19/09.

210.   *Reading from Exhibit 10:* "I saw that they are very proud of the money settlement, I hope for your sake that when you get out and if you do receive a settlement, I worry about the people who have written you off will come back and act like they do care and have cared. But they haven't. I know you will be so happy to have friends and family around. It won't seem like it at the time, but they will be using you." Regarding what attorneys I'm referring to when it says I saw that they are very proud of the money settlement, I believe it was a flyer that my dad sent me. I want to say it was from Loevy & Loevy.

211.   He didn't ever offer me any money that may come to him as a result of a lawsuit.

212.   He wasn't concerned about people attempting to use him for any money he may receive as part of a lawsuit. *Reading from Exhibit 10:* "As for your first lawyer, he was a dumbass who should not be allowed to practice law."

213.   It had to do with him finding out that the lawyer didn't do his due diligence in finding evidence. I believe it was dealing with an aerial photo.

214.   It surfaced through the state's attorney but never made it to his defense attorney. My knowledge related to my father's first lawyer is based on information he provided.

216.   My father said that his lawyer didn't want him going on the stand to defend himself. I understood that my father wanted to.

219.   *Reading from Exhibit 10:* "I hope the lawyers you have now are able to undo the mess he let accrue, because the prosecutor just wants guilty and will do anything to get it. It's up to the defense attorney to do all they humanly can for their clients."

220.   I don't believe the attorney who represented my father did a good job on his behalf. He didn't get all the information that was available. They knew this fire had happened the same day. He didn't look into that.

221.   He didn't look into any other reports. He didn't look into finding the photos that the state's attorney had. He allowed Duane's testimony to go unquestioned.

223.   *Reference is made to Exhibit 11.*

Cavanaugh 189

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

224.     This is a letter to my father on 12/12/09. *Reading from Exhibit 11:* "I will read all I am sent from you and your lawyers." It was stuff that he forwarded to me from his lawyers. *Reading from Exhibit 11:* "I'm glad I didn't offend you with what I had to say because all I know is people have very simple motives. What can I get from someone without having to work for it?

225.     I don't know about Jimmy, but that is how Sam is." I didn't know about Jimmy because never met him at that point. Sam, at that point in her life, her only worry was what she could get from someone without having to do anything for it.

226.     I don't know whether my father planned on giving Sam any money related to his lawsuit. *Reading from Exhibit 11:* "I totally understand you wanting to help out your brother Just asking the number you wrote is 190,000, not supposed to be $190. I only ask because if it is the larger of the two, with the right planning and budgeting, you can make that last until you get a job and get on your feet."

227.     We had talked about if he came into any large amount of money he wanted to help out his brother and arrange suitable living conditions for him. I don't recall what was wrong with his brother, some kind of accident happened.

228.     *Reading from Exhibit 11:* "As for the civil suit, I think that you are entitled to something for being wrongfully convicted."

229.     I think he was entitled to something because he was sent to prison for a crime he didn't commit. He lost 25 years of being able to gain job history to pay into Social Security for when it's time for him to retire. I didn't ever correspond with him about how much he thought he should get.

230.     *Reading from Exhibit 11:* "As for the time served question, do you want to have fought all this time to give them the satisfaction of being able to label you guilty that way?"

231.     Regarding whether I corresponded with him about contemplating foregoing a lawsuit or moving forward with his certificate of innocence and taking time served and moving on with his life, I believe he got to a point where he was contemplating taking that just because he was missing so much of our lives. I don't know why he chose to move forward with maintaining his innocence. I don't believe he chose to stay in jail in order to get money from a law suit. I don't recall corresponding with him as to whether he chose to stay in jail to get money from a lawsuit as opposed to being released on time served.

232.     *Reading from Exhibit 11:* "No, I have not received anything from your lawyers." I don't recall ever receiving anything from his attorneys while he was in prison.

31

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

235.   I don't recall ever talking with my father about any depression he may have suffered before, during or after his incarceration. *Reference is made to Exhibit 13.*

238.   *Reference is made to Exhibit 15.* This is a letter I wrote to my father 8/7/07.

239.   *Reading from Exhibit 15:* "My mother has told me she tricked and lied to you about me and hauled ass to VA before I was 8 months old. Her favorite thing to tell me when I was growing up was that my father was either dead or in jail and that she was fine with that. I can't blame you totally for not finding someone that you didn't know where or who they would be."

240.   My mother told my father that she had twins and one of them died. He didn't know whether to believe she had any child, surviving or not.

241.   Since we were gone from the city shortly after my birth, there was no way to track her down or any of her friends to see if that was the case. Her best friend was Donna Gramont. They were no longer friends as a result of the interactions between my father and them. I don't know whether Dawn was aware that my mother was pregnant with me. *Reference is made to Exhibit 16.*

242.   This is a letter to my father 4/11/08. *Reading from Exhibit 16:* "I do really hope everything goes well and your innocence is proven.

243.   I totally understand that there is stuff you have to keep to aid yourself. No, I do not have a copy of the photo. I can totally understand you being scared. A lot of things have changed so much. But we will cross that when it comes and I'll be here to help with the adjustment if you would like. I will not say anything to Donna or Sam." By that point, Donna no longer cared about him and Samantha had decided she no longer liked him. I couldn't tell you why.

244.   My father didn't ask me to keep any other secrets related to his correspondence with me. I believe he directed me not to talk with Donna or Sam regarding dealings with his innocence.

248.   I don't remember my father ever being upset with me in correspondence or phone calls or visits.

Exhibit 1. 11/3/99. Correspondence from Sarah to Kluppelberg.

6626.   Hello, this is one of your daughters. My name is Sarah. You may be wondering why I am writing you now after almost 15 years. My aunt called Chicago to find out where you were. I live in VA with my grandmother and aunt. My mom doesn't know I am writing

32

Cavanaugh 191

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

DATE OF RECORD REVIEW:      August 26, 2015
C&A DICTATION NUMBER:      3073
BRIEF CITATION:      Kluppelberg v. Burge

you. It is weird to know that I might actually get a chance to know my father. That is if you want to get to know me.

Exhibit 2. 2/5/00. Correspondence from Sarah to Kluppelberg.

6620.      I've had to lock up all your letters so my mom won't read them because she's spending a month here.

Exhibit 3. 8/14/00. Correspondence from Sarah to Kluppelberg.

6673.      Thanks a lot for the stamped envelopes. The birth certificates came out fine. I just made up some birthdays.

Exhibit 4. 8/17/00. Correspondence from Sarah to Kluppelberg.

6642.      I'm glad you want to put your name on a birth certificate. My mom was almost 3 weeks late with me so the dates could be off but I have the feeling that you are my father. I am fine with you having it put on my birth certificate.

6644.      Do all the letters I send you get opened and read? I understand if they do. I'm just wondering.

Exhibit 5. 9/8/00. Correspondence from Sarah to Kluppelberg.

6666.      Donna can't get my birth certificate, only my grandma can.

Exhibit 6. 10/19/00. Correspondence from Sarah to Kluppelberg.

6675.

REDACTED

Exhibit 7. 3/8/01. Correspondence from Sarah to Kluppelberg.

6659.      The reason I was upset with you had nothing to do with the lawyer. My aunt told me you had written her a letter telling her everything about what I told you about Todd and my plans.

Exhibit 8. 6/30/05. Correspondence from Sarah to Kluppelberg.

33

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

6610.  As you know, I am now married. It was a wonderful ceremony. My dad walked me down the aisle and cried before we even got to the end of it. My mother was there but I sometimes think she didn't want to be.

Exhibit 9. 8/3/09. Correspondence from Sarah to Kluppelberg.

6881.  I am very happy to hear that things are still moving forward in your case and I do hope that they are resolved soon. I totally understand you being worried about being in the world after so long. All I can say is I am here for you and anything I can do to help I am more than willing to do. As for where to go, I really can't answer that. You will have to look at all your options. See who all is left in Chicago for you or if you even want to be there. I would like you to be a part of my child's life.

6885.  Feel free to send me anything you want me to read, I will be more than happy to read it and help anyway I can.

6887.  I am sad to hear your health still has not improved. I do hope it is not serious.

6893.  Money is very tight right now so I won't be able to mail this until we get some extra money.

Exhibit 10. 8/19/09. Correspondence from Sarah to Kluppelberg.

6934.  So far this pregnancy has been hell!

6935.  Yesterday we had an US done and I'm going to copy one and send it with this letter.

6937.  I did read all that you sent from the lawyers. I saw they are very proud of the money settlements. I hope for your sake that when you get out and if you do receive a settlement, I worry about the people who have written you off will come back and act like they do care and have cared, but they haven't and I know you will be so happy to have friends and family around it won't seem like it at the time but they will be using you. Any and all money that you get should be yours. So that you can make a life for yourself.

6939.  There is no reason I wouldn't want you to be in my child's life. My mother is psycho so the baby won't have a grandmother from her.

6947.  I have taken the time to read all of the legal documents. You definitely have a better chance this time and I don't see any reason you should not have a new trial or just be released. As for your first lawyer, he was a dumbass who should not be allowed to practice law. I really hope the lawyers you have now are able to undo the mess he let accrue. The prosecutor just wants guilty and will do anything to get it.

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

6949.    It is up to the defense to make sure to do all the humanly can for their clients.

   Exhibit 11.  12/12/09.  Correspondence from Sarah to Kluppelberg.

6867.    I'm happy to hear that my letters brightened up your day.  Some of the court filings do become a bit confusing but I guess they want them to be difficult.

6868.    You being able to attend REDACTED 2nd birthday would be beautiful.  I hope your sleeping has improved with the last week.  And you have adjusted.

6873.    If you can get a number and person for us to contact, Timmy, my aunt or I will gladly call you.  I totally understand about you finding out a month later after it happens because of mail.

6874.    I will read all I am sent from you and your lawyers.  All I know is people have very simple motives, what can I get from someone without having to work for it.  I don't know about Jimmy but that is how Sam is.  I totally understand you wanting to help out your brother.  Just asking, the number you wrote is 190,000 not supposed to be $190.  If it is the larger of the two with the right planning and budgeting you can make that last until you find a job and get on your feet.  As for the civil suit I think that you are entitled to something for being wrongfully convicted. And your lawyers know how to calculate how much you should get.

6875.    As for the "time served question," do you want to have fought all this time to give them the satisfaction of being able to label you guilty that way.  That is a decision you have to come to on your end.  All I can say is you are my father, the only one I'm going to have, so it does not matter to me one way or the other.

6879.    No, I have not received anything from your lawyers.

   Exhibit 12.  1/20/07.  Correspondence from Sarah to Kluppelberg.

6737.    Sorry about not writing.  I've been a little depressed.  I've moved again.  Ed and I have broken up.  I moved in with my mom.  I've been depressed on and off since Sept.

6738.    REDACTED

   Exhibit 13.  3/15/07.  Correspondence from Sarah to Kluppelberg.

6846.    You have hopefully got my last letter and pictures.

35

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

---

DATE OF RECORD REVIEW:      August 26, 2015
C&A DICTATION NUMBER:       3073
BRIEF CITATION:             Kluppelberg v. Burge

---

6847.  Is there anything you regret from your life?

Exhibit 14. 5/5/07. Correspondence from Sarah to Kluppelberg.

6959.  The hard part about keeping up with letters, I'm never sure of how long it takes you to get a letter from me. I hope your retreat gets rescheduled soon, I know you were looking forward to it.

Exhibit 15. 8/7/07. Correspondence from Sarah to Kluppelberg.

6753.  I'm very happy to read about the University and as I've said before I would like to be kept up with your case. I do not blame you with everything of not being there for me growing up. My mother has told me she tricked and lied to you about me and she hauled ass to VA before I was 8 months old. Her favorite thing to tell me when I was growing up was that my father was either dead or in jail and that she was fine with that. I can't blame you totally for not finding someone that you didn't know where or who they would be. So please don't blame yourself.

6758.  I'm happy to hear you got a visit from the student people. I do hope they help you. I have no problem talking with them if they wish to speak with me.

Exhibit 16. 4/11/08. Correspondence from Sarah to Kluppelberg.

6899.  Amazing how it can take weeks for you to get letters for me but from you 4 days.

6901.  I am so happy about the lawyer. I hope everything goes well and your innocence is proven. I don't know what help I could be but I'm here if you need it. I totally understand that there is stuff you have to keep to aid yourself. I hope it all works out for you in the end. No I do not have a copy of the photo. I can totally understand you being scared, a lot of things have changed so much. But we will cross that when it comes and I'll be here to help with the adjustment if you would like. And I will not say anything to Donna or Sam.

6913.  Yes, I would like a copy of what the lawyers send you. I will read any and all papers you send me. I appreciate being kept up to date on what your lawyers are doing.

6930.  I did receive your last letter with Duane's testimony. I am so happy for you. I do hope justice will prevail.

Cavanaugh 195

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

## 5. Deposition of Michael Duffin, 5/20/14.

8.      I retired from the CPD, Area 4 violent crimes, in 4/01.

51.     When I was interviewing witnesses when I was an Area 3 detective I would take notes both during my interview and after.

52.     I would prepare a supplementary report if anything evidentiary area was determined.

71.     I rarely worked on cases with bomb and arson.

72.     They would do the investigation of the arson and if they determined somebody was killed, then the investigation would be turned over to homicide. I don't think that there were circumstances where bomb and arson would continue to investigate while Area 3 Violent Crimes was also investigating.

74.     I didn't ever work with Rolston. I never spoke with him.

75.     I don't know John Schmitz. I don't remember ever working with Larry Tuider.

79.     Kluppelberg was charged with arson and I had contact with him in the past prior to him being charged, something to do with fire. You have a supplementary report that Ptak and I submitted saying we drove him downtown, that we had met him sometime before at the scene of a fire. I knew Kluppelberg from before that time, but I don't know where. I do recall it has something to do with fires. I saw him at the scene of a fire, it was around 1983.

80.     He came up to our car and was talking to us on a friendly basis and we asked what he was doing there. He said he had a board-up service. He had a fire radio showing where fires were so he was there to board up the place, I guess.

81.     I interacted with him at a west side fire around 1983, and before that another time, which I can't remember.

82.     It seemed like back then every time I seen Kluppelberg it involved a fire. I don't know anything about the Hermitage fire.

85.     Assuming I prepared a police report documenting what a homicide suspect said about his possible responsibility for other homicides, I was expected to have a copy of my report placed in the files associated with those other homicides.

37

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

DATE OF RECORD REVIEW:     August 26, 2015
C&A DICTATION NUMBER:      3073
BRIEF CITATION:            Kluppelberg v. Burge

87.    I don't remember if there was a requirement in place in the department to make sure that information got coordinated.

93.    A street file was a file used prior to 1983 that would be transferred from shift to shift.

95.    After 1983 it didn't exist.

97.    After that all the notes would be on general progress reports in the file.

98.    Prior to 1983 the notes would be reduced to reports and then discarded.

117.   I didn't do any work on the Hermitage fire investigation.

120.   *Reference is made to Exhibit 1.* This is Griffin, not Duffin.

121.   *Reference is made to Exhibit 2.*

122.   My partner signed my name to this report with my permission. The person we were driving was Kluppelberg.

123.   I don't know if there is any other document that relates to any work I did on the homicide investigation at 4448 S. Hermitage other than this.

124.   It says here that the sergeant told us to take Kluppelberg downtown. I don't remember where we picked him up.

125.   The report was submitted 1/29/88. I don't know the date that we drove him.

126.   I don't remember if he was under arrest when we transported him.

127.   I don't have any memory of the car ride. *Reading from Exhibit 2:* "While en route to 1121 S. State, r/d recalled working on the homicide Kulikowski which occurred 12/12/82."

128.   I don't even remember driving Kluppelberg, so I don't recall what was said.

129.   I don't remember anything about the Kulikowski homicide.

130.   *Reading from Exhibit 2:* "Further that in the month of 4/83 while the reporting officers were working 3rd watch, in the area of Madison and Ashland we were stopped in traffic because of a large fire."

38

**Cavanaugh 197**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

131.    I remember an incident in 4/83 in which Kluppelberg stopped me in traffic. I remember this incident and I remember him from some other incident. I don't remember what it was. When I'm saying I remember him from this incident, I'm referring to the fire at Madison and Ashland.

132.    I remember he was kind of a friendly guy.

133.    When I found out that he was charged with the Hermitage fire, I was surprised. I don't know why.

136.    I don't know what the point was of putting information about the Kulikowski murder or the Madison and Ashland fire into a police report regarding the Hermitage fire. My partner did the report.

138.    Regarding what I remember about the Madison and Ashland fire, this report says we looked at his car for radio but couldn't find one. I thought I remembered him having a radio. I think he had some kind of truck, like a board-up truck.

139.    It says here he showed us a radio and a Realistic handheld scanner. It's a radio that could get fire department calls. According to this he said he was working for a lawyer as an ambulance chaser.

140.    I can't think of any reason we would have inspected his truck.

141.    I remember being surprised because he was at the scene of another fire. I don't remember where I knew him before but as I recall it had something to do with fire. I knew that he lived in the area of 47th and Ashland.

142.    There were multiple fires in that geographic area over a 2 or 3 year time period. We worked in that area and every night it seemed like there was a fire there. I don't remember if I believed Kluppelberg had anything to do with any of those fires.

Exhibit 1.  *This document was identified as unrelated to the case.*

Exhibit 2.  1/29/88. Supplementary report by Ptak and Duffin.

583.    R/d were assigned to transport Kluppelberg to 1121 S. State. While en route r/d recalled working on the homicide Kulikowski which occurred 12/12/82. During this investigation Kluppelberg had been charged with murder. Further that in 4/83 while reporting officers were working 3rd watch in the area of Madison and Ashland we were stopped in traffic because of a large fire. At this time Kluppelberg approached our vehicle and asked, "Do you remember me?" R/d immediately recognized him because of the previous murder

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

investigation and asked what he was doing there. He replied that he was working for a board-up service.

584.   We told him this is not what we meant, and asked why he was not in jail. He replied he was out on bond. The fire had just started and he was asked how he got there so fast and replied he had a radio in his truck. A brief inspection of the truck revealed no such radio. He then showed us a Realistic handheld scanner. He stated he was hustling for the board-up service and also working for a lawyer getting him personal injury cases.

Cavanaugh 199