*Kluppelberg v. Burge, et al.*
Case No. 13 CV 3963
Our File No. 13-3050

# DEFENDANTS' RESPONSE TO PLAINTIFF'S MIL NO. 40 EXHIBIT A-4 (REDACTED)

# Replacing Dkt. 500-6

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

**6. Deposition of Duane Glassco, 7/18/14.**

8.      I'm in prison.

9.      What crime I'm convicted of is none of your business. How long my sentence is is none of your business.

11.      Regarding that as a result of my testimony Kluppelberg spent more than 2 decades in prison, that's where he should have been. Regarding testifying that I witnessed him committing an arson, I don't remember. It's been 30 years. I've been using drugs ever since I've been 9 yo. I don't remember anything about the nature of what I testified to at his trial. I don't remember the crime he was accused of. I don't remember interacting with police before I testified.

12.      I don't remember speaking to attorneys for Kluppelberg in 2008. I don't remember if I told them that what I testified to at his trial was false. I don't remember telling them that what I testified was what the police told me to say. *Reference is made to Exhibit 1, affidavit signed by Glassco 5/12/08.* I don't recognize this.

13.      Regarding if I truthfully related information to attorney Horn in 5/08, I wasn't honest, no.

14.      I don't remember if I told Horn at this meeting that I hadn't seen Kluppelberg go into the building on Hermitage on the date of this fire. I don't remember if I told her that from the window in the attic you can't even see the door to the building. I was high that day from PCP, cocaine, drinking.

15.      I was partying that night. I don't remember who was there. Michelle Brittain. I couldn't tell you if Dawn was there. I was in the attic. Regarding how much alcohol I consumed, from the time I was 10 yo I've consumed so much alcohol in one day, I don't even keep track.

16.      Most likely I was also using cocaine. I told you I was consuming PCP that day. It doesn't cause me to hallucinate. I see and hear things a lot better. It improves my perception.

17.      Tic is PCP. These are drugs I regularly consumed at the time. I can't remember if I saw Kluppelberg from the window that night. I didn't come to understand that Kluppelberg's attorneys were coming to ask me the truth about what I testified to in court.

18.      I don't care about Kluppelberg. He comes near my family, comes near me, we got a problem. He's tried killing me 3 times. I don't trust the man. Leave me out of it. I don't remember if I testified at his trial. I don't remember if I testified truthfully.

41

**Cavanaugh 200**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

19.  I haven't ever lied under oath. I don't remember if I lied when I created the affidavit with Horn.

20.  *Reading from Exhibit 1:* "I only did the testimony that I did so I could get a deal on my cases. I got a deal on my burglary charge and on my violation of probation."

21.  I wrote my signature on there because I was sitting there talking to them. I wanted to get out of my cube for a while. Regarding if I took seriously the affirmation under penalty of oath, to be honest, I don't really care.

22.  I've had a chance to read it. Not all of it is truthful. Some of it is.

23.  I signed this statement to get Kluppelberg out of jail because he wrote me a letter when I was CCJ in 2001 and asked me to please help him get out of prison because he's done enough time for something he didn't do. I don't really care. The man deserves to be there because he did do it so I figured after as long as he did for his crime I'd help him out. There's the truth. Regarding if there's anything in Exhibit 1, p.2, that's not true, I couldn't tell the truth if it was or not. Regarding any paragraphs that are untrue, I didn't get no deal. I still went to prison. The police came to me while I was going to court. They didn't offer me nothing. They didn't promise me nothing.

24.  The prosecutors never talked to me about nothing. The prosecutors didn't take into consideration the fact that I was cooperating when they decided my sentence, because I still went to prison.

25.  As a result of my cooperation against Kluppelberg I didn't get any benefit at all. *Reference is made to Exhibit 2, transcript of Glassco's testimony at Kluppelberg's trial.*

26.  I see discussion of my being convicted in 11/87 of burglary and theft. On 7/24/87 I was convicted of a different burglary. Another on 8/3/84.

27.  I had a case pending for violation of probation. I don't remember if I entered into a deal with the state's attorney before I testified against Kluppelberg. It says I did.

28.  Just because I made a deal with the prosecutor doesn't mean I made a deal with him about Kluppelberg. I testified against Kluppelberg because I wanted to. I couldn't tell you if I made a deal with the prosecutor that I would get time served on my burglary.

29.  *Reading from Exhibit 2:* "Is it your understanding that the agreement was as follows: That in exchange for your truthful testimony against Kluppelberg an ASA would recommend to Judge Urso that on your petition for violation of probation the state's attorney's office would recommend 3 years considered time served?" Your answer was yes.

42

**Cavanaugh 201**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

30.  I couldn't tell you if it's true that when I agreed to testify that Kluppelberg was the arsonist they gave me a deal for time served.

31.  Kluppelberg tried killing me 3 times, so, yeah, I had a problem with him. We were road dogs. We did burglaries together.

36.  At some point before the fire Kluppelberg started dating Dawn. That didn't piss me off, I was dating Michelle.

39.  Regarding if there's any reason I would not have told the police the first time I talked to them that I saw Kluppelberg commit the fire, would you turn around and go to the police knowing the man tried killing you 3 times and he's living with your kids?

40.  I'll tell you one instance only. I commented on something that was at his sister's and brother-in-law's house that night. We left there. He took me to 25th and California in the projects and left me in the car and sent 3 guys after me. Donna and Bee pulled up behind the car and told me to get in their car and wouldn't tell me why. Then James came out of nowhere, got in the car, we left. James purposely smashed the car into a light pole going 65 MPH. When we got back to Donna and Bee's house Bee told me that James was setting me up to be killed that night and tried to kill me in the car.

41.  That's twice in one night he tried to kill me. I know that he sent 3 guys after me because Bee and Donna overheard the conversation. The 3 guys didn't come after me because Bee and Donna got there before they got there. Regarding who the 3 guys were, Disciples, that's all I know. Regarding why they couldn't come and get me somewhere else, it was set up for me to be hit in the projects.

42.  I viewed the car accident as an attempt to kill me. It wasn't an attempt to kill himself because he had his seatbelt on. He put it on just before the car smashed into the light pole. Donna and her boyfriend told me that Kluppelberg sent guys after me.

43.  That was way before I testified against Kluppelberg. Regarding if I was afraid he would harm me if I testified against him, at first. He even threatened me in CCJ. Maybe I went ahead and testified against him because I wanted to. I was afraid of him but I had backup after that. I didn't have to worry about it. I was in CCJ. I had backup, trust me.

44.  Just like he's affiliated, I'm affiliated. I'm a gangbanger out of Chicago. Regarding that the affidavit says some of the testimony I gave in Kluppelberg's case was not true, that is not a truthful statement.

45.  I didn't get no deal. Regarding that I testified at Kluppelberg's trial that I got a deal, to me, yeah, it was a deal, but I didn't get no deal if you really look at it. I still went to prison. I didn't get time served.

43

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

46. The police didn't really tell me what to say. They just ask questions like you're asking and kept drilling me like you're drilling me until I say, I'm going to tell you what you want to hear just to get you off my ass, like I'm doing right now. I'm telling these people what they want to hear so they leave me alone and quit bothering me in prison. Every time you people come to me you put my life in jeopardy because people think I'm a snitch. I wish you people would leave me alone.

48. I told you the reason I made this affidavit. One was because I felt Kluppelberg done enough time in prison. Two, because she kept coming up there bothering me. So that's the reason I made this affidavit to get you people off my back once and for all. I figured once he got out of prison you would leave me alone but no, I get out of prison I got you guys knocking at my door again.

50. I don't remember the window in the attic.

53. *Reference is made to Exhibit 4, aerial photograph.* Nobody ever showed these photos to me.

54. From the attic window in Donna's house I would not agree that you cannot see the door into the apartment that burned. I can't tell if the building at 4450 blocks the view.

55. I told police that I saw Kluppelberg going back and forth in the yard. From this picture I would have been able to see him going into the yard.

56. I don't know if from this picture you would not have been able to see the door at 4448. I don't remember anything about that from that night. I don't remember what I told the police.

57. I don't remember anything from that day. I might have told police I saw him going into the yard.

63. *Reference is made to Exhibit 6, CCSAO investigative report, 9/23/10.*

64. It says, Glassco agreed to be interviewed at a later date but only because a condition of his parole demanded that he cooperate with law enforcement.

65. *Reference is made to Exhibit 7.* When the state's attorneys came back to visit me at the parole office they asked me to go back on the affidavit I had given to Horn.

66. I agreed to undo it. The only reason was to stop you people from bothering me. When the state's attorneys asked me to reverse my testimony again I agreed to because I told them the truth to the best of my knowledge. Regarding that I didn't even remember what happened, like I said, to the best of my knowledge.

44

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

67.     Regarding that I told Horn that I didn't actually see Kluppelberg commit a crime, no. I talked to Horn to get her off my ass. So when the prosecutors come I did the same to them.

70.     Regarding if I ever spoke to Kluppelberg after I testified against him, in CCJ when he threatened me. I was in CCJ when I testified against him.

71.     They gave me time served but I still went to prison. They never made a deal.

72.     I haven't ever testified untruthfully at a proceeding. I haven't ever signed a false affidavit that I can remember. Regarding if when I created the affidavit with Horn stating that I had testified untruthfully at Kluppelberg's trial, if that was the truth, let me explain this to you for a 3rd time. I signed it to keep these people from fucking with me because every time these guys come appear I got to deal with this shit on the yard. I'm tired of my life being put in jeopardy because of you idiots.

73.     I don't have any regrets for putting Kluppelberg in prison.

74.     I signed the affidavit for the prosecutors because my parole officer told me I had to talk to them. Regarding why I signed the affidavit reversing my testimony again, I did this shit to keep you people away from me. I didn't tell police in 1987 that I didn't actually see anything.

81.     Regarding that I don't remember seeing Kluppelberg commit an arson, I don't remember shit. I don't remember him confessing to me. I don't remember none of it.

82.     Regarding if that's true, why I signed an affidavit for the state's attorney saying that I did in 2010, I did it to get you people off my back. Regarding if I did that in 2010 even though I didn't really remember the truth about what happened, I'm saying I don't remember anything now.

84.     If it wasn't true what Kluppelberg did I wouldn't got up on the stand and said he did it, because much as I didn't like him I'm not going to send somebody to prison that don't deserve to be there because I know what it's like to be in there. 2001 I get a letter from him saying, I want to go home, be with my daughter and this and that. He's like will you help me. You're the one that put me in here, you're the only one that can help me get out. My kids are his son's brothers, so my kids come to me and say, let Jimmy have his dad. They kept bugging me. So I turned around and I said, after 20 some years maybe the man has changed, I'm going to help him out.

85.     You can't get me for perjury because the statute of limitations was up after 20 some years so I'm going to help him out hoping the man changed but I see he's just the greedy bastard that he's always been. When I testified it wasn't because of any coercion by

45

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

police. Regarding that they didn't threaten me to testify, I was already in jail, what more could they do to me?

86.  Regarding if any police officers told me what I should say when I testified, they don't really tell you what you should say, but the same way he's asking the questions, 9 times out of 10 you just turn around and say, okay, this, this, this, and this. So some people say, well, he told you what to say. No, he didn't. I already knew it. It's just I didn't want to remember it because I know how Kluppelberg is. I'm in CCJ, he's in CCJ. It ain't like you can't get a hold of somebody. There is no such thing as protective custody, especially in CCJ. Everything I testified to at that time was things I knew or believed to be true at that time even if I can't remember them today.

87.  Regarding when Kluppelberg threatened me in jail, I was in the bullpen and he was coming back from court. He saw me and said, bitch, you're a dead motherfucker. That was before I testified because he found out that I was going to be witness against him. That was the only time I saw him in CCJ. I haven't seen him since.

88.  My son was going out with one of Bonnie Kluppelberg's relatives and Kluppelberg sent her and my son a letter and they forwarded it to me. It's when I was in CCJ in 2001. That's when he wrote me the letter. That was the only time I've had contact with him. I didn't have contact with his lawyer until 2008. When I was first contacted by his lawyer I was sitting in St. Louis. They called me out in the yard and said I had an attorney visit.

89.  She said, I'm here for Kluppelberg. I said goodbye and they told me I had to talk to her.

90.  That was Horn.

92.  She wrote out this and you got to go through a page by page and I finally said, I'm tired of this shit. I'm going to do you a favor and get Kluppelberg out of prison. She said, how are you going to do that, and I told her exactly what I said in that. I told her, I'm going to sign this shit to get you people off my back because I'm tired of going back to the yard and getting harassed. She's like, just sign the affidavit and we're done.

93.  She went and typed it up and came back about 2 hours later and left and then a couple days later came back with the other one. We got to make adjustments on this, this. I told her, don't ever come back again. She goes, I promise I won't.

I went home in 2010 and as soon as I get home the very next day I got the prosecutors at my door.

94.  The 2nd time the changes that were made dealt with my testimony about statements Kluppelberg made to me. Regarding if I told her whether that was truthful or untruthful, I just told her what she wanted to hear to get her off my back.

46

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

95.      I told the state's attorneys exactly what I'm telling you. I did that affidavit to get Kluppelberg out to get these fuckers off my back.

96.      Then I got Horn running her mouth in front of inmates and officers, putting my life in jeopardy, so, to get you off my back, I'll take the penalty for perjury because it's better than fighting here.

102.      Regarding that the handwriting next to #2 on Exhibit 7 says I told them this to keep them from bothering me in prison, I told him that.

103.      Regarding paragraph #4, some of the testimony I gave in Kluppelberg's case was not true. In particular I did see him go back and forth from Dawn's house to Hermitage the night of the fire. I didn't see anything about how the fire was started. I was getting high with Michelle and Donnie.

104.      The handwriting says she, and in parenthesis, Gayle, twisted my words on everything else. Regarding if that's something I told the investigator from the state's attorney's office, they twisted a lot of my words. Some of the shit I told them she just turned around and twisted and I just signed. I just wanted them out of there. Like I told Gayle, I'm doing this because I feel Kluppelberg has done enough time in prison.

105.      After 20 years the man deserves to go home to his family.

107.      Regarding #5 on Exhibit 7, I saw James carrying newspapers on the sidewalk to the house, yes. He came back without any papers. When the fire started I assumed he left the papers in the house. That's something I told the investigator and it was truthful.

108.      Me and Kluppelberg were looking out that porthole in the attic and I turned around and asked him why he started the fire and he told me shut my fucking mouth or he'll end up killing me. That's what I told the investigator and I initialed indicating it was truthful.

109.      I did not get a deal in exchange for my testimony. The prosecutor told me he could not make a guarantee, it was up to the judge. That's what I told the investigator and the state's attorney when they came to see me. It's accurate that the police and prosecutor did not tell me what to say.

110.      Regarding #10, this is not accurate. I didn't get anything. That's next to the typewritten statement that says I did what I did to get out.

111.      Exhibit 4 I wrote on explaining the porthole that me and Kluppelberg were standing at in Dawn's house when he threatened me. *Reference is made to Exhibit 10.* Nobody showed me a photograph.

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

112. They were sitting on the prosecutor's desk when the investigator came in.

113. I put an X on the photograph where the window existed at the time. It isn't the window I was talking about standing next to when I had the conversation with Kluppelberg. This was the window I was looking out when I observed Kluppelberg go to the house that burned down.

114. That's where I observed Kluppelberg going back and forth in the house to the alley.

115. He didn't come back to the house until after the fire started. I don't even remember him leaving the house because I was upstairs. When I noticed he was gone I went downstairs and asked Dawn where he was and she says he went out, so I figured he was doing his thing. We're burglars.

116. I went back upstairs. We were standing by the window smoking a joint. Me and Michelle observed Kluppelberg outside, that's when he was walking back and forth between the house and the alley. I'm talking about the house that got burned. I can't remember if he was carrying anything.

117. It's fair to say I remembered more details in 1986.

118. The best of my memory of the whole thing is I don't want to remember anything. He's lucky he's out of prison because I could have left his ass in there.

119. Give Kluppelberg a couple hundred thousand dollars, let him live his life because he's a murdering, greedy prick.

120. I don't remember everything and if I don't remember I'm going to tell you I don't remember. I don't remember seeing Kluppelberg actually going in the door to the building that burned. I remember him saying words to the effect that he committed this crime. I don't remember if I told police that.

121. When I was talking to Horn I didn't tell her the truth. Regarding Exhibit 7, paragraph #4 says, some of the testimony I gave was not true. I didn't see him going back and forth and I didn't see anything about how the fire started.

I wrote under there for the state's attorneys, she twisted my words. What I mean is I didn't tell her that. I signed it. I told you the reason. I told her whatever you got to say, say.

122. She did twist my words because she asked me questions, I gave her answers so I told her write whatever you want, so she twisted it. I said nothing like that that I can remember.

48

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

124.  I told her what she wanted to hear so she would leave me alone. I didn't exactly tell her the words. I guess words to the effect of what she wanted to hear.

125.  Regarding if that's what happened with the state's attorneys, too, no, because I stood there when he wrote it down and signed it after he wrote it. I read it and initialed it. I wasn't telling the state's attorneys what they wanted to hear so they would leave me alone. I wasn't in prison at the time. When I was talking to the police in jail I wasn't telling them what they wanted to hear so they leave me alone because when I talked to them it was behind the judge's chambers. Everybody thought I was in court. Nobody knew I was talking to a cop.

126.  Regarding if I knew what they wanted me to say, I didn't even know what they wanted when they came and talked to me, so why are you twisting my words?

129.  Regarding that in this deposition I said at various times I have no memory of it and said I have some memory of it, regarding which is the truth, I have some memory but not all memory. I remember seeing Kluppelberg going toward the house that night. Regarding if I could see him going into the door, I don't remember.

130.  I can't remember if I testified at Kluppelberg's trial that I saw him go in a door that would have been physically impossible for me to see.

131.  The police told me they'd talk to the prosecutor and judge and let them know that I was cooperating with them on another investigation. I don't remember which officer told me that.

132.  I first told the police something to the effect of I'm not going to tell you shit. They didn't keep bothering me trying to get me to say that Kluppelberg was guilty. I went back to the police after I thought about it.

133.  I had somebody call them for me. Regarding if I had in mind that maybe I could get a deal, I thought maybe. After I passed on the message I wanted to disclose information to the police, they waited for my next court date and came and saw me. Regarding if that's when I told them that Kluppelberg had confessed to me and that I had seen him, I didn't give them all the information at one time.

134.  I'm not stupid. I tried playing my cards to get a deal and it didn't work. I still went to prison.

135.  Regarding if the gist of Kluppelberg's letter was he was asking me to tell the truth, he asked me to help him get out. He didn't say shit about telling the truth. *Reference is made to Exhibit 11.* I don't know where this letter came from. Regarding if it's from Kluppelberg to me, I had a handwritten letter, not a typed letter.

49

Cavanaugh 208

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

Exhibit 1.  Affidavit of Duane Glassco.  *Summarized in 8/13/15 record review, Section #16.*

Exhibit 2.  Testimony of Duane Glassco.  *Summarized in 8/21/15 record review, Section #16.*

Exhibit 3.  Copy of aerial photograph.

Exhibit 4.  Copy of aerial photograph.

Exhibit 5.  6/18/10.  CCSAO Investigative Report.  *Summarized in 8/25/15 record review, Section #7.*

Exhibit 6.  9/2/10.  CCSAO Investigative Report.  *Summarized in 8/25/15 record review, Section #7.*

Exhibit 7.  5/17/08.  Affidavit of Duane Glassco.  *This copy has handwritten notes on it that were initialed by Glassco.*

7158.   2.  No threats or promises have been made to me.  *Note: I told them this to keep them from coming and bothering me in prison.*

4.  Some of the testimony I gave was not true.  In particular I didn't see Jim go back and forth from Dawn's house to 4448 S. Hermitage on the night of the fire.  I didn't see anything about how the fire got started.  I was getting high with Michelle and Donnie.  *Note: I was getting high with Donnie and Michelle.  She (Gayle) twisted my words on everything else.*

5.  In addition, you couldn't see from the attic window to the backyard or back door of 4448 S. Hermitage because i there t was a building in the way.  *Note: You can see from the attic window to the backyard at 4448.  I saw James carrying paper on the sidewalk to the house.  He came back without the paper.  When the fire started, I assumed James left the papers in the house.*

6.  Kluppelberg never said anything to me about having set the fire.  He never told me to shut my mouth or else, never told me, "You know how I am when I feel like I'm losing someone, I do stupid things."  *Note: I asked if he started the fire.  He told me not to worry about what he did.  He told me if I said anything, "you know what would happen," meaning he would kill me.*

7.  I only gave the testimony I did so I could get a deal on my cases.  I got a deal on my charges.  *Note: I did not get a deal in exchange for my testimony.  The prosecutor told me he could not make a guarantee.  It was up to Judge Urso.*

50

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

8. Before I give my testimony I met with police and prosecutors. They told me what I needed to say. *Note: The police and prosecutors did not tell me what to say.*

10. I did what I had to do to get out. *Note: This is not accurate. I didn't get anything. I went to prison.*

Exhibit 8. Supplementary Report by Rolston and Schmitz. *Summarized in 8/25/15 record review, Section #6.*

Exhibit 9. 5/20/10. Correspondence from Gayle Horn to Glassco.

5899. Kluppelberg has been granted an evidentiary hearing on the claims in his post-conviction petition. We anticipate calling you as a witness. I am enclosing a copy of the affidavit you signed that was attached as an exhibit to Kluppelberg's post-conviction petition.

Exhibit 10. Photograph of an unidentified house.

Exhibit 11. Undated Correspondence from Kluppelberg to Glassco.

6403. I really do not know what to say. There is a lot that has happened in the last 14+ years. I know you took the stand out of fear at what they would have done to you, the state that is, and to be honest for a number of years I was quite upset with you for what you did. But then I grew older and saw how rough it must have been for you, I mean the night that they picked me up they beat me for hours. So I do understand. What I'm trying to say is I do not hold any hard feeling for what they made you do. I know why you said what you said and even though it was not true I still understand. I'm asking you for the sake of my family and my life, for what is left of it, that you please consider coming forward and telling the truth about how they forced you to say what you said. We both know that you did not see the back of that house that night, that the other buildings were in the way. I know what I am asking is a scary thing on your part but they can no longer hurt you. I know they can no longer have anything to hold over your head like before. I know that if jail was a fear of yours and now they can no longer hurt you in any way. I pray that you are willing to come forward to clear this up. They can do nothing, the statute on perjury in IL is only 3 years and they knew that you were lying because they are the ones who told you what to say. I am begging you to do the right thing and pray that God puts the strength in you to stand up to the State and not let them continue to get away with what they did to me. I hope you consider giving me and my family my life back.

Cavanaugh 210

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

### 7. Deposition of Francis Huber, 4/29/15.

12.     I'm a private investigator.

15.     I worked for CCDOC 8/95-9/98 as a correctional officer.

42.     I believe it was SOP that an inmate saw a paramedic when he came into the jail.

44.     When an inmate c/o a medical problem you call the paramedic or let the Sgt. know.

58.     Division V, which I was located in, was the receiving division.

73.     I know Kluppelberg because he was an inmate at CCDOC.

74.     *Reference is made to Exhibit 1, transcript of deponent's testimony at Motion to Suppress Testimony hearing.*

75.     I don't know how many days elapsed from the time Kluppelberg was booked into the jail to the time I first saw him. At some point I had an interaction with him. He was being held in Division V.

76.     When I was making my morning count, I opened the door and he stated he needed to see me about something. I told him to see me after the count cleared. Once the count cleared, he knocked on my window.

84.     He explained to me that he was hurt and needed medical attention.

85.     He stated that he needed to see the paramedic because he had been beaten up by CPD. He lifted up his shirt and showed me bruises on his back, lower back, around the waist.

86.     I don't recall how big the bruises were, what color, how many, if it was more than one.

87.     It was both sides of his body, the lower L-hand and lower R-hand side of his back.

88.     He didn't show me any other bruises. I told him I would call the paramedic. He sat in the dayroom and waited for the paramedic.

89.     I didn't notice anything abnormal about his gait. There wasn't anything to indicate that he was in pain.

52

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

91.   I paged the paramedic to call my tier so I could let him know what was going on. That when he was making rounds to dispense medications in the morning, he needed to see a particular inmate. I don't recall whether Kluppelberg was brought to CCH.

92.   Kluppelberg was the dayroom most of the day. He didn't leave until the paramedic came, and then he sat there the whole day. I don't recall what time the paramedic came.

93.   I next saw him the next day that I worked the tier.

95.   At some point I spoke with Kluppelberg's criminal attorney about the conversation I had with him.

97.   After my interaction with Kluppelberg at the jail and prior to being subpoenaed by Weinberg, I only learned what Kluppelberg told me about the nature of the criminal charges pending against him.

98.   I talked with Weinberg in the hall before the motion to suppress hearing.

99.   The conversation lasted 3-5 seconds.

100.  Prior to that I hadn't learned any additional information about the allegations Kluppelberg had made against detectives at the CPD.

102.  During the initial interaction with Kluppelberg he didn't make any c/o other than the fact that he had sustained these bruises to his lower back.

115.  *Reference is made to Exhibit 3.*

116.  *Reading from Exhibit 3:* Hi, Mr. Lana. I sent you an email regarding Kluppelberg last night. I was one of his correctional officers when he was in CCDOC and instrumental in getting medical help for him at the time. If you could use any information I have to help clear his name, you can get in contact with me.

117.  This is not exactly what I said. I don't remember exactly what I said. I said that I testified for him at his first trial and wanted to know what had happened to him and if they needed any help in clearing his name, they should contact me.

118.  I felt compelled to contact Kluppelberg's attorney out of curiosity. I wanted to know what happened.

119.  I believe I said I was the first one to make sure he got medical attention.

53

**Cavanaugh 212**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

123.  I thought he should be exonerated because I didn't believe he did it. Regarding why, basically, the way Chicago PD was then.

124.  A lot of us heard that Chicago PD was good for beating a confession out of somebody. Regarding if I had any other reason to believe that Kluppelberg was not guilty of the arson murders, I didn't know of any other evidence other than the confession. I don't know what I would have meant by "too much inconsistencies."

125.  I asked if they needed me to testify on one of his trials on what I said at the first trial.

126.  I didn't receive a call back from Kluppelberg's attorney.

127.  *Reference is made to Exhibit 4.* This is an email I sent to Kluppelberg's attorney on 2/20/13.

129.  It's possible that Kluppelberg arrived at CCJ days before my first interaction with him.

130.  I wasn't asked to testify in any of the proceedings following his release from prison. *Reading from Exhibit 4:* "I would testify as to what I saw when he first arrived at CCJ as to his condition and who he stated gave him the beating."

131.  Other than what I've already testified to I don't have any reason to believe that Kluppelberg was not guilty or suffered a miscarriage of justice.

132.  To date, I have not spoken with Kluppelberg.

134.  I didn't receive a response from Mr. Leonard.

139.  [During the hearing in 11/88] you were asked: Question: Did he c/o any other injuries? Answer: Yes. He was urinating blood and basically just wasn't feeling good.

Exhibit 1. Report of Proceedings, Motion to Suppress Confession. *Summarized in 8/21/15 record review, Section #16.*

Exhibit 2. Drawing by deponent of the floor plan of Division V.

Exhibit 3. 2/19/13. Computer transcription of voicemail.

419.  Hi Mr. Lana. I was one of Kluppelberg's correctional officers when he was in CCDOC and was instrumental in getting medical help for something that happened [illegible]. If you could use any information I have to help him clear his name you can get in contact

Cavanaugh 213

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

with me.  I was hoping he was exonerated because I never felt [illegible] too much inconsistencies with it.

Exhibit 4.  2/20/13.  Email to Karl Leonard.

424.   I know Kluppelberg from CCDOC.  I was one of the correctional officers at the time of his incarceration.  I was the officer who got him medical attention when he first arrived due to being beat up by Chicago police.  I testified at his trial.  I would like to get in contact with him if possible and would testify as to what I saw when he first arrived at CCJ as to his condition and who he stated gave him the beating.  I never thought he was guilty of the charges and feel that it was a miscarriage of justice at the time.

Cavanaugh 214

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

**8. Deposition of Bonnie Kluppelberg Hileman, 5/14/15.**

13.  I was married to Kluppelberg 8/16/88 until 2001 or 2002. He was incarcerated when we got married and when we got divorced.

16.  My current relationship with him is distant. We last spoke last week on the phone. He's in FL on vacation.

19.  In 1986 I was working as a secretary for my father's construction company, Chicago Standard.

21.  I met Kluppelberg in 1986.

22.  Safer Foundation called and asked if we had any openings and we hired him. He was incarcerated at that point. He was in a work release program. He was hired as a carpenter.

24.  He worked for us 1986-88. He also worked for himself on the side.

25.  The day he was arrested he was working on frozen pipes in a basement in a bar where his mother lived. I was helping him. I'm very knowledgeable in plumbing and I do material runs.

26.  I developed a personal relationship with him after he started working for the company.

27.  It evolved into a romantic relationship about 6 months after he started. When I started dating him he said he didn't have any relationships with any other women at that point. I learned later he was in an ongoing relationship with Dawn Gramont.

29.  He told me he was at the Metro Community CC because of burglary.

30.  He told me that he actually did the burglary. He didn't ever tell me about other burglaries that he committed. We started living together immediately upon his release.

32.  His own business was construction. He operated it until 1/12/88.

33.  He started working for ELA Security around Christmas.

34.  He told me about some car fires that occurred on that job.

35.  He said that he saw someone running from the car. He believed it was a person that started the fire.

56

**Cavanaugh 215**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

39.     I was present when Kluppelberg was approached by detectives on 1/12/88. We were working in the basement on the frozen pipes. The police called and said they wanted him to come in. He told them he was working and he couldn't. They said, we can come and show you the pictures there. He said okay. They came. He came out of the basement. They proceeded to put handcuffs on him and put him in the car. I asked could I go. They said no. I said, I'm going to follow you. They left and had him for hours. I went to the police station. I waited and waited.

42.     There were two officers.

43.     I didn't hear what took place between the officers and Kluppelberg.

44.     I was standing there. They handcuffed him and put him in the backseat. I don't remember if they patted him down. I didn't see the officers physically abuse him in any way before putting him into the car. I didn't hear him say that he didn't want to go with them.

45.     At that point I thought he was under arrest. I had no idea what for. He didn't ever tell me he had started the car fires. I didn't ask if I could take him to the station myself. I followed the officers in my car.

46.     I didn't notice any injuries on Kluppelberg's body at any time prior to that day.

47.     The officers didn't tell me that he was under arrest. At 11th and State I waited in the lobby.

48.     I stayed there for hours. I don't know if I called any lawyers on Kluppelberg's behalf while I was at the police station.

49.     At some point I went home.

52.     I remember having a 3-way phone conversation with Kluppelberg and Weinberg. I don't know when.

53.     Kluppelberg said that they were charging him. I don't remember him saying that they were charging him with murder. I remember Weinberg saying it will be okay. That's all he said the whole time. Every conversation with that lawyer, he was going to come. Never did anything.

54.     At some point I learned that Kluppelberg was being charged with murder that was the result of a fire.

55.     I next saw Kluppelberg in bond court.

Cavanaugh 216

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

57. When I heard the charge I couldn't believe he did it. I hadn't ever known him to start any fires, only on accident. He was killing snakes in our back yard, there was a rock wall that was infested with them.

58. He was burning the rocks. He was upset during bond court.

59. They said something about he needed to go into the hospital. It must have been Weinberg.

60. That he had something on his back, swollen, his arms, his back from an incident. I think they actually showed things to the judge. And the judge said he had to go to the hospital.

61. But they never took him. After bond court I was allowed to see him once a week.

62. There were times I saw him more than once a week. I got to know the bailiff quite well. We had conjugal visits in the courtroom.

63. I don't remember ever telling the police that Kluppelberg told me that he liked to start fires. I told them that he had a sexual problem and likes to screw anything that walks.

64. He had a problem with cheating. There were times when he was living with me and I learned he had been sleeping with other women. One of them was Dawn.

65. I think the first visit I had with James was in a visiting room. I don't remember if I saw him at 11ᵗʰ and State. I seem to remember him being behind bars and talking to him.

66. I remember him telling me that Duane was lying. I knew who Duane was prior to Kluppelberg's arrest. He worked for me part time. And I know Dawn very well, he's the father of her first 3 kids.

67. I knew that Kluppelberg had a child with Dawn but didn't know they had an ongoing relationship.

68. I formed a close relationship with Dawn because I took care of her kid, James Jr. from the time I started living with Kluppelberg. He would come and stay with us. My understanding about Kluppelberg and Dawn's relationship during the time prior to Kluppelberg's arrest was just the mother of his child.

69. I didn't have a friendship with Duane.

70. Kluppelberg said he was there because Duane had lied. He said Duane told the police that he saw him enter the building and was carrying newspapers and started a fire. I don't know how Kluppelberg knew Duane had said these things to the police.

58

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

71. Regarding what happened the night of the fire, he said he and Dawn were fighting because Duane and Dawn and Michelle were doing drugs. He left and went for a walk because they were arguing. And came back. Then supposedly Duane said that he smelled like smoke.

73. Regarding the reason Duane would have for telling a lie to the police, he was being charged with forgery and to give testimony against Kluppelberg, he was going to get less charges. Kluppelberg didn't tell me how he knew that. He told me to talk to Duane, ask him what was going on, why he was doing that.

74. I don't remember talking to Duane. I was in love with Kluppelberg at that point. I believed he was innocent.

75. I went to the PD to get police reports the 1st week that he was locked up. I got the reports that said it was an accidental fire. I got any report that I could from prior to him being arrested because they were totally different from when he got arrested. They were fire department reports.

76. I provided a copy to Weinberg. The reports said no accelerant used.

77. There were times I would have conversations with Weinberg to give him information that might assist in Kluppelberg's defense.

79. Michelle Brittain contacted me and told me could I pay her and she wouldn't go to court. I said I'm not paying you for nothing. She told the state's attorney that I called her and offered her money not to go to court.

83. I learned whether it was possible for Duane to see what he claimed he saw the night of the fire through the public defenders after we fired Weinberg.

84. Regarding her grand jury testimony, Dawn said 2 police officers picked her up on the way to court. Told her that if she didn't say exactly what they wanted her to say, that when she got home her kids would be in the same condition as the kids that were in the fire. She went to the grand jury and said what they wanted her to say. When she came home, she called and said everything was a lie because she was threatened. She didn't tell me they had physically abused her.

85. I don't remember who she called but she did call and tell them everything was a lie.

88. I learned that Kluppelberg had been cheating on me with Dawn shortly after it happened. His mother set up the dates. She would call and say she needed him to come over so he could go out with Dawn. Sometime after Kluppelberg was locked up Dawn and I reconciled and became friends again.

59

**Cavanaugh 218**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

89.   She lived with me for 9 years. She was sick with cancer. She talked to me about Kluppelberg in those 9 years. She didn't want him to get out because she was afraid of him. I don't know why. I guess because when she went to court for that thing.

99.   *Reference is made to Exhibit 1.* I remember a conversation about this but I don't know about this letter.

100.   I did not bond [Duane] out. He asked me to bond him out and he would disappear. That he wouldn't testify against Kluppelberg. The handwriting in this Exhibit is probably Dawn's.

101.   The last name is spelled Greymont here. I don't know why Dawn would misspell her name. This statement is pretty much accurate. I don't remember signing this. I never took illicit drugs.

102.   *Reference is made to Exhibit 2.*

103.   It's dated 12/28/97. At the top it says James Kluppelberg and purports to be a letter to whom it may concern.

104.   I probably didn't prepare this document. I don't know why this document was typed out. Regarding faxing this to someone in 2/98, it must have been Weinberg.

105.   It says, "Dawn had called me and told me that the window in the attic was boarded up and that Duane had lied about seeing out that window." I don't remember that Dawn had called me but the window was boarded up. I know because they said that in court.

106.   I don't have any personal knowledge of that. I hadn't ever been to Dawn's house.

107.   Exhibit 2 says, "I did go to the PD and got copies of any reports from the 3/24/84 case and to the FD for the same information." I don't have any reason to believe that is not accurate.

108.   I was selling drugs after Kluppelberg got arrested. I did that until I went to jail. I was selling cocaine. The purpose was to earn money to survive.

109.   I never used cocaine. I was arrested 6/28/91. I was convicted. I served 3½ years. I was released 12/23/94.

110.   That was for delivering a controlled substance. I have another felony conviction for crack 6 or 7 years ago. I got probation. I was charged with delivery.

111.   I had another conviction for cocaine. I don't even know what the charge was.

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

112. The sentence was probation.

114. Regarding if I continued to try to assist Kluppelberg in his defense, I did everything already. He said I wasn't doing anything to help him in his case anymore, so he divorced me. I don't know what he wanted me to continue to do.

115. I went to visit him. He said that he feels it would be better if we got divorced because I'm not helping him with his case. The conversation took place 15 years after I married him.

116. He filed for divorce. He never asked me to try to get any witnesses to change the testimony or to fabricate any evidence. Weinberg assured him they had no evidence whatsoever and he would never be convicted. I was present for 3-way calls between Kluppelberg and Weinberg. Those took place all the time. Those were before his trial.

117. I remember Kluppelberg telling Weinberg to look into certain things. To check out the foundation lines on the house. They didn't match what they were saying. When he fired Weinberg and the public defenders took over, Kluppelberg told them to go check the foundations. It proves that the house on either side sat back far and the one in the middle where the fire happened was actually inside.

118. In order to see the back door that Duane said he saw, they had to see through the building. That was something Kluppelberg was telling Weinberg to look into the whole time. It was during a time I was on a 3-way call between Weinberg and Kluppelberg.

119. Almost all the conversations Kluppelberg kept telling him to go and check things out and he just did nothing. He also told Weinberg that he believed Duane was lying and that he had been offered something in exchange for his testimony.

120. He said that Duane was offered probation on the forgery case opposed to getting time. That conversation occurred during a 3-way phone conversation between me and Weinberg and Kluppelberg. That was before his trial.

121. I don't remember hearing Kluppelberg talking to Weinberg about the fact the police reports indicated that the fire was accidental, but it had to have happened because I got the reports and gave them to Weinberg and Kluppelberg. I think Exhibit 2 was because he was firing Weinberg.

122. I visited Kluppelberg in jail once a week from the time he was arrested until 8/88.

123. Regarding things Kluppelberg did in his spare time, we did a lot of things with my kids. He was always tinkering with things and building things. We worked most of the time.

126. I attended the criminal trial. I knew Judge Morgan's deputy, Ofc. Anderson.

61

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

127.     I asked him if I could visit Kluppelberg. Regarding if it became up to the deputy whether or not I was allowed to visit him, it came up to the money. I learned that from Kluppelberg. He told me for $150 he'll call me into court and we can have a visit. It wasn't on court days.

128.     I was to pay the $150 to the bailiff. I paid Anderson in order to see Kluppelberg numerous times. I saw him in the jury room. All of those were conjugal visits.

129.     I didn't ever pay Anderson in drugs.

130.     This was before his trial. Kluppelberg's sentencing hearing was delayed because he fired his lawyer. Between the time he was convicted and before he was sentenced he escaped one time from CCJ.

131.     He escaped by changing the mittimus papers. That was done by Velasquez, an officer that worked in CCJ in receiving. I knew him from a bar at 35th and California.

132.     I met him while Kluppelberg was incarcerated. I saw him at his house to sell him cocaine. He would buy from me a few times a week.

133.     I don't remember exactly how the agreement came about in which he was going to assist Kluppelberg in escaping from CCJ. But just that he could change the mittimus papers.

134.     He can change the papers to say that the arson fires were SOL'd and he had a bond on the other case. Regarding what he wanted in exchange for that, he owed me a lot of money, a few thousand. The agreement was if he would change the papers I would forgive what he owed me. At some point I let Kluppelberg know this was taking place.

135.     I told Kluppelberg's mother that I wasn't going to bond him out. I told her I had an arrangement with the deputy and he was going to make it so a bond could be posted. She was going to need to post money in order for him to be able to escape from CCJ.

136.     At the point when this arrangement was made I was aware that Kluppelberg had been convicted of killing the 6 people. I didn't think he was guilty. I didn't know the ASA was going to seek the death penalty.

137.     I was concerned that he was going to at a minimum be locked up for the majority of his life. I had a concern that the judge who would be sentencing him was prejudiced against him. After the 1st day of trial, I sat in the courtroom waiting for my visit. The stenographer said to the judge, so you're leaving on vacation after the trial. And she goes, the trial is done. I'm not going to think about anything on my vacation. And it was only the 1st day of trial. Nobody really testified. So how did you already make the decision the trial is done?

62

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

139.  I had no idea where Kluppelberg was going to go once the bond was posted. I told him he couldn't come home because I had a boyfriend.

141.  I gave Kluppelberg's mother the money and she bonded him out. I didn't want to go to the jail to do it because you have to sign papers. I got the money to bond him out from selling drugs. I learned that she posted bond for him when he called me.

142.  He said, what is he going to do? I said, you cannot be with me because they're going to be looking for you.

143.  We went for a ride to IN. Somehow my boyfriend found out and called his uncle, who was a cop, and told him that I was being held at gunpoint. When we came back from IN, the police stopped us and searched the van. They found bullets that my boyfriend put in the back door because we were taking them to the farm in IN. They charged me with live ammo and let Kluppelberg go. They couldn't hold him because they had all the paperwork that he had a legal bond.

144.  We went to IN to talk. We talked about what he was going to do. His sister worked for the circus. So he was going to FL to work the circus.

146.  The police also found a sheriff's badge in my car. It came from Bob Velasquez.

147.  I was in the car when Bob gave it to me and I forgot to take it out. My boyfriend told the police that the bond papers were fake. Despite that they still released Kluppelberg. They took both of us to the station. I was the only one charged.

149.  At some point I met him at the hotel on Cicero and he was leaving from there to go to FL.

150.  I kept telling him you can't call me because they're going to be watching me because you escaped. When he left he kept calling and calling and calling. He said he couldn't do it. He had to turn himself in. So that's what he did. Initially when he left the hotel he went with his sister and her boyfriend and they started driving to FL.

153.  At some point he turned himself in. He called me and told me where he was at. I was on the phone with him when the police got there.

154.  He said he called me after he called the police. He was in Macon, GA.

155.  I had conversations with him when he was locked up in Macon County. That was when he cut up his arms. He said he got like 100 stitches. He told me he was trying to kill himself. He said he couldn't do this. He's going to spend the rest of his life in prison. He had to be taken to the hospital as a result of cutting his arms.

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

156.  I had known him to cut himself one other time when we were dating in 1986. I was still with my husband. He called and said he wanted me to come over. I told him I couldn't come. He said, but I need to see you. I said I can't. Then he called back and said he had cut himself and needed to go to the hospital.

157.  I went and took him to the hospital. He cut himself on his arm.

158.  He lost part of his finger in a machine as a young man.

159.  Before he went to Macon County I wasn't aware of him being in contact with any other women other than me and Dawn. I wasn't aware of him being in contact with a 14-yo girl.

160.  He was brought back to CCJ. I continued to visit him.

162.  I continued to visit Kluppelberg at IDOC. I discussed with him that I had a boyfriend even though I was married to him at the point in time when he escaped from CCJ.

163.  He didn't really say anything. He had life with no parole.

164.  When he was in IDOC I continued to believe he was innocent. I still believe he's innocent.

166.  There isn't something that makes me doubt that. I don't have any fear of him. Dawn was fearful of him in her final days because of the grand jury statement.

168.  Dawn didn't tell me that anything she said before the grand jury was truthful.

169.  Kluppelberg's ex-wife, Donna, visited him in IDOC. That's why he divorced me. He told me she's going to help him with his paperwork.

171.  I told a reporter that Kluppelberg had admitted to me to starting the fire. I said that because he cheated on me with Donna.

172.  What caused me to tell the reporter that Kluppelberg had admitted to killing 6 people is I spent 15 years, a lot of money. I went to prison because I sold drugs. Then he's going to tell me on a visit that I'm divorcing you. Then I find out that he was cheating on me from prison. There wasn't any truth to the statement that he had told me that he set the fire. I would describe my relationship with Kluppelberg today as friends.

173.  In my opinion he is doing very good these days. He's held a job for a long time. He's got a good relationship with his son and grandkids. He has contacted a daughter that he

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

didn't even know he had and he's got a good relationship with her. He has listed me as a reference in his resume because he worked for me on different jobs.

174. I haven't had any conversation with him about his lawsuit.

177. *Reference is made to Exhibit 3. The statements in this document are accurate.*

181. *Reference is made to Exhibit 4, letter from Kluppelberg to Sarah.*

182. This doesn't refresh my recollection as to any conversation I had with one of Kluppelberg's lawyers. It says, "Bonnie, my ex, and Dawn, your brother's mother, out of hate and spite sent a letter to James telling him I was guilty." I didn't ever make that statement because James lived with me up until he was 18. He didn't open any letters his dad sent anyway.

185. Regarding that I don't believe he set the fire, I don't think he could deliberately hurt someone.

187. I would not have told the police that Kluppelberg liked to start fires.

189. The only time Kluppelberg saw Weinberg was when he would come to the courtroom, walk in back, have a conversation with him. That was the extent of their contact.

Exhibit 1. 1/22/92. Statement signed by Bonnie Kluppelberg.

5997. After the incarceration of my husband James Kluppelberg in 1/88, Dawn Greymont and I went to visit Glassco in CCJ. At this time he let it be known that he was asked to testify for the State. With Dawn as a witness, he informed me that if I would bond him out of jail and give him enough money to leave the area, he would "disappear" and not be available to testify at trial.

Exhibit 2. 12/28/97. Typed statement listing Bonnie Kluppelberg as contact for more information.

5994. On 1/12/88 my husband was taken to 11th and State to look at photos of men thought to have started a fire on a job that he had at that time. After a time I was told he was being charged with the death of 6 people. I called our lawyer, Weinberg, he called the station and told my husband not to say anything further to the police. The next day Weinberg was in court and told me I would have to pay him $5000 to investigate to start but if I wanted I could do some of the legwork myself. I went to the PD and got copies of reports from the 3/24/84 case and to the FD for the same information. I called Weinberg numerous times to give him information about my husband's case but he would not check

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 26, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

anything out. I told him my father was a contractor and checked out the building foundations but he didn't think that was important. Dawn had called me and told me that the window in the attic was boarded up and that Duane had lied about seeing out that window. She even went into his office and gave a statement. Weinberg was asked by my husband time after time to come to the jail to see him, his answer was, you don't have to worry, I know this judge very well and with the evidence the State has he will never convict you of these charges. After a time he would no longer take calls if he was told it was Kluppelberg on the phone, the answer was he is not in at this time. Once we called and while waiting for him to come to the phone, he picked up the line we were holding and yelled at his secretary, "I told you if James or his wife calls I am not in."

Exhibit 3. 10/16/95. Affidavit of Bonnie Kluppelberg.

5992. In 1/88 at the request of my then boyfriend now husband I retained the service of Marshall Weinberg. He told me he needed $15,000 to defend my husband with $5000 upfront for him to hire investigators to track down witnesses. Over several months I came up with the money he requested and to my knowledge he never hired any investigators or used the money for any of the other things that he claimed he needed it for.

A few months after I gave him the last of the $5000 he requested, he then started asking for more money and I informed him I wasn't able to come up with anymore because my husband was in jail and I was without income. After this conversation, I began to notice that he was beginning to ignore my husband's phone calls and when asked when he was going to see my husband and talk about the case, all he would say was, "don't worry, everything is okay and I will see him soon." But he never once before trial went to see my husband at CCJ to talk about how he was going to handle the trial.

I also heard him tell my husband in two of the calls he did take that my husband was not allowed to testify in his own behalf because of the statements that he made at the police station on the night he was arrested. My husband asked why not, since the statements were not allowed in the trial because the officers that arrested him were found to have beaten him into giving the statements, and Weinberg said that did not matter, he was not going to let him take the stand.

5993. After my husband's trial and conviction a lot of very important evidence was found by the public defender's office. I believe that once Weinberg found out that he was not going to receive any more funds from me he cut his losses in this matter and fell short of his responsibility in defending my husband to the best of his ability.

Exhibit 4. 7/29/09. Correspondence from Kluppelberg to Sarah. *Summarized in 8/13/15 record review, Section #16.*

66
**Cavanaugh 225**

# Cavanaugh & Associates

# APPENDIX I

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

DATE OF RECORD REVIEW:        August 28, 2015
REVIEWER:                      Aimée St. Pierre, M.D.
C&A DICTATION NUMBER:          3073
C&A FILE NAME:                 James Kluppelberg v. Jon Burge, et al.
BRIEF CITATION:                Kluppelberg v. Burge
COURT NUMBER:                  13 CV 3693
ATTORNEY NAME:                 Elizabeth A. Ekl/Jaclyn L. McAndrew
ATTORNEY TELEPHONE:            630.735.3370/630.735.3317

## TABLE OF CONTENTS

1. Video Deposition of James Kluppelberg, 3/31/15 ...................................................... 2

2. Deposition of Donna Kluppelberg, 1/19/15 ............................................................. 30

3. Deposition of James Kluppelberg, Jr, 8/11/14 ........................................................ 40

4. Deposition of Karl Leonard, 2/25/15 ..................................................................... 50

5. Deposition of Edward O'Donnell, 7/15/14 ............................................................. 56

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

## 1. Video Deposition of James Kluppelberg, 3/31/15.

7.  I was born in Michigan City, IN, [REDACTED] I was expelled from Harrison HS in junior year.

8.  I received a GED in 1985 when I was incarcerated for burglary at Logan CC.

9.  My first job [after high school] was as a ride mechanic for a traveling carnival for a couple months. Then I did mostly odd jobs until my incarceration in 1985. After that I worked for McDonald's as a fry cook for 5 or 6 weeks.

10. Then I worked for Chicago Standard, a remodeling and decorating company, doing general household repairs and remodeling.

11. I worked there for less than a year, until spring 1987.

12. Then I went out on my own and formed a business, West Town Construction. I didn't have employees. It was home repair and remodeling. I operated that until my wrongful incarceration.

13. After my release I spent the 1st year attempting to gain employment. I finally gained employment through a temp agency at a manufacturing company, Metal-Matic in 4/13.

14. I was there for 5 months. I was unable to master the overhead crane; it was a requirement of the job. The temp agency found me a position with Senior Lifestyle Corp. That was within a week or two after leaving Metal-Matic.

15. I was the maintenance coordinator for an independent living facility for senior citizens. I resigned in 10/14.

16. Because I was offered a position at an apartment complex 10 min. from my house. I'm not still working there. I started in Oct. of last year and left in Dec.

17. The temporary job ended. I'm still looking for employment. When I was 1st released, people donated money to help me get back on my feet. I don't recall how much.

18. Maybe $10,000-15,000. There hasn't been income from donations for quite a while. I received $214,000 from the State when I was granted my certificate of innocence. I received payment for expert testimony in the deposition I gave, a couple hundred dollars.

2

Cavanaugh 227

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

19.   I've spoken at a few universities and received small amounts for my expenses, maybe half a dozen times. All totaled up, it would be under $1000. My son supported me when I was released. I lived with him, he basically paid all my bills.

20.   Otherwise, the occasional side job, I repair something for somebody, something like that. I've received probably $2000-5000 from that kind of work since I got out.

21.   I did board-up work for 2 companies in '83 and '84.

22.   It was part of my job to get business for the company.

23.   When I came out of incarceration for the burglaries I was released to a work-release center in 6/86. A job assistance counselor there sent me to McDonald's. I worked as a security guard for a short period of time in 12/87.

25.   It was just for a few weeks. I worked at 820 W. Belle Plaine on multiple days.

26.   At that time I was still involved in my home remodeling business.

39.   *Reference is made to Exhibit 5, 10/17/89 interview in connection with escape from CCJ.*

41.   I was never charged with an escape. I bonded out after arranging to have the records altered. I had every intention of making my next court date, so I didn't think it was an escape.

42.   *Reference is made to Exhibit 6, photos.* Regarding if these are the cars that had fires while I was working security on Belle Plaine, I don't recognize them.

43.   In 12/87 I saw 2 burned vehicles during my employment as a security guard on Belle Plaine. *Reference is made to Exhibit 7, photographs.*

44.   Photo #4 is of a sergeant's Sheriff CCDOC badge.

45.   They found it in my wife's vehicle. I never had it in my possession. I don't recall if I arranged for it to be put in her vehicle.

47.   Regarding the photo of the box of PMC Centerfire pistol cartridges, on the night they stopped me and my wife in her vehicle they said they found ammunition in it.

53    I recall finding a fire in a garbage chute while I was working at 820 W. Belle Plaine.

54.   *Reference is made to Exhibit 11.*

3

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

---

DATE OF RECORD REVIEW:          August 28, 2015
C&A DICTATION NUMBER:           3073
BRIEF CITATION:                 Kluppelberg v. Burge

---

58.   There was another night when there was a car fire that involved 2 cars. I saw somebody running out the back end of the garage. I'm pretty sure I called 911. The FD put out the fires.

60.   I believe I described the man I saw to the police.

62.   *Reference is made to Exhibit 12.*

65.   This is the write-up I did of the car fires. It talks about seeing a black male about 20 wearing an army jacket and gym shoes.

68.   *Reference is made to Exhibit 13.* This says this incident was the 2nd occurrence on this date with the same offender identified at the same location.

69.   I don't recall if there was a 2nd incident.

70.   *Reference is made to Exhibit 14.* It's an incident report from 12/26/87, a few days after the date of the car fire reports.

71.   I recall from reading this that there was an automobile that was emitting a sound from the trunk and when they got into the trunk they found it was a smoke detector. There wasn't any indication of a fire that I recall. I recall the police being there. I wrote up the report as ELA Security.

72.   They eventually gave me a polygraph. I believe it was after the car fires. I believe they were a subject of the polygraph.

73.   I wasn't informed whether I had passed or failed. I don't believe that I was discharged from that job. I recall the police contacted me about the car fires in 1/88. I received a call from someone in the PD who said they wanted me to look at photographs to see if I could identify the person that I saw that night.

74.   I explained that I was busy and would come in at my earliest convenience. He said they would bring the photos to me.

76.   They came to the apartment building I was working at. I spoke to them in my mother's apartment. I don't recall how many people were there. Two officers came.

77.   I learned they were Det. Schmitz and Rolston. I asked where the photographs were. They said they were down at the station. I told them I was busy, in the process of replacing frozen water lines in the building. They said I was coming with them one way or another and we went out to their vehicle.

4

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

78.     I remember them searching me, removing items from me and placing me in the back of their vehicle. They removed my pager, my keys, I don't recall what else. We drove to 11th and State.

79.     I ended up in an interview room with Rolston and Schmitz. They proceeded to talk to me about the auto fires. They said they had a witness that saw me commit the crime. I continued to tell them I didn't. They said we would have to wait until their witness got off work, it wasn't going to be until morning, and if I wanted to go home now, all I had to do was take a polygraph to convince them. I agreed, because I was innocent.

80.     One of the detectives escorted me to the floor where the polygraph was supposed to take place. We entered a dimly lit room and the officer told me to sit down and he left. Another gentleman came in, identified himself as the examiner. He said he was going to give me a waiver stating I was voluntarily agreeing to the examination.

81.     The document stated I was about to be questioned about a fire in 1984 where 6 people had perished. I realized that I was being lied to. I told the man that this was not what I was told I was coming down here for, and that I wasn't going to sign.

82.     I believe he left, the officer that brought me downstairs came in, grabbed me out of the chair, threw me up against the wall, placed handcuffs on me and dragged me to the elevator. It was either Rolston or Schmitz. Prior to this I had not been handcuffed. I returned to the room I was originally in.

83.     They began accusing me of murdering a family. I told him I did nothing of the sort. I don't remember which one, but I was thrown to the floor face down, and I don't know for how long, but for a very extended period of time. I was brutally beaten in my lower back area. While I was being beaten it was said that if I would confess, it would stop. I don't recall if anything else was said. It was not only so long ago, it's something that I struggle with to have two human beings have such disregard for another human being. To this day, I still struggle with it. Regarding if there came a time when the beating stopped, I had urinated on myself. I reached a point where I believed that if I didn't say what they wanted me to say, that I was going to die that night.

84.     I remember saying I did it and they stopped. I made a big mess as a result of the beating causing me to urinate. I don't recall exactly what happened after I said I did it. I remember them saying something about how did I start it. I just kept saying I did it, whatever you want, and they said, you brought garbage in and used a cigarette lighter and where did you start the fire. I don't remember how the conversation went. At that point I would have told them anything to where they wouldn't have started beating me again. They said they were going to send in an ASA and that I was going to confess to him and he would take my statement and I was going to sign it.

5

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

DATE OF RECORD REVIEW: August 28, 2015
C&A DICTATION NUMBER: 3073
BRIEF CITATION: Kluppelberg v. Burge

85. The only thing I vividly remember is continuing to say I did it so they wouldn't start beating me again. If you have not experienced it, it's very hard to understand what it's like for somebody to get you to admit to something that you didn't do simply because they had their mind made up.

86. After they talked for a while they left the room, left me handcuffed to the wall. Regarding how long they were gone, I have no reference of time from that night. I lost all ability to remember how long anything took place.

87. When they were beating me, it was in my lower back. I was facedown, I couldn't tell if it was one officer or two. I believe some of their strikes went up higher on my back.

88. It felt like both fists and feet.

89 They didn't do anything other than strike me on the back in terms of physical coercion. When I said I did it they stopped beating me. They didn't ever beat me again.

90. My understanding was they wanted me to confess to the Hermitage fire. I knew it was the fire that resulted in the deaths of children.

91. As a result of the beating my back was severely bruised. I was urinating blood. I was in a lot of pain.

93. At some point the ASA came in. I don't recall prior to the ASA coming in discussing with the officers starting a large number of fires since I was 9 yo. I don't recall discussing starting fires in the area around 1748 W. 45th St. or starting fires out of sexual frustration.

94. After I was beaten, I don't remember much of anything. The ASA was Axelrood.

95. I just remember telling him I started the Hermitage fire.

96. I don't recall telling him anything about the beating. I don't believe I talked to him about getting medical attention.

97. I didn't tell the ASA that the scars on my wrist were from a previous suicide attempt because there are no scars on my wrist. There were no scars on my wrist in 1988. Regarding if I told him I was feeling guilty for something I did in 1984, I don't recall the specific conversation we had.

98. I may have told him that, I don't remember. Regarding if I told him I sometimes get upset after a fight with my girlfriend and go start a fire, I understand your questions, but it's not going to change the fact that I don't remember what I said to him that night.

6

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

99.     I don't remember if I told him I got into a fight with my girlfriend on the night of 3/23/84 or if I told him I went for a walk in the neighborhood after fighting with her or if I told him I disconnected the streetlight in front of 4448 S. Hermitage while taking a walk that night.

100.     I don't remember if I told him I went into a vacant 1st-floor apartment at 4448 S. Hermitage that night or if I told him I started a pile of garbage on fire with my cigarette lighter in the front room of the 1st floor apartment at 4448 S. Hermitage that night. I don't remember if I told him I left through the rear door of the 1st floor apartment after setting the fire or if I told him I walked down the alley behind 4448 after setting the fire.

101.     I don't remember if I told him I returned home after setting the fire. I don't remember telling him that after the fire spread to two other buildings I and my companions went into one of the burning buildings to help my landlord Charlie Petrosus to safety. I don't remember telling him I felt guilty after learning that 6 people had died in the fire.

102.     I don't remember telling him I had not been threatened or promised anything to make my statement or that I had been treated well by the police.

103.     7 o'clock is about the time I got home the evening of 3/23/84. Home was 1748 W. 45th St. Myself, Dawn Gramont, and her 3 children lived there.

104.     I was coming from my wife's house, Donna Kluppelberg. At the time I was still married. Donna was carrying our 1st child. We were separated and I was living with Dawn. When I got home Dawn, the children, Duane Glassco and Michelle Brittain were present.

105.     Glassco was the father of Dawn's 3 children. He was temporarily staying there. Dawn and Glassco were separated. Michelle was Duane's girlfriend. When I arrived home the house was a mess, the kids hadn't eaten, diapers needed to be changed.

106.     I recall trash being all over the kitchen floor, the dog had gotten into it. Dawn and Michelle and Duane were downstairs.

107.     Me and Dawn got into an argument because of the state of the house, the children, the fact that she was drunk, that they all were drunk.

108.     After the argument I left for a while. It was probably within the hour after I got there.

109.     I took the dog and walked around the block. Then I came back into the house. I was gone maybe 15, 20 min. We continued arguing. I cooked dinner for the kids, cleaned them up. I left again afterwards. I don't remember for how long.

7

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

110.    I just went walking around.  I don't remember exactly what route I took.  I returned to the house.

111.    On the 1st walk I believe that's when I turned off the streetlight.  There was a streetlight in front of the house that shined into the house at night.  It was really annoying and at the base of the pole I unscrewed the wire nut and the light turned off.

I remembered at lunch that I had compensation from a knee injury that occurred last year I had forgotten about.

112.    I injured my knee at work at Senior Lifestyle Corporation.  I was pushing a dumpster and tore my MCL in 4/14.

113.    I had knee surgery.  At the time of the incident I was off work for a week and went back to light duty and then was off for the 1st of 2 carpal tunnel surgeries that summer.  I took off work for a 2nd carpal tunnel surgery.

114.    The compensation for the MCL injury was $18,000-$20,000.

115.    It was a workers comp claim.  Other than this lawsuit, I don't have any other lawsuits or claims pending.

I didn't do anything else in the 1st walk on the evening of 3/23.  When I returned the 2nd time, they were still drinking, and me and Dawn continued to argue.

116.    The nature of the argument was a combination of the neglect of the children, me being gone all day at my wife's house, and their apparent partying all day.  They were still drinking when I returned.  I don't remember talking with Glassco or Brittain after I returned the 2nd time.

118.    I believe I left a 3rd time.  I was just walking around with the dog.  I don't think it was a terribly long time each time I left.  I believe they were all 15-20 min.

119.    When I returned after the 3rd walk me and Dawn went into the bedroom.  Michelle and Duane went upstairs.  Me and Dawn argued a bit more.  At some point we all came back into the kitchen.  We were sitting at the table, I think we were playing cards, and we saw a police car stop at the corner of Hermitage and 45th and turn its lights on.  We thought maybe something had happened in the park and as we leaned into the kitchen window, we could see the glow of fire in the distance.

120.    I remember going outside.  We heard fire trucks.  We put the kids in my car which was outside the house and me and Duane went to the front where there was a separate dwelling where the landlord and his wife resided and we went and woke them up.

8

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

122.  To the best of my memory, we gawked at the fire for a while, and after we saw there was no danger to the house we went back inside and put the kids to bed and me and Dawn went to bed. Glassco and Brittain went upstairs to the best of my memory. I believe they spent the night. Regarding if I passed out any cards in connection with my board-up interests at the time of the Hermitage fire, I had no board-up interest at the time.

123.  I didn't do anything to try to capture any board-up business in connection with the Hermitage fire. I don't believe I spoke to the police or FD on the night of the fire. At the time I went to bed I didn't have any knowledge as to whether anyone had been hurt in the fire. Years later I came to learn that people were hurt.

124.  I don't know if I knew about it before I was discussing it with the police on the night that I was arrested. I didn't read newspapers, didn't watch TV hardly.

126.  I talked to the police about the Hermitage fire prior to 1988. The only reason I know the date is because I've read it, but I believe it was 4/3/84. I don't remember the name of the detective.

127.  They came to my house. They told me I was under arrest for suspicion of armed robbery. They took me to the station at which point they started asking questions about the fire. I wasn't interviewed about the armed robbery, just about the Hermitage fire.

128.  They just wanted to know what I knew. It wasn't a long conversation. After we were done talking I asked can I go, and they said no, you're going to be held pending a lineup on the armed robbery, and they sent me to a cell. A day or two went by and I had missed a traffic date and they sent me to traffic court and dismissed the charges from there and sent me home. I didn't ever hear anything more about the armed robbery.

129.  During the time the police were talking to me in 1984 about the Hermitage fire they didn't disclose that there had been deaths. There wasn't any further contact between me and the PD regarding the Hermitage fire prior to 1/88 after this. On the night of 3/23-3/24/84 I didn't ever go into 4448 Hermitage.

130.  I didn't ever set garbage cans on fire behind any of the buildings in that neighborhood.

131.  I haven't ever started a garbage can on fire. I don't recall there being a fire at a building at 4513 S. Wood in March or April 1984. I wasn't ever aware the police wanted to talk to me about a fire there.

I indicated that at the time you asked about, I had no scars on my wrists. I have 2 small incision marks now from carpal tunnel surgery.

132.  I had 2 small scars on my L forearm at the time.

9

**Cavanaugh 234**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

133.   They're still visible. They were from an injury. I think I fell on some glass.

134.   I didn't ever tell anyone that the marks on my arm were the result of a suicide attempt.

135.   I had a suicide attempt that left marks on my arms. Those are marks other than the ones made by the glass. I attempted suicide in 10/89 in Macon County, GA. I sliced open both arms with a razor blade.

136.   My intent was to not wake up. I infflicted multiple deep cuts. I was in the Macon County jail in a cell by myself.

137.   I received medical treatment while I was in custody.

138.   Regarding how I came to be in jail there, I had contacted the Cook County State's Atty. when I was told he wanted to speak with me about my absence from CCJ. He contacted the authorities in Macon County to take me into custody.

139.   I heard that the state's attorney wanted to talk to me from either my mother or my wife.

140.   I expected to be arrested after I talked to State's Atty. Paul Tsukuno. After I was placed in custody, 2 officers from Cook County arrived. They insinuated that my return trip was going to be a very uncomfortable one, and that since I was facing the death penalty, maybe they would just save the state a whole bunch of money. They were Cook County sheriffs.

141.   That, coupled with the fact I was facing the death penalty for something I didn't do and everything else I had gone through in the last year and a half, got the best of me. The razor blades were out of a disposable razor that I disassembled.

142.   I slashed my arms after final lockup for that day. I don't know how I was discovered because the next thing I knew I woke up in the hospital.

143.   After they got done sewing my arms up they sent me back to the jail. I was taken back to Chicago by plane. I wasn't mistreated by the officers.

145.   *Reference is made to Exhibit 15.*

146.   There were no threats made with respect to getting this statement from me.

149.   In order to get out of jail I conspired with my wife to provide a guard with cocaine bribes. She provided him with cocaine bribes on multiple occasions. The scheme was for him to cause my most serious charges to disappear from my record. I had not made bond at this time.

10

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

150. I knew that Velasquez was falsifying records so I could get out of jail.

151. Regarding if I turned myself in through Director Snooks, my recollection is I called the state's attorney.

152. The statement says when I was arrested a DOC star was taken from me, and that Velasquez told me in Aug. that he could get me a correctional ID if I chose not to return to court.

153. My mother bonded me out. I didn't tell her about the scheme with Velasquez. I don't remember if I told Velasquez I wanted to get out of jail to get evidence for my defense.

154. I don't remember if he told me he could get me a mittimus that would indicate the major charges had been dropped. It's possible that I called him through a 3-way connection with the help of my sister. I know what it says there, but I don't have an independent recollection.

156. I didn't ask Velasquez for a correctional star.

158. The night that they stopped us they found a star in the van. The 1st time I saw it was when the police found it.

159. The statement says Velasquez hid the star under the seat of my wife's van; when I got out of jail I went to the van and the star was under the passenger's seat right where he said it would be.

   I 1st remember hearing about and seeing the star when the officers found it the night they pulled us over.

160. I don't recall whether I said what's in the statement or whether it's correct. I was stopped before I went to GA, after I escaped from CCJ. The gentleman my wife was seeing while I was in jail called the CPD and said I kidnapped her, that I had escaped out of CCJ.

161. That's what the police told us when they pulled us over. This separated us and spoke to my wife. They found the ammunition and the star in the vehicle. They asked if I had a firearm's card, I said no. She didn't have one so they arrested us for unlawful possession of ammunition. We were taken to a police station.

162. They said I was being charged with unlawful possession of ammunition, a misdemeanor, and that after my background cleared, I could place a $100 bond. I gave them the bond and I left. They asked if I was out on bond from CCJ and I showed them my bond slip. That was the one I got as a result of Velasquez altering my records.

11

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

163.  I went to Dawn's house where she and her boyfriend were living and her children and my son. I spent the night with my son. The next day I met up with my sister Laura and headed for GA.

164.  We were headed to my sister's residence in FL.

165.  *Scars on deponent's arms are inspected.* The scars as a result of falling on glass would be these 2 in the middle of my forearm on the front side on the L arm.

166.  On the L arm, a vertical scar on the forearm down just a little from the break in the arm is a wound inflicted in the Macon County jail in 1989. Other scars from Macon are 2 or 3" below the scar, a parallel scar again running perpendicular to the forearm.

167.  Another scar starts on the forearm and comes around almost to the backside of the arm, 2 or 3" from the previous scar. Another scar on the L arm associated with Macon is above the elbow on the front of the arm about 3-4" in length.

168.  There are scars on my R arm relating to the Macon incident. More or less perpendicular to the length of the forearm, on the side of the arm more than on the inside.

169.  Another toward the hand from the other scar with a perceivable indent to it. Another scar from Macon, almost in the center of the forearm running almost perfectly perpendicular to the bone, about 4" in length. Another scar about an inch below the scar I just showed, essentially parallel to it, of a similar length.

170.  There's a scar that runs at an angle, almost a V, out of the scar I've just shown, not quite perpendicular. Another almost V'ing out of that scar, going back perpendicular to the bone, about 3-4" long. Regarding any scars that would have been present in 1988, this one might have been. That was a playground incident when I was a kid.

171.  I'm pointing to a scar on my forearm about 4" above my wrist.

172.  On the night I was interviewed by Axelrood, I don't recall asking to speak to my lawyer. I recall asking if I could call my girlfriend. I don't remember if the police were present. He agreed. I called Bonnie and I had her 3-way with my lawyer, Weinberg.

173.  The ASA spoke to my attorney and then told me he couldn't talk to me anymore and left the room. I believe he came back with the officers, told them they were not to question me anymore, to charge me with the automobile fires.

174.  I wasn't threatened or mistreated after that. I don't recall that I indicated to the ASA that I had set the car fires on Belle Plaine.

12

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

175. I can't say for certain if I didn't go into some part of the alley behind the house on Hermitage on the night of 3/23-24, but I don't recall going anywhere near the back of the building.

176. Regarding my relationship with Bonnie, she was working for her father. They had a hardware store and home remodeling company.

177. I met her late July or early Aug. 1986. She interviewed me through the work-release center.

178. We became more like acquaintances with benefits because she was married at the time.

179. *Reference is made to Exhibit 16, H&P at Cermak Health Services, 1/13/88.*

180. In the 4 diagrams I see the marking of scars on my forearms.

181. The scars I had on my forearms at the time were the outer ones.

182. I didn't have the scars on the inside of my forearms in 1/88. They're depicting scars that weren't there in 1/88.

188. I didn't ask Bonnie to offer cocaine to any witness in my case. I don't have any knowledge of her offering Michelle Brittain cocaine in connection with testimony in my case. I married Bonnie in 8/88. We were divorced in mid-summer 2000.

189. I didn't ever admit to her that I started the fire on Hermitage or that I started any fires. My relationship with Dawn in 1988 was amicable. She was the mother of my son. She visited me in jail. She made a complaint to OPS in connection with her treatment concerning testimony that she gave in my matter.

191. I testified once as an expert witness at a deposition.

192. It's possible that I talked about my disciplinary record in prison. I had one weapons charge that I was found guilty of and I think I received a verbal reprimand for failure to report to a job assignment. I was not disciplined in connection with a syringe inside a magic marker. I was written a disciplinary report for that but it was dismissed.

193. *Reference is made to Exhibit 17, IDOC records.*

194. Regarding if the incident about the syringe ended up with me losing some privileges, yes and no. Yes, on paper, but no, it physically did not happen.

13

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

195.     It says here I was revoked one month good time. I was serving a natural life sentence, I didn't have good time. There's a check for commissary denial 2 months. It could have happened. Demotion to C Grade for 2 months is checked.

196.     It's possible I was demoted for 2 months. Regarding when I started using Weinberg as a lawyer, there was a party my mother had given. There was a gentleman that was highly intoxicated that didn't want to leave. A couple people pushed him out the door, shut the door. He came in through another entrance, struck my mother, and I hit him one time with a 2 x 4.

197.     I was charged with aggravated battery and armed violence. He eventually died. The charges were changed to manslaughter. Weinberg represented me in that matter. I was acquitted.

198.     After I lost my trial with respect to the Hermitage fire, I reported Weinberg to the ARDC. I indicated that I paid him a $5000 retainer and he didn't do any of the services he agreed to do. I said he never visited me once in the 21 months leading up to my trial to discuss the case. I said I asked him to obtain photos from the attic of 1748 W. 45th St. to confirm that Glassco could not see what he testified to.

199.     I asked him to research whether the CPD had closed the fire as accidental and noncriminal and he failed to do that. He was asked to interview two CPD officers who could offer favorable evidence but never did that. I believe I was referring to Ofcs. Urbon and Jenkins.

200.     I believe Urbon's report stated the cause and origin of the fire could not be determined. I believe it gave an alternate explanation as to the burn patterns as opposed to what Burns testified to at trial and he noted no beading of the copper wiring so it was not an extremely hot fire as Burns had testified. To my knowledge Weinberg never f/u on my request. I also complained that I wanted a jury trial and Weinberg said he knew the judge and no jury trial was necessary.

201.     *Reference is made to Exhibit 18.* Back then I never heard anything concerning the woman who might have started the blaze on Hermitage.

202.     This may have been attached to a post-conviction filing. I remember meeting a couple detectives in connection with the Kulikowski case.

204.     I don't recall seeing detectives that were involved in the Kulikowski case around 4/83 near a fire at Madison and Ashland when I was involved in the board-up business. I don't remember a conversation at that scene with police about what I was doing out of jail.

14

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

DATE OF RECORD REVIEW:      August 28, 2015
C&A DICTATION NUMBER:      3073
BRIEF CITATION:      Kluppelberg v. Burge

206.    I don't remember having any contact with Ofc. John Nelson, Inv. Wayne Micek, Inv. George Jenkins, Inv. Ken Urbon, Inv. Victor Vega. I had contact with Det. Tuider. I believe he was one of the officers that interviewed me in 1984.

207.    During that interview they just asked questions regarding the fire, if I had any information regarding it. It didn't seem like I was a suspect.

208.    No officers mistreated me during my interactions with them in 1984. I didn't learn in 1984 that Glassco had called a tip line in relationship to me.

209.    To my knowledge I didn't have any contact with Billaletto who worked for the CFD or Sgt. Olivieri or Burge. I moved in with Dawn 2/16/84. I continued to live there until late Oct., beginning of Nov.

212.    I don't think I had any contact with Rolston or Det. Kelly in 1984.

219.    Regarding if it's accurate to say that I was unhappy with the way Weinberg defended me in general, I was unhappy with the outcome. I was unhappy with what I perceived as the way things should have been done. I'm not saying that my perception was correct but I was convicted and facing the death penalty for a crime I did not commit.

220.    I wasn't happy with the way he investigated the case.

221.    He failed to do a number of things that I asked him to do. I requested him to hire an investigator to research the fire due to the fact that the CPD had closed the incident as an accident, noncriminal, on 5/14/84. That request took place prior to my trial.

222.    I requested that he interview Urbon and Jenkins. I learned about them after my conviction. The complaint says that prior to trial Weinberg was asked to interview them. Regarding if that refreshes my recollection that I knew about them prior to my trial, no, I misstated earlier. I thought the officers in question, were those two, but I'm assuming that since it was prior to trial, I was talking about the officers that wrote the original report and closed the case.

223.    I didn't review police reports prior to the trial. I saw a few police reports at my motion to suppress. It was based on viewing those that I wanted Weinberg to interview two police officers. The motion says that they could have added valuable evidence to the trial proceedings in favor of the defense, but this was not done.

224.    It was my belief that since they had classified the fire as an accident, that without the fire being a crime, there was no crime, so if they said it was an accident and were the ones assigned to investigate the fire, I thought they should be part of the trial.

15

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

DATE OF RECORD REVIEW:     August 28, 2015
C&A DICTATION NUMBER:      3073
BRIEF CITATION:            Kluppelberg v. Burge

226.    Paragraph 7 says during the trial I asked Weinberg to put certain evidence into the trial on my behalf but he ignored me and did nothing. I don't remember what evidence I asked him to put into trial. I don't know what I meant when I wrote this. I was trying my best I could to get somebody to listen to me.

227.    I believe it was the motion in limine where the officers testified to the case being closed. I thought that should have been part of my trial. Paragraph 11 says after trial Weinberg put in a motion for new trial. I had asked that certain things be added to this motion but even though Weinberg said he would do this, he still has not done these things. I believe again I was referring to the fact that this was not an arson fire according to the people who were charged with investigating the fire.

228.    The official investigating body declared the fire to be an accident and I vaguely remember something in the judge's ruling that the testimony of Burns went unrefuted. I thought that the officers that investigated the fire that said it was not arson would have refuted what Burns testified to.

229.    I believe that all the evidence wasn't presented. Whether it would have changed the outcome, I don't know. All I know is that I didn't commit this crime. I lost a quarter-century of my life because of it, and at the juncture when this was written, I was facing the death penalty and was scared to death.

230.    At some point I learned that Glassco had provided evidence to the police inclulpating me. At the trial I listened to his testimony that he saw me with a stack of newspapers walking into the back door of 4448 S. Hermitage.

234.    I knew that all of the things that Glassco had told the police about me were false at the time of my trial. At trial he claimed that he saw me while he was looking out an upstairs window at Dawn's house.

235.    Regarding if I knew it to be false that Glassco could not have [sic] seen me walking into the back of 4448 S. Hermitage on the night of the fire, I knew it to be false to the extent that I did not do this.

236.    I now have personal knowledge as to if you looked out the window in the back of Dawn's 2nd floor window whether you could see 4448 S. Hermitage. That's based on photographs that I have viewed that depict how the building stood that clearly show it's impossible for it to be seen.

237.    Regarding that prior to trial I tried to get Weinberg to prove the impossibility of Glassco's statements that he saw me from the window, I don't remember exactly what we discussed on that issue. Exhibit 3 states that I asked him to obtain photos from the inside of 1748

16

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

W. 45th St. toward the rear of 4448 S. Hermitage to show what Glassco claims to have seen as virtually impossible, but this was not done.

238. Prior to trial I had knowledge from Dawn that someone standing in her home would not be able to see anyone walking in and out of the back of the building at 4448 S. Hermitage.

242. I don't recall having conversations with anyone at the convenience store about the fire. I eventually learned there had been more fires than just at 4448 S. Hermitage on 3/23 and 3/24/84.

243. I believe I learned that in 2008. On the evening of the fire I saw a couple of people at the scene that I knew from my job at the board-up business. At trial I learned that Glassco had received a deal in exchange for his testimony.

244. I don't remember if I knew about it before trial. I may have said something to Dawn before trial about the fact that Glassco was going to testify against me. I didn't have any conversations with him after my arrest but before my trial.

245. *Reference is made to Exhibit 19.*

246. In this document Weinberg referred to me as a master manipulator.

248. Exhibit 19 says after his recapture, he did not want to be sentenced by Judge Morgan and has been going [sic] everything in his power to delay sentencing and create stronger grounds for appeal.

249. He has told me several times that this complaint and his attempt to remove me from the case in court were only ploys to accomplish this end and that he did not intend to harm me in any way.

The statement is true in part. I had no wish to be sentenced by Judge Morgan. I felt she had a bias. Because she convicted me of a crime I did not commit. I was concerned that she would sentence me to the death penalty.

250. To my knowledge I didn't ever say to Weinberg that my complaint against him was only a ploy to accomplish the goal of not having Morgan sentence me.

251. I felt I wasn't being treated fairly because I had been just convicted of a heinous crime that I did not commit. I didn't know what to do because nobody was listening to me.

252. The Kulikowski incident occurred ~12/12/82.

17

**Cavanaugh 242**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

254. I don't know if I ever told police that my mother was struck during that incident.

256. I didn't see where Kulikowski struck my mother. I saw her fly backwards.

257. After she fell back I saw him advance toward her again. At that point I grabbed a 2 x 4. I believe that when I grabbed the 2 x 4 Kulikowski's back was to me. My memory is he was advancing on my mother and I struck him one time in the head.

258. I can't remember when I saw my mother fly back, where she went and what happened to her. I don't remember details. Kulikowski lost his life. It was not my intent. My intent was for him to not cause harm to my mother anymore.

259. I'm stating that due to my age [at the time of the incident], and the fact I am about to turn 50 and have lost a quarter-century of my life to hell on earth that, my memory is a little cloudy.

266. I can't remember for sure where I struck him on the head, I believe the rear part. I only struck him one time.

267. He fell to the ground. Some people drug him outside to the sidewalk and someone called an ambulance to pick him up. I don't know why they drug him out of the party. I didn't see them drag him out.

268. The police arrived. I think they asked me to come with them for questioning.

269. I don't recall hearing my mom tell the police that she had asked everyone to leave the party, that Kulikowski left and came back in, and then walked up to Chris and punched him in the mouth.

270. I don't remember her telling police that after this Kulikowski was arguing with Alfred Perez. I don't remember Kulikowski arguing with Perez.

271. All I know is that I saw a man attacked my mother. How this relates to me losing a quarter-century of my life, I'm a little puzzled right now, but I'm sure there's a point to it somewhere, right?

272. I wasn't aware that my mother told police that Kulikowski walked away from Perez and myself at the point when I picked up the board.

273. I'm not aware that my mother told police that it was at that point that I struck Kulikowski over the head.

18

**Cavanaugh 243**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

274.  I don't remember telling police that I hit Kulikowski over the head with a 2 x 4 because he had my stepfather Perez by the neck and was threatening to beat him up.

275.  I'm not aware that my stepfather told police that he was upstairs at the point in time when I hit Kulikowski. I don't remember Chris Kolip. I don't remember a conversation about moving the victim outside to make it look like he hit his head on the sidewalk.

276.  I had a bench trial in this case. I testified in my own defense. I'm currently living in IN. I don't live with anyone.

277.  Regarding if I'm in a relationship with someone, we haven't decided yet. The last woman that I had a romantic relationship with was Renée Kilgore. We started discussing a relationship 7, 8 years ago.

278.  I don't know where she lives. I haven't been to her house by her choice. She hasn't told me why she doesn't want me to come to her house. I have 3 children. The oldest is Samantha Kluppelberg, 30.

279.  I last spoke to her on the phone a couple weeks ago.

280.  I would describe my relationship with her as rebuilding. She grew up without me. There was a long period where we didn't speak. We're now trying. Her mother is Donna. I would describe my relationship with Donna today as agree to disagree. Donna is partly responsible for the period of time where I didn't have as close a relationship with Samantha.

281.  Another reason I wasn't as close to Samantha as I am today is my incarceration, the hundreds of miles. I couldn't make anybody come see me.

282.  It was their choice. You have to remember the dynamic of prison, people forget about you, it's out of sight, out of mind. I wrote letters to Samantha while I was in prison. She wrote back occasionally. I have another daughter, my 2nd child, Sarah Brobst, age 30.

283.  Her mother is Katherine Meagher. My relationship with Sarah today is good. I didn't learn of her existence until she was 13, 14. She wrote me a letter.

284.  I started corresponding her in maybe 2000, 2001. It was an acquainting period. I corresponded with Sarah more than with Samantha.

285.  I didn't know where Sam was living at the time. Sarah didn't come visit me. Samantha visited when I was moved closer to Chicago, sometimes weekly or biweekly. I have a son, James, Jr, age 30.

19

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

286.   My relationship with him today is good. Before my incarceration I saw Samantha as often as I could, sometimes daily, sometimes every other day. She was 3 or 4 yo. Before my incarceration I saw James a little bit more because he would spend weeks or weekends with me.

287.   His mother was Dawn. My mother passed away while I was incarcerated. Regarding the loss of any other family relationships as a result of my incarceration, I didn't hear from my sisters. I have 3 sisters.

288.   They didn't make contact with me while I was in prison. They visited once or twice when I was in CCJ. I have one brother.

289.   Before my incarceration my relationship with my sister Laura was a normal brother-sister relationship. Regarding how it changed, I haven't seen her since I got out, and that's as much my fault as hers because she lives in another state. The shortest answer would be I'm still trying to get over everything. The feeling of abandonment. They had to go on with their lives, I understand that, but it doesn't make it any easier. The fact I haven't seen her isn't because we have had a falling out. We talk occasionally on the phone.

290.   I had a good relationship with all my sisters and my brother, it was a tight family. My sister Victoria lives in Chicago. I last saw her a month or so after I was released. I don't talk to her on the phone.

291.   Regarding my relationship with my sister Theresa today, we text back and forth. She was living in MS and is back in Chicago so I've seen her a few times. There isn't a relationship with my brother Frederick today. I haven't spoken to or seen him since release. Regarding the reason, other than the fact that he lives where Laura lives.

293.   I have 3 granddaughters and they never had a chance to meet me until my release. Since my release I've established a relationship with my grandchildren. I lost friendships as a result of my incarceration. The few friends I did have, people go on with their lives.

294.   There was a girl named Debbie, a guy named Frank. I was friends with Bonnie's brother Harry, who passed away. I haven't tried to reach out to Debbie or Frank since my release. While I was incarcerated I talked to Frank a few times on the phone. Debbie came to see me in CCJ a few times.

296.   I'm not claiming any loss of sexual function as a result of the actions of the police. When I was released I gave several speaking engagements. They were at U of C, Loyola, UIC.

297.   Generally the subject matter was my incarceration, what prison was like, the struggles of trying to prove your innocence. The deposition where I provided expert testimony was along the lines of what I saw at Menard and the Menard psych center.

20

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

299. Talking about my experiences is cathartic to a degree. I do it more to enlighten people as to what has happened. I've spoken to Chicago Tribune, Chicago Public Radio. Allison Flowers did a series on me that was part of the Exoneree Diaries. I've spoken to ABC and CBS news.

300. I also spoke to reporters from Fox 32. Regarding if I have difficulty talking to people about my experiences, it's always difficult and sometimes emotional when I relay what happened to me but I try to let people know that things like this do happen. A writer from the NY Post did a series of phone interviews with me. He's supposedly writing a book on exonerated people. He said he would like me to be one of his chapters.

301. He hasn't offered me any money in exchange for an interview. At one point I had a website. A paralegal at the Exoneration Project set it up.

302. I believe there was a place on the website where people could donate money to me.

303. There were people that sent checks to my attorney's office.

304. I don't remember how much money I received in checks. A gentleman that was part of a computer software firm donated $5000. Since release I haven't taken any classes.

305. I did study for an EPA test to handle refrigerants in 12/14.

306. I did take an EMT course when I was on work release. Work hours started interfering with school so I kept the job.

307. Regarding what I do in my free time, I spend some of it with my granddaughters. I've spent it with my girlfriend. I have been to basketball games, a couple, and to a NASCAR race. I've been to a couple exoneration conferences. I've been to my daughter's graduation. I don't go to bars or clubs. I'm more a homebody. That's the way I would have described myself in 1984 in terms. The 1st conference was in NC, the 2nd in Portland.

308. The 1st conference, my transportation and hotel were paid for me. The 2nd, my hotel was paid for me, I paid my airfare. Regarding vacations since my release, I've been to NC twice for my granddaughter's birthdays. They had a tradition of renting a house out there for her birthday week. Going to see my daughter graduate last June in VA was sort of a vacation.

309. I spent a weekend at Key Lime Cove in Gurnee this past Dec. with my granddaughters and son and his wife. Regarding how the defendant's actions have affected my life, my children grew up without a father. My brother, sisters grew up without me around to be a

21

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

<div style="border:2px solid black; padding:10px;">

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

</div>

part of their lives. My mother never got to see me be released, proven innocent, so that had a profound impact on me.

310.     I missed all the milestones you would expect in a child's life from 1st days of school to graduation to boyfriends to illnesses, all those things that as a parent you look forward to and some make you cringe. I lost the ability or privilege of being present for the births of my granddaughters and their formative years, their 1st steps, 1st everything, that as a grandparent you look forward. I lost out on the prime of my life. I lost out on the ability to provide for my retirement, my ability to secure my future, my legacy with my children because that part of my life where I was supposed to be working on building something for the family was taken from me. I received the hardship of seclusion. A very solitary life is what prison life is.

311.     It's very hard to vocalize all of it and I know that's the point of this. I have a hard time putting words is just how devastating it is to lose that much time with your life. There's so much I missed that I'll never be able to reclaim. It's gone.

When I was released nobody knew it was coming. My son found out because I was on the news. He stepped up and acted in a manner that I would expect of someone, family value-wise. He embraced me, took me into his house. He provided for me. He taught me. It was more at times that I was his child vs. him being mine. Had it not been for him, I don't know what would have happened. I don't know where I would have ended up. I don't know where I would have lived past the week that the hotel was paid for me.

312.     I didn't have a clue. Everything had changed. The world passed me by while I was incarcerated, Internet, cell phones, computers, laptops, the city itself didn't look the same. It was all different. It was like waking up from a sleep, so he and his wife did the best they could. Had it not been for them, I would have really been lost.

Regarding if I had formed personal relationships with some of the attorneys and law students who worked on my case over the years, I don't know if personal would be a proper word, because it was always professional. Did they care about what happened to me when I walked out? They did, they embraced that responsibility of, we got him out, now what happens.

313.     Regarding if they took steps to assist me in getting a job, one of my attorneys wrote a letter trying to help people understand that I was innocent, had been exonerated. That was Karl Leonard.

314.     Regarding if I have any mental disorder as a result of actions by the police officers, I don't know at this point. I don't know how this is going to continue to affect me. If you are asking, do I have problems? Yeah. I sleep 2, 3 hrs/night maybe, sometimes more, but very rarely, occasional nightmares. It's very unnerving for me to use metal utensils. I

22

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

eat with plastic is much as possible. I don't know why. I just feel more comfortable with plastic. It's a mental thing.

315. I still have a problem with crowds. I have problems if I go to a place, a restaurant or something, of putting my back to the room or to the door. I'm trying to reestablish life and be normal. When I'm in a crowd I've been told that I shut down, that I get this mask-like look on my face, become very standoffish. I project a stay away from me aura that people say they find unnerving. I hadn't been aware that this was happening before they told me. The apprehensiveness and skittishness has subsided somewhat but I guess this other problem still exists.

316. I didn't have any experiences in prison that may have caused me to have an issue with metal utensils. Prison, all you had was plastic. The only thing I can rationalize is that that's what I've been with for the last 24 years and it's what I'm comfortable with. I haven't seen a psychologist or psychiatrist in relation to any of my claims in this case as of yet. Regarding any plans to do so, I've been wrestling with this issue because I was of the hope maybe it would cure itself but the more time that passes and certain things are changing, I believe it's going to be a necessity for me to do that.

317. There isn't anything that has prevented me from seeing a psychologist or psychiatrist other than my fears of psych doctors. In prison, if you get labeled as a psych patient, it's not a good thing, so I have latent phobias and fears of it, trust issues, talking to people and opening up. I didn't have occasions in prison where I talked to a psychologist or psychiatrist. Regarding if it was a situation where felt I needed to see a psychologist or psychiatrist in prison but didn't because of the stigma, I'm sure at some point I may have benefited from it, but I can't recall a specific instance.

318. There were bouts of depression and anxiety, times of rage when you would get turned down again and again, so maybe there would have been benefits. I never explored them. I just dealt with it a day at a time to the best of my ability and kept waking up and hoping that tomorrow was going to be that day.

319. Regarding that I was able to get through that without the help of a psychologist or psychiatrist, I just did the best I can to survive each day. Regarding coping mechanisms, I read, did school work. I tried to not think about it, tried to stay busy. Regarding physical injuries as a result of any actions of the defendants, I have back issues. I can't make the conclusion if that's due to the brutal beating I received, that's not for me to say. I've recently been to a doctor for those.

320. It was Dr. Hahn. I saw him last year because I have numbness on the outer portions of both feet. I haven't asked him to provide an opinion as to whether the issues I was suffering were the result of anything that happened at the hands of the defendants.

23

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

322. I didn't have back issues prior to my interactions with the police. I can't think of any other physical injuries that may be attributable to the actions of the defendants. Regarding plans for the future, I'm just trying to get through each day. I plan to continue to work as long as I can. Regarding if I'm currently happy in my job, I like working with my hands, but it's a very manual, intensive job, and I don't know how long I'll be able to continue to do it.

323. I recall telling a reporter as part of the Exoneree Diaries that working in an apartment building was a dream job of mine. I would have said something like that because it's fun to fix things, work with your hands. I plan to continue to experience as many family activities as I can, see my grandchildren grow up and hopefully great-grandchildren. I don't currently have plans to take any classes.

324. I don't have plans for any money I may receive as a result of this lawsuit. I haven't promised any money to anyone. I owe ~ $250,000.

325. To a loan company.

326. It was used for living expenses, going to see my daughter for graduation, Christmas gifts, things like that. I have no idea if the fire at 4448 S. Hermitage was intentionally set.

328. I believe I 1st learned of Dawn's allegations against police officers in Feb., March 1988.

329. I became aware at some point that she gave a statement before the grand jury.

330. In 1989 I didn't believe that she was responsible in any way for my arrest.

331. I was in Joliet initially for receiving for about 60 days. When you go through receiving, your clothing issued is a jumpsuit. You are placed in a cell with another individual. You get out of the cell to eat 2 meals a day, lunch and dinner.

332. Except for diagnostic lines, like to the healthcare unit for the testing they do when you come into the facility, or the interview that the counselor does, you stay in that cell until you're assigned an institution. The cells in Joliet in receiving are very small.

333. I had a cellmate. After I left Joliet I went to Menard. I left Menard to go back to Joliet and when they closed Joliet I was transferred to Stateville and from there was transferred back to Menard. The first stint at Menard was 4/90-5/98.

334. From the time I got there until about spring 1996 it was a very violent place. The gangs controlled everything. There were almost daily fights, gunfire, stabbings, beatings. In April or so 1996 an incident occurred. I think it was in Pontiac where an inmate was shot and a couple correctional officers were stabbed or something and the entire state was on

24

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

lockdown for almost the rest of the year, and IDOC went through its maximum-security facilities and removed everything that was not considered prison-issued or was considered contraband and took back their institutions. For a period of time after that it was the complete opposite of what it was. You went from the wild west to the most restricted environment one could imagine.

335. It cut down on the violence but it was still a place I was at for something I didn't do so it was very hard to reconcile the fact that I was waking up each day in the same bed, the same cell, for something I didn't do. When I first entered the prison I didn't affiliate with the Vice Lords. I was considered an associate or friend to the organization because my sister was married to a gang member. It was the Latin Kings.

336. His name was Thomas Sicher. He was in CCJ with me but wasn't at Menard with me.

337. I wasn't ever stabbed in prison or the victim of a beating or a sexual assault or attempted sexual assault. Regarding coping mechanisms to deal with other inmates, the best way to survive is to mind your own business, stay to yourself, that's what I did.

338. I had several jobs in prison. I was provided at a certain point in time with jobs that were considered more favorable than others. I was part of a maintenance crew. That allowed me to have access to areas of prison that I wouldn't otherwise be allowed to go into. That included the Warden's office or any other place that might need repairs. I was assigned to the commissary in Stateville.

339. That is a more favorable position. The commissary was considered somewhat favorable because you got to see the items as they came in. If an item was running low, you could put it aside for yourself. You'd always get to buy what you want. I don't recall that there were a couple occasions when I was accused of having alcohol-making devices in my cell.

340. I was never making alcohol in my cell. My cellmates were. Regarding how frequently that happened, it depended on the person I was living with. That wasn't unusual in IDOC.

341. I've never been a drinker. Just no interest.

There was another time where things changed where rules were eased up a little bit. It was a gradual progression.

342. Regarding experiences in prison that particularly stand out that I think affect my life today, I saw carnage, I saw people die that should never have died. It's hard to say what the effect is and how I would have been different had I not lived through it. I can't answer that with a degree of honesty at this point because I really just don't know.

25

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

343.    There's things that stand out in my mind. The guy that was a friend of mine that c/o chest pain, went to the healthcare unit, they told him he had gas, sent him back and 2 hours later he was dead of a heart attack. The young kid that was supposed to be released in a few weeks that was in a cell with a person that said don't put this person in the cell with me, and the guy proceeded to beat him to death over the course of several hours of this kid screaming for help and staff doing nothing. I have seen people brutally beat. I have seen guards that have been stabbed or beaten themselves.

344.    I've experienced people who have lost loved ones, I've lost loved ones myself. There are many things that over the course of a quarter of a century were disturbing.

345.    Regarding the person with whom I haven't quite figured out if we are in a relationship, Renée Kilgore.

        After my trial Weinberg was removed as my counsel and the public defender's office came to represent me.

346.    That took place prior to my sentencing hearing. I saw Dr. Savarese for a mitigation report for sentencing.

347.    I've reviewed the report. I was truthful with Savarese when I spoke to him.

348.    Regarding that in 8th grade I missed ~67 days of class, it was a high amount because that was when I injured my hand.

349.    I have an amputated finger, that's what I'm referring to.

350.    I had 2 or 3 attempts at corrective surgeries before the finger had to be amputated. I missed a number of days of school as a result. Regarding if I enjoyed school during junior high, it wasn't bad. It wasn't that I didn't like going to school.

351.    I don't remember doing things in 8th grade to avoid having to attend school. I'm not aware that there are records from Mercy Hospital and JPA that indicate I purposely damaged my finger several times after receiving the initial treatment in order to avoid going to school. I'm not aware that those records were made part of my mitigation report. I don't recall ever self-inflicting an injury to my fingers to avoid going to school.

352.    Prior to my incarceration I didn't ever receive psychological counseling. I don't recall ever seeing a psychiatrist, psychologist or social worker as a result of sexual impulses I had. I think there was a time me and Bonnie were talking about my promiscuous ways and we had talked about me talking to somebody but I don't remember if I actually did.

353.    I'm talking about when I was living with Bonnie and sleeping with other women.

26

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

---

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

---

355.    I haven't at any point told any psychiatrist, psychologist or social worker I would get frustrated if women would not give me sex.

357.    I don't remember if I told Dr. Savarese about my suicide attempt.

Exhibit 1.    Plaintiff's Response to Defendant William Kelly's First Set of Interrogatories. *Summarized in 8/13/15 record review, Section #13.*

Exhibit 2.    9/13/89.    OPS statement by Kluppelberg.    *Summarized in 8/25/15 record review, Section #11.*

Exhibit 3.    ARDC Complaint against Attorney Weinberg.    *Summarized in 8/25/15 record review, Section #1.*    Defendants Motion for a Murder Task Force Attorney.    *Summarized in 8/25/15 record review, Section #13.*

Exhibit 4.    Petition for Pre-Hearing.    *Summarized in 8/25/15 record review, Section #15.*

Exhibit 5.    10/17/89.    Miranda warning presented at time of interview with Flynn and Snooks.

Exhibit 6.    Photograph of a burned car.

Exhibit 7.    Photograph of a box of Centerfire pistol cartridges.

Exhibit 8.    1/29/09.    Correspondence to Sarah.    *Summarized in 8/13/15 record review, Section #16.*

Exhibit 9.    7/3/07.    Correspondence to Sarah.    *Summarized in 8/13/15 record review, Section #16.*

Exhibit 10.    7/29/09.    Correspondence to Sarah.    *Summarized in 8/13/15 record review, Section #16.*

Exhibit 11.    12/20/87.    Incident report, ELA Security.

988.    At 03:30 this officer began rounds.    When the elevator doors opened on 11th floor I smelled smoke and upon investigating found a fire in the bottom of the garbage chute.

Exhibit 12.    12/24/87.    Incident report, ELA Security.

989.    At 01:20 I approached a black male wearing green army jacket and gym shoes. I asked what he was doing in the parking lot.    He said he was looking for a friend.    I told him he

27

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

was trespassing. After a while I smelled smoke. I made a search of the building and found nothing, then went outside and found a car on fire. I called the FD.

990.  At 0443 I left the building, upon entering parking lot saw the black male from earlier run from the 2nd car that burnt tonight. I called the FD.

Exhibit 13. 12/24/87. CPD case report.

3165.  Kluppelberg observed offender flee from vicinity of victim's burning auto. Battalion Chief stated possible origin of fire flammable liquid. This is 2nd occurrence on this date with same offender identified.

Exhibit 14. 12/26/87. ELA incident report.

991.  I attempted to make contact with apartment 1809 because of a beeping sound from trunk.

992.  Supervisor gave authorization to make a forced entry. Found smoke detector to be the cause of the noise.

Exhibit 15. 10/17/89. Interview by Flynn and Snooks. *Summarized in 8/21/15 record review, Section #1.*

Exhibit 16. 1/13/88. H&P, Cermak Health Services. *Summarized in 8/21/15 record review, Section #5.*

Exhibit 17. IDOC disciplinary reports. *Summarized in 8/13/15 record review, Section #23.*

Exhibit 18. Undated newspaper article, "What a foolish idea!", source unidentified.

3940.  News coverage can be manipulated by means convenient to the editors although not necessarily focusing on the truth. This happened on the news report depicting Back of the Yards to be a conglomerate of residents terrified by the uncertainty of a dangerous arsonist doing away with all of the homes in the area.

Of course there have been fires, we do not deny that, but to this day, and after an exhaustive investigation by the PD, there has not been any proof that suggests there is a crazy arsonist on the loose. The only arsonist, a woman whose mental faculties are disturbed, started the blaze at 45th and Marshfield (she admits the possibility of having started the blaze at 44th and Hermitage but cannot remember, as she had been drinking heavily that night). She is being detained. The fire at 45th and Honoré was caused by children playing with matches. After thorough investigations by police of other local

28

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

fires, none came up with traces of an accelerant being used. Then where is that arsonist the Channel 2 is referring to?

Exhibit 19.  1/18/90.  Response of Weinberg to ARDC complaint.  *Summarized in 8/ 25/15 record review, Section #2.*

29

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

## 2. Deposition of Donna Kluppelberg, 1/19/15.

7.     Kluppelberg is my ex-husband.

8.     We met in 8/82. He was working at a carnival and I had taken my kids there. As I was taking my kids on the ride, he told me he wasn't going to let them off until I agreed to go out with him. I said yes.

9.     We were married 9/11/82.

10.    We moved in together maybe 2 weeks after we met. What attracted me was he was charismatic.

11.    We lived in the projects near CCJ with his mother, his 3 sisters, his brother, and my 2 kids.

13.    I met Kluppelberg on 7/29.

14.    Regarding his relationship with his family, since there was no man in his household, he was like the dad. He took care of everybody. He was super close to his mother.

15.    She depended on him for almost everything. Like taking care of the kids, making sure dinner was done, shopping. He was very protective of his siblings.

16.    He assumed the father role of my 2 kids but was very strict with them. If they went out and got dirty, they had to come in and hurry up and change clothes. He would discipline them by sending them to their room.

17.    When Kluppelberg and I got married, his mom and her boyfriend got married at the same time.

19.    We first lived in the projects then moved into a house.

20.    That was at 48th and Racine.

21.    Alfred and Delores Kluppelberg lived there as well upstairs.

23.    When we moved to 4758 S. Ada, his siblings and his mom lived upstairs. From 8/82 until the time we separated, Kluppelberg had a business called West Town Construction.

24.    It was a board-up service.

30

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

25.  Regarding how he got business, he had a scanner.

29.  I was on public aid in 1983. He didn't ever give me any money in 1983.

34.  I know who Glassco is. He was the boyfriend of the woman that Kluppelberg left me for.

35.  That's Dawn Gramont. Regarding how I found out about her, I was 7½ months pregnant. Kluppelberg was talking on the phone and I walked in. He put the phone on the bed and said, I'm going to take this call upstairs. That's when I heard him talking to her.

36.  He was saying that I was going to be leaving to my mother's house and he would be over to her house soon. I let them know I was listening on the other line because he called me a bitch. He came down. He said he was leaving. I told him no, we have a child on the way, we need to work this out. He backhanded me and that's the day we split up.

37.  He hadn't hit me before.

38.  Kluppelberg stopped working at the carnival a few days after I met him. I don't know if he left or they let him go.

39.  I believe he was working at West Town Construction in 1983. So he could have been working part of the time we were together.

40.  Samantha was born in ███████.

41.  Kluppelberg left, he never came back. Regarding what he and I did together between 8/82 and 3/84, every once in a while he would come over and we would have sex.

42.  Other than sex we didn't do anything else together in our spare time.

43.  We separated in 3/84 or 2/84.

45.  He wasn't happy when I got pregnant.

46.  Before then, he wanted to have a baby.

47.  He didn't provide any financial or emotional support while I was pregnant.

49.  After Samantha was born he would take her sometimes to Dawn's house.

50.  He was living at her apartment.

31

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

53.     I don't think Samantha has spoken to Kluppelberg since his release from prison.  She doesn't want to be part of his life.

54.     Because of the way he treated her brother and sister when they were living with him, that's Nick and Julie.  He was very rough mannered with them.  They weren't allowed to do a whole lot of things.

55.     He didn't play with them or take them anywhere.  He didn't take an interest in their lives.

56.     He had West Town Construction in 1984.

60.     Regarding that he stopped seeing Samantha, it was me that kept him from seeing her.  There was a time he had to go on one of his board-up services, took her with him and left her in the van.  I didn't want him taking her anymore after that.

61.     He told me that Dawn wouldn't watch her and he had to take her with.  I asked why he didn't bring her back home.  He said because it was his time to be with her.

62.     Regarding how long she was in the van, I don't know.  It couldn't have been too long.  He's not a monster.

63.     If he wanted, he could come see her at the house.  I don't think that happened.  Maybe a couple times.

65.     He didn't ever pay for expenses associated with Samantha.  In our divorce he was ordered to pay $67/month child support and he paid it maybe 2, 3 times.  I believe at this time he was employed with West Town Construction.

69.     Regarding if he had been seeing other women besides Dawn, Kathy Meagher.  The day that he backhanded me and I left, he brought Kathy into my bed and had sex with her and she got pregnant that day.

71.     At that time he was also having a relationship with Dawn.  I don't know of any other women with whom he had a relationship at that time.

72.     About 7 or 8 years ago, Sarah called me and said, Is this Donna Kluppelberg that has anything to do with James Kluppelberg?  She said, I'm James' daughter, my mom is Kathy.

73.     She had been wanting to know who her dad was.  So I connected them while he was in prison.  She started writing him and he started writing her back.

74.     In 2000 Kluppelberg and I tried to get back together while he was in prison.

32

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

DATE OF RECORD REVIEW:        August 28, 2015
C&A DICTATION NUMBER:         3073
BRIEF CITATION:               Kluppelberg v. Burge

75.  That was 2000-04. Regarding how our relationship began again in 2000, he was calling Samantha every weekend. He would talk to her for 2, 3 min. and then he and I would talk. Things escalated and we tried to make things work again but they didn't.

76.  Between 2000 and 2004 think I visited him 3 times/month.

77.  Samantha accompanied me on a few visits. He tried to convince her to visit more frequently.

79.  Kluppelberg and I remained in contact between 2000 and 2004. In 2004 he got too demanding. I was giving him $50 out of every paycheck. I had an outstanding credit card and he said, You better get that paid off, because if you don't, I know who's going to suffer for it, and he pointed to himself. He wrote letters every day. I had kids to take care of, my job. I said, can we do a back and forth letter instead of you sending a letter every day and me having to write back every day?

80.  He said, No, I want you to write me every day. I said okay. Then one day I wrote him a letter. I said, I can't do this anymore. It's too demanding, too stressful. He wrote letters to my friends telling them that I was upset and supposed to be his wife and they need to talk to me. I gave him half of my check because I wanted him to be comfortable, be able to buy stuff from the commissary and he liked ordering things through the mail.

81.  I haven't had any contact with him since 2004. I don't think Samantha has.

84.  I filed a petition for dissolution of marriage.

85.  I think it was filed in 1987.

86.  It wasn't a marriage. It was just him coming and going and me being at home with the kids. I don't know where he was coming and going to.

87.  *Reference is made to Exhibit 1, divorce documents.* He may have been in prison when I filed but he was out when we got the divorce because he brought Dawn with him to the divorce proceedings.

90.  It was filed 9/30/85.

95.  I testified that I had not lived with Kluppelberg since 2/16/84.

96.  I testified that he left me because he said he couldn't live with anybody anymore. He told me that he couldn't be with just one woman.

97.  By that time he had been in a relationship with Dawn.

33

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

98.     He didn't ever try to come back to live with me.

99.     2½ weeks after we were married he was already messing around on me.

100.    I don't know who he was messing around with. My friends told me that even they had sex with him.

101.    The court found him guilty of deserting me.

102.    He didn't contest it.

103.    Between 1987 and 2000 I had contact with him when he called Samantha. He used Samantha to get to me, to get me to go back with him while he was in prison. One time in a conversation we decided we were going to try and make it work. It might have been at the beginning of 2000.

104.    Between 6/87 and 1/88 I didn't have any contact with him other than him contacting Samantha.

112.    When I did go back with him I helped him get his documents to the law schools. This was between 2000 and 2004.

113.    I can't tell you how many emails I sent out for him with his case papers that I had scanned.

114.    I sent these to lawyers and law schools because he had convinced me that he hadn't done it.

115.    From the beginning in 2000 he was saying, You have access to a computer and printer, could you please help me get these to the lawyers? Maybe somebody will take my case pro bono.

116.    Regarding my opinion today as to whether he may have started the fire, I really don't have an opinion. I could care less.

117.    He told me that he was at my house either the day of or the day before the fire. I told him, I don't remember.

118.    He had come over several times. I don't remember dates. I don't remember how he was certain that he had been with me on 3/23/84. I recall being questioned in 1/88 about the fire.

34

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

119.  I told detectives everything I'm telling you now. I don't know anything. He wasn't with me.

120.  Regarding my reaction when I found out he had been convicted, I just felt sorry for the people who had died in the fire.

123.  Since his release I haven't had any contact with him.

124.  I get a letter from a lawyer that said he was getting letters he has to pay back his child support. I said, I don't want anything from him. The courts judged me $2.88 a week.

126.  I got a letter that the child support of $2.88 a week was being eliminated.

127.  The letter says, Following a meeting with IL Dept of Healthcare and Family Service, records indicate that James owes Donna a total of $11,224.93 in past due support. It's my understanding that he owed me that and that's why he had filed the petition.

128.  I called his lawyers. I said, he's only giving me $2.88 a week and wants to either cut it to $1.44 or eliminate it? She said, yeah, you have 28 days to respond, I said, I don't want to.

129.  He made the $2.88 payment about 6 times. I didn't receive any other payments. I figured out at $2.88 a week he'd be paying me for 73 years.

132.  Since the court eliminated the debt in 2014 he hasn't had any contact with Samantha.

136.  Regarding how I would describe him as a person then, a cheater. Now I don't know him so I have no opinion.

137.  Regarding being charismatic, women just fawned over him. He knew how to speak, what to speak, and where to speak it.

138.  Wherever he went, women flocked. He was hot when he was younger. I felt lucky at the time that such a good-looking guy would want to marry me.

139.  Shortly after I was married I left my employment with Sweetheart Cup because I was tired of getting up at 6 AM and watching him lay in bed and sleep. I didn't ever know him to drink or do drugs.

140.  While we were married I wasn't aware of any crimes he committed.

142.  He didn't ever tell me that he was sleeping around until I went back with him in prison. He said, I want to be honest with you, this is all I did, this is everyone I've been with. I didn't ever know him to set fires.

35

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

143.  Other than where he was going, I can't think of another instance of him lying.

144.  I would characterize him as manipulative. After he left, he would come back, we would have sex. I'm like, Why can't you come back? He would give me all kinds of excuses, I still love you, I just can't be with you right now. I didn't know him to be manipulative with other people.

151.  Regarding telling me what happened the night of the fire, he said he was in Dawn's house.

152.  That the confession had been beat out of him.

154.  In the divorce document, I did not desert my wife in 2/84. Yes he did.

155.  Even after my incarceration, my wife and I to this day keep in full contact with each other. Crap.

156.  This was his response to my petition for dissolution of marriage.

157.  When he says he saw and spoke to me and his daughter every day and also kept up support of us, it's false.

158.  Regarding that I told him that the only way he could come back to me and my daughter is if he could make money, that's false. Where it says, We were separated in 2/84 but reunited in 12/84, that isn't true. We were separated never reunited. Regarding saying, Even during our separation, I never stopped performing my marital duties, for a while he did come back and we had sex.

159.  That's what I understand he's meaning when he said marital duties. He would write me letters every day between 2000 and 2004. The context was what he did every day, what he watched on TV. He spoke about his legal proceedings. Just asking me for help.

160.  He was also corresponding with the girl that he's engaged to now. She met him through a prisoner line. He said, she's just a friend. Now he's with her.

161.  *Reference is made to Exhibit 2.* This was my email address in 2005. This is an example of me reaching out to someone on behalf of Kluppelberg.

162.  We broke up right after 2005. It was New Year's Eve and I was home by myself.

163.  I'm honestly contemplating suicide, just end it all. I went to sleep and woke up the next morning to his phone call. I said, I had a real rough night, I was honestly contemplating

36

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

DATE OF RECORD REVIEW:          August 28, 2015
C&A DICTATION NUMBER:           3073
BRIEF CITATION:                 Kluppelberg v. Burge

suicide. He said, well, we all have our bad days. But guess who I talked to? It was maybe 2-4 weeks later that I broke off with him.

164.     I recall corresponding with Maurice Possley at the Tribune.

165.     He wrote back saying he would read the court records.

166.     Regarding that he mentioned he had obtained the trial record and was going to do some interviews and that they had sent out Burns' transcript for analysis, I think Kluppelberg told me to suggest to him that they do that. Suggestions that were made were because Kluppelberg told me to make them. Reading on the 1st page, a reason they are unable to advance the case more, probably the two most significant aspects of this are that Glassco refused to be interviewed and statements made by Bonnie.

167.     At this point, Glassco's testimony at trial remains in place unchanged. Additionally, Bonnie has told us that Jim admitted to her he set the fire.

         I didn't ever speak with Bonnie about statements in this email. After 1/05 I didn't have any further contact with reporters or lawyers or investigators.

168.     2-4 weeks after New Year's day I broke it off with Kluppelberg. I didn't want anything more to do with him because I knew he was all in it for himself. I never spoke to him again.

169.     He told me he was 19 when I met him. The day before we got married, he told me he was 17. That's why his mom had to sign for him for us to get married.

171.     At the time I was married to Kluppelberg I drank alcohol very rarely. He didn't like alcohol or drugs and didn't want his wife drinking or doing drugs. One time I became very intoxicated, the time he had to carry me upstairs.

172.     I didn't have a drinking problem. He knew that. Regarding any issues I have with long-term memory, I just can't remember dates and stuff like that.

174.     Regarding being backhanded by him in 2/84, whether there was a telephone involved in that incident, when he came back down and I picked it up to go hit him with it? Yes. But he got up on the bed like a crying little baby and I just put the phone through the wall. I wasn't going to hit him.

175.     He backhanded me and then I picked up the phone. I threw it at him after he hit me. I wasn't drinking. I was 7½ months pregnant.

176.     One time I had a couple beers while I was pregnant.

37

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

180.  I knew he couldn't pay child support while he was incarcerated but the payments stopped while he was still out.

181.  The sum the state arrived at represented the accumulation of child support over the course of his incarceration. When he was released from prison Samantha was 27.

182.  She was financially independent.

185.  He knew he was innocent but I think he resolved himself that he might spend the rest of his life in prison.

193.  Regarding what I meant by Kluppelberg was all in it for himself, at that point, I realized he was using me. Getting $50 out of my check every week. Visits, prisoners relish visits from people. Whatever he could get for himself, that's what he wanted.

194.  He would often express gratitude for all the work I did but I think he was only grateful because he knew if he puffed me up, I'd help him even more.

Exhibit 1.  Divorce documents; Motion to Reduce or Eliminate Child Support Arrears. *Summarized in 8/13/15 record review, Section #18.*

Exhibit 2:  Email exchange, Donna Kluppelberg and Maurice Possley.

2628.  1/10/05. Email from Donna to Possley.

We obtained the trial record and will be doing some interviews soon. Have sent out Burns' transcript for analysis by fire experts.

2627.  1/14/05. Email from Possley to Donna. We interviewed Bonnie and Dawn. Duane refused to be interviewed. We had a brief conversation with Weinberg. We read the transcript of the trial and the court file.

We are not going to be able to pursue this matter further unless there's some action by the courts. We feel we are unable to advance the case. The two most significant aspects are that Glassco has refused to be interviewed and statements made by Bonnie. Glassco's testimony at trial remains in place unchanged. Bonnie has told us that Jim admitted to her that he set the fire. Jim may contest this but any story we would write would have to include Bonnie's statements. Given that, we feel at this point we're not going to write anything.

My reading of the testimony at the suppression hearings prior to trial tells me that while police did abuse Jim his alleged confession was in fact suppressed. As to the finding by

38

**Cavanaugh 263**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

police that the fire was accidental, at this time, absent other evidence, I can see the possibility that homicide detectives wrote the report one way and bomb and arson investigators had a separate report. This evidence is thin, I will say, but given what I know, we are taking a pass on this for the present.

39

Cavanaugh 264