*Kluppelberg v. Burge, et al.*
Case No. 13 CV 3963
Our File No. 13-3050

# DEFENDANTS' RESPONSE TO PLAINTIFF'S MIL NO. 40 EXHIBIT A-5 (REDACTED)

# Replacing Dkt. 500-7

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

## 3. Deposition of James Kluppelberg, Jr, 8/11/14.

6.      I was born REDACTED.

7.      My mother is Dawn Gramont, my father is James Kluppelberg. I have 3 brothers, Duane Glassco, David Glassco, Donald Gramont. I have 2 sisters, Sarah and Samantha.

9.      I'm married to REDACTED. We have 2 girls.

10.     I'm a journeyman electrician.

12.     My first memory of spending time with my father is visiting him in prison I don't remember a lot about it. I was really young in the picture, 4 or 5.

13.     I was always excited when we would go down to see him. I would go mostly with Bonnie Kluppelberg, my stepmother.

16.     I didn't know he was in prison until we went to visit him. I learned that he was in prison for arson murder when I was 6 or 7.

17.     I had an argument with my mother and during the argument she told me that he was never coming home, that he was in there because he killed 6 people. That was Dawn.

18.     Later I remember asking my mother's mother about my dad. She said he was imprisoned for a very long time and would probably never get out and she didn't want to talk about it.

20.     Every time me and my mother got into an argument she told me my father was guilty. I talked to my father's mother and she always said he was innocent.

22.     A little over a year ago my mother passed away. About a year before that she was in a nursing home and my brother told me she had some stuff she needed to tell me. We had a bad falling out a few years before and I was reluctant to go talk to her but I did and that was the first time she told me she thought my dad was innocent.

23.     Up until then it was he was guilty. My mother was a drug addict so throughout the years we had a lot of disagreements. She told me she really did believe my father was innocent and that she said stuff in the courtroom because Duane told her to say it. That conversation was the 1st time she said he was innocent. I asked her why she was saying he's innocent and before she was saying he was guilty, and she told me she has always maintained he was guilty because she wanted to protect Duane. She was young and didn't know what to do and thought my father would never get out so why put false hope into my head.

40

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

DATE OF RECORD REVIEW:        August 28, 2015
C&A DICTATION NUMBER:         3073
BRIEF CITATION:               Kluppelberg v. Burge

24.     Regarding wanting to protect Duane, he's the father of my 3 brothers so they had a strong relationship and as far as I know, Duane was in trouble himself with the law so my mom did what she had to do to help him with that. I didn't ever speak with Duane about my father.

25.     Bonnie's conversations over the years, he's been guilty and innocent, again, he was guilty when she wanted to get remarried and he didn't want to grant her a divorce, so she was really mad and that was when I stopped communicating with my father, when I was 14 or 15. That was the first time she told me he's guilty, that he was never getting out, that he did it. Since then, I was asking people if I should let my father see his granddaughter, and Bonnie told me, this is a tough decision because he's probably never going to get out, but I think he's innocent.

26.     I said, you told me he was guilty, and she said, because I was mad. I think he is innocent and I think you should have his granddaughter be a part of his life. But I decided that wasn't a good idea. This would have been probably 2005, 2006. I asked Bonnie why she believed my father was innocent.

27.     She said that by that time my mother had lived with her and she knew more of the story. She told Bonnie that my father always maintained his innocence. We never had an in-depth conversation of what my mother said to Bonnie.

28.     Bonnie had always said he was innocent until they had the altercation when she wanted to get the divorce, then it was he was guilty.

29.     I had a falling out with my mother about 2007, 2008. She had moved in with me, had just had a heart attack, was in the hospital about 3 months. She was clean, they got her a job. I let her move in and then I came home one day and all of our stuff was gone. That was the end of that.

        I moved in with Bonnie when I was 8, so from 8 onward me and my mom kept in contact but not close contact.

30.     Regarding a conversation I had with Duane's mother, Elizabeth, about my father's incarceration, about 2 years before she passed my oldest brother, Duane, lived with her. I went to visit him. I think we were talking about Duane's father and how he was in prison, and she threw out, you guys are two of a kind, fathers in prison.

31.     We had started talking about my dad. She told me that she told Duane that if my father was innocent, he needed to tell the truth. She told me she let him know that it wasn't right if he lied for all those years.

41

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

34.     Regarding what else I remember about those prison visits, I remember the Polaroid all the time.  I remember he would open a whole bag of chips.  They were short visits, never more than an hour.  I learned how to spell my name with him through bingo.  I remember a lot of just talking.  When I started to get older he would ask me about girlfriends and stuff, we would talk about sports.

35.     Just normal conversation.  Bonnie was the person who always brought me to the prison.

37.     He always seemed tired.  He would never say he was good, he would say he's coping, making it work.

38.     He didn't ever talk about friends he had made in prison.  He developed an interest in law to try to get out but not really too many hobbies.  We never really had conversations about his wrongful incarceration.

39.     I stopped speaking to my father when I was 14 or 15.  We went for a visit and him and Bonnie got into a real bad argument because she wanted to marry Ali, he didn't want her to.  I was at the rebellious age anyway.  I remember telling him he needed to let Bonnie move on.  That was the last time I saw him for a long time.

40.     During the time I wasn't speaking with him I received at least 5 letters from him between then and the time he was released.  That was 9 or 10 years.  I read 3, 2 of them I never opened.

41.     The letters I read were pleading for me to make contact with him. They asked how my daughter was, one of them asked how my mom was because he heard she was sick.

42.     I threw them away after I read them.

43.     His sisters never bothered with him.  Samantha did visit him after I decided not to speak with him anymore.  She and her mother were regular visitors when he was in Stateville and Joliet.

44.     Samantha made a decision to stop visiting.  I don't know why or when.

46.     I first met Sarah about 2 months after my father got out.  I didn't even know I had a sister. I met Samantha when I was a kid, we grew up around each other.

48.     Samantha and I haven't talked in quite a few years.

49.     When I was visiting my father, I visited maybe once every 2 months.

42

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

---

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

---

51.    Every year I got a birthday and Christmas card, he never forgot. Around 14-15 the birthday cards and stuff stopped, when I told him I didn't want to see him anymore.

53.    I always wanted to believe he was innocent. As I sit here today I believe he is innocent.

54.    The state doesn't usually let go of innocent people that have already been convicted, everybody I've talked to believes he is innocent, a judge declared him innocent, gave him a certificate of innocence. I would have no reason not to believe he's not innocent. I always thought he was innocent.

64.    On the day of his release I went to meet my father straight from work. I met him at WGN news studio.

66.    Then we drove to Loevy & Loevy. We did another news interview with Fox News.

68.    We went shopping, went out to eat, then I brought him back to the hotel. I remember buying clothes because the State didn't give him any.

69.    I paid for everything.

70.    I contacted him the next day. I offered him to move in with us. He told me he would have to think about it. He had had other plans as to where he was going but it didn't work out.

71.    He was going to move out of state to be far away from all of this but it didn't work out. He didn't want to be by Chicago. He wanted to move to NM where he had an acquaintance, Renée.

72.    They met through penpals. I don't know why the plans didn't work out. I gave him the invitation to move in with us and he took me up on it later.

73.    He moved in with us 3 days after he was released.

74.    I purchased a bed for him. I purchased more clothes for him. He had had some donations but I went out and bought him a few more outfits before the donations came in. People from church brought him a bag of clothes.

75.    That's the church I go to. When he got to my house both of my girls ran up and hugged him like he had always been there.

77.    Since his move in I've done all kinds of stuff with my father. We've gone to church together.

43

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

78.     We've gone to races, water parks, Six Flags, Busch Gardens, VA, Indianapolis. I try to do as much with him as I can, we like to do it. He's living with Renée. He moved out of our house last July. He lived with us a little over a year.

79.     He moved out by himself at first and then Renée moved in with him 2 months after he moved out. While he was living with us between 6/12 and 7/13 I wasn't paying for clothing for him. I was letting him borrow the car. I was paying for his toiletries.

80.     He did work some of the time he lived with me. It took him almost 8 months to get a job when he got out. I think it was Feb. when he started working. Prior to that he helped at the church, grounds work or whatnot.

81.     He donated his time. Between 5/12 and 2/13 he was unemployed. He started work in 2/13 for a tube manufacturing company.

82.     He liked the job. He doesn't still work there.

83.     I know exactly when he left. He couldn't get used to the crane operation and it was a mutual agreement that they parted ways. He got a job pretty soon after that. He's working as a maintenance man for an assisted living facility now.

85.     He's painted some apartments, vacuuming cleaning hallways. I believe it's a 40 hour week. He likes what he's doing.

86.     Since he started working he hasn't offered to reimburse me for clothes, gas for the car. I haven't asked.

88.     He hasn't talked to me about money he expects to receive.

89.     *Reference is made to Exhibit 1, article by Allison Flowers, 11/25/13.*

90.     *Reading from the article,* "I thought he was guilty. There was no one that said he was innocent."

91.     I don't recall making that statement. Like she says, there was no one that would say he was innocent, so I might have said that and she might have translated it that she thought I thought he was guilty.

92.     *Reading from the article:* "A few years before James' release 2 detectives came to James Jr's door. As they asked questions, he started to think that perhaps he had been wrong. Perhaps his dad was innocent and his mom, even though she was cracked out whenever he heard her say so, was right."

44

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

94. That would be in the time range that I was having conversations with people that my dad may have been innocent the whole time, which doesn't mean I think he was ever guilty. I can't help what she writes. I don't recall saying that.

95. I may have used the phrase cracked out. It refers to a person being high on crack. Most of the times that my mom and I were arguing she was high on crack and that's when she always told me he was guilty. The only time she ever told me my father was innocent was when I saw her in the nursing home and she was not cracked out then.

97. She was cracked out all the times that she said he was guilty.

102. I remember speaking with a reporter and saying I was angry at the justice system. That was Tisha Lewis. I'm still angry at the justice system. They took my father.

103. I didn't grow up with a father because they messed up. I could have maintained a relationship with him during those years but I chose not to speak with him. But if the justice system never messed up in the first place, we would never have been in that predicament. Regarding what I base my anger on, how would you feel if you didn't have the right to grow up with your father. You'd be angry if you found out he was innocent the whole time. I lived in homeless shelters, my mom was a crackhead. Me and my brothers didn't get to grow up together because we had no family structure, so those are the feelings that I base my anger on.

104. I believe I had a bad upbringing. *Reference is made to Exhibit 3.*

105. I would be the kid in the 59 jersey. I was a junior in high school.

106. It reads, A group of distinguished De la Salle students participated in the taping of a TV show for the CPD CAPS initiative.

109. I would have considered this an achievement. I did a lot of stuff in high school. I played sports, I was a peer mediator, I volunteered at the soup kitchen once a week. I was very involved in high school. I didn't want to be at home. I was B honor roll.

110. My father knew I was a good football player, knew I loved wrestling. My sister Samantha told me my father was trying to get in touch with me, wanted to mail me a letter.

111. I told her I didn't want to talk to him. Since his release from prison my relationship with my father is awesome. He's a great grandfather, loves my kids. I like spending time with him. We like to do stuff. He's had a hard time adjusting to society so I think we have had a strong relationship as far as that goes. He has a hard time being in public places with a lot of people. He feels a little antsy sometimes, a little anxiety, too much going on.

45

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

112.    The world is really fast compared to when he went in. If we are out in public he doesn't like to be touched which is prison lifestyle, it's not a good thing if you're touched. Regarding bad experiences he had in prison, he was jumped a few times, it's a real rough life. He doesn't sleep very well. He's usually up when I'm up, and I get up at 4.

113.    We haven't talked too much about the prison experiences. We try to focus on the fact he's out now and we can move forward. He wants to settle down where me and the girls are, wants to move on with his life. He's happy working. He wants to see NASCAR races.

114.    He's living with Renée now.

115.    Based on the fact that he has employment, is living with Renée, I would say he has started to get on his feet in becoming more self-sufficient. I don't feel like I need to support him anymore. If he needs help, I would help him, but he hasn't asked.

116.    We're family, there is no need for him to reimburse for anything. I learned about his criminal history probably through my mother.

117.    She told me that he had burglarized a couple places, nothing else before the other conviction.

118.    I was 6 the first time we went into a homeless shelter.

119.    For 2 or 3 years we were in and out until I moved in with Bonnie.

121.    Whenever my mom didn't want me, she called Bonnie. I was with Bonnie a lot.

122.    Other than being a drug addict, there were things about my mom that made it tough to live with her. We were abused. We didn't eat all the time, stuff like that.

123.    I wouldn't characterize my mother as honest.

124.    When she was on drugs she would get violent and start yelling crazy stuff. Stuff about my dad being guilty, about she didn't care about us, that we were taking up too much of her time.

130.    There was one time I talked to my mom about my father and it wasn't an argument. It was maybe Feb. before she passed away.

131.    I would be angry at her that we weren't eating, and if my dad was around, well your dad is a piece of crap, he's guilty. That was all the time when his name came up. I took everything my mother said with a grain of salt. She just wasn't a trustworthy person.

46

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

DATE OF RECORD REVIEW:        August 28, 2015
C&A DICTATION NUMBER:         3073
BRIEF CITATION:               Kluppelberg v. Burge

132.    She didn't ever say she was afraid of my father. Elizabeth Glassco admitted that she was afraid that if he did get out that he might hold bad feelings toward their family.

133.    Regarding my conversations with Bonnie about my father, when I was younger, it was always good. In high school when they got in that fight it was the first time she didn't have anything good to say about him.

138.    I see my father very often.

139.    He talks about NASCAR, he loves baseball. I talk to him about work and he talks about little projects that he's doing.

144.    He received money from the government in connection with his certificate of innocence. I don't know what he's done with it.

149.    He said he didn't know how to type before he went in prison. From conversations I had with my aunt Teresa, he's not the same person as before he went in, she said he was always outgoing, loved to be around people, and that's not who he is anymore.

150.    I've asked her, why is he antisocial at some of my parties and with my friends, and she says he was never like that before.

151.    He was always busy, always had something happening. He always wants to be doing something, keep his mind busy, so that part stayed the same.

157.    Regarding what would have been different about my childhood had he been around, I believe we wouldn't have bounced around so much, maybe got to know my aunts and cousins better.

158.    Given that he had kids with different women within a few years and was in and out of jail for burglary and other things, regarding the likelihood of my childhood being more stable with him around, I haven't thought much about that, but if you knew my mother and the men and the stuff that happened, I think it would have been better no matter what. I don't think it could have been any worse than it was even if he was a criminal. The way I see him with my kids and the way he interacts with my sister and her kid, he never would let anybody hurt a child.

159.    I'm a good worker. I'm spoken highly of by my coworkers. I was a good student. I love my kids. I pride myself in making sure their life is way better than mine was.

164.    When my mom was in the nursing home we had a very coherent conversation.

47

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

166.    That was the only time she had said that my father was innocent and that she had lied on the stand and had lied to the detectives. The conversation started out as she started to tear up and said she had something to tell me that she couldn't die without telling.

167.    She proceeded to tell me that she believed my dad was innocent and that she had lied to protect Duane and that she wanted me to know the truth. That she didn't know where he was that night, she didn't see him go in and out, she just wanted me to know that he was innocent.

168.    She had told the detectives what Duane told her she needed to say.


Exhibit 1.  Transcript of WBEZ program.

1.    11/25/13. James Kluppelberg's return home. " I may have been deprived of my life for 25 years, but my children were deprived the privilege of a father. That's something that a lot of people overlook. There's a lot of victims in this. It isn't just the people who perished in the fire. It isn't just me. It spiderwebs out to my children, my grandchildren, my wife, my sisters, my brother, my mother."

Renée 1st got in touch with James through a prison correspondence service almost 20 years ago. She picked him at random from a list of inmates. When she learned he was serving 6 life sentences, she felt safe he wouldn't get out and find her. She wasn't looking for a relationship.

10 years later, when she was passing through Chicago, she took a weekend to visit James. His wife accompanied her. It was the first and only time during his incarceration that they met. After his wife divorced him, James sent Renée a letter. He told her he didn't have many connections on the outside, and the two became penpals.

2.    She became curious about his case. Ask me any question you want, and I'll answer it, he would write. The more she read, the more she realized her penpal was in the wrong place.

His first night as a free man he called her from the hotel where his attorneys put him. He was to stay there until they could figure out where else he could go. They agreed she should visit in a week's time.

James Jr hadn't seen his father since he was a kid when his stepmother would take him for prison visits. On prison visits, they would sit together in a big open room. They would eat potato chips with ketchup.

48

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

3.  Prison staff would take two Polaroid pictures during the visits. When James Jr was in junior high, the visits stopped. James' wife wanted a divorce. James kept writing to his son, but the letters went unanswered.

"I thought he was guilty," he says. "There was no one that said he was innocent." A few years before James' release, 2 detectives came to James Jr's door. As they asked questions, he started to think perhaps he had been wrong. Perhaps his dad was in the innocent and his mom – even though she was cracked out whenever he heard her say so – was right.

Exhibit 2. 5/31/12. Email to Tara Thompson.

4011.  My name is James Kluppelberg Jr. I just found out the news about my father and if he would like to contact me can reach me at [phone number]. I would like to thank you for your hard work on his case.

Exhibit 3. Undated newspaper article about DeLaSalle students. *Discussed in deposition above.*

49

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

## 4. Deposition of Karl Leonard, 2/25/15.

12.  I obtained my IL law license in 2009.

14.  I attended law school at U of C. I joined the Exoneration Project in 2008.

30.  I'm an associate with Winston & Strawn.

53.  I represented Kluppelberg in connection with his post-conviction and habeas proceeding as well as his certificate of innocence proceeding.

59.  *Reference is made to Exhibit 2.* This is an ECF notice dated 9/24/10. It appears to be when I filed my appearance in Kluppelberg's federal habeas proceeding.

61.  I appeared on his behalf maybe a dozen times at status hearings and I remember being in contact with the Attorney General's office. Late 2009, early 2010 is when I began representing him in connection with his post-conviction proceeding.

67.  I recall a newspaper article attached to one of the filings that we did. The title was something like: Who's setting these fires?

74.  *Reference is made to Exhibit 3.*

75.  It's a letter with my signature addressed to Weinberg on 1/4/12. Apparently we talked on the phone on 1/3. I don't recall that conversation. I don't know whether I spoke with him at any other time.

79.  The first time I spoke with Kluppelberg was probably 2010. He was in Stateville so it would have had to have been by phone.

80.  Prior to his release from prison I had dozens of conversations with him.

83.  *Reference is made to Exhibit 4.* These are examples of the written requests seeking an unmonitored attorney/client phone call between me and Kluppelberg.

86.  I will not be answering any questions about any conversations that Kluppelberg and I had.

88.  *Reference is made to Exhibit 5.* It's a letter sent by David Carter who identifies himself as an inmate at Stateville and a cellmate to Kluppelberg.

89.  It's dated 9/19/11.

50

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

91.    The first time I met Kluppelberg in person was at 26th and California when he was still in custody but brought there by IDOC to attend the hearing on the state's motion to dismiss his post-conviction petition.

92.    While I was representing Kluppelberg in connection with his post-conviction proceedings, I issued a subpoena to the CPD.

93.    *Reference is made to Exhibit 6.* It's a subpoena cover letter and related materials that I served on the CPD seeking documents related to Kluppelberg's case in 9/10.

94.    Whether they actually gave something in response or the State had to get it themselves, I don't know. *Reference is made to Exhibit 7.*

95.    These documents are exemplary of the issue I was just describing, where I served a subpoena, pursuant to Judge Jones' order, seeking documents related to a 6 person homicide, and the PD provided a 2-pg police report regarding this man, Raymond Runchess, who had the misfortune of crashing his car into a police cruiser. After receiving this response, I reissued a subpoena to the CPD.

96.    *Reference is made to Exhibit 8.*

97.    The first 2 pages are another copy of the subpoena I issued and the following documents appear to be the police reports related to Kluppelberg's case.

113.    After Kluppelberg's release from prison on 5/31/12, I represented him in conjunction with his petition for a certificate of innocence.

114.    He was the first client I had whose petition for a certificate of innocence was opposed.

119.    Regarding speaking with witnesses, between 5/31/12 and 7/9/13, I would have spoken to at least Russ Ogle [arson expert] and Marshall Weinberg.

121.    I didn't speak with Francis Huber.

126.    *Reference is made to Exhibit 10.* It's an email to me from Huber. If I emailed him back, I produced it to you. I don't know.

127.    *Reference is made to Exhibit 11.* These are emails I received from people who had heard about Kluppelberg's story and wrote asking how they might be able to help him as he transitioned to life outside of prison.

128.    In a few cases I responded, directing them to a website where if they wanted to make a distribution to Kluppelberg they could.

51

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

132.    *Reference is made to Exhibit 12.*

133.    This is an email chain between myself and Steve Mills.

134.    An email sent to Mills on 6/4/12 says: "He has several offers on places to stay. Everybody from the Salvation Army to acquaintances to perfect strangers have offered him a bed. At this point, he is still trying to figure out what is best, but at least he has some options."

135.    He accepted an offer of a place to stay from his son. I don't know whether he still resides with his son. I don't know whether he resided with anyone other than his son following his release. I last spoke with Kluppelberg in 12/14.

136.    I don't think he discussed how he's doing since his release. I saw him at a Christmas party for about 5 min. He introduced me to his granddaughters and daughter-in-law, Felicia. I haven't seen him any other times since 8/5/13.

137.    *Reference is made to Exhibit 13.*

138.    It's an order entered by the Court of Claims on 10/28/13 awarding Kluppelberg the funds that he was due under the certificate of innocence statute.

141.    *Reference is made to Exhibit 14.*

142.    These are emails back and forth between me and Jim Thomas, a professor at NIU, between 10/12 and 11/12. I put him in touch with Kluppelberg.

146.    I know of one other speaking engagement since Kluppelberg's release from prison. We talked together here. And we talked at U of C. The 1st speaking engagement occurred at Winston & Strawn. The purpose of the presentation was to sort of advertise Winston's pro bono commitment.

147.    He had a positive attitude when he was speaking to the summer associates at Winston & Strawn.

148.    The speaking engagement at U of C was during a lunch that any students could come to, just talking about the experience of getting out and the work that the students and lawyers had done.

152.    *Reference is made to Exhibit 15.*

153.    It's another voicemail transcript. I have no idea what he's talking about.

52

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

have this transfer reversed, including internal affairs. He was rebuffed at every turn. I have been his cellmate for the past 8 years and have never seen him this scared before. I think it is important that you know what is going on. I personally believe that the administration was tired of his complaining about the lack of medical care he is receiving, and they decided to shift the problem somewhere else.

Exhibit 6. 9/22/10. Subpoena issued to CPD.

Exhibit 7. 11/24/10. Subpoena issued to CPD.

Exhibit 8. 9/22/10. Subpoena issued to CPD with attached police reports. *Police reports summarized in 8/25/15 record review, Section #6.*

Exhibit 9. 2/19/13. Transcription of voicemail from Francis Huber. *Summarized in 8/26/15 record review, Section #6.*

Exhibit 10. 2/20/13. Email from Francis Huber. *Summarized in 8/26/15 record review, Section #6.*

Exhibit 11. 6/4/12. Email exchange with Art Nicol. *Summarized in 8/21/15 record review, Section #15.*

Exhibit 12. 6/4/12. Email exchange with Steven Mills. *Summarized in 8/21/15 record review, Section #15.*

Exhibit #13. 10/28/13. Correspondence from the Court of Claims.

939.    Enclosed is a copy of the Court of Claims order granting an award in the above entitled claim. The General Assembly must pass a fiscal year 2015 special awards bill to authorize payment of this claim. We anticipate that this bill will be passed in the spring 2014 legislative session. Upon passage, and the release of the funds, your award will be vouchered for payment.

940.    10/28/13. Order. It is hereby ordered that Claimant is awarded $213,624.

Exhibit 14. 11/16/12. Email exchange with Jim Thomas. *Summarized in 8/21/15 record review, Section #15.*

Exhibit 15. 11/26/12. Transcription of voicemail from John Evans. *Summarized in 8/21/15 record review, Section #15.*

Exhibit 16. Email exchange, Leonard and Mills.

54

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

457.    1/30/13.  8:27 AM.  Email from Steven Mills to Karl Leonard.  I've gotten one job inquiry for James already and passed that along to him.  I imagine I'll get more.

1/30/13.  9:44 AM.  Email from Leonard to Mills.  This is great news.  I hope something comes through for him.  Thank you for all of your hard work on this.  I thought the story was excellent.

1/30/13.  9:55 AM.  Email from Mills to Leonard.  My pleasure.  James is likable and quite articulate and his story is very moving.  I'm happy to help tell it.

Exhibit 17.  5/14/14.  Correspondence from Leonard to Jeffrey Kivetz regarding production for the deposition.

Cavanaugh 279

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

## 5. Deposition of Edward O'Donnell, 7/15/14.

5.    I'm a retired Chicago police commander. I retired 4/10.

6.    I made detective in 11/81, was assigned to the Bomb and Arson section until 1988.

10.   I wasn't ever disciplined while I was in the department.

11.   I testified at the certificate of innocence hearing regarding Kluppelberg.

12.   I 1st learned about him when I was assigned to Bomb and Arson as a detective in 1984.

20.   The reports I looked at in 1984 from Bomb and Arson detectives said that cause and origin could not be determined.

28.   At the time I gave my testimony it was my opinion that Kluppelberg was not entitled to a certificate of innocence. The reason was, based on his prior history, his employment. I believed he was not innocent of the crime.

29.   Based on the fact that the anonymous We-Tip stated that he was seen cutting wires to a streetlight with wire cutters, which he did admit to doing the interview. The We-Tip stated that Kluppelberg was observed going in and out of 4448 S. Hermitage several times.

30.   Then he was seen cutting the wires to the streetlight by the residence. Regarding that my involvement in the investigation was short, my partner and I picked him up on a stop order, brought him into Area 3, confronted him, advised him of his Miranda warnings, asked him questions about the fire. He did admit cutting the wires. Suspicious, I would think so.

31.   The We-Tip stated he was seeing going in and out of the location where the fire started. Then he went back to his girlfriend's apartment and went to sleep, to me that is suspicious. At that time there wasn't enough evidence to arrest him. Once I completed that interview I didn't ever do anything else regarding the Hermitage fire.

32.   Roughly 30 years later I was contacted about Kluppelberg. I remembered him from 1984.

40.   I'm aware there were individuals who had been interrogated by Burge whose convictions were later vacated on the basis that the confessions were obtained through improper methods.

56

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

41.    I have no opinion one way or another on any of the convictions that got vacated on the grounds that the confessions had been procured through torture.

45.    I haven't ever felt troubled by the allegation that there had been a regime of torture under Burge in which people were beaten into giving confessions.

46.    I'm aware that he was convicted of perjury regarding whether torture was used under his supervision.   When I learned that Kluppelberg obtained a certificate of innocence regarding the Hermitage fire, I thought he was guilty.

47.    One of the reasons I thought he was guilty was because of the interaction I had with him during my short involvement in the Hermitage investigation.  Another reason was because of his employment.  He was employed by a board-up company in 1984.

48.    The relevance of that is board-up companies respond to the scenes of fires, solicit business.  There's a lot of competition.  Occasionally they would set fires.  I learned that he worked for a board-up company at the time of the Hermitage fire when I interviewed him in 1984.

50.    *Reference is made to Exhibit 1.*  This is an arrest report I prepared.  Date of the arrest was 4/3/84.

51.    Kluppelberg was arrested at his girlfriend's house.  We transported him to Area 3, interviewed him, and did the arrest report.

52.    It says, employed at AAA Board Up Service.

53.    He was placed under arrest for suspected armed robbery.  At this point he was not under arrest for the Hermitage fire.  *Reading from the report:* "R/d while investigating the alleged arson committed at 4448 S. Hermitage went to 1748 W. 45th St. to interview arrestee on f/u to a We-Tip implicating subject in said arson."

59.    *Reference is made to Exhibit 2, We-Tip.*

60.    We-Tip is a phone hotline people could call toll-free with information regarding a crime.

61.    We would respond to them, run name checks.  We would do background checks on possible suspects and respond to the scene.  The first thing I did when I got this We-Tip is I ran Kluppelberg's name.

65.    We found out there was an active stop order for Kluppelberg and proceeded to his girlfriend's address.

57

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

41.  I have no opinion one way or another on any of the convictions that got vacated on the grounds that the confessions had been procured through torture.

45.  I haven't ever felt troubled by the allegation that there had been a regime of torture under Burge in which people were beaten into giving confessions.

46.  I'm aware that he was convicted of perjury regarding whether torture was used under his supervision. When I learned that Kluppelberg obtained a certificate of innocence regarding the Hermitage fire, I thought he was guilty.

47.  One of the reasons I thought he was guilty was because of the interaction I had with him during my short involvement in the Hermitage investigation. Another reason was because of his employment. He was employed by a board-up company in 1984.

48.  The relevance of that is board-up companies respond to the scenes of fires, solicit business. There's a lot of competition. Occasionally they would set fires. I learned that he worked for a board-up company at the time of the Hermitage fire when I interviewed him in 1984.

50.  *Reference is made to Exhibit 1.* This is an arrest report I prepared. Date of the arrest was 4/3/84.

51.  Kluppelberg was arrested at his girlfriend's house. We transported him to Area 3, interviewed him, and did the arrest report.

52.  It says, employed at AAA Board Up Service.

53.  He was placed under arrest for suspected armed robbery. At this point he was not under arrest for the Hermitage fire. *Reading from the report:* "R/d while investigating the alleged arson committed at 4448 S. Hermitage went to 1748 W. 45th St. to interview arrestee on f/u to a We-Tip implicating subject in said arson."

59.  *Reference is made to Exhibit 2, We-Tip.*

60.  We-Tip is a phone hotline people could call toll-free with information regarding a crime.

61.  We would respond to them, run name checks. We would do background checks on possible suspects and respond to the scene. The first thing I did when I got this We-Tip is I ran Kluppelberg's name.

65.  We found out there was an active stop order for Kluppelberg and proceeded to his girlfriend's address.

57

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

66.  *Reference is made to Exhibit 3.* This is a general offense case report. It states the offense is robbery.

67.  *Reading from the report:* "Beat #815 assigned to 6205 S. Cicero in response to an auto theft. Upon arrival, complainant stated he picked up a hitchhiker at 5500 S. Cicero, who in turn displayed an unknown caliber handgun and demanded victim's money.

68.  Offender then ordered victim out of the car at 62nd and Cicero." I didn't have any reason to see this robbery report before I went out to talk to Kluppelberg.

69.  The stop orders indicates that Kluppelberg was identified as the offender in the armed robbery and says a lineup is required.

71.  We proceeded to Kluppelberg's girlfriend's address, 1748 W. 45th St.

72.  We knocked on the door, a female answered.

73.  We informed her that we were investigating the fire with 6 fatalities. We asked if she knew Kluppelberg. She said she did. She invited us inside. He was inside.

74.  We placed him under arrest on the basis of the stop order.

75.  Regarding why we told Dawn that we were there to ask Kluppelberg questions about the fire instead of saying we were there to arrest him about an armed robbery, because we were investigating the fire, too. When we brought Kluppelberg to Area 3, we informed him we wanted to ask him about the Hermitage fire.

76.  We informed him of his Miranda rights and took him to the car. We handcuffed him.

78.  We took him to Area 3 because they were investigating the armed robbery. Once we got there we advised him of his Miranda warnings a 2nd time. Then we explained why he was in custody, regarding the stop order, and explained that we were also investigating the fire where there were 6 fatalities. We had received a We-Tip which stated he was seen going in and out of the apartment building where the fire occurred and that he was seen cutting the wires with wire cutters to the streetlight.

79.  We told him all that when we first got him into the room in Area 3. He stated he understood his rights and did not request an attorney at that time.

93.  Kluppelberg admitted cutting the wires at the streetlight. He stated he went back to Dawn's apartment and went to sleep. I believe I read the We-Tip to him.

94.  The interrogation lasted 20-30 mins.

58

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

95. He said the lights were shining in his eyes and he couldn't sleep. He got a pair of wire cutters and cut the wires to the streetlights.

96. He said he had cut the wires about 3 hours before being alerted to the fire.

97. He denied setting the fire. We asked him to take a polygraph and he refused. We said the subject of the polygraph questions would be regarding the fire. I don't recall if I said that. I would think I said that.

98. We did not discuss the armed robbery with him. I believe he asked for a lawyer at the end, I'm not sure. After we asked him about the polygraph.

102. A copy of this arrest report should have gone into Bomb and Arson's file relating to the Hermitage fire.

144. *Reference is made to Exhibit 7.* These are my notes from my work on the 4448 S. Hermitage investigation.

145-49. *Deponent states that he cannot interpret the meaning of many of the notes on this document.*

167. *Reference is made to Exhibit 8.*

168. This is the supplementary report I prepared regarding the Hermitage investigation.

177. It says the building was "a 3-story occupied frame building, ignited in an unknown manner." I wrote it was ignited in an unknown manner because they could not conduct a cause and origin due to the destruction of the building. At the point when I was following up the leads regarding Rodriguez and Kluppelberg I knew the cause and origin could not be determined.

178. Regarding why I interviewed Rodriguez and Kluppelberg even though the cause and origin can't be determined so you couldn't even know it was an arson, because fires are set in the dead of night like this, there are no witnesses, the property is completely destroyed, cause and origin can't be conducted, so further investigation will be done by the detectives to locate suspects, motive. So the investigation is ongoing to try and determine how the fire started.

192. My summary of Kluppelberg's statement is not verbatim. I did it from memory. The following day.

193. He didn't say anything to me in addition to what appears in my report that I recall.

59

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

195.     I wrote at the time I prepared the report that there is not any evidence to indicate that either Rodriguez or Kluppelberg was responsible for the fire.

197.     Rodriguez passed the polygraph.

200-54.  *This portion of the deposition is testimony regarding crime pattern analysis and how it was performed in the 1980s in Bomb and Arson.*

256.     My opinion of Kluppelberg's guilt or innocence didn't impact the truthfulness of my testimony at the certificate of innocence hearing or my testimony here today.  Burge was commander of Bomb and Arson 1986-88.

257.     I didn't ever witness him torturing anyone when he was commander of Bomb and Arson. I learned about the allegations of him torturing suspects in the mid-1980s.

259.     When I wrote "At this time there is not any evidence to indicate that either Rodriguez or Kluppelberg was responsible for the fire," I did not mean to say that Kluppelberg was innocent of committing the fire.  I didn't mean that he was no longer a suspect.


Exhibit 1.  4/3/84.  Arrest report.  *Summarized in deposition above.*

Exhibit 2.  3/25/84.  We-Tip.  *Discussed above.*

Exhibit 3.  1/12/84.  General offense case report.  *Summarized in 8/13/15 record review, Section #26.*

Exhibits 4 & 5.  3/15/84.  Stop order.  Kluppelberg positively identified as the offender in the armed robbery by photograph.  Lineup required.

Exhibit 6.  1/12/84.  Major crime worksheet.  Offense: armed robbery.  Offender: Kluppelberg.

Exhibit 7.  Handwritten notes.  *Discussed in deposition above.*

Exhibit 8.  4/4/84.  Supplementary report by O'Donnell.  *Summarized in 8/25/15 record review, Section #6.*

Exhibit 9.  5/15/14.  Notice of Rule 30(b)(6) Deposition of City of Chicago in regard to crime pattern analysis.

Exhibit 10.  General order.  *Document related to crime pattern analysis testimony.*

60

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

<u>Exhibit 11.</u>  *Document related to crime pattern analysis testimony.*

<u>Exhibit 12.</u>   Crime analysis pattern.  *Document related to crime pattern analysis testimony.*

<u>Exhibit 12.</u>   General information bulletin.  *Document related to crime pattern analysis testimony.*

61

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois  60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 28, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

## 5.  Deposition of Edward O'Donnell, 7/15/14.

5.      I'm a retired Chicago police commander.  I retired 4/10.

6.      I made detective in 11/81, was assigned to the Bomb and Arson section until 1988.

10.     I wasn't ever disciplined while I was in the department.

11.     I testified at the certificate of innocence hearing regarding Kluppelberg.

12.     I 1st learned about him when I was assigned to Bomb and Arson as a detective in 1984.

20.     The reports I looked at in 1984 from Bomb and Arson detectives said that cause and origin could not be determined.

28.     At the time I gave my testimony it was my opinion that Kluppelberg was not entitled to a certificate of innocence.  The reason was, based on his prior history, his employment.  I believed he was not innocent of the crime.

29.     Based on the fact that the anonymous We-Tip stated that he was seen cutting wires to a streetlight with wire cutters, which he did admit to doing the interview.  The We-Tip stated that Kluppelberg was observed going in and out of 4448 S. Hermitage several times.

30.     Then he was seen cutting the wires to the streetlight by the residence.  Regarding that my involvement in the investigation was short, my partner and I picked him up on a stop order, brought him into Area 3, confronted him, advised him of his Miranda warnings, asked him questions about the fire.  He did admit cutting the wires.  Suspicious, I would think so.

31.     The We-Tip stated he was seeing going in and out of the location where the fire started.  Then he went back to his girlfriend's apartment and went to sleep, to me that is suspicious.  At that time there wasn't enough evidence to arrest him.  Once I completed that interview I didn't ever do anything else regarding the Hermitage fire.

32.     Roughly 30 years later I was contacted about Kluppelberg.  I remembered him from 1984.

40.     I'm aware there were individuals who had been interrogated by Burge whose convictions were later vacated on the basis that the confessions were obtained through improper methods.

56

# Cavanaugh & Associates

# APPENDIX I

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

---

DATE OF RECORD REVIEW:      August 29, 2015
REVIEWER:      Aimée St. Pierre, M.D.
C&A DICTATION NUMBER:      3073
C&A FILE NAME:      James Kluppelberg v. Jon Burge, et al.
BRIEF CITATION:      Kluppelberg v. Burge
COURT NUMBER:      13 CV 3693
ATTORNEY NAME:      Elizabeth A. Ekl/Jaclyn L. McAndrew
ATTORNEY TELEPHONE:      630.735.3370/630.735.3317

---

## TABLE OF CONTENTS

1. Deposition of George Savarese, PhD, 6/9/15 ............................................................................. 2

2. Deposition of Marshall Weinberg, 5/20/15 ............................................................................. 10

3. Report of Proceedings, 9/6/89 ............................................................................. 32

4. Report of Proceedings, 11/15/89 ............................................................................. 33

5. Internal Affairs Documents Re: Deputy C. Anderson ............................................................. 34

6. IDOC Records ............................................................................. 37

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

<div style="border:2px solid black; padding:10px;">

| DATE OF RECORD REVIEW: | August 29, 2015 |
|---|---|
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

</div>

## 1. Deposition of George Savarese, PhD, 6/9/15.

3.     I'm a LCSW. I've got a bachelor's in psychology and sociology from CUNY, a Master's in clinical social work, social administration from NYU and PhD in clinical social work and social policy analysis from U of C. I consult in clinical, medical, forensic areas and also teach. I received my PhD in 1989.

8.     Since 1989, 1990, I've consulted in the forensic area in civil, military and criminal cases on probably 120 cases. On death penalty mitigation specifically, 70-80 of those cases.

9.     I did a mitigation report dated 3/21/90 in the matter of People v. Kluppelberg.

10.     At most, there was one other mitigation report I had done prior to that. I don't have an independent recollection of the assessment I did of Kluppelberg in 1990.

11.     *Reference is made to Exhibit 1.*

12.     I reviewed this pre-sentence investigation report on Kluppelberg prior to my deposition.

13.     I don't remember if I spoke to anyone at JPA or Mercy Hospital as opposed to just reviewing the report.

15.     *Reference is made to Exhibit 3.* This is my testimony from the death penalty hearing.

16.     The testimony was on 3/22/90.

18.     *Reference is made to Exhibit 4, correspondence to McAndrew. Reading from Exhibit 4:* "After a diligent review of my report, I do not have any independent recollection of any of the interviews conducted, records obtained or facts outlined therein."

19.     The report that was submitted to the court, it was titled A Pre-sentence Investigation Report. I think that was a misnomer. Technically, a pre-sentence investigation report had other aspects that were not a part of my analysis.

20.     My analysis probably should have been titled mitigation report, or a more technical term now is biopsychosocial developmental evaluation. A biopsychosocial developmental evaluation is the same thing I did for Kluppelberg, just a different name.

21.     In the Kluppelberg report the framework seems to be around issues of how he perceived himself, the world, and how he put that together in terms of how it plays out in his functioning. I was using the rubric of I am Life is Therefore in this report. When I make a diagnosis, I use the DSM.

2

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

23.   I don't list any of the DSM axes in the section where I made the statement, "From a psychological perspective, he can be regarded as having borderline personality disorder." I don't list any DSM axes in my report.

24.   I didn't make a diagnosis that Kluppelberg had borderline PD.

26.   I'm not able to offer any diagnoses about Kluppelberg's psychological state in 3/90. I'm not offering any opinions about him currently.

28.   When I was doing my mitigation report in 3/90 I wasn't asked to make a diagnosis.

31.   1970-80 I was in internship programs as part of the Master's degree. The 1st year was clinical work at Creekmooe Psychiatric Center. 2nd year was at Long Island Jewish Hillside Medical Center outpatient clinic.

32.   My treatment entailed psychotherapy during those internships.

34.   Then I worked for 2½ years at the Texas Research Institute of Mental Sciences in Houston. I was a clinician in the outpatient division providing psychotherapy. I was also head of the central intake. As a clinician there I provided diagnoses to patients.

39.   After I received my PhD I taught at Governor State Univ. for about 10 years. I also began work in the medical social work field working with medical patients that have psychosocial issues that impact their medical condition.

40.   After 1989 I started doing forensic consulting and began working through the public defender's office of Cook County.

43.   On the death penalty cases were death penalty mitigation cases. The other cases ranged from military cases, Article 32 court-martial, clinical malpractice, social work malpractice, wrongful death, immigration, ARDC matters, custody cases, misdemeanor, felony crime.

44.   In about 2/3 of those cases I provided reports to mitigate a sentencing of some kind.

45.   My hourly rate today is $200.

65.   I don't recall who provided me with the documents to review or the list of people to investigate.

66.   The testimony says I spent 29 hours of interview time with Kluppelberg.

67.   I reviewed CPD General Progress Reports, ~ 36 pages.

3

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

DATE OF RECORD REVIEW:  August 29, 2015
C&A DICTATION NUMBER:  3073
BRIEF CITATION:  Kluppelberg v. Burge

69.   The content of those GPR's serves in part as the basis for my opinion that Kluppelberg should receive the minimum sentence.

70.   I reviewed newspaper accounts of the murders.

74.   I considered the content of those articles in determining if Kluppelberg should receive a minimum sentence.

76.   I don't see anything here [in report] specifically saying criminal history report, but other records might contain the same sort of information. It's important to get an accurate description relative to Kluppelberg's criminal record before making a determination that he should receive a minimum sentence.

78.   *Reading from the report:* "There was another incident in James' life in 1982 in which it was determined by the court that he involuntarily killed a man while the man was attacking his mother and then turned to attack James. He was found not guilty. He struck the man with a 2 x 4 in an attempt to stop him. Aside from this incident, there is no h/o any violence in James' past."

79.   I have no idea if I took any steps to contact the family of the person Kluppelberg killed.

80.   I don't recall seeing in the report that I talked to anybody.

81.   I have no recollection of speaking to any victims of the arson murder Kluppelberg was convicted of.

82.   I didn't see anything in the report that indicates that. In the testimony I identified that I did not speak with any family or friends of the victim.

83.   In determining whether someone should get a maximum sentence in a murder case, whether I think it's important to get the perspective of the victim's family or friends, I assume victims are very upset and want the maximum sentence. Sometimes victims' families want leniency, but it's not relevant to looking at the mitigating issues with regard to his developmental factors that was the focus of this report. I'm trying to put context around the offense or the behavior, or his development or understanding him as a person. That's a very specific focus and the reactions of other people towards victims doesn't really play into that specifically, but it's not irrelevant to the whole picture.

84.   I'm looking at it from the perspective of his developmental history and explaining his behavior and function. I didn't talk to any victims. It wasn't relevant to my analysis.

85.   I don't see in the report that he was arrested in 1988 for setting to car fires.

4

**Cavanaugh 291**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

86.   *Reading from the report:* "This report outlines the personal life experiences of Kluppelberg who comes before the court convicted of arson murder." That's the extent of how I identified what the arson murder was in this report.

87.   It's a safe assumption that I knew he was convicted of setting a house on fire and killing a mother and 5 children. I don't recall seeing in the report any mention of my asking family or friends whether or not Kluppelberg started any fires.

88.   There's nothing in the report about Kluppelberg's inclination to start fires. Generally if someone is convicted of an arson murder it's important to inquire about a tendency to start fires.

89.   There is a great deal about his sexual history in this report. In his own words, he fooled around a lot before his conviction. Sometimes he would have sex with 2 or 3 girls in one day.

90.   There's nothing in the report that discusses any type of sexual frustration he had.

91.   There's nothing in the report that talks about Kluppelberg getting sexually frustrated and starting fires. *Reading from the report:* "There is no malicious violence in James' background." Malicious violence would be of a more predatory nature, somebody seeking to initiate violence, regardless of the provocation.

92.   There is nowhere in this report that indicates that Kluppelberg was charged with purposely setting on fire two cars.

93.   Regarding if that would be considered malicious violence, it depends on the circumstances.

94.   Regarding that my report outlined Kluppelberg's entire background up until 1990, I can't assume what's in there in terms of entirety. There may be information that's not in there.

95.   Whatever information I had at the time was the basis for the conclusion of a minimum sentence, but I don't know what that entailed. What's contained in there is what I represented to the court as his psychosocial background.

96.   Generally speaking I would agree that lighting a house on fire would fall into the category of malicious violence. Generally speaking, lighting two cars on fire is a violent act. In terms of understanding it from a larger perspective, I think the facts need to be considered and I don't know what those are.

5

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

98.  I have no recollection of my discussions with Kluppelberg. There's nothing in my report that indicates Kluppelberg attempted to commit suicide any point up to the time of this report.

99.  Regarding if he attempted to kill himself, whether that's something I would include in my report, it depends on if you're getting sources of information that are consistent vs. conflicting information.

100.  If a client told me something, you always have to take that information as well with a grain of salt. If there was a clear indication that Kluppelberg attempted suicide and it was corroborated and there's credibility in the corroboration, it's probably something that would go in the report if it was relevant.

101.  There isn't anything in my report about Kluppelberg escaping from jail on the arson murder charges. Regarding if an attempt to escape from jail would be relevant to my mitigation report, everything is at least in consideration to understand its relevance. Whether or not the final analysis is relevant is a question of the whole assessment. If he had attempted to escape from jail, that's something I would take into consideration in determining my final analysis.

102.  If he had attempted suicide, that's something I would take into consideration in my final report. My report describes that Kluppelberg started creating a better life for himself after incarceration for the burglary.

104.  There's nothing in the report about any problems he had while incarcerated for burglary. I don't see anything in the report that indicates that he had problems as a result of being incarcerated for burglary.

105.  I don't recall seeing in the report that after being incarcerated for burglary he became fearful or had any problems sleeping. There's nothing in the report about any fears he may have had with regard to talking to a psychiatrist. He talked to me for ~ 29 hours.

106.  My report indicates that the structure of jail suited Kluppelberg.

107.  It says that he made an exceptionally good adjustment to life in prison. Everyone interviewed regarding his activities while incarcerated agreed that his behavior was exemplary.

109.  The report says he purposely damaged his finger several times after receiving treatment in order to stay out of school. That information was from reports from Mercy Hospital and JPA.

6

**Cavanaugh 293**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

---

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

---

110.  I would consider purposely damaging your finger self-mutilation. I can't say that Kluppelberg's self-mutilation served in part is the basis of my opinion that he should receive a minimum sentence.

111.  I took it into consideration. Looking at the whole picture, what weight it had I can't say. I considered it in determining whether he should receive a minimum sentence.

112.  I didn't make the diagnosis of borderline PD so I wouldn't have considered his self-mutilation in part as the basis for that.

113.  Regarding what I mean by, "regarded as having a borderline PD," it's a diagnosis.

114.  I don't believe it was me who made that diagnosis. I have no idea who did. It's possible it's something I gleaned from records I reviewed. Regarding if the diagnosis that Kluppelberg suffered from borderline PD served in part as the basis for my opinion that he should receive a minimum sentence, all of these factors are part of that consideration.

115.  I believe someone else made that diagnosis. I don't have enough information to say if he actually had it.

116.  That's information I provided to a judge in determining whether Kluppelberg should receive the death penalty.

117.  I don't see anywhere in the report that somebody else thought Kluppelberg has borderline PD.

118.  The reason I believe I didn't make the diagnosis is because the DSM axes are not outlined in the report. Regarding that I made the representation to the court that Kluppelberg suffered from borderline PD, what I said is he could be regarded as having borderline PD.

119.  That fact was included in this report no differently than any other fact, reported as something gleaned from the records.

121.  Having evaluated all these variables, it was my recommendation that a minimum sentence was appropriate. At the time I prepared the report I found the diagnosis of borderline PD sufficiently credible that I included it in the summary and recommendation.

122.  Regarding if I would have included a diagnosis of borderline PD in my summary and recommendations if I did not agree with that diagnosis, since I don't believe I had anything to do with this diagnosis, I included it because it was out there, that's all I can say without seeing the specifics. I don't recall looking at if it was correct or not. It looked credible from the source that it was, and it was just more information being

7

**Cavanaugh 294**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

included in this report. If I thought it was not credible, I wouldn't include it. If I'm not diagnosing it myself, I'm not really making a reference to its credibility; I'm saying he can be considered to have and had apparently been considered by others to have that diagnosis.

123. I can't say I put a minimum sentence because he was considered a borderline PD. That was one factor. Regarding if his diagnosis of borderline PD served in part as consideration for my determination that he should receive a minimum sentence, it was one piece, and how important that one piece is I can't say.

124. Regarding in how many of the mitigation reports I've prepared I recommended a sentence other than the minimum sentence, this was a very early report. It's been my practice since then that I don't recommend sentences. What I'm doing is reporting information and let the court make the decision whether or not it's mitigated.

127. Outside of this case I don't recall ever making recommendations for what the sentence should be.

131. It was my opinion that Kluppelberg should receive psychological treatment. Regarding if I spoke with any law enforcement officials who were handling Kluppelberg's arson murder case, just the prison officials.

134. I didn't speak with any psychiatrist who previously had examined Kluppelberg. I only reviewed a one-page report, a letter stating that he was fit for trial.

135. I didn't review any other Psychiatric Institute records.

136. I didn't review a presentence investigation report that had been ordered by Judge Morgan.

139. Considering that I never spoke to a psychiatrist who examined Kluppelberg in the past, whether it's possible that the diagnosis in my report could be my diagnosis that Kluppelberg suffered from borderline PD, I don't believe it was my diagnosis. I have no memory of anything in this report.

140. I'm saying from the point of view of what's on paper here, if I had diagnosed it, I'm positive I would have had a 5 axial set up to describe it.

142. I have no recollection of speaking to anyone from JPA about Kluppelberg. Grace Thomas, community outreach worker for Mercy Hospital, was interviewed. I don't have any recollection of any communication I may have had with her.

144. I don't have an independent recollection of reviewing GPRs. I don't recall the substance of the newspaper accounts listed in my report.

8

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

147.     I don't include every fact I learned during my mitigation analysis in my final report.

149.     The report says I reviewed records from Mercy Hospital and JPA.  It says it's in relation to Kluppelberg self-mutilating his finger.

> Exhibits 1 & 2.  Presentence Investigation Report on James R. Kluppelberg.  *Summarized in 8/25/15 record review, Section #9.*

> Exhibit 3.    Transcript of Death Penalty Hearing in Aggravation and Mitigation.  *Summarized in 8/21/15 record review, Section #16.*

> Exhibit 4.  7/18/14.  Correspondence to McAndrew from Savarese.

01.     In response to the subpoena, unfortunately all the records I retained from the case were destroyed in a basement flood in my home ~8 years ago.  The only record I have is a copy of my report dated 3/21/90.  After a diligent review of my report, I do not have any independent recollection of any of the interviews conducted, records obtained, or the facts outlined therein.

9

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

## 2. Deposition of Marshall Weinberg, 5/20/15.

4.  I'm licensed attorney in IL. I handle criminal law. I'm now a defense attorney, at one time I was a prosecutor.

5.  I passed the bar in 1967. I was a prosecutor in the CCSAO for ~5 years.

6.  I conducted hundreds of trials as a prosecutor.

7.  I was in the opening unit of Felony Review.

11.  I've been doing defense work since 1974. I worked on probably 1000 or more criminal trials.

12.  I represented Kluppelberg in his prosecution for a fire at 4448 S. Hermitage. I had represented him on other occasions. He called me ~2 AM when he was arrested. He was hysterical, crying, saying the police had beaten him and forced him to make a confession.

13.  I told him to calm down because he was hysterical. He calmed down and was able to tell me what happened to some extent and then I began representing him when I saw him in court. The date was the early morning hours of 1/13/88.

14.  *Reference is made to Exhibit 1.*

15.  This proceeding occurred 1/14/88. The night before that I talked to him on the phone and then I saw him again in lockup. His girlfriend was on the phone with me and Kluppelberg. She placed the call.

16.  He said he had signed a confession but that the police beat him and made him sign it. We tried a motion to suppress the confession before Judge Collins and he suppressed the confession based on that.

17.  In my representation of him from the 1st day he called until I terminated representing him he always maintained his innocence. In the phone conversation he said he didn't do the crime. My advice was to calm down, keep his mouth shut.

18.  1/14 I saw him in court. Before he was called I went back in lockup and he showed me the bruises he had on his body. I saw bruising in the area of both kidneys. He had a bruise on his lower abdomen. Those are the only visible injuries I saw.

19.  I asked that the mittimus be marked "hospital" and that he be sent directly to the hospital and examined that day. Bruises have a tendency to heal and I wanted somebody to verify

10

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

DATE OF RECORD REVIEW:   August 29, 2015
C&A DICTATION NUMBER:    3073
BRIEF CITATION:          Kluppelberg v. Burge

his injuries ASAP. The judge said he was marking the mittimus "hospital" and that usually means when the prisoner is returned from lockup back to incarceration he would be returned to the to the hospital.

21.   I didn't have any concerns during my representation of Kluppelberg that the CCSAO was not providing me with a complete copy of whatever information they had. It's my practice to rely on the CCSAO to provide me with all evidence favorable to the defendant that the CCSAO has in its possession.

23.   I have no reason to believe that the CCSAO did anything improper in their prosecution of the Kluppelberg matter.

24.   I didn't ever have any experiences wherein the CCSAO wasn't forthcoming about whatever they had. *Reference is made to Exhibit 2.*

25.   This is an affidavit I signed. *Reading from Exhibit 2:* "I was unaware of statements made by Isabel Ramos to police investigating the fires at 4504 S. Marshfield and 4448 S. Hermitage. A copy of the police reports containing these statements is attached."

26.   When I was representing Kluppelberg I didn't have this report prepared by Det. Micek. I would remember if I had received it because it's a smoking gun. You have a lady who confesses to an arson within a couple blocks where the arson that killed those people took place. It certainly is relevant and something you would want to bring out in front of a judge or jury, that there's an arsonist in the neighborhood at the same approximate time as the one that killed those people that Kluppelberg was charged with killing. Had I known it, I would have used it because it's obvious.

27.   It would help create a reasonable doubt.

28.   The passage about how she may have set some of the fires after viewing her burned down building, I would have found that relevant while I was defending Kluppelberg. You have somebody who is an admitted arsonist saying they were so drunk they don't remember, but they might have set other fires. That's reasonable doubt.

29.   If she might have set other fires, what's to say she didn't set the Hermitage fire? I would have put on an alternate suspect if I had evidence of one. I wasn't informed through some other means at the time about Isabel Ramos and the statements she made.

30.   *Reference is made to Exhibit 3.*

31.   This is the RD number for the Hermitage fire. On the last line is a reference to Ramos, that she was returned to central detention.

11

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

32.     I didn't receive this document while I was working on the Kluppelberg matter. The next page at the bottom, states: "Ramos, Isabel, who had been arrested and charged with aggravated arson relative to the fires which destroyed 4 houses on Marshfield, was brought into Area 3 headquarters and interviewed regarding this fire."

33.     I read it to mean that there is another person who might have burned the building that Kluppelberg is charged with burning. You have an alternate suspect. It's a woman who is obviously mentally injured. She lives a very short distance from where the fire on Hermitage took place. I would certainly think she is a candidate for being charged with the arsons on Hermitage since there is no direct evidence as to who started the fire. She was out there on the night of the fire, intoxicated, and has no recollection about doing that, but does remember setting a fire and possibly other fires.

34.     If that doesn't create reasonable doubt, I don't know what does. Regarding if I would have called her to testify in Kluppelberg's trial, I would have called her or anybody who saw her or any police officers who took her statement.

35.     I would have used information about Ramos as a possible alternative suspect in every way I could in my representation of Kluppelberg.

36.     *Reading from Exhibit 3:* "Minerva Harast said that she was aware that there was dangerous wiring in the basement of 4448 S. Hermitage." I know I didn't have that information when I was representing Kluppelberg because, again, this thing sets off rockets. You had testimony in the police reports that the arson investigators could find no reason that the fire started. Here's the theory about how it started. The fact that there was wiring loose all over the floor in the unoccupied 1st floor could have been brought out through cross examination of the police officer.

37.     *Reference is made to Exhibit 4.* These are handwritten notes regarding an interview of Minerva Harast.

38.     It appears to be police street files which we are entitled to as defense attorneys. I never got this because it's talking about the cords all over the floor as well.

39.     *Reference is made to Exhibit 5.* This is Burns' testimony from the criminal trial.

40.     Burns' opinion that the fire was arson was dependent, at least in part, on the fact that there were no accidental causes because, "We couldn't find anything that would have been electric."

41.     If I had learned about Minerva Harast's statement, I would have interviewed her and anybody that could corroborate it.

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

43.    I would have cross-examined Burns with information about extension cords or dangerous wiring.

44.    *Reading from the affidavit:* "I was unaware of the existence of aerial photographs of 4448 S. Hermitage and its surrounding neighborhoods. Had I had this evidence I would have used it in my defense of Kluppelberg."

59.    As of 1/88, I had represented Kluppelberg, I believe, on a plea, and then on the other homicide case. I don't how many times I actually went to court for him.

61.    In addition to representing him on the 1st murder case, I also represented him on a theft case in 1983. I don't recall that it involved a case where he was arrested after some electrical wire that had apparently been missing from nearby street poles was found in the back of a truck that he was in.

62.    I don't recall representing him in relation to a 1984 carjacking. I don't recall him being accused of holding up a person at gunpoint and then stealing their car. I represented him in relation to a string of burglaries in 1984. I believe there were 5.

63.    I don't recall him contacting me in spring 1984 for representation in connection with the Hermitage fire. I believe he was brought in for questioning regarding the Hermitage fire after a WeTip came into the PD. I don't remember being contacted in 4/84 in relation to a fire at 4513 Wood St. in which he was wanted for questioning. I don't remember telling officers in 4/84 that he would surrender himself but would not answer any questions about the Wood fire or any other fire.

66.    I don't know if Kluppelberg sold drugs in order to pay for my representation. In 12/82 when I represented him in the Kulikowski murder, that case went to trial. I believe he testified in his own defense because it was a self-defense defense.

68.    I don't recall that [on 1/13] Kluppelberg was calling in relation to confessions not only in a murder/arson case but also in relation to some car fires.

70.    [In the call] Kluppelberg didn't mention the ASA.

72.    As a criminal defense attorney, I had concerns whenever I got a confession that it was based on the individual having been primed by the police.

73.    There's nothing you can do to ensure the statement was valid, that it wasn't the product of coercion. If it's within a certain time period, you look at the defendant and see if he shows any marks of injury. Because if the policeman was a good liar, the ASA wouldn't know it and therefore the defense attorney wouldn't know it.

13

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

74.    I had other occasions where people said they had confessed based on police coercion. I had concerns in relation to Kluppelberg for his physical well-being when he called me on 1/13/88. Because he was hysterical. He was in the custody of the police, not in CCJ at the time, so I didn't know what was going to happen.

76.    I didn't doing anything that evening to try to ensure that he did not suffer from any further physical abuse at the hands of the officers. I didn't go to the police station to talk to him that morning, I essentially told him to hang in there until I can see him in court.

77.    I don't remember saying that they could beat him all they wanted but they couldn't kill him and to withstand it until morning. I don't recall him testifying at his motion to suppress hearing that that's what I said.

78.    When he called me and said he did not do it, I believed him. Based on the fact he was crying, hysterical and such. He wasn't sitting around with a clever answer. He may have told me later that he had blood in his urine. I wasn't surprised that if the police had physically abused him that they then allowed him to call me. I didn't ask to talk to any of the officers.

79.    After I hung up with Kluppelberg I didn't try to reach out to the PD to talk to any of the officers. I've done that on a number of occasions and received the same stonewall.

80.    I was in court two days after Kluppelberg had made the call to me. In lockup I observed severe bruising on him. By that I mean bruises that you can see.

82.    It was reddish and in the kidney area on both sides.

83.    I didn't photograph the injury because I didn't have a camera with me. They are not allowed above the 1ˢᵗ floor. I did ask the judge that he be sent directly to the hospital. I assumed the hospital would make a report and take any photographs that were required.

84.    I don't know if he was then taken to the hospital.

85.    I don't recall any conversations with Kluppelberg in which he relayed whether he was taken to the hospital. When I was told by him that he was abused, I knew that would be significant for purposes of trying to get his confession suppressed.

87.    *Reference is made to Exhibit 7.* This is my motion to withdraw as counsel for Kluppelberg. 12/11/89 is the day I filed that.

88.    The basis was that Kluppelberg filed an ARDC complaint against me saying I didn't adequately represent him. I thought, as did the judge, that that put me in an adversarial position to my own client and therefore I withdrew. I wrote, "This action by defendant

14

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

destroys attorney-client privilege and further places the petitioner in an adversary position to his client."

101.   When I was talking with Kluppelberg in the lockup on 1/14 there were at least 10 people in the lockup with him.

104.   Regarding telling me how he received the bruising, he just said, "The police beat me." I didn't go into detail. He showed me the injuries by raising his shirt.

107.   I don't remember that he had been asked to provide a polygraph in relation to the Hermitage fire. I wasn't aware that he was asked to provide a polygraph in 1984.

108.   I didn't know that he submitted to a polygraph in relation to his job at the security firm.

113.   As a defense attorney I had tools I could use if the CCSAO didn't give me all the reports I believed existed. Even though it was my understanding that the CCSAO was to turn over documents from the PD, that didn't prevent me from being able to send a subpoena to the PD. I had occasions where I issued subpoenas to the PD.

114.   I would expect when I received reports from the PD that I would also receive notes.

116.   *Reference is made to Exhibit 8.* The letter dated 1/18/90 is my response to the ARDC.

117.   Reading the document refreshes my recollection about Kluppelberg's attempt to escape in 10/89. I don't know any of the details.

118.   I believe the subject of his escape was used in aggravation of his sentencing.

119.   He didn't ever tell me that he had, at any point in time, tried to kill himself. I saw scars on his forearms when I first met him.

120.   They were diagonal cuts, a couple inches apart up and down the forearm up to the lower biceps.

121.   From the wrist area up to just past the elbow. He told me they were self-inflicted. He didn't tell me when he inflicted those injuries.

127.   *Reference is made to Exhibit 9.* I don't remember the name Duane Glassco.

128.   This isn't my handwriting. I don't believe I received this in the course of discovery in Kluppelberg's case.

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

129.  I don't remember ever seeing it before. I don't know one way or the other that I didn't get it.

131.  *Reference is made to Exhibit 11.* This is Answer to Discovery that I received while representing Kluppelberg.

132.  At the top of the 1ˢᵗ page where it says "car fire info," that's my handwriting. *Reference is made to Exhibit 12.* This is Supplemental Answer to Discovery that I received while representing Kluppelberg.

133.  There are Roman numerals on the top R-hand corner. I don't recognize the handwriting.

134.  *Reference is made to Exhibit 13.* This is my answer to discovery to the State. I see Roman numerals in the upper R-hand corner. I don't recognize the handwriting.

135.  *Reference is made to Exhibit 14.* It's a Motion in Limine I filed to prevent the testimony of certain witnesses.

136.  I was seeking to suppress testimony of Don Gramont, Duane Gleason [sic] and Michelle Brittain. I don't recall the significance of each of those witnesses in relation to Kluppelberg's case. This was served on 1/19/89.

137.  I didn't put the Roman numerals in the upper R-hand corner. *Reference is made to Exhibit 15.* It's a police report concerning the fire on Hermitage. I don't know whether I received this document in discovery.

139.  When I was representing Kluppelberg I didn't look through old newspapers to find articles in relation to the fire that he was accused of having set. Sometimes newspaper articles can provide names of witnesses to various events.

141.  Knowing that it was such a large and involved fire, there could have been potential witnesses. *Reference is made to Exhibit 16.*

142.  I probably didn't have occasion in 1984 to look at articles from the Chicago Sun-Times. I haven't read any of these. *Reference is made to Exhibit 17 and Exhibit 18.* I don't recognize Exhibit 17.

143.  It's an article printed in the Chicago Tribune 3/25/84. I didn't read it. Exhibit 18 is from Back of the Yards Journal. I haven't ever looked at any articles from that.

144.  *Reference is made to Exhibit 19.*

16

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

145.   There was a witness who testified that he observed Kluppelberg going into the back of 4448 S. Hermitage while he was inside the 2nd floor of Dawn Gramont's house. Duane Glassco could very well be the witness. I remember him being a key witness against Kluppelberg. I remember trying to impeach his testimony at trial.

146.   Exhibit 19 appears to be the testimony of Glassco taken 7/14/89.

147.   I cross-examined him regarding the inconsistent testimony given at the grand jury about seeing Kluppelberg climb up a pole to cut some streetlights. One of the other ways in which I attempted to impeach him was by establishing that he had a motive to testify falsely against Kluppelberg and also he was high on cocaine and beer. I don't remember what I believed was the motive for Glassco to testify falsely. I don't remember that he had a relationship with Kluppelberg's girlfriend, Dawn, and a child with her prior to Kluppelberg seeing Dawn.

149.   I also attempted to impeach Glassco by pointing out that he didn't come forward with his testimony until 12/87 when he was already in prison for burglary. I don't remember that I attempted to impeach him with alleged false documents that he submitted in conjunction with a TASC program in his probation.

153.   One of the other ways I attempted to impeach Glassco was by pointing out his criminal history. I tried to establish that he received a promise from the ASA in return for his testimony against Kluppelberg. I don't recall photographs that show the line of sight from Dawn's house to the back of 4448 S. Hermitage.

154.   I don't remember Kluppelberg telling me that Glassco could not have been able to see out of the 2nd floor window to the back of 4448 S. Hermitage. I didn't do anything to try to determine whether Glassco would have been able to see what he says he saw from the 2nd floor of Dawn's house.

155.   *Reference is made to Exhibit 20.* I don't recognize the document. I don't recall learning about Dawn's allegations against the CPD before Kluppelberg's trial. I have no independent recollection that she testified before the grand jury.

156.   I don't remember her alleging after she gave the grand jury testimony that her testimony was false. *Reference is made to Exhibit 21.*

157.   This is a report of proceedings in Kluppelberg's case, testimony of Dawn Gramont.

158.   Now that I read it I recall that I was able to get her to testify that her grand jury testimony was not truthful. I also elicited testimony from her about her complaint to the OPS.

17

**Cavanaugh 304**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

159.   That refreshes my recollection that prior to Kluppelberg's trial I had learned that she made a complaint to OPS. I elicited testimony from her about the fact that the buildings between 1748 W. 45th St. and 4448 S. Hermitage were taller than her house. The issue was line of sight. The issue was whether Glassco could have seen what he said he saw from the position where he was.

160.   *Reading from Exhibit 21:* "Neither of these 2 photographs depicts the line of sight from your building to the buildings that burned, do they? Answer: "No." None of the photographs used at trial showed the line of sight between Dawn's building and 4448 S. Hermitage.

161.   It was an issue that I cross examined witnesses about and an issue I was aware of prior to trial.

163.   When I was representing Kluppelberg, I had probably at least 20 or 30 cases, most of them felony. I had other murder cases during that time period.

164.   *Reading from Exhibit 8:* "Kluppelberg was advised by me at all times as to my conduct and strategy at trial and in each and every instance concurred with me." That was an accurate statement.

165.   I talked to him about trial strategy throughout the entire proceeding of his case. He didn't disagree with me regarding strategy that I remember. *Reading from Exhibit 8:* "It appears the only reason for this complaint is that the trial court found him guilty, much to the surprise of Kluppelberg and myself." That's why I believe he filed the complaint against me. *Reading from Exhibit 8:* "After his recapture, he did not want to be sentenced by Judge Morgan and has been doing everything in his power to delay sentencing and create stronger grounds for appeal."

166.   He told me he didn't want to be sentenced by Judge Morgan because she found him guilty and both of us did think we had the case that won. She is a very tough judge.

167.   She's a tough sentencer. She used to be a prosecutor.

168.   My recollection is Kluppelberg wanted the case continued between the time of conviction and sentencing. He came up with the complaint about an ex-lawyer. He didn't have any conversations with me about the fact that he was doing things specifically with the intent of delaying his sentencing that I remember. This was my impression.

169.   Regarding doing things to create stronger grounds for appeal, what I mentioned before about complaining about the lawyer. He actually apologized for the ARDC complaint, that he didn't mean it but was doing it as a means toward appeal. *Reading from Exhibit 8:* "He has told me several times that this complaint and his attempt to remove me from the

18

**Cavanaugh 305**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

case were only ploys to accomplish this end, and he did not intend to harm me in any way."

171.   *Reading from Exhibit 8:* "Kluppelberg is a very clever man and a master manipulator." He's one of the smartest defendants I've ever represented. Master manipulator was just a word of art that I used.

172.   What led me to believe he was clever and a master manipulator, his ploy to file a complaint to begin with. He was very childlike in a lot of ways. I think he did that on purpose.

173.   It could be that he was portraying himself to be less intelligent or more naïve than he really was. I can't think of any other examples of manipulative behavior.

174.   I don't have an opinion as to his general truthfulness. I think he was telling the truth about not being responsible for that fire.

175.   I felt that the ASAs were honest with me in their dealings with me during the criminal proceedings.

176.   I didn't ever get the sense that they were hiding anything from me.

177.   *Reference is made to Exhibit 22.* This is the letter I got from the ARDC containing Kluppelberg's complaint. It had attached to it "Defendant's Motion for a Murder Task Force Attorney."

178.   It says, "All that Mr. Weinberg has done wrong has been put forth in a motion before Judge Morgan." I don't know what motion that's in reference to.

179.   It's not accurate that I was given $5000 as a retainer. I don't remember how much money I requested as a retainer but I know I didn't get $5000.

180.   It's not accurate that not once in the 21 months prior to trial did I see Kluppelberg in CCJ.

181.   I did see him at the jail. I don't remember how many times. I would see him in the bullpen every time we went to court.

183.   Kluppelberg didn't tell me to obtain photos from inside 1748 W. 45th St. that I recall. I don't remember any conversations regarding how it would be impossible to see the back of 4448 S. Hermitage from 1748 W. 45th St. I didn't attempt to get photos portraying that line of sight.

19

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

184.    It's true that prior to trial Kluppelberg asked me to hire investigators to do research on the fire due to the fact that the CPD had closed the incident as an accident, noncriminal, on 4/14/84. It's true that was not done. I didn't hire an arson investigator because there was no point at this time to have somebody go back to try to find evidence of a fire because it was years later. I believe I knew at that point that the CPD had closed the incident as accident noncriminal. I believe I learned that from police reports that were provided during discovery. I don't recall providing Kluppelberg with documents because you're not allowed to give him police reports.

185.    He looked over documents on occasion. He at no point looked through my complete file.

187.    I don't recall a conversation with Kluppelberg about his desire to have me interview two police officers. I don't know which police officers he's referring to. I didn't make any efforts to interview any police officers involved in his case prior to trial.

188.    I don't recall him asking me to put any particular pieces of evidence into trial. I never ignored anything he told me. *Reading from Exhibit 8:* "Weinberg chose to rest on behalf of the defense without putting on any sort of a defense. This was totally without my knowledge or approval."

189.    We did rest, but the 2nd part of the statement is totally idiotic. Because it was "totally without my knowledge or approval." I tell every client in a major case there are 2 things I can't take away from you, your right to a bench or jury trial is your choice, and whether or not you want to testify is your choice. I told that to Kluppelberg. The judge also advised him that it was his right as to whether he would testify. It was his choice not to testify in his defense.

190.    *Reading from Exhibit 8:* "After trial, Weinberg put in a motion for a new trial. I asked that certain things be added to this motion, but even though Weinberg said he would do this, he still has not." I don't know what things he's referring to. I don't recall him asking me to put things in the post trial motion and I was refusing.

191.    *Reading from Exhibit 8:* "Pursuant to a 3-way phone conversation on 11/9/89 that my sister made to Weinberg's office, he stated that he was tired of my case and if I wanted to be my own attorney, to just tell the judge and he would gladly resign from my case." I don't recall a conversation with any sister of Kluppelberg. I probably did tell him that.

192.    Regarding what precipitated that conversation, his constant interruptions and constant saying, "Do this, do that, don't do that, don't do that." I said, "If you want to be your own lawyer, you have a right to be." I was frustrated. I recall Kluppelberg telling me things he wanted me to do on the case on occasion. I don't recall them specifically.

193.    I don't believe I talked to any of his family members in preparation for trial.

20

**Cavanaugh 307**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

---

DATE OF RECORD REVIEW:      August 29, 2015
C&A DICTATION NUMBER:      3073
BRIEF CITATION:      Kluppelberg v. Burge

---

195.    *Reference is made to Exhibit 24.* It's James Kluppelberg's affidavit. I have no idea where it came from or what it's about.

196.    It's the first time I've ever seen it. *Reference is made to Exhibit 25.* It's an affidavit by Kluppelberg but I don't recognize it.

197.    Both of these affidavits postdate my representation of Kluppelberg. Exhibit 24 says, "I informed my trial attorney that I wanted a jury trial and wished to testify." That isn't a truthful statement. It says, "On March 28, 1989, after the proceeding in court, I again told my attorney that I wanted to testify and that I wanted a jury trial." That isn't truthful.

198.    "On 5/12 and 5/18/89, I asked my attorney again for jury trial and told him that I wanted to testify. He again told me that I was not going to take the stand and he was not going to pick a jury." That isn't a truthful statement. "Between March and July 1989, during ~6 phone conversations with my attorney, I repeatedly asked to be allowed to testify and that I wanted a jury trial, to which he consistently replied that I should not worry. The judge was not going to convict me and he was not going to pick a jury and I was not going to testify". That isn't truthful.

199.    "He told me to sign the jury waiver and keep my mouth shut in court. He said it was either his way or he was going to withdraw from my case and leave me in the hands of a public defender." That isn't truthful. "On 7/14/89, after Glassco testified, I begged my attorney to allow me to testify because he had lied. I was told by my attorney that I could not take the stand." That isn't truthful. "Not once prior to or during trial did my attorney or anyone advise me that I had a constitutional right to testify even though I made repeated requests to be allowed to testify."

200.    That isn't truthful. "After Duane's testimony, the State rested. My attorney then argued for a directed verdict which the court denied. My attorney then rested. This was a total surprise and I asked what he was doing. He told me to be quiet and not to worry.". That isn't truthful.

201.    I don't recall him telling me that a few days after the fire officers picked him up and took him to Area 3 for an interview. It's not accurate that he never met with me in a private setting.

202.    It's not accurate that the only time I talked to Kluppelberg was when I came to court and would see him for a few minutes in the holding cell or when he called me from the monitored phones at CCJ. It's probably accurate that during every visit in the bullpen there were at least 5-15 people present. It isn't accurate that my talks with Kluppelberg never lasted more than a few minutes.

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

203.     Regarding that Kluppelberg stated he never saw me take notes during our conversations, I did take notes. It isn't accurate that I never told him how I was going to proceed with the case, what the strategy was, or what evidence I was planning to present.

204.     It's not accurate that almost every time Kluppelberg asked how I planned to proceed and what evidence I was going to present I always told him not to worry because I knew the judge and everything was going to be all right.

205.     *Reference is made to Exhibit 26.* It's a petition for postconviction relief file-stamped 10/6/94. This postdated my representation of Kluppelberg.

206.     I don't agree that I was ineffective in failing to present bias/motive evidence which established that Dawn and Glassco lied and implicated defendant because of their relationship. I did question both witnesses about their relationship.

207.     It says, "Trial counsel was grossly incompetent when not once prior to trial did he visit or discuss the trial strategy with defendant, even though defendant made dozens of requests for said visits to discuss the trial and plan his defense." I don't agree with that.

208.     Exhibit 2 is an affidavit I signed 6/2/08. There were certain items that were not tendered by the State or the police that I did not have at the time of trial and I found out only subsequent to the trial.

209.     I'm referring to the aerial photographs and the statements of Ramos.

211.     I would have used Ramos' story, called in the policeman that arrested her, found out what condition she was arrested in and what she said. Because she said she didn't remember she lit any other fires.

214.     If I had evidence that somebody else committed an arson within 2 blocks of the scene of the arson with which the defendant is charged, that I would have absolutely used it in cross examination in my defense.

217.     *Reading from Exhibit 2:* "I did not impeach Burns with the Bomb and Arson or Area 3 police reports. This is not trial strategy." I have no idea what I mean by that. I was being honest, this was not a part of trial strategy. I just didn't cross-examine him. I don't know why. I'm denying in paragraph 4 that I had information from Bomb and Arson and Area 3 police reports that I could have used to impeach Burns.

218.     I effectively cross-examined Burns with other items. I verified that he did not do any scientific testing on the debris and didn't know whether police collected and tested any debris for possible accelerants. I verified that he didn't make any report documenting his

22

**Cavanaugh 309**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

conclusion that the Hermitage fire was an arson. I also had him point out that OFI did not have responsibility for investigating fires in 3/84. It was Bomb and Arson.

219. I pointed out that he was testifying to memory in 7/89 about events that took place in 3/84. I pointed out that on other occasions when he's testified about major incidents, he always prepared reports. *Reading from Exhibit 2:* "I was unaware of the existence of aerial photos of 4448 S. Hermitage and the surrounding neighborhood such as the one attached to this affidavit. Had I had this evidence, I would have used it in my defense of Kluppelberg at his trial."

220. That's an accurate statement. There wasn't anything that prevented me from trying to get an aerial photo when I was representing Kluppelberg. I don't think we had money to hire somebody to fly over and take photos. I don't know where the aerial photo that was attached to the affidavit originated. I don't know how it came to be in my possession. I imagine it was provided to me by the Exoneration Project.

221. I don't have anything to show that the police had this photo. I'm not aware of evidence to suggest that the ASAs knew of this photo at the time of Kluppelberg's trial.

222. Regarding what steps I took to investigate the fire, I used the ASA's file because were entitled to the entire file. I talked to Kluppelberg. I interviewed other people who might have been witnesses. I don't recall the names. By the time I got into the case, there was nothing left of the physical evidence. That's why I didn't get an expert on arson to say it wasn't arson.

223. I tried to talk to witnesses who would be able to describe the scene and were present. There weren't many available. I didn't know about the lady that set the other arson. I don't have a recollection of interviewing Glassco and Brittain. I don't recall what Dawn told me about the night of the fire.

225. At the time I was trying the case I was aware there were arson investigators who in 1984 were unable to determine whether it was an intentionally set fire. Those were investigators who were present at the fire scene shortly after the fire. I didn't attempt to interview those investigators. I don't know why. I believe the State called those investigators at trial.

226. I was expecting there to be testimony that showed that in 1984 they were unable to determine that it was an intentionally set fire. I don't recall whether there actually was. I didn't go to the scene. I didn't ever go to Dawn's house to see whether I would be able to see the back of 4448 S. Hermitage from her 2nd floor. I didn't hire any investigators.

228. I haven't ever requested additional reports from the PD to determine whether there was a pattern of the same type of crime within the same area. I was unaware you could issue

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

subpoenas requesting police reports for geographical areas. I didn't request any additional reports from the PD. I thought I had them all.

229. We didn't get street files. I knew that they existed. I suppose I could have requested those.

230. We should have been given any street files. The fact that we weren't is surprising. I didn't interview any witnesses to determine the condition of the building prior to the fire.

232. I don't remember getting Exhibit 15. It lists a number of witnesses.

233. It says, "While at the scene a citizen informed police that while watching the fire she overheard a youth inform his mother that he and a friend had set this fire and the one earlier." I don't recall having this information prior to trial.

234. If I had this document it would have indicated the existence of a possible alternative suspect.

235. I don't have any reason to believe that this particular report was withheld for me.

237. As a defense attorney you would expect to get street files, the handwritten notes that the police used to make their reports which often contained things that the officer might or might not put in his typewritten summary. While I was representing Kluppelberg, based on my experience, I believed that if the prosecutor had had written notes or police reports that related to my case I would have gotten them.

238. I relied on the prosecutor's office to give me whatever they had on the case. I never believe as a defense attorney that police reports are truthful. I did believe that we were getting all the police reports.

239. *Reference is made to Exhibit 27.* This is a police report signed by Tuider.

240. There are several people interviewed, the 3rd person is Minerva Harast. I didn't have any reason to doubt that the summary of the interview with Minerva was inaccurate [sic].

243. I don't have any reason to believe that I would have deviated from my normal practice of advising a criminal defendant not to take the stand when I was representing Kluppelberg. His defense in that case was the State can't prove that I did anything.

245. It's possible that I saw Kluppelberg at CCJ only one time. The majority of my interactions with him took place at the courthouse.

24

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

247.    I don't recall ever being notified of any other deal with Glassco other than the one that is memorialized in his trial testimony.

248.    I wasn't aware that when Glassco 1st communicated with police regarding the Hermitage fire he informed them that he did not know anything about the fire. I was surprised when Kluppelberg got convicted. I thought we had the case won.

249.    I was initially upset that he filed an ARDC complaint against me until he told me why.

251.    Regarding if there's anything in Exhibit 15 that informs me that a person had been charged with arson for a fire that occurred in the same vicinity and same timeframe as the Hermitage fire, I didn't see it at the time, but clearly, it does. It doesn't say someone had been charged with another arson but that's the assumption. "Woman was seen running through the yard carrying a gasoline can just after a fire occurred the previous day." I'm assuming this could be referring to Ramos. This is based on information about Ramos I know today but did know then.

Exhibit 1. Report of Proceedings, 1/14/88.

7064.    Weinberg: I would ask that mittimus be marked defendant [inaudible] hospital. I have personally observed defendant's injuries. He has severe swollen arm. He has bruises to back and indicates that he is urinating blood.

The Court: Hospital on mitt.

Exhibit 2. 6/2/08. Affidavit of Marshall Weinberg.

655.    I representing Kluppelberg in relation to a fire that occurred at 4448 S. Hermitage on 3/24/84. I was his defense attorney from the night of his arrest through his trial. I did not impeach Burns with the Bomb and Arson or Area 3 police reports. This was not trial strategy. I was recently made aware of evidence that existed at the time of trial that I would have found extremely useful in my defense of Kluppelberg.

First, I was unaware of statements made by Ramos to police investigating the fires at 4504 S. Marshfield and 4448 S. Hermitage. A copy of the police reports containing these statements is attached. Had I had the police report regarding Ramos' statements to police, I would have used it in my defense of Kluppelberg at trial.

Second, I was unaware of the existence of aerial photographs of 4448 S. Hermitage and its surrounding neighborhood, such as the one attached to this affidavit. Had I had this evidence, I would have used it in my defense of Kluppelberg at trial.

25

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

Exhibit A. 3/24/84. Supplementary report by Micek.

6553. On 3/23/84 at 2315 hrs. there was a garage fire at 1840 W. 46th St. On 3/24/84 at 0408 hrs. there was a fire at 4454 [sic] S. Hermitage in which there were 6 fatalities. [Illegible] fire at 4504 S. Marshfield and these 2 fires are within a few blocks of one another.

On 3/24/84 Det. Vega and [illegible] located Isabel Ramos. She blurted out, without being asked any questions, that she set the fire in her apartment [illegible]. Vega then advised her of her rights and asked what had happened in her apartment. She stated on 3/23/84 she set fire to the kitchen curtains and then left the building. She stated that she was mad at her landlord and the woman who lives in the 1st floor apartment at 4502 S. Marshfield. After drinking a few beers, she decided to set fire to her apartment. She took a piece of paper and lit it on fire and then used it to set the kitchen curtains on fire. She then picked up a 6-pack of Old Style and left. For the next several hours, she went to different bars on Ashland. Late that night she eventually went back to her apartment and observed that the building was burned to the ground. Because she had been drinking for several hours, she stated that she did not remember anything after seeing her building burned down, except that she was walking around a lot and somehow ended at her [illegible] apartment at 4640 S. Marshfield. At this time she did not remember setting any other fires other than the one in her apartment but said she may have set some after viewing her burned down building. Because of her intoxicated condition, she does not remember what happened after finding her building burned down.

Exhibit B. Aerial photograph.

Exhibit 3. 3/24/84. Investigation report.

4315. Minerva Harast says there was dangerous wiring in the basement of 4448 S. Hermitage.

4316. Isabel Ramos, who had been arrested and charged with aggravated arson relative to the fires which destroyed 4 houses on Marshfield was brought into Area 3 and interviewed regarding this fire. Subject attempted to cooperate but was unable to give any new information as to the cause of this fire. It should be noted that Ramos, who also uses the name Elizabeth Taylor, is under the care of mental health clinic at 47th and Wood. She is a recent graduate of the Madden mental health facility.

Exhibit 4. Undated. Hand written notes of interview with Minerva Harast.

4329. Extension cords all over basement floor in home where fire killed the people.

Exhibit 5. Trial testimony of Francis Burns. *Summarized in 8/21/15 record review, Section #16.*

26

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

Exhibit 6. 5/29/84. Supplementary report by Surdej.

5342. Victim Maguda stated that an unknown male white subject alerted him to the fire. The subject also told him that he worked for a board-up service and left a business card. Victim remembered the name of the company, AAA Board-Up.

During previous investigations of arsons in the area reporting detective recalled a male white subject had been implicated through a We-Tip in another fire. The subject, Kluppelberg, had been questioned regarding involvement in other arsons. He at the time denied any involvement or knowledge of the incidents. He was released due to lack of corroborating evidence and witnesses. He refused a polygraph. It was the opinion of this detective that Kluppelberg should still be considered a subject.

5343. R/d reinterviewed Maguda and showed him photographs. Maguda was able to identify Kluppelberg as the subject who alerted him of the fire. R/d during a neighborhood canvas showed the same photographs to other residents. Kluppelberg was identified several times by persons who remember seeing him at several of the other fires in the area, noting that he was among the crowd watching the fire. Additional investigation revealed that Kluppelberg did work for AAA Board-Up. R/d contacted a supervisor there who stated Kluppelberg was laid off due to lack of work. She stated he would contact the company and report fires in the area usually within minutes after they were discovered, apparently so that AAA would get the board-up contracts. Due to lack of corroborating evidence or witnesses no attempt was made to re-interview Kluppelberg. In summary, Kluppelberg is still considered a suspect in this arson and possibly in other similar arsons. At present not enough evidence exists to charge him.

Exhibit 7. 12/11/89. Motion to Withdraw as Counsel.

651. As of 12/6/89 petitioner received a complaint from the ARDC from Kluppelberg. This action by defendant destroys attorney-client privilege and further places petitioner in an adversary position to his client. The aforementioned makes it impossible for petitioner to effectively represent Kluppelberg. Wherefore petitioner prays that this Court allow him to withdraw as counsel.

Exhibit 8. Response of Weinberg to ARDC Complaint. *Summarized in 8/25/15 record review, Section #2.*

Exhibit 9. 10/6/88. Petition for Violation of Probation and Warranty. *Document related to Duane Glassco.*

Exhibit 10. 7/15/88. Motion to Quash Arrest and Suppress Evidence.

27

**Cavanaugh 314**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

---

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

---

5917.　　On 1/12/88 Kluppelberg was arrested near 5101 S. Hermitage Ave. The arrest was a seizure as contemplated by the 4th Amendment. The Exclusionary Rule prohibits the introduction into evidence of the direct and indirect products of unreasonable searches and seizures.

5920.　　Defendant was arrested and taken without probable cause by the police to believe that he had committed a crime. He was arrested when police forced him into a squad car, not some hours later as the police reports allege. The arrest was made without a valid search or arrest warrant. The conduct of the defendant prior to his arrest was such as would not reasonably be interpreted by the arresting officers as constituting probable cause. Subsequent to his arrest, defendant was searched, photographed, fingerprinted, questioned, and exhibited by the police. During the arrest and subsequent detention, police and prosecution became aware of the existence of physical evidence, witnesses and other evidence, all the direct and indirect fruits of the arrest and detention, which connect the defendant with a crime. During the arrest and subsequent detention, verbal and written statements were elicited from defendant, the detention having provided the police with the forum for interrogation. As a result of the arrest, the prosecutor has acquired knowledge that it intends to employ in the prosecution of this cause, to wit, statements of the defendant and various witnesses.

5919.　　Wherefore, defendant respectfully prays unto this court to quash his arrest because of the absence or authority or probable cause to effect it and to suppress from introduction into evidence in this cause: physical evidence; statements, utterances, reports of gestures and responses by defendant during detention; witnesses who viewed defendant during detention as well as witnesses discovered as a result of the arrest; photographs, fingerprints and other information, the product of processing the defendant.

　　　　Exhibit 11. 3/14/88. Answer to Discovery. *State's listing of discovery.*

　　　　Exhibit 12. 7/5/88. Supplemental Answer to Discovery. *State's listing of discovery.*

　　　　Exhibit 13. 7/15/88. Answer to Discovery. *Defendant's response to discovery.*

　　　　Exhibit 14. 1/19/89. Motion in Limine.

5758.　　Kluppelberg moves this Court to limit and prevent the testimony of Dawn Gramont, Duane Gleason [sic] and Michelle Brittain. Judge Collins suppressed a confession made by defendant. It was suppressed based upon physical coercion used by police to obtain same. As a result of said illegally obtained confession the police and state's attorney's office obtained the names of Gramont, Gleason [sic] and Brittain and interviewed them and placed them before the grand jury. Prior to defendant's confession in 1988 the case was listed cleared closed (fire not arson) on 4/13/84.

28

**Cavanaugh 315**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

5759.    But for defendant's illegally obtained confession, the aforementioned parties would not have been interrogated and presented before the grand jury. Said witnesses are clearly "fruit of the poisonous tree." Defendant prays that the court limit and prevent their testimony in the instant case.

Exhibit 15.  3/25/84.  Supplementary report. *Summarized in 8/25/15 record review, Section #6.*

Exhibit 16.  Articles from Chicago Sun-Times regarding Hermitage fire.

Exhibit 17.  Article from Chicago Tribune regarding Hermitage fire.

Exhibit 18.  Article from Chicago Tribune regarding Isabel Ramos.

Exhibit 19.  Report of Proceedings, 7/14/89.  Examination of Duane Glassco. *Summarized in 8/21/15 record review, section #16.*

Exhibit 20. 2/3/88. OPS interview of Dawn Gramont.

3201.    On 1/22/88 three plainclothes officers took me to 39th and California. They wanted to question me about Kluppelberg and the arson in 1984. Two of them asked me questions. One of the officers said he had a personal vengeance toward Kluppelberg, those were his exact words, and that he was going to see him sit for life one way or the other. I explained that Kluppelberg couldn't have started the fire because he was at home with me and some friends. But he said I was going to say that Kluppelberg climbed a pole and cut some wires to start the fire or else he was going to make sure that my kids got hurt. We went to 26th and California. The same two officers took me to the ASA's office.

3202.    The ASA said he had to leave the room and when he left, the same officer who had threatened me told me that I was going to make the statements in court that he told me. I told him I didn't want to go along with him and he said wasn't I forgetting what he was going to do to me and my kids. Then he pushed my head against the door and said I better do what he said. He hit me with his flashlight on my right hand once. A little while later the ASA came in and asked me questions which I lied to. I told him what the officer told me to say. Then we went down to court for the grand jury testimony. When I went in, the ASA asked me questions and I lied, gave the same answers as upstairs.

3204.    I received a bump on the head and my hand hurt for a couple days.

Exhibit 21.  Report of proceedings, 7/14/89. *Examination of Dawn Gramont. Summarized in 8/21/15 record review, Section #16.*

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

Exhibit 22.  12/1/89.  ARDC Complaint against Weinberg.  *Summarized in 8/25/15 record review, Section #1.*

Exhibit 23.  11/15/89.  Defendant's Motion for a Murder Task Force Attorney. *Summarized in 8/25/15 record review, Section #13.*

Exhibit 24.  9/21/99.  Affidavit of James Kluppelberg.  *Summarized in 8/25/15 record review, Section #10.*

Exhibit 25.  9/9/02.  Affidavit of James Kluppelberg.  *Summarized in 8/25/15 record review, Section #10.*

Exhibit 26.  10/6/94.  Pro se Petition for Post-Conviction Relief.

3086.   Petitioner moves this court to vacate the judgment entered in the Circuit Court of Cook County.

3087.   The following facts support my claim of constitutional deprivation under the 6th and 14th amendments.

Appellate counsel was ineffective in failing to file a motion to transfer cause to another division since Judge DeVito was the trial judge in an earlier criminal proceeding involving petitioner.  Appellate counsel was ineffective in failing to present to the court proper descriptions of models of the scene where the key issue was eyewitness ability to see what he testified to

3088.   Trial counsel ignored petitioner's wishes to have a jury trial.  Appellate counsel was ineffective in failing to raise issue regarding improper impeachment of defense/prosecution witnesses.  Trial counsel was ineffective in failing to file a motion to dismiss since grand jury transcript containing supposedly damaging testimony was burned in a fire.  Appellate counsel was ineffective in failing to raise issue of trial counsel's ineffectiveness in not filing aforementioned motion to dismiss.

3089.   Appellate counsel was ineffective in failing to file a petition for rehearing in order to notify the appellate court that it had failed to address the issue of eyewitness inability to see what he testified he saw.  Appellate counsel was ineffective in failing to file a petition for rehearing to call the appellate court's attention to the fact it misconstrued Judge Morgan's ruling and ignored the fact that Morgan misconstrued eyewitness Glassco's testimony when she indicated he never testified he could see the rear of 4448 S. Hermitage.

3090.   Trial counsel was ineffective in failing to present bias/motive evidence which established that Dawn and Glassco lied and implicated defendant because of their relationship.  Trial

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois  60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

counsel was ineffective in not allowing defendant to testify.  Appellate counsel was ineffective in not raising trial counsel's ineffectiveness.  Trial counsel was incompetent proceeding at trial when he was not properly prepared to produce evidence to back up claims he made in his opening statement concerning Glassco's ability to see the rear door of 4448 S. Hermitage.

3091.    Trial counsel was ineffective in failing to give an offer of proff at defendant's motion in limine when limitations were put upon his cross-examination of Rolston.  Trial counsel was ineffective in failing to give an offer of proff when his cross-examination of Glassco at trial about his involvement in TASC.  Appellate counsel was ineffective in failing to file a petition for rehearing in order to bring to the appellate court's attention that it did not properly address the issue of defendant's right to confront witnesses specifically Glassco..

3092.    Appellate court was ineffective because Glassco was rewarded with admission to TASC in exchange for his testimony against defendant.  Trial counsel was ineffective in not objecting to the state's failure to prove inconsistent statements during impeachment of Gramont.  Trial counsel was incompetent in not bringing to trial court's attention that neither grand jury nor trial testimony of Gramont corroborates testimony by Glassco.

3093.    Appellate counsel was ineffective in not raising and stressing to appellate court the importance of the aforementioned issue.  Trial counsel was incompetent in not introducing into evidence police reports by Bomb and Arson police that contradict testimony by Burns. Appellate counsel was ineffective by not raising the aforementioned on appeal.  Trial counsel was grossly incompetent when not once prior to trial did he visit or discuss trial strategy with defendant.

3094.    Trial counsel was incompetent and ineffective by proceeding with trial when on the 2nd day of trial he stated that he was sick with the flu, running a fever and on medication.  Appellate counsel was ineffective by not raising on appeal that Judge Morgan stated at defendant's motion for new trial that Glassco never stated he could see the house at 4448 S. Hermitage.  That according to Morgan the defendant was not seen entering 4448 S. Hermitage so there is no evidence to place defendant in said house.

3095.    Appellate counsel was ineffective in not raising on appeal that trial court should have in gone to the scene as requested by defense counsel at motion for a new trial.

Exhibit 27.  4/14/84..  Supplementary report by Tuider.  *Summarized in 8/25/15 record review, Section #6.*

31

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

## 3. Report of Proceedings, 9/6/89.

583.    Weinberg: I had conversations with the family of the defendant for purposes of using it in possible mitigation.   One of the elements in mitigation is the mental state of the defendant.  I am asking to have the defendant examined for possible mental illness.

584.    His mother indicated that since age 2 the defendant has had psychological problems.  The court would observe that on the forearms of the defendant there are many wounds.  Those wounds are self-inflicted.  There are fresh wounds and old wounds going back several years.

585.    I am not raising the picture of Kluppelberg not being competent to be sentenced.  He certainly has been cooperating with me.  There is a mitigating factor, possible evidence that would be produced relative to his mental health.

586.    I would ask that he be examined by the court psychiatrist.

587.    The Court: There is no question but that I am going to allow that evaluation.

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

### 4. Report of Proceedings, 11/15/89.

1470.  Weinberg: Kluppelberg indicated one of the motions would be to have the Court have me withdraw as his counsel.

1471.  Kluppelberg: I sent a subpoena through CCDOC to have visiting records sent to the court to substantiate allegations within the motion.

1472.  The Court: I have read your motion which I'm allowing to be filed. Defendant's motion for murder task force attorney. The law is well settled that strategy decisions on behalf of the trial attorney are certainly not grounds to contend that this attorney didn't ably represent you.

1473.  I saw absolutely nothing over the conduct of this trial that would raise any doubt in this court's mind about the adequacy of the representation on your behalf. You may not be happy with the way things turned out but Weinberg is a trained litigator.

1474.  Weinberg always put forth clear evidence of having prepared his case. Motion to change attorneys will be denied.

1475.  Over the course of the trial and certainly not until today was there any indication by you of not being pleased with your attorney.

1476.  Kluppelberg: I have presented things to my attorney, have asked him to help me in the face of a post-trial motion. I have constantly been shot down. This is not personal. It is not a stalling tactic.

1477.  The Court: One of the reasons we're here today in Nov. is because of your antics after my finding of guilty. So if you want to talk about where this may have gotten off track, you need to look in the mirror and not at this Court.

1478.  Kluppelberg: I'm not waiving a jury for purposes of sentencing.

ASA: I have a letter dated 9/22/89 from the Psychiatric Institute. The defendant was examined on 9/21/89 by Dr. Kaplan. It was his opinion that the defendant was mentally fit for sentencing.

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

---

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

---

## 5. Internal Affairs Documents Re: Deputy C. Anderson.

465.  10/18/89. Supplementary report.

Investigation. Interview of Anderson. He was regularly assigned to courtroom 302 during appearances of Kluppelberg. Stated he never really spoke with Kluppelberg. Stated he also knew Bonnie Kluppelberg and that the extent of his conversations with her were "hello" or "good morning."

Anderson denied that Kluppelberg or his wife received any special treatment. Denied that Kluppelberg was ever permitted to visit his wife while in courtroom 302 and denied that anyone placed Kluppelberg or his wife in the jury room for any reason. Stated he never received any payment from Kluppelberg or his wife and that he never saw them together.

Stated he filled out data sheets for Kluppelberg on one occasion, 10/6/89.

466.  He indicated the only information he wrote on the sheet was Kluppelberg's's next court appearance and then he signed the judge's name, which he did because the judge was not in court that day. Could not recall if he filled out data sheets for other prisoners in his custody that day. Stated that no Sheriff or correctional officer visited Kluppelberg on 10/6/89. Stated he never made out a "Special" for Kluppelberg to appear in court.

Investigator confiscated Anderson's county credentials, advised him that he was relieved of duty with pay.

469.  10/24/89. Supplementary report.

Investigation. The following irregularities were discovered in Kluppelberg's paperwork.

On 9/22/89 a "Special" sheet appears to have been written by Anderson. This was not a scheduled court date, Kluppelberg did not appear before the judge. His name does not appear in Anderson's prisoner logbook. The same set of circumstances was found on 6/15/89, 6/16/89, 8/4/89, 6/27/89, 4/6/89, and 4/14/89.

470.  On all regularly scheduled court dates where Kluppelberg did appear, entries were made in the prisoner log. On 6 separate occasions where he was not scheduled to appear, but was taken to the courtroom, there was no entry in the prisoner log indicating that Kluppelberg was in the custody of Anderson. On all 6 occasions where Kluppelberg was sent to court, the data sheets appear to have been written by Anderson.

471.  10/24/89. Supplementary report.

**Cavanaugh 321**
34

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

Investigation. Interview of ASA Murray. On one occasion he observed Kluppelberg in the rear of the courtroom on a day he was not scheduled for court. He observed Kluppelberg and Anderson preparing to board the elevator. This struck him as odd. He yelled, "What's going on." Anderson replied that Kluppelberg had a court date in another courtroom and then boarded the elevator with Kluppelberg. Murray stated that his partner, ASA Lefevour, also on one occasion observed Kluppelberg in the jury room of courtroom 302.

472.    10/25/89. Supplementary report.

Investigation. Interview of court clerk Talley, assigned to courtroom 302. She stated the prisoner datasheet is filled out by the clerk. Sometimes Anderson would fill out the name of the prisoner and then give her the datasheet for completion. She was shown the datasheet dated 9/22/89, marked "Special." She stated that the handwriting appeared to be Anderson's, and that the judge's signature on the sheet is not that of Judge Morgan. When asked if there was any reason Kluppelberg would be sent to court if he was not scheduled, she could not think of one.

475.    Undated. Statement of Bonnie Kluppelberg.

I had the opportunity to visit Kluppelberg when he was in custody. Anderson was assigned to the courtroom. The judge gave permission for visits if the bailiff had time. I was told by Kluppelberg to assure the visits that I should give him something. He suggested $20 so we could sit in a walkway and talk. If we wanted more privacy, the price went up to $50 so that we could hold hands. Once we moved to Morgan's court, it would be harder for the visits; therefore we had to give $100. If we wanted special visits, this would cost $150. The 1st visit took place around 3/88. Visits were every court date and then the extra ones started June or July 1989.

476.    The $100 visits took place in the jury room with the door locked. I would know to go into the jury room when Anderson would call me. The visits took place during the judge's lunch or after court. The payment to Anderson was made mostly from Kluppelberg. I give Anderson a payment myself on at least 10 occasions.

477.    If it was too long between court dates Anderson could send papers through and have Kluppelberg come to court. On these special visits, Kluppelberg didn't appear before the judge. There were about 4 specials.

478.    The visits in the jury room were private contact visits behind closed doors. For $150 I was permitted to visit for 20-30 min. When time was up, Anderson would knock on the door, open it, and say 5 more min.

479.    10/31/89. Supplementary report.

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

Investigation. Interview of court clerk Bruno. She stated on 10/6/89 Morgan was not in court. Anderson filled out all of the prisoner datasheets on that day. She was shown a datasheet for Kluppelberg dated 10/6/89 and stated the handwriting appeared to be Anderson's. When asked if there were any visitors for prisoners that day, she stated that a correctional officer visited Kluppelberg.

480.     She observed Kluppelberg, Anderson and the correctional officer conversing.

481.     11/9/89. Supplementary report.

Investigation. Interview of ASA Lefevour. During the latter part of June he observed Kluppelberg in the sheriff's office in the courtroom with Anderson. He knew that Kluppelberg was not scheduled for court on that date and asked Anderson why he was there. Anderson replied that Kluppelberg was a trustee at the jail and got special privileges. Anderson advised that Kluppelberg's son had been in an accident and that Anderson had arranged for a visit between Kluppelberg, his son, and Bonnie. Anderson advised Lefevour not to tell the judge about the incident.

Records indicate that on 6/15 and 6/16 Kluppelberg was sent to courtroom 302 but was not scheduled to be before the court. On both occasions, data sheets were found that appeared to have been written by Anderson, the datasheet for 6/15 being a "Special."

482.     11/15/89. Supplementary report.

Investigation. Review of telephone records from telephone in Sheriff's office in courtroom 302 for the month of 8/89. On 8/4/89 a call was placed to Bonnie Kluppelberg. On that date Kluppelberg appeared in courtroom 302 but this was a nonscheduled court date. On 8/25/89 a call was placed to Bonnie's father-in-law, where she would sometimes stay. On this date, Kluppelberg appeared before Judge Morgan.

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

## 6. IDOC Records.

5-19.   Tested negative for drug use on: 12/17/98, 5/1/99, 5/19/00, 7/3/00, 9/20/00, 10/28/00, 12/1/01, 3/5/02, 8/7/02, 5/9/03, 10/1/03, 12/11/03, 3/25/04, 1/8/05, 6/24/06.

154.   8/27/92.  Incident report.  Kluppelberg was removing air vents when he fell off a 6' ladder. Hurt L shoulder and arm. Escorted to healthcare unit for treatment.

153.   9/10/92. Incident court. Kluppelberg said he had just taken the end of his R thumb off in the 12" jointer. Taken to healthcare unit for treatment.

152.   12/7/92. Incident report. Kluppelberg was welding when a piece of metal fell off a table injuring L big toe. Escorted to healthcare unit and treated.

145.   4/19/94.   Hearing investigator's report.   Offense: drugs and drug paraphernalia; unauthorized property.  Ofc. stated Kluppelberg asked him to take sodas and magic markers to [another inmate]. Officers opened the markers and found 2 complete syringes with needles.

141.   4/25/94. Assignment vote sheet. Consideration for: storage building worker. Approved.

138.   8/29/94. Adjustment committee summary. Guilty: 7 homemade weapons found in cell.

136.   11/3/94. Adjustment committee summary. Recommend segregation time reduction.

134.   3/5/95. Assignment vote sheet. Consideration for: concession worker. Approved.

133.   4/19/95.  Incident report.  While performing routine shakedown, officers found ~5 gallons of homemade intoxicants.

130.   6/30/95. Adjustment committee summary. Guilty: disobeying direct order; unauthorized movement.

129.   9/25/95. Incident report. While conducting shakedown, found ~5 gallons of homemade liquid intoxicants, 3' of plastic tubing, 1 small scale, 1 can of backwoods aerosol repellent, plastic containers, 3 homemade or altered stingers, 1 modified stinger.

135.   11/3/95. Adjustment committee summary. Recommend early segregation release.

126.   12/13/95. Adjustment committee summary. Guilty: unauthorized movement.

66.   6/20/97. Assignment vote sheet. Consideration for: janitor. Approved.

**Cavanaugh 324**

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

65.     7/8/97.  Assignment vote sheet.  Consideration for: law library clerk.  Approved.

64.     1/13/98.  Disciplinary report.  Unauthorized movement: disobeying direct order.  Order given to grab your door and lock up.  Kluppelberg refused by missing his door.

63.     1/23/98.  Adjustment committee summary.  Guilty: unauthorized movement; based on admission by inmate.

62.     1/28/98.  Assignment vote sheet.  Consideration for: law library clerk.  Approved.

61.     2/27/98.  Disciplinary segregation double celling screening form.  Double cell recommended.  Low aggression level prior to segregation placement.  No psychiatric contraindications for double cell placement.

60.     3/2/98.  Assignment vote sheet.  Consideration for: removal from law library clerk.  Approved.  Rationale: investigative status for alleged trafficking on gallery.

59.     5/6/98.  Assignment vote sheet.  Consideration for: officers' kitchen.  Approved.

58.     5/7/98.  Assignment vote sheet.  Consideration for: vocational school.  Approved.

98.     7/9/98.  Assignment vote sheet.  Consideration for: grounds detail.  Approved.

57.     7/30/98.  Assignment vote sheet.  Assignment: data entry.  Approved.

92.     2/18/99.  Adjustment committee summary.  Kluppelberg provided a statement saying he was given a choice and not a direct order to report.  He wrote it would have been a health hazard for him to have reported to work without his coat.  Disposition: guilty, failure to report.

179.    4/1/01.  Visiting list request.  Ersie Reed, ex-mother-in-law.  Ron Reed, ex-father-in-law.  Tom & Richard Fitzpatrick, ex-stepsons.  Vicki Fitzpatrick, ex-stepdaughter.  Maggie Noke, Debbie Halderman, Dawn Holt, Laura Meagher, Julie Maca, Pam & Demetrius Arteaga, Linda Mitschelen, Tabatha Kelman, Lena Parma, friends.  Dolores Phillips, mother.  Fred Schubmehl, brother.  Teresa Clark & Vicki Sircher, sisters.  Daniel Flores, nephew.  Bonnie Kluppelberg, ex-wife.  James Kluppelberg, son.  Deborah Israel, attorney.

52.     12/8/01.  Incident report.  Inmate involved: Kluppelberg.  While inspecting equipment officers discovered a boom broken at the base.

176.    1/22/02.  Approved visitor list.  Donna Kluppelberg, wife.  Samantha Kluppelberg & Sara Meagher, daughters.  James Kluppelberg, Jr, son.  Fred Schubmehl, brother.  Julia

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

Maca, mother-in-law. Delores Phillips, mother. Irene Reyes, Linda Mitschelen, Pam & Demetrius Arteaga, Tabitha Killion, friends. Mike Berry, pastor. Deborah Israel, attorney.

175.    4/25/02. Approved visitor list. Donna Kluppelberg, wife. Samantha Kluppelberg & Sarah Meagher, daughters. James Kluppelberg, Jr, son. Fred Schubmehl, brother. Julia Maca, mother-in-law. Delores Phillips, mother. Irene Reyes, Linda Mitschelen, Lena Parma, friends. Mike Berry, pastor. Elyse Miller and Harold Winston, attorneys.

50.    5/1/02. Assignment vote sheet. Assignment change from [illegible] to H-machine operator. Approved.

49.    7/10/02. Assignment vote sheet. Assignment change from H-machine operator to furniture factory. Disapproved.

174.    6/27/03. Approved visitor list. Donna Kluppelberg, wife. Samantha Kluppelberg & Sarah Meagher, daughters. James Kluppelberg, Jr, son. Julia Maca, mother-in-law. Mike Maca, brother-in-law. Roger Vanhoughton, Lena Parma, Rena Eslick, Bill Hayes, Laurie Garcia, Maria Perez, Sabrina Cantu, friends. Mike Berry, pastor. Elyse Miller, attorney.

173.    9/25/03. Approved visitor list. Donna Kluppelberg, wife. Samantha Kluppelberg & Sara Meagher, daughters. James Kluppelberg, Jr, son. Julia Maca, mother-in-law. Mike Maca, brother-in-law. Roger Vanhoughton, Ron & Cynthia Adnit, Dolores Reed, Rena Eslick, Ella Adnit, Jim Prendergast, Bill Hayes, Sabrina Cantu, friends. Mike Berry, pastor. Elyse Miller, attorney.

48.    12/9/02. Assignment vote sheet. Assignment change from H-machine operator to unassigned utility man. Approved.

44.    12/17/03. Incident report. Kluppelberg requested to see a med tech. C/o severe lower L back pain extending to groin. Medical staff contacted.

45.    12/18/03. Incident report. At ~ midnight Kluppelberg came to ER. Dr. was notified of case results, instructed to transport inmate to St. Joseph's ER.

170.    1/9/04. Approved visitor list. Donna Kluppelberg, wife. Samantha Kluppelberg & Sarah Meagher, daughters. James Kluppelberg, Jr, son. Julia Maca, mother-in-law. Mike Maca, brother-in-law Raymond Brobst, Roger Vanhoughton, Irene Reyes, Laurie Garcia, Ron and Cynthia Adnit, Jim Prendergast, Rena Eslick, Linda Mitschelen, Rena Kilgore, friends. Mike Berry, pastor. Elyse Miller, attorney. Prof. Halpin, professor, John Marshall Law School.

# Cavanaugh & Associates

300 South Ashland Avenue, Suite 207
Chicago, Illinois 60607

| | |
|---|---|
| DATE OF RECORD REVIEW: | August 29, 2015 |
| C&A DICTATION NUMBER: | 3073 |
| BRIEF CITATION: | Kluppelberg v. Burge |

43.     3/31/04. Assignment vote sheet. Consideration for assignment change from unassigned utilityman to commissary worker. Approved.

168.    5/26/04. Approved visitor list. Done Kluppelberg, wife. Samantha Kluppelberg & Sarah Meagher, daughters. Mike Maca, brother-in-law. James Kluppelberg, Jr, son. Rena Kilgore, Irene Reyes, Ron & Cynthia Adnit, Lisa Perez, Laurie Garcia, Miguel Cobaxin, Linda Mitschelen, friends. Mike Berry, pastor.

164.    6/13/05. Approved visitor list. Donna Kluppelberg, wife; Samantha Kluppelberg, daughter; James Kluppelberg, Jr, son. Sarah & Raymond Brobst, daughter and son-in-law; Ronald & Cynthia Adint, Irene Reyes, friends. Mike Berry, pastor. Deborah Israel, attorney.

163.    9/22/05. Approved visitor list. *Same as above with the following additions.* Rena Kilgore, Miguel Cobaxin, friends. Vicky Sircher, sister.

37.     8/14/06. Grievance officer's report. Grievant alleges that medical staff failed to provide him with a copy of medical records he requested. Recommendation: medical records staff are short. They will get to it as soon as they can.

166.    7/25/07. Approved visitor list. Donna Kluppelberg, wife. Samantha Kluppelberg, daughter. Sarah Meagher-Brobst, daughter. James Kluppelberg, Jr, son. Timothy Moody, Rena Kilgore, Linda Mitschelen, friends. Vicky Sircher, sister. Mike Berry, pastor. Barba Karm, Geneva Benson, Jane Riley, attorneys. Julie Silva, Lindsay Weinberg, law students.

26.     10/11/11. Hearing of administrative review board, Menard. Grievance: Kluppelberg is grieving denial of protective custody. Has been housed at Menard since 9/19/11. Grievant has declared (two) enemies at Menard. Has been declared an enemy by: none.

        Offender's statement: I left Menard in 1998 to get out of gangs. When I first got to Menard I aligned with the Latin Kings. At that time you had to align with someone or get hurt. I left them in 1998 owing them money. They don't take kindly to that. They don't just let you walk out from them. I'm trying to be safe. I'm trying to keep a low profile and haven't received any current threats. I didn't try GP when I got here, I signed into PC because the Latin Kings are one of the most ruthless gangs out there.

        Recommendation. Grievant has not provided sufficient verifiable information to warrant protective custody. Warden is to ensure that he is kept separate from [named enemies].

20.     4/24/12. Vote sheet. Consideration for: janitor. Disapproved.