IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| JAMES KLUPPELBERG, | ) | |
| | ) | |
| Plaintiff, | ) | 13 CV 3963 |
| | ) | |
| v. | ) | JUDGE LEFKOW |
| | ) | |
| JON BURGE et al., | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Arthur Loevy
Jon Loevy
Michael Kanovitz
Russell Ainsworth
Gayle Horn
Elizabeth Mazur
Roshna Bala Keen
Sarah Grusin
Joel Feldman
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
(312) 243-5900

**TABLE OF CONTENTS**

Table of Authorities.................................................................................................................iii

I.       Introduction ........................................................................................................................1

II.      Factual Summary ...............................................................................................................3

         The 1988 Re-Investigation Undertaken Under Burge's Supervision....................................4

         Defendant Burge's Role .....................................................................................................5

         Burge's Further Due Process Violation: Knowledge of the Withheld Street File ...............9

         Defendant Alletto's Role...................................................................................................12

         Plaintiff's Exoneration......................................................................................................15

III.     Burge's Motion for Summary Judgment Should Be Denied.................................................15

         A.   Defendant Burge Has Failed to Justify Summary Judgment On Any Of Plaintiff's
              Various Claims Against Him...........................................................................................16

              1.   On These Facts, Burge Is Liable On The Due Process Claim Based On, *Inter
                   Alia,* Supervisory Liability....................................................................................16

              2.   Independent Of His Supervisory Liability, There Is Also Sufficient Evidence
                   Of Burge's Direct Role In The Fabrication Of Evidence ..............................19

              3.   Summary Judgment On Plaintiff's Due Process Claim Is Also Inappropriate
                   Given Burge's Complicity In Withholding The Exculpatory "Street File"....20

              4.   Plaintiff's Failure To Intervene Claim Is An Independent Basis To Deny
                   Burge's Motion....................................................................................................22

              5.   Burge Is Also Unable To Justify Summary Judgment On Plaintiff's Federal
                   And State Law Conspiracy Claims .....................................................................23

         B.   In Addition To All Of The Incriminating Evidence In The Record, Burge's Fifth
              Amendment Assertions, And The Resulting Permissible Inferences Therefrom,
              Necessarily Preclude A Judicial Finding That No Jury Could Possibly Find Against
              Burge Where All Reasonable Inferences Are Drawn In Plaintiff's Favor .................24

IV.     Alletto's Motion For Summary Judgment Is Equally Misplaced..........................................26

      A.   For Rule 56 Purposes, Alletto Violated Plaintiff's Right To Due Process, Failed To Intervene In The Violation Of The Same, And Conspired To Wrongfully Convict Plaintiff.................27

      B.   Defendants' Counter-Arguments Are Unavailing ...........................................................28

          1.   Even Without Testifying At Trial, Defendant Alletto Provided The Prosecution with A Fabricated Opinion That The Fire Was An Arson...........................................28

          2.   For Summary Judgment Purposes, Defendant Alletto's Findings Were Fabricated and Not Merely Erroneous ...............................................................................29

V.     Plaintiff's Malicious Prosecution Claim Survives Against Both Alletto and Burge.........................32

VI.    Defendants Are Not Entitled To Qualified Immunity .........................................................34

VII.   Conclusion...........................................................................................................................35

## TABLE OF AUTHORITIES

*Alexander v. McKinney,* 692 F.3d 533 (7th Cir. 2015) ............................................................... 20

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ...............................................................24

*Baxter v. Palmigiano,* 425 U.S. 308 (1976) ........................................................19, 20 24, 33

*Bell v. City of Milwaukee,* 746 F.2d 1205 (7th Cir. 1984) .........................................................28

*Bianchi v. McQueen,* 2016 IL App (2d) 150646 ................................................................. 20, 34

*Brisco v. LaHue,* 460 U.S. 325 (1983) ......................................................................................28

*Brown v. Miller,* 519 F.3d 231 (5th Cir. 2008) ......................................................................... 34

*Buckley v. Fitzsimmons,* 509 U.S. 259 (1993) ...........................................................................29

*Buie v. McAdory,* 341 F.3d 623 (7th Cir. 2003) ....................................................................... 31

*Burns v. Reed,* 500 U.S. 478 (1991) ..........................................................................................29

*Byrd v. Brishke,* 466 F.2d 6 (7th Cir. 1972)......................................................................... 22, 28

*Cannon v. Burge,* 752 F.3d 1079 (7th Cir. 2014).......................................................................33

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ........................................................................24

*Collins v. Leibach,* 04-2148, 2008 WL 343443 (C.D. Ill. Feb. 5, 2008) .................................. 18

*County of Sacramento v. Lewis,* 523 U.S. 833 (1998) ...............................................................17

*Crowder v. Lash* 687 F.2d 996 (7th Cir. 1982)................................................................... 16, 17

*Davis v. City of Chicago,* No. 03 C 2094, 2003 WL 21781898 (N.D. Ill. July 30, 2003) .................. 17, 18

*Deets v. Massman Const. Co.,* 811 F.3d 978 (7th Cir. 2016) ....................................................30

*Ewing v. O'Brien,* 60 F. Supp. 2d 813 (N.D. Ill. 1999) ...................................................... 32, 33

*F.T.C. v. Kitco of Nev., Inc.,* 612 F. Supp. 1282 (D. Minn. 1985) ..............................................25

*Farmer v. Brennan,* 511 U.S. 825 (1994) ..................................................................................17

*Fields v. Wharrie,* 740 F.3d 1107 (7th Cir. 2014) ............................................................... 27, 34

*Fillmore v. Page,* 358 F.3d 496 (7th Cir. 2004)..........................................................................17

*Gentry v. Duckworth,* 65 F.3d 555 (7th Cir. 1995)........................................................................22

*Graystone Nash, Inc.,* 25 F.3d 187 (3rd Cir. 1994) ......................................................................26

*Gregory v. City of Louisville,* 444 F.3d 725 (6th Cir. 2006) .........................................................34

*Hampton v. Hanharan,* 600 F.2d 600 (7th Cir. 1979)...................................................................23

*Harris v. City of Chicago,* 266 F.3d 750 (7th Cir. 2001) ....................................................... 19, 20

*Hoskins v. Poelstra,* 320 F.3d 761 (7th Cir. 2003) .......................................................................28

*Hughes v. Godinez,* 14-CV-00633-MJR, 2014 WL 3232219 (S.D. Ill. July 8, 2014).......................................... 19

*Ienco v. Chicago,* 286 F.3d 994 (7th Cir. 2002) ...........................................................................28

*Jimenez v. City of Chicago,* 732 F.3d 710, 721-22 (7th Cir. 2013) ............................................... 31

*Jones v. City of Chicago,* 856 F.2d 985 (7th Cir. 1988) ............................................10, 16, 17, 21

*Jordan v. City of Chicago,* No. 08 C 6902, 2012 WL 88158 (N.D. Ill. Jan. 12, 2012) .................................31

*Julian v. Hanna,* 732 F.3d 842 (7th Cir. 2013). ...........................................................................27

*LaSalle Bank Lake View v. Seguban,* 54 F.3d 387 (7th Cir. 1995).................................................24

*Lewis v. Anderson,* 308 F.3d 768 (7th Cir. 2002)..........................................................................17

*Locke v. Haessig,* 788 F.3d 662 (7th Cir. 2015) ...........................................................................16

*Logan v. City of Chicago,* 891 F. Supp. 2d 897 (N.D. Ill. 2012)............................................. 17, 25

*Myett v. Heerdt,* No. 12 CV 09464, 2017 WL 75738 (N.D. Ill. Jan. 9, 2017) ...........................................33

*National Acceptance Co. of Am. v. Bathalter,* 705 F.2d 924 (7th Cir. 1983) ..................................26

*Newsome v. McCabe,* 256 F.3d 747 (7th Cir. 2001) ................................................................ 20, 29

*Ortiz v. City of Chicago,* No. 09 CV 2636, 2010 WL 3833962 (N.D.Ill. Sept. 22, 2010)..........................35

*Pierce v. Gilchrist,* 359 F.3d 1279 (10th Cir. 2004) ....................................................................35

*Potts v. Moreci,* 12 F. Supp. 3d 1065 (N.D. Ill. 2013).................................................................16

*Quinones v. Szorc,* 771 F.2d 289 (7th Cir. 1985) .........................................................................17

*Rascon v. Hardiman,* 803 F.2d 269 (7th Cir. 1986) .....................................................................17

*Saunders-El v. Rohde,* 778 F.3d 556 (7th Cir. 2015) ....................................................................30

*Smith v. City of Chicago,* No. 15 CV 3467, 2015 WL 6859299 (N.D. Ill. Nov. 9, 2015)............................17

*Spurlock v. Satterfield,* 167 F.3d 995 (6th Cir. 1999)....................................................................29

*Starks v. City of Waukegan,* 123 F. Supp. 3d 1036 (N.D. Ill. 2015) ............................................................30

*Steidl v. Fermon,* 494 F.3d 623 (7th Cir. 2007).....................................................................22, 34

*Stichting Ter Behartiging Van de Belangen v. Schreiber,* 407 F.3d 34 (2d Cir. 2005) ........................................24

*Stinson v. Gauger,* 799 F.3d 833 (7th Cir. 2015)......................................................................... 30

*T.E. v. Grindle,* 599 F.3d 583 (7th Cir. 2010).....................................................................16

*Thompson v. City of Chicago,* No. 07 C 1130, 2009 WL 674353 (N.D. Ill. Mar. 12, 2009) ........................25

*United States v. Agurs,* 427 U.S. 97 (1976) ........................................................................32

*Wearry v. Cain,* 136 S.Ct. 1002 (2016) ........................................................................32

*Whitlock v. Brueggeman,* 682, F.3d 567 (7th Cir. 2012) ...............................................................15, 28, 29, 30

I.      Introduction

Plaintiff James Kluppelberg was wrongfully convicted of an arson-murder, a crime he did not commit. After more than two decades of wrongful imprisonment, Plaintiff was exonerated and granted a Certificate of Innocence ("COI") by the Circuit Court. This COI was granted based on persuasive proof that the evidence previously used to convict Plaintiff – including a false confession, two false witness statements, and bogus scientific testimony – was all fabricated by the Chicago Police Department ("CPD"). Thereafter, additional constitutional violations have been discovered many years after the fact when, during discovery in this civil litigation, the City located and for the first time produced to Plaintiff a copy of the Defendants' "street file," a previously-undisclosed set of extremely exculpatory documents.

With the case set for trial this Summer, the majority of the Defendants have properly acknowledged that Plaintiff's claims cannot be resolved via Rule 56. As for the two Defendants who do seek summary judgment, there is no merit to either of their positions.

For starters, the factual recitation underpinning Defendants' motion does not accurately or comprehensively set forth the record evidence supporting either (a) Plaintiff's claims generally, nor (b) those facts which could specifically enable a jury to find against Defendants Burge and Alletto. As set forth in below, there are ample facts from which a reasonable jury could find both Burge and Alletto complicit and liable on multiple constitutional torts.

Moreover, not only is summary judgment inappropriate based on the available evidence in the record, but that conclusion becomes all the more unavoidable as to Burge when that record is viewed in combination with his Fifth Amendment privilege assertions. Specifically, Defendants' motion fails to come to terms with the significance of the fact that Burge asserted the Fifth in his

1

answer to the allegations of his misconduct contained in the Complaint, as well as in response to all

discovery in this litigation. When asked at his deposition, for example, whether he conspired to

violate Plaintiff's constitutional rights in the manner alleged, Burge declined the opportunity to deny

those allegations. Instead, he affirmatively asserted a privilege, one which is only available where the

privilege-asserter has a good faith basis to believe that truthful answers to the questions could be

incriminating.

The case law is well-settled that in civil cases such as this one, Burge's Fifth Amendment

assertions permit jurors to draw the inference that the truth about Plaintiff's allegations would

implicate him in the alleged conspiracy. That permissible inference renders summary judgment

totally unavailable here for the obvious reason that summary judgment is appropriate only where *no*

reasonable inferences could support Plaintiff's theory of liability.

On that score, the cases on which Defendants' motion is premised merely stand for the

proposition that Burge's Fifth Amendment assertions are insufficient standing alone to support

summary judgment *in Plaintiff's favor.* That is because the inference of culpability associated with the

privilege assertion is only permissible: a jury *may,* but is not required to, infer that a truthful answer

to the question of whether Burge framed Plaintiff would be adverse to him. For that reason, Fifth

Amendment assertions are not themselves sufficient to warrant summary judgment *against* those

Defendants. But the law is equally clear that a movant's privilege assertions render summary

judgment unavailable when sought affirmatively.

Were it otherwise, civil defendants would routinely seek to escape liability by refusing to

answer any and all questions, thereby blocking plaintiffs' efforts to prove their claims (particularly in

circumstantial conspiracy cases such as this one, where the malfeasance occurred largely outside the

plaintiff's knowledge and the proof is therefore generally in the control of the defense). The reason such a strategy is so uncommon in civil litigation is because it is a loser, not a winner: Under clearly established law, the Fifth Amendment cannot be used both as a shield and a sword. Having invoked their Constitutional right to protect themselves against self-incrimination in order to avoid potential criminal consequences, a defendant cannot then turn around and try to exploit the evidentiary gap created by his own refusal to participate in the discovery process. For this and the other reasons discussed below, both Defendants' motions should be denied.

## II. Factual Summary

At about 4:00 a.m. on March 24, 1984, a fire occurred at three-story building located at 4448 South Hermitage in Chicago; the building burned to the ground, killing six people, including several children. Pl.'s Stmt. of Add'l Facts ("SAF") ¶ 1. According to the B&A detectives who originally investigated, there was no way to determine what caused the fire because the building had been so completely destroyed. *Id.* ¶¶ 2-4 (citing Jenkins Dep. at 247-48 stating that "the fact is, we couldn't determine cause and origin. There was nothing for us to get to determine the cause and origin... [T]here was nothing the Police Department could do."). The neighborhood canvas uncovered "no indication of foul play" and samples of debris taken from the scene tested negative for any accelerant, so Area 3 Violent Crimes closed the case as "non-criminal ... apparent accidental fire deaths." *Id.*

Three years went by. In late 1987, Duane Glassco, who was in Cook County Jail awaiting trial on burglary charges, told police he would implicate Plaintiff (with whom he a grudge because he had been romantically involved with the same women Glassco was dating) in a crime if he got a deal

3

on his pending burglary charges. Glassco spoke to Defendant detectives Rolston and Schmitz; those detectives presently claim that Glassco implicated Plaintiff in the Hermitage fire, though they made no report of their 1987 conversation with Glassco. *Id.* ¶ 9.

### The 1988 Re-Investigation
### Undertaken Under Burge's Supervision

The 1988 re-investigation of the Hermitage fire was undertaken under the direct supervision of Burge. Plaintiff's Statement of Additional Facts (Dckt. 562) at ¶¶ 37-42. The investigation proceeded as follows.

On January 12, 1988, Rolston and Schmitz brought Plaintiff to the police station under the pretense of questioning him about two car fires he had reported while working as a security guard. However, Rolston and Schmitz had already re-opened the Hermitage fire case (per Glassco's false tip) and intended to question Kluppelberg about that fire as well. *Id.* ¶ 10.

Once Plaintiff was at the police station, Rolston (who took the Fifth in this litigation) physically beat Plaintiff until he falsely confessed to setting the Hermitage fire; this included throwing Plaintiff on the floor and punching and kicking him in the back. *Id.* ¶ 11. The beating was so vicious that Plaintiff had significant bruising on his back and was urinating blood. *Id.* Plaintiff made a contemporaneous outcry of coercion, and the criminal court judge later suppressed his false confession, concluding that "[i]t is obvious the defendant was mistreated by the police." *Id.* ¶ 12.

When detectives Rolston and Schmitz brought the case to the Cook County State's Attorney's felony review office, Assistant State's Attorney ("ASA") Axelrod told the detectives that he would not approve charges despite Plaintiff's supposed murder "confession" because they needed more evidence to corroborate Plaintiff's statement. *Id.* ¶ 13 (citing Axelrod's testimony that the investigation was lacking in the detail that one would ordinarily expect).

Rolston and Schmitz, as well as Detectives Foley and Kelly, went back to Glassco several times, in each instance telling him what to say and adding more inculpatory details to his story. *Id.* ¶¶ 14-16. Thereafter, detectives Kelly and Foley prepared a formal report with a false, inculpatory statement, which Glassco then repeated in his testimony before the Grand Jury in January 1988 and at Plaintiff's criminal trial in July 1989. *Id.*

Glassco subsequently admitted that his testimony about having seen Plaintiff enter the Hermitage building was false and that, in fact, it would have been impossible for him to have even seen the Hermitage building from his home "because there was a building in the way." Glassco further admitted that he implicated Plaintiff to get a deal in his cases, and that the police told him "what [he] needed to say." *Id.* ¶ 9, 16-17.

Rolston and Schmitz also gave Foley and Kelly information about Dawn Gramont, who was brought in for questioning on January 22, 1988. *Id.* ¶¶ 18-21. Gramont initially reported that Plaintiff could not have started the fire because he had been with her and some friends. *Id.* Instead of accepting this account, the detectives told Dawn what to say at the grand jury; threatened her and her children if she did not go along with the false testimony; pushed her head against a door; and hit her hand with a flashlight. *Id.* As a result of the coercion, Dawn lied to the ASA and at the Grand Jury, repeating what the detectives had told her to say. *Id.* Gramont's testimony, however, was untrue. She was told what to say by the police and she lied because of the threats involving her children. *Id.* Gramont contemporaneously reported her abusive treatment and told the CPD's Office of Professional Standards ("OPS") that her false grand jury testimony had been coerced. *Id.*

5

**Defendant Burge's Role**

During the 1988 re-investigation of the Hermitage fire, Burge supervised Rolston and Schmitz at B&A, and, after he transferred to Commander of Area 3, Burge also supervised Foley and Kelly at Area 3 Violent Crimes. *Id.* ¶ 37.

Burge, as Commander of B&A and later as Commander of Area 3, was kept informed at each stage as the Hermitage fire investigation progressed through its conclusion. *Id.* ¶ 38. The supervision was even more direct since this was a high-profile fire, involving the death of children. *Id.* Prior to asserting the Fifth over Plaintiff's allegations in this case, Burge has previously described himself as a "hands-on" supervisor, who routinely looked in on interrogations while they were occurring and would frequently crack the door open to watch interrogations. *Id.* ¶ 46. Burge further previously admitted that while detectives operate without a lot of supervision when they are out on the street, "there's a lot of supervision" and "very close supervision" of their actions that occur within the police station. *Id.*

In the case at bar, Burge conspired with Rolston, Schmitz, Foley, Kelly, and others to frame Plaintiff, and together they decided to charge Plaintiff based on his own coerced false statement, Glassco's false statement, Gramont's coerced statement and OFI's fabricated finding that the fire was incendiary. *Id.* ¶ 39. Burge knew that the there was no legitimate evidence that the fire was an arson, and that the detectives under his supervision had coerced and/or manipulated false statements from Glassco and Gramont. *Id.* Burge also knew that Plaintiff had been beaten into confessing, but did not stop it and did not report the misconduct. *Id.* Burge was personally involved in all of the foregoing fabrication and withholding of evidence. *Id.*

6

As a supervisor, Burge taught his subordinates how to conduct criminal investigations, including interrogations, and provided close supervision of their investigations. *Id.* ¶ 46. Burge's practice as a supervisor in Areas 2 and 3 and at B&A was to encourage the use of physical coercion to obtain statements from witnesses and suspects. *Id.* ¶ 45. Burge specifically taught the detectives under his supervision to use physical force to obtain witness statements and confessions, and encouraged and condoned his detectives to use force, never once reporting an officer for abuse. In fact, Burge bragged about beating suspects to obtain confessions. *Id.* ¶ 47. One review of documented instances of Burge and his subordinates shocking, hanging, and bagging detainees while he was Commander at Area 2 includes at least 27 allegations of beating. *Id.* ¶ 48. Numerous other individual have lodged complaints about Burge and his subordinates physically abusing them to obtain statements. *Id.* ¶ 49. In fact, Burge was convicted of obstruction of justice and perjury for falsely denying that he and detectives under his command had engaged in abuse, and that he was aware of that abuse. *Id.* ¶ 50.

In this case, Burge was aware that Plaintiff and Gramont were interrogated by his subordinates in a manner consistent with his instruction and practice. *Id.* ¶ 51. At a minimum, Burge was on notice of Gramont's allegations when he received copies of her OPS complaint, which recounted Foley and Kelly's coercion of her and her admission that her grand jury testimony was false. *Id.* ¶¶ 43-44. Despite knowledge that Gramont's testimony was coerced and false, *id.,* Burge signed off on the decision to close the investigation without issuing any findings adverse to the detectives, and did nothing to stop that false testimony from being introduced at trial. *Id.*

On January 30, 1988, Defendant Burge announced Plaintiff's indictment to the press. *Id.* ¶¶ 41-42. Relating what he claimed Plaintiff "told us," Burge knew the details of the case, answered

7

questions, and repeated portions of Plaintiff's and Gramont's coerced statements to the police, including that Gramont "told authorities that Kluppelberg admitted to her that he set the house on fire" that "Kluppelberg told us he had been setting fires since he was nine years old," and that "Kluppelberg admitted to setting numerous other fires…" *Id.*

Defendants' expert (Jeffrey Noble) and Plaintiff's expert (Michael Brasfield) have both opined that CPD commanders, as supervisory personnel, were responsible for monitoring the detectives under their supervision. This includes ensuring that the detectives all complied with the Department's policies governing homicide investigations, such as the manner of interrogation and the proper documentation of witness statements. *Id.* ¶ 37.

Per the General Orders of the CPD, the B&A Commander (Burge) was responsible for overseeing the proper follow-up investigation of all fires, including arsons. *Id.* ¶ 38 (citing General Order 86-5 at IV.A.2.f). According to Plaintiff's police practices expert, based on his knowledge and experience, it would have been standard practice for Burge to have been involved under these circumstances in the interviews conducted at the police station at times when he was present, particularly for high profile investigations such as the one surrounding the Hermitage Fire. *Id.* ¶¶ 38, 45-47. Burge would have known about any important investigative developments as they were occurring, and would have reviewed the detectives' police reports and any misconduct complaints against them. *Id.* ¶¶ 37-38.

Consistent with his experience and training on the features of high-level supervision, it is also the opinion of Plaintiff's police practices expert that Burge would have advised the detectives investigating the Hermitage Fire about how to conduct the arson investigation, kept himself appraised of his detectives' activities in real time, as they were going on, and observed/monitored

the suspect interrogations in this case. *Id.* ¶ 38. Plaintiff's expert will also offer the jury the opinion

that the failure of supervisory personnel to set the appropriate tone and to correct malfeasance can

lead subordinates to believe that the rules are optional and need not be followed. *Id.* ¶ 47. Here, that

failure includes the absence of any notes from Plaintiff's interrogation in the Area 3 investigative file

and other violations of the Special Orders that should have been noted by Burge concerning

Glassco, Gramont, and Plaintiff himself, evidence which Plaintiff's expert characterizes as

"supervisory indifference." *Id.* ¶¶ 47, 66.

### Burge's Further Due Process Violation: Knowledge of the Withheld Street File

On August 15, 2014, as part of this civil litigation, the City disclosed a file relating to the

Hermitage fire (hereafter referred to as the "New File" or "Street File"), a file that had never before

been disclosed during Kluppelberg's criminal (or any other) proceedings. *Id.* ¶ 58. The New File was

created back in 1984 during the Area 3 investigation of the Hermitage fire, but also contained some

reports from B&A. *Id.*

The New File contained highly exculpatory information, including, for instance, the

revelation that a witness named Minerva Harast told detectives that there was "dangerous wiring"

and "extension cords" all over the basement, which sometimes got wet, suggesting an electrical

cause of the fire as opposed to an intentional arson. *Id.* ¶ 59. Alternatively, the New File also

contained documents pointing to other, heretofore-undisclosed suspects in the fire, a few of which

would have comprised "smoking guns" for Plaintiff's criminal defense. *Id.* ¶¶ 6-8, 60-64. This

includes reports the identities of at least two alternative suspects who had admitted to setting other

recent nearby fires, and other suspects who had argued with some of the victims prior to the fire. *Id.*

Among others, documents contained in the previously-withheld New File described a fire that was

9

intentionally set only hours before the Hermitage fire, and only a few blocks away. *Id.* ¶ 6. That fire had been set by a woman who claimed to have been so drunk that she did not remember if perhaps she had set other fires in the neighborhood that night, but that she may have. *Id.* ¶ 7.

In 1988 and 1989, the New File that was never produced to Plaintiff's criminal defense was at all times sitting in a filing cabinet in Area 3, where it would have been readily accessible to Burge (as well as to the other Defendants, none of whom have even attempted to move for summary judgment on the withholding claim, and properly so). *Id.* ¶ 61. Indeed, when Kelly and Foley began investigating, they retrieved all the files relating to the case, including the Street File. *Id.* ¶ 15. As the supervisor familiar with the common practices at Area 3, Burge knew about the New File and the now-missing B&A files, but did not disclose those files to the ASA prosecuting Plaintiff at any time prior to Plaintiff's conviction, or since. *Id.* ¶ 62.[1]

In 1982, following federal litigation in the *Jones* and *Palmer* cases, Burge, as Commander of Area 2, participated in a meeting about CPD's street file problem, where "all present were in agreement that the Detective Division has probably abused its use of memorandums, *i.e.* too much material which could and should be placed in a supplementary case report was not making it to supplemental case reports." *Id.* ¶ 65. Burge specifically advocated for continuing the street files practice, arguing that memos containing "things to do" or "uncorroborated tips and clues" "should have but a relatively brief retention period - only a few days," and should not be retained in files for cleared cases. *Id.*

---

[1] Some of the Defendants' other files and investigative materials remain concealed to this day, including the B&A file itself (whether an official investigative or an unofficial street file) as well as any notes, photographs, or reports generated during the OFI training exercise. In fact, during this litigation CPD claims to be unable to locate any of the B&A materials. *Id.* ¶ 60.

10

Notwithstanding Burge's objection, CPD eventually issued new policies that only superficially addressed the street files problem. *Id.* ¶ 66. Even after these new policies were enacted, however, Burge continued to permit and promote the street files practice among his subordinates in B&A and in Areas 2 and 3. *Id.* ¶¶ 66-67. At the time, Judge Shadur commented that the Detective Division implemented the new policies in "an improperly restrictive and grudging manner, under which detectives could consider their investigative writings as their personal property," and a review of files from Area 3 reveals that CPD's policies were consistently flouted throughout the 1980s and into the 1990s. *Id.* These problems remained so pervasive that even a cursory review would have revealed Area 3 detectives continuing the street files practice. *Id.*

Most recently, in December of 2016, the jury in *Fields v. City of Chicago,* No. 10 C 1168 (the case involving Plaintiff's counsel that had been set by Judge Kennelly for trial on the same day as the original trial date in this case) found following a four-week trial that the reforms referenced above failed to remedy its street file practice. As a result, the jury found in favor of the plaintiff and against the City on the *Monell* claim, finding a policy and practice of systematic withholding of *Brady* material due to the City's street files practice.[2]

The "New File" is an archetypal example of a "street file." It contained several examples of detectives using unofficial forms to document this investigative information, including "To/From" memos between detectives, discussing their opinions and proposed next steps, and handwritten notes written on the back of Major Crime Worksheets, rather than CPD's prescribed form and was suppressed as a result of CPD's continued policy and practice of maintaining street files. *Id.* ¶ 67.

---

[2] By operation of elementary principles of *res judicata*, the City should be bound from relitigating this finding at the upcoming trial in this case. Indeed, one of the risks of trying cases rather than settling them is the reality that adverse findings can have meaningful repercussions. To the extent the City disagrees, this will be an issue for the Court to resolve prior to our trial.

11

Burge personally instructed his subordinates to withhold exculpatory information in street files, including in the Hermitage fire case. *Id.*

**Defendant Alletto's Role**

After the Defendants had improperly obtained Plaintiff's false confession roughly four years after the Hermitage fire, several of the Defendant detectives (including Rolston) met with Cook County ASAs seeking murder charges. *Id.* ¶ 22. The ASAs told them, however, that even with their confession, the State would not charge the case because the fire had not been ruled an arson. *Id.* As stated above, absent any evidence to the contrary, the B&A investigation of the Hermitage fire had already concluded that the cause was non-criminal and accidental. *Id.* ¶¶ 2-4. Rolston himself had been part of the original B&A investigation that found no evidence of any foul play. *Id.* ¶ 3.

Even though two of the original Hermitage fire investigators (Urbon and Jenkins) were still working in B&A, the Defendants did not go back and interview or consult any of the original B&A investigators who had investigated the fire. *Id.* ¶ 23. Instead, Detective Rolston, along with other Defendant detectives, decided to go to the CPD's Office of Fire Investigation ("OFI") to get an opinion that the fire was an arson. *Id.* ¶ 24.

There were several problems with that approach. Perhaps the most obvious is that OFI was not yet even operational at the time of the Hermitage fire, and B&A had sole legal authority to determine the fire's cause and origin. *Id.* ¶ 24. Nor had any member of OFI created a single contemporaneous report regarding the now four-year old Hermitage fire. *Id.* ¶ 24.

It turned out, however, that Defendant William Alletto, the OFI's new Chief, claims to have gone to the scene of the Hermitage fire with OFI's (aptly-named) Assistant Director, Patrick Burns. *Id.* ¶ 21. Alletto and Burns are alleged to have been there as part of a "training exercise" for OFI. *Id.*

12

At the time, Alletto did not conduct any field examination and took no photographs or notes, nor did he write any reports, or make a cause and origin determination. *Id.* Moreover, back in 1984, no one from OFI had told the investigating detectives that they believed the fire was incendiary or an arson. *Id.*

Sometime between January 15, 1988 and January 19, 1988, Rolston, Foley and Kelly met with Alletto and Burns. *Id.* ¶ 25. The detectives' decision to approach OFI was a substantial deviation from CPD's normal practices at the time. *Id.* ¶ 32. In fact, there was substantial tension between OFI and B&A, the latter of whose personnel believed the OFI was interfering in police investigations and stripping B&A of responsibility, not to mention too quick to reach the conclusion that fires were incendiary. *Id.*

According to the Defendants, Alletto and Burns reported to the detectives at these meetings that they had conducted their own cause and origin analysis as part of an OFI training exercise and concluded that the fire was incendiary. *Id.* ¶ 25. Specifically, Alletto and Burns reported that the fire must have started in the rear of the first floor based on an alleged "v-pattern" they identified, and that they saw "alligatoring," "burn through," and "V-patterns" at the scene, and were supposedly somehow able to eliminate accidental causes. *Id.*

In reality, both Burns and Alletto knew that there was no evidence that the fire was incendiary. *Id.* ¶ 26. For starters, it was impossible to view any burn patterns at the scene or photos because the damage was too extensive. *Id.* That should have been the end of it. However, even if patterns were visible in the manner they claimed to have recalled (without photos, notes, or other records), Alletto and Burns nevertheless knew they were not actually indicative of arson.

13

First, V-patterns only show where the fire vented out to adjacent buildings. *Id.* ¶ 26. While that may provide information about fire spread, from which an area of origin can be identified in a simple fire, where flashover has occurred (as was the case for the Hermitage fire) then "all bets are off" and V-patterns provide no evidence of the area of origin. *Id.*

Alletto and Burns also knew in 1988 that alligatoring did not indicate that a fire was an arson; as Alletto admitted as his deposition, "all it says is that there was direct flame contact, flame impingement on that particular piece of wood for an extended period of time." *Id.* ¶ 27. Alletto and Burns were likewise aware that burn through did not indicate that a fire was an arson. *Id.* ¶ 28. Alletto and Burns further knew in 1988 that accidental and electrical causes of the Hermitage fire had not been ruled out, and needed to be, before there could be a finding of arson. *Id.* ¶ 29. For example, Alletto identified outdated BX cable in a photograph of the Hermitage Fire and testified that you would "absolutely" need to "eliminate it as a causal factor" by determining if any of the wires inside were compromised. *Id.*

Under policies developed by Alletto to address the situation, whenever disagreements between the conclusions of B&A and OFI about the cause and origin of a fire arose, they were supposed to be brought to the attention of the Commander of B&A and the Chief of OFI for resolution. *Id.* ¶ 33. Under the policies established by Alletto, OFI deferred to B&A, and if a disagreement could not be resolved, B&A's determination governed. *Id.* ¶ 34.

Pursuant to the City's policies in place in 1988, the disagreement between B&A and OFI about the cause/origin of the Hermitage fire was brought to Burge's and Alletto's attention for resolution. *Id.* ¶¶ 35-36. The disagreement was never resolved, however. Instead, contrary to the City's policies, Burge, Rolston, and the others simply adopted OFI's conclusion. *Id.*

14

Despite knowledge that the fire was not an arson, Alletto related that fabricated finding to the ASAs prosecuting Plaintiff at a meeting also attended by Rolston and others. *Id.* ¶ 31. Alletto also consulted with Burns before the latter gave his false arson testimony at Plaintiff's criminal trial, referencing "alligatoring," "burn through," "v-patterns," and elimination of accidental causes. *Id.* ¶¶ 53-54. In finding Plaintiff guilty, Judge Loretta Morgan explicitly relied on this testimony, noting that it "left no doubt in my mind that the fire was started by means of arson, that the fire, in fact, had its origin in the rear area of 4448 South Hermitage . . . [and] I don't think that the evidence admits of any other conclusion. . ." *Id.* ¶ 55.

### Plaintiff's Exoneration

On May 30, 2012, the Circuit Court of Cook County, Illinois vacated Kluppelberg's sentence. Rather than retry him, the State decided to dismiss the charges. *Id.* ¶ 56. On August 5, 2013, Judge McHale of the Circuit Court of Cook County granted Plaintiff a Certificate of Innocence, stating that the emotional nature of the fire "may have clouded or affected the judgment of some of the participants in our criminal justice system," and that "a terrible injustice was done to Mr. Kluppelberg." *Id.* ¶ 57.

### III.    Burge's Motion For Summary Judgment Motion Should Be Denied

No matter how badly the Defendants would apparently prefer to try this case without Jon Burge as a party, Rule 56 is not applied more aggressively just because a given Defendant may or may not be unpopular. Applying the law and facts dispassionately, Plaintiff's various claims against Burge are plainly viable.

15

### A.     Defendant Burge Has Failed to Justify Summary Judgment On Any Of Plaintiff's Various Claims Against Him

The summary set forth above contains more than sufficient facts for a reasonable jury to find Burge liable for each of the following constitutional torts.

### 1.     On These Facts, Burge Is Liable On The Due Process Claim Based On, *Inter Alia,* Supervisory Liability

Due process is violated where police officers frame a criminal defendant by fabricating evidence against him to falsely implicate him in the crime. *E.g., Whitlock v. Brueggeman,* 682, F.3d 567 (7th Cir. 2012). Viewing the factual record set forth above in a light most favorable to Plaintiff, that is precisely the due process claim that will be tried in August.

Burge nonetheless seeks relief on the grounds that he was not on the front lines of the violation alleged here in that he (allegedly) did not himself directly manipulate the witnesses and the bogus arson finding. Defs.' Mem. (Dckt. No. 546) at 7. This argument misapprehends the law. As this Court recently observed, supervisors in Burge's position can be individually liable for constitutional violations where they "kn[ew] about the unconstitutional conduct and facilitate[d] it, approve[d] it, condone[d] it, or turn[ed] a blind eye for fear of what they might see." *Potts v. Moreci,* 12 F. Supp. 3d 1065, 1072 (N.D. Ill. 2013), citing *T.E. v. Grindle,* 599 F.3d 583, 588 (7th Cir. 2010) (quoting *Jones v. City of Chicago,* 856 F.2d 985, 992 (7th Cir. 1988)). *See also Locke v. Haessig,* 788 F.3d 662, 671-72 (7th Cir. 2015) (expressing doubt about a defense contention in light of *Grindle* and *Iqbal* that constitutional liability requires action, as opposed to simply inaction of the "turning a blind eye" variety).

Given this theory of liability, a "defendant's direct participation in the deprivation is not required." *Miller v. Smith,* 220 F.3d 491, 495 (7th Cir. 2000); *see also Crowder v. Lash,* 687 F.2d 996,

16

1005 (7th Cir. 1982); *Logan v. City of Chicago,* 891 F. Supp. 2d 897, 903 (N.D. Ill. 2012); *see also Rascon v. Hardiman,* 803 F.2d 269, 274 (7th Cir. 1986). While personal responsibility requires more than mere negligence, it can be established if a defendant "acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights," *Fillmore v. Page,* 358 F.3d 496, 506 (7th Cir. 2004), "or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent." *Crowder,* 687 F.2d at 1005; *see also Farmer v. Brennan,* 511 U.S. 825, 842 (1994); *County of Sacramento v. Lewis,* 523 U.S. 833, 848-49 (1998); *Lewis v. Anderson,* 308 F.3d 768, 773 (7th Cir. 2002).

The personal responsibility requirement "is easy to understand in a case such as this case where the ground of the supervisors' liability is that they conspired with subordinates to violate the plaintiff's constitutional rights. There is no such thing as accidental or inadvertent participation in a conspiracy." *Jones,* 856 F.2d at 993. A supervisor is also "personally involved" where he creates or condones a custom or practice among his subordinates that he knows creates a substantial risk of constitutional harm. *See Davis v. City of Chicago,* No. 03 C 2094, 2003 WL 21781898, at *1-*3 (N.D. Ill. July 30, 2003) (allegations that defendant "may have known about the policy and acted with deliberate indifference in doing nothing to stop it . . . sufficiently alleges . . . personal involvement."); *Rascon,* 803 F.2d at 274; *Smith v. City of Chicago,* No. 15 CV 3467, 2015 WL 6859299, at *8 (N.D. Ill. Nov. 9, 2015).

The record evidence before the Court easily satisfies this standard. Even without direct evidence, the persuasive circumstantial evidence establishes Burge's involvement, and the latter form of proof is just as valid. *Quinones v. Szorc,* 771 F.2d 289 (7th Cir. 1985); 7th Cir. Pattern Instruction 1.12. Here, where Plaintiff has adduced evidence establishing that detectives under Burge's direct supervision (as the Commander of both Area 3 and B&A) physically coerced Plaintiff's confession

17

and egregiously manipulated two witnesses to falsely implicate him, there is evidence that Burge was a Commander who supervised his investigations closely. That was particularly true in high-profile cases such as this one. He was known to regularly observe interrogations directly, going so far as to peek his head into the room even he was not the one asking the questions. Burge's public statements further corroborate personal knowledge of Plaintiff's interrogation and the entire investigation, including his ability to recount specific details of Plaintiff's alleged false confession when he later spoke to the press and his description of what Plaintiff allegedly "told us."[3] Then, when the witnesses raised contemporaneous complaints, Burge personally signed off on the findings of no wrongdoing. This was so despite evidence from which it can be inferred that Burge did have knowledge of what actually occurred. *See* discussion supra at 4-11.[4]

Were there any doubt about Burge's liability as a supervisor, Plaintiff has proffered police practices expert testimony corroborating the extent to which a commander in Burge's position would have been personally involved in overseeing an investigation such as this one. PSOAF ¶¶ 37-38, 45-49. Drawing on his lengthy career in law enforcement, and his personal knowledge and experience, Plaintiff's expert (Michael Brasfield) opined that given the way police departments

---

[3] Defendants' citations criticizing Plaintiff's reliance on a newspaper article, or on Burge's review of a disciplinary report, are inapposite in the context of Burge's invocation of the Fifth, and are factually distinguishable in any event. For instance, Plaintiff does not contend that Burge's statements to the press are the basis for liability, as in *McDonald* and *Davis*. Rather Plaintiff contends that Burge's statements documented in the article are evidence from which a jury could infer that Burge was part of the investigation (*inter alia,* Burge's statement that Kluppelburg told "us") and had detailed knowledge of the investigation as it developed.

[4] In asserting that Plaintiff's claim against Burge is based solely on his post-hoc notification of Kelly and Foley's misconduct, Defendants erect a strawman. True, Plaintiff cites Burge's signature on Gramont's OPS complaint, which is an after-the-fact document. But Plaintiff cites that document as evidence that corroborates Burge's knowledge of Gramont's allegations, and more importantly shows Burge's failure to discipline Kelly following Gramont's complaint and his encouragement of a widespread practice of coercing witnesses to fabricate evidence. In that light, Defendants' citation to *Collins* is wholly inapposite. *Collins v. Leibach,* 04-2148, 2008 WL 343443, at *9 (C.D. Ill. Feb. 5, 2008) (the plaintiff conceded that one defendant was only notified of the constitutional violation after the fact).

18

operate, the alleged abuses would not have occurred without the participation and acquiescence of the Commander in charge of the investigation. *Id.* If the jury credits this expert testimony, which is certainly its prerogative, the resulting inference is sufficient to support a constitutional claim for supervisory liability under the due process clause.[5]

### 2. Independent Of His Supervisory Liability, There Is Also Sufficient Evidence Of Burge's Direct Role In The Fabrication Of Evidence

While the allegation that Burge turned a willful blind eye to misconduct by his subordinates is itself sufficient, Plaintiff's evidence also suffices to hold Burge accountable directly for his firsthand role fabrication of evidence aspect of Plaintiff's due process claim. *See discussion supra,* at 4-11, citing PSOAF ¶¶ 37-50, 65-66. When given the chance to deny that he participated with the other Defendants in framing Plaintiff, Burge declined to disavow his personal involvement. Instead, he refused to answer any questions on that subject (or any other) on the grounds that the truth could be incriminating. Having done so, Burge's non-denial gives rise under the law to a permissible inference that truthful answers would be adverse to his interests. *Baxter v. Palmigiano,* 425 U.S. 308, 318 (1976); *Harris v. City of Chicago,* 266 F.3d 750, 753 (7th Cir. 2001).[6]

---

[5] Defendants' citation to *Hughes v. Godinez,* 14-CV-00633-MJR, 2014 WL 3232219 (S.D. Ill. July 8, 2014) does nothing to diminish the evidence of Burge's supervisory responsibility. Viewed carefullly, *Hughes* actually supports Plaintiff's position. There, the court concluded that the plaintiff had made out a claim against the Warden because policies of overcrowding, which were attributable to him, put the plaintiff at risk of an unreasonable assault from another inmate. *Hughes,* 2014 WL 3232219 at *2. In our case, Burge is akin to the Warden: he facilitated a widespread practice among his subordinates of coercing confessions and fabricating evidence to cover up their misconduct. As part of the cover-up, he completely refused to impose discipline on his subordinates, all in violation of due process. That widespread practice put Plaintiff at the very risk of a deprivation of due process that he suffered.

[6] Burge is also personally responsible for creating a custom and policy of coercion and fabrication. Specifically, Burge encouraged and taught his subordinates to use physical coercion to obtain false confessions; and he instructed them how to cover up their misconduct by withholding the evidence of coercion, failing to document it in their police reports, and fabricating other evidence that corroborated the coerced confessions so that they would appear to be true. PSOAF ¶¶ 45-50. While Burge was Commander of Area 2 (just before he

19

This inference is all the more appropriate where, as here, the evidence Plaintiff needs to prove the claim against Burge is primary in the control of Burge and the other main Defendants (the key one of which, Rolston, also refused to answer any questions). Having opted to protect his own criminal interests at the expense of preventing Plaintiff from investigating the very claims on which Burge now seeks summary judgment, Burge is in no position to now turn around and seek summary judgment by arguing that Plaintiff's proof falls short. Under *Baxter, Harris,* and other similar cases, it simply does not work that way. The very fact that Burge declined to avail himself of the opportunity to deny the allegations is itself evidence from which a jury can infer the alleged wrongdoing. Indeed, "[s]ilence is often evidence of the most persuasive character." *Baxter,* 425 U.S. at 319.[7]

### 3. Summary Judgment On Plaintiff's Due Process Claim Is Also Inappropriate Given Burge's Complicity In Withholding The Exculpatory "Street File"

Without belaboring the facts in the summary above, suffice it to say that the evidence set forth above surrounding each Defendants' involvement in withholding the exculpatory Hermitage fire "street file" (supra at 9-11) is amply sufficient to state a classic *Brady* violation actionable under Section 1983 under the due process clause. *E.g., Newsome v. McCabe,* 256 F.3d 747, 749-53 (7th Cir. 2001).

---

transferred to B&A) Burge and his subordinates' repeatedly physically abused detainees, including at least 27 documented allegations of beating. *Id.* ¶ 48.

[7] Defendants' citation to *Alexander v. McKinney,* 692 F.3d 533 (7th Cir. 2015) does nothing to change the result either. That case involved an evidence-fabrication claim by a plaintiff who was arrested, immediately released on bond and found not guilty at trial. *Id.* at 555-57. The court found that the plaintiff's acquittal foreclosed a fabrication claim. *Id.* at 557 & n.2. Such a result is hardly surprising: "A deprivation of liberty is a necessary element of a due-process claim premised on allegations of evidence fabrication." *Bianchi v. McQueen,* 818 F.3d 309, 319-20 (7th Cir. 2016). Here, by contrast, Plaintiff was arrested, wrongfully convicted, and spent over two decades in prison for a crime that he did not commit. There can be no dispute that he was deprived of his liberty as required for a fabrication claim.

20

With respect to Plaintiff's *Brady*-based "street file" due process claim (on which the plaintiff prevailed at the recent *Fields* trial against both the lead investigator *and* his supervisor) there is proof in this record that the Hermitage Fire street file was at all relevant times sitting in a file cabinet in the office at Area 3. As a matter of routine custom and practice, this file was accessible to, and regularly accessed by, anyone and everyone involved in the investigation. Also consistent with the CPD's policy and practice, the file did not make it to the criminal justice system when it came time for Plaintiff's criminal trial. *See discussion supra* at 9-11.

Under these circumstances, Burge's liability for the withholding of evidence due process claim is an open question for a jury. Indeed, when asked whether he, as Commander of Area 3, had directed that the New File be suppressed, Burge asserted his Fifth Amendment rights. PSOAF ¶ 62. The fact that Burge chose not to deny that he knew about and participated in this *Brady* violation in Plaintiff's case does not compel the conclusion that he therefore was ignorant of the problem. Under the law previously discussed, the jury is free to draw the opposite inference.

Finally, Burge is also personally and directly responsible for encouraging and condoning the street files practice itself, a practice which led to the Hermitage Fire street file being suppressed. Even after the federal *Jones* litigation surrounding the street files practice describe above, Burge continued to insist that detectives should continue to use street files as their personal property, and advocated for their continued use in command-level meetings within CPD, despite the court orders prohibiting the practice. PSOAF ¶¶ 63-66. Unsurprisingly, a review of files from Area 3 demonstrates widespread and blatant violations of CPD's new policies. *Id.* In fact, the problems remained so pervasive that even a cursory review of the files would have revealed that the measures

21

enacted to address the problem were being blatantly ignored, even into the 1990s, *id.*, as the *Fields* jury recently determined.

Given that the street files practice continued unabated throughout Burge's time as Commander of Area 3, Burge either willfully ignored the problems despite knowledge of the risks of constitutional violations, or he was aware that the street files practices continued, yet nevertheless approved it and encouraged it. This evidence alone requires denial of Burge's summary judgment motion. *See Gentry v. Duckworth,* 65 F.3d 555, 561 (7th Cir. 1995) (allegations that official knew of the deprivation of rights and yet the deprivation of rights continued allowed the court to infer that the deprivation constituted the official's policy and supported an individual capacity claim). Were that not enough, when asked specifically whether he directed and encouraged his subordinates at Area 3 to continue the Street Files practice, Burge took the Fifth. PSOAF ¶ 66.[8]

### 4. Plaintiff's Failure To Intervene Claim Is An Independent Basis To Deny Burge's Motion

Burge can also be liable for failure to intervene in the violations of Plaintiff's constitutional rights. *Byrd v. Brishke,* 466 F.2d 6 (7th Cir. 1972). The analysis here overlaps with the discussion of the supervisory liability and the other due process claims, and Plaintiff is thus not going to rehash that discussion, but the same reasons that justify denial of summary judgment on those claims applies just as strongly to the failure to intervene claim. Indeed, the nature of this claim fits so well with the alleged misconduct that it would justify submission to the jury even if Defendants' version of the events were basically credited.

---

[8] Defendants contend that Burge's constitutional obligations somehow ended on January 27, 1988, when Plaintiff was arrested, and that evidence of his involvement following that date is somehow less probative of his personal involvement. *See* Defs.' Mem. at 5-6. But the prohibition on withholding exculpatory evidence continues, at a minimum, through trial. *Steidl v. Fermon,* 494 F.3d 623, 632-33 (7th Cir. 2007).

The only argument that the Defendants make on this score is that because Plaintiff cannot prove any underlying constitutional violation, he cannot proceed to trial on this claim. Because the premise of the argument fails, summary judgment is unavailable on the failure to intervene claim as well. Any other argument has been waived.[9]

### 5. Burge Is Also Unable To Justify Summary Judgment On Plaintiff's Federal And State Law Conspiracy Claims

In order to establish a conspiracy claim against Burge, Plaintiff must offer evidence sufficient to support an inference of an agreement among two or more people acting in concert to commit an unlawful act or, alternatively, a lawful act by unlawful means. *Hampton v. Hanharan,* 600 F.2d 600, 620-21 (7th Cir. 1979), *rev'd other grounds*, 446 U.S. 754 (1980).

All of the evidence discussed above is independently sufficient to support a conspiracy claim. In a nutshell, the very essence of Plaintiff's allegation is that Burge and his subordinates reached an understanding to frame Plaintiff for a heinous murder he did not commit. They did so despite the lack of any genuine evidence, endeavoring instead to falsify the case against him through illicit means. The result was disastrous for Plaintiff, who suffered 20+ years of wrongful incarceration before his exoneration. This is the quintessential conspiracy case and, most tellingly, neither Burge nor Rolston have even denied their malfeasance. There is a good reason why none of the other Defendants sought summary judgment on this claim, and Burge is not in any better

---

[9] Defendants also rely heavily on the assertion that Burge's name does not appear on any investigative document in this case. First, that is not a prerequisite to demonstrating personal involvement. But that claim rings especially hollow in a case like this where there is significant evidence that CPD followed a practice of withholding and destroying evidence. In light of that fact, it is unsurprising that Burge's name does not appear on many documents: the bulk of the Hermitage Fire re-investigation took place while Burge was Commander of B&A, but the B&A files have somehow all gone missing. If Defendants can find the B&A file for Hermitage fire, it may well show more Burge involvement than is presently known, and the fact that the now-missing B&A file was in the Defendants' exclusive control justifies just such a spoliation-related inference. *See* 7th Cir. Pattern Instruction 1.

23

position than the others, notwithstanding his present insistence that the hole in the record caused by his own silence somehow mandates his absence from trial.

**B.      In Addition To All Of The Incriminating Evidence In The Record, Burge's Fifth Amendment Assertions, And The Resulting Permissible Inferences Therefrom, Necessarily Preclude A Judicial Finding That No Jury Could Possibly Find Against Burge Where All Reasonable Inferences Are Drawn In Plaintiff's Favor**

Any summary judgment motion must start with a showing by the movant that there is "no genuine dispute as to any material fact." Fed. R. Civ. Pro. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment is appropriate only where no reasonable jury could credit Plaintiff's evidence, even with all reasonable inferences from the record are drawn in Plaintiff's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

While these summary judgment standards are so familiar that it is tempting to pass right over any discussion, they warrant more careful consideration where, as here, a moving party is also asserting his Fifth Amendment right over a material fact in the case, inter alia, the level of his personal involvement. Indeed, a defendant making Fifth Amendment assertions about the central issues in the case trips on this very first hurdle: Under *Baxter,* the Fifth Amendment assertion permits, but does not require, the jury to draw an adverse inference. 425 U.S. at 318; *LaSalle Bank Lake View v. Seguban,* 54 F.3d 387 (7th Cir. 1995). By definition, then, whether to draw the inference or not is a factual question which must be resolved by a jury. Because Defendants' motion cannot be evaluated without the Court drawing all reasonable inferences in the non-movant's favor, Burge necessarily loses. Plaintiff as the non-moving party is entitled to the benefit of these adverse inferences. *See Stichting Ter Behartiging Van de Belangen v. Schreiber,* 407 F.3d 34, 55 (2d Cir. 2005) (noting that although a "a jury might draw" an adverse inference from the privilege assertion, "we

24

[the court] are required at summary judgment to draw all reasonable inferences in favor of the non-moving party").

In a case such as this where the moving party has asserted the Fifth Amendment, other courts have applied a framework in which Plaintiff is only required to present "some evidence to support his claims," that, when coupled with the adverse inferences demonstrates genuine issues of fact exist. *E.g., Logan,* 891 F.Supp.2d at 903 (Bucklo, J.) (also involving Defendant Burge and his privilege assertions); *Thompson v. City of Chicago,* No. 07 C 1130, 2009 WL 674353, at *3-*6 (N.D. Ill. Mar. 12, 2009). The "some evidence" standard takes account of the fact that the invocation of the Fifth prevents plaintiff from conducting discovery and hampers his ability to meet the burden of proof. *Logan,* 891 F.Supp.2d at 903. Accordingly, even assuming hypothetically that the extrinsic evidence of Burge's involvement "might not be sufficient to withstand summary judgment on its own, when taken with the adverse inferences from [Burge's] silence, it does create a genuine issue of fact." *Id.* at 904; *Thompson,* 2009 WL 674353, at *4-*6 (denying summary judgment to defendants who invoked their right to silence even though the plaintiff's "evidence does not establish that defendants violated plaintiff's due process rights," because when that evidence was "coupled with the adverse inferences . . . it does create a genuine issue of fact"); *see also F.T.C. v. Kitco of Nev., Inc.,* 612 F. Supp. 1282, 1291 (D. Minn. 1985) ("Where plaintiff's trial preparation has been hampered to some extent by defendant's assertion of privilege, the court finds it appropriate to consider evidence of Farkas' fifth amendment invocations.").

To the extent there is something of a paucity of law on this point, this is so precisely because so few defendants would even attempt to seek summary judgment after asserting the Fifth. Defendants certainly cite no law to the contrary. Instead, the cases upon which Defendants rely

25

stand for the proposition that the Court cannot enter judgment in Plaintiff's favor solely on the basis of Fifth Amendment assertions because, taken alone, the invocation of the Fifth Amendment does not constitute an automatic admission of guilt. *See e.g., Seguban,* 54 F.3d at 391 (plaintiff not entitled to summary judgment where defendant invoked the Fifth Amendment privilege instead of responding to summary judgment motion); *National Acceptance Co. of Am. v. Bathalter,* 705 F.2d 924, 932 (7th Cir. 1983) ("failure to answer the allegations of a civil complaint based on an assertion of the Fifth Amendment privilege" did not entitle plaintiff to judgment on the pleading pursuant to Rule 8(d)). These cases stand for the non-controversial proposition, with which Plaintiff has no quibble, that automatic judgment for plaintiff, and against the Fifth Amendment invoking defendant at the pleading or summary judgment stage, would impose too high a cost on the invocation.

But the law still exacts some "cost" for invoking the Fifth, and that is exactly as it should be given the interference that such invocations entail for plaintiffs, who bear the burden of proof. Were it otherwise, refusing to testify would be a widespread – and powerfully effective – defense strategy. To combat the inevitable potential for abuse, if not outright gamesmanship, the "cost" associated with asserting and protecting one's own constitutional rights and interests is the attendant possibility that the jury might decide to draw an adverse evidentiary inference at trial. *See Graystone Nash, Inc.,* 25 F.3d 187, 191 (3rd Cir. 1994) ("The principle that the invocation of the privilege may not be too 'costly' does not mean that it must be 'costless.'").

That reasoning makes perfect sense when applied in the context of rejecting summary judgment: a permissive evidentiary inference is essentially a disputed fact, and a disputed fact would never entitle Plaintiff to summary judgment against Defendants. But while a permissive inference cannot support a grant of summary judgment, it remains a sufficient basis to deny it. Here, the jury's

26

prerogative to draw an adverse inference on the central question of Defendant Burge's personal involvement necessarily defeats Burge's summary judgment motion. In short, with respect to Burge, this is a case for the jury.

## IV. Alletto's Motion For Summary Judgment Is Equally Misplaced

The basis for Alletto's liability is as follows.

### A. For Rule 56 Purposes, Alletto Violated Plaintiff's Right To Due Process, Failed To Intervene In The Violation Of The Same, And Conspired To Wrongfully Convict Plaintiff

If Plaintiff's version of events is credited, then Alletto was a willing and necessary participant in the effort to frame Plaintiff. Having coerced Plaintiff's false confession through physical violence, and having manipulated two witnesses to falsely implicate him, the Defendants were still unable to prosecute him because the "crime" for which they had gathered evidence had been classified by B&A as an accidental fire of undermined origin. After multiple meetings with the Defendant detectives, Alletto fixed that problem by fabricating an arson finding even though he knew (certainly for Rule 56 purposes) that there was in fact no evidence of arson. *See discussion supra,* at 11-14.

This alleged conduct more than suffices to defeat summary judgment on multiple claims. First, Alletto's fabrication violated Plaintiff's right to due process, and this is true even though Alletto did not present the evidence or testify at trial. Where Alletto met with the prosecutors and supplied the missing link for charges, the fabrication "harmed the defendant before and not just during trial, because it was used to help indict him." *Fields v. Wharrie,* 740 F.3d 1107 (7th Cir. 2014), citing *Julian v. Hanna,* 732 F.3d 842, 847 (7th Cir. 2013).

Second, this same misconduct states a *Byrd v. Bryske* failure to intervene claim. Defendants only argument is that there is no constitutional violation, but because there is, Defendants' argument fails.

Third, Alletto's role can also be fairly characterized as that of a conspirator under the law discussed above. The Court must keep in mind that "[r]arely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire" and thus "circumstantial evidence may provide adequate proof of conspiracy." *Bell v. City of Milwaukee,* 746 F.2d 1205, 1256 (7th Cir. 1984). *See also Hoskins v. Poelstra,* 320 F.3d 761, 764 (7th Cir. 2003) ("conspirators rarely sign contracts").

### B.      Defendants' Counter-Arguments Are Unavailing

Alletto argues that he cannot be held liable because his deputy Burns provided the arson testimony at trial, and because Alletto's opinion that the fire was incendiary was merely erroneous. To reach either conclusion, however, this Court would have to resolve the summary judgment evidence in the Defendant's favor, not the other way around. If Plaintiff's evidence is credited, as it must be, Alletto not only provided the prosecution with an opinion that the Hermitage Fire was an arson, but also did so knowing that the opinion was fabricated.

### 1.      Even Without Testifying At Trial, Defendant Alletto Provided The Prosecution with A Fabricated Opinion That The Fire Was An Arson

Testifying at Plaintiff's criminal trial is not a required element of his due process claim. *See Whitlock,* 682 F.3d at 582-83. Quite the opposite, there is absolute immunity for any tort based solely on witness testimony. *See Brisco v. LaHue,* 460 U.S. 325, 326, 345 (1983).

Plaintiff alleges something different than garden variety perjury, namely, that Alletto misled the prosecution via fabricated opinions. *Ienco v. Chicago,* 286 F.3d 994, 1000 (7th Cir. 2002) ("Neither

28

the withholding of exculpatory information nor the initiation of constitutionally infirm criminal

proceedings is protected by absolute immunity"). As one court explained, "adopting [defendant's]

reasoning would lead to the untenable result that officials who fabricate evidence or manufacture

probable cause could later shield themselves from liability simply by presenting false testimony

regarding that evidence." *Spurlock v. Satterfield,* 167 F.3d 995, 1003-04 (6th Cir. 1999); *see also Buckley v.*

*Fitzsimmons,* 509 U.S. 259, 272-76 (1993) (no absolute immunity for obtaining fabricated expert

testimony); *Burns v. Reed,* 500 U.S. 478, (1991) (no absolute immunity for giving legal advice to

police). *Cf. Newsome v. McCabe,* 319 F.3d 301, 302 (7th Cir. 2003) ("Secreting evidence is not covered

by absolute immunity"). Instead, "[t]he actions of an official who fabricates evidence that later is

used to deprive someone of liberty can be both a but-for and proximate cause of the due process

violation," even if that evidence is ultimately presented at trial by someone else. *Whitlock,* 682 F.3d at

582-83. That is exactly the circumstance here.

### 2. For Summary Judgment Purposes, Defendant Alletto's Findings Were Fabricated and Not Merely Erroneous

Also without merit is Alletto's second contention that his findings that the fire was an arson

were erroneous, and not a fabrication. Defendants contend that because Dr. Ogle testified that fire

science is not an exact science, and because fire investigation has evolved over the past three

decades, Alletto cannot be held liable, since he was merely mistaken. But Alletto himself has testified

that he knew in 1984 and 1988 that the three bases on which he and Burns built their arson finding

were invalid: (1) the presence of alligatoring, (2) burn-through of the floor; and (3) the elimination of

all accidental causes. PSOAF ¶¶ 25-30. As to both alligatoring and burn-through, Alletto testified

that in 1984 he knew that neither were indicators of an arson. *Id.* ¶¶ 27-28. Moreover, Alletto knew

that electrical causes had not been eliminated, since there were pictures of BX electrical cables in the

29

photographs. *Id.* ¶¶ 29-30. Given this testimony, any suggestion that Alletto was simply erroneous when he falsely opined that the Hermitage Fire was an arson is contradicted by Alletto himself. Accordingly, this is a classic credibility question for the jury, and Alletto's summary judgment motion should be denied. *Deets v. Massman Const. Co.,* 811 F.3d 978, 982 (7th Cir. 2016) (a "credibility determination may not be resolved at summary judgment").

Nothing in the Defendants' citation to *Starks v. City of Waukegan,* 123 F. Supp. 3d 1036 (N.D. Ill. 2015) changes this calculus. In *Starks,* the plaintiff claimed that the dentists had fabricated bite mark evidence against him, which caused his wrongful conviction. As support, the plaintiff alleged that the dentists had a pre-existing relationship with the police officer in charge of the criminal investigation; that the dentists' work-up was not in accordance with the prevailing scientific standards; and that the dentists failed to preserve photographs used to compare the plaintiff's dentition to the bitemark. *Id.* at 1053.[10]

The evidence of Alletto's fabrication is qualitatively different from the evidence presented in *Starks*. Rather than simply show that Alletto was "incompetent or wrong" -- whether compared against the standards of arson science today or in 1988 -- it demonstrates that Alletto affirmatively knew that the bases on which he alleged the Hermitage Fire was an arson were entirely invalid at the time that he gave them, but gave them anyway. Such an allegation clearly states a claim for fabrication. *See Saunders-El v. Rohde,* 778 F.3d 556, 560 (7th Cir. 2015) ("[I]n *Whitlock. . .* we expressly

---

[10] In *Stinson v. Gauger,* 799 F.3d 833 (7th Cir. 2015), the Seventh Circuit reached the opposite conclusion from Judge Finerman's *Starks* opinion. The Seventh Circuit subsequently heard the Stinson case *en banc,* but the decision has not yet been released.

stated that 'a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty . . . .'").[11]

Likewise, the fact that Dr. Ogle declined to reach an opinion on Burns' credibility (an opinion that would surely be inadmissible had he given it) does not insulate Alletto from liability. *See Jordan v. City of Chicago,* No. 08 C 6902, 2012 WL 88158, at *4 (N.D. Ill. Jan. 12, 2012); *see also United States v. Benson,* 941 F.3d 598, 604-05 (explaining that expert testimony about whether a witness is telling the truth or not is on the wrong side of the *Daubert* line). First, it is Alletto's, not Burns's, knowledge that is at issue in this motion. Second, the Defendants' self-serving citation to a small portion of Dr. Ogle's testimony ignores testimony that creates a dispute over what Burns knew, including Dr. Ogle conclusions that: (a) Burns would have known that the bases on which he reached his determination that the Hermitage Fire was an arson started in the rear of the first floor were not scientifically valid; (b) Burns' interpretations of burn patterns were not "reasonable"; and (c) Burns' testimony and approach to reaching a cause and origin determination demonstrated a lack of objectivity. Resp. SOF ¶ 62. As a result, for purposes of summary judgment, that portion of Dr. Ogle's testimony about the "reasonableness" of Burns' findings must be credited (unlike a determination that Burns was or was not a liar is admissible at trial). *See, e.g., Jimenez v. City of Chicago,* 732 F.3d 710, 721-22 (7th Cir. 2013) (unlike testimony about whether a witness is credible, testimony about the reasonableness of that witness' actions is admissible).

Finally, the fact that Detective Urbon, the B&A detective who investigated the fire in 1984, found that the cause of the fire was undetermined does not undo Alletto's fabrication. According to

---

[11] For the same reason, the Defendants' citation to *Buie v. McAdory,* 341 F.3d 623, 625 (7th Cir. 2003) is unavailing. Plaintiff is not arguing that he was entitled to a "correct" expert opinion, but instead one that was not knowingly fabricated. *Buie* does not speak to those circumstances.

the Defendants, because Plaintiff could have used Urbon's finding to impeach Burns at trial, Plaintiff's fabrication claim against Alletto must fail. Such an argument fails to withstand scrutiny.

At bottom, Defendants' claim is that Burns' and Alletto's fabrication was not material because of the availability of Urbon's report for impeachment. For fabrication to be material, however, a court requires a showing that there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs,* 427 U.S. 97, 103 (1976); *see also Wearry v. Cain,* 136 S.Ct. 1002, 1006 (2016) ("Evidence qualifies as material when there is 'any reasonable likelihood' it could have 'affected the judgment of the jury'"). There is no doubt that the false arson testimony affected the outcome of the trial; there was no other evidence that the fire was an arson. Had the court been aware that the arson finding was scientifically false, the court would not have convicted plaintiff. See PSOAF ¶¶ 54-55.[12]

## V.    Plaintiff's Malicious Prosecution Claim Survives Against Both Alletto and Burge

Defendant challenge two elements of Plaintiff's malicious prosecution claim -- initiation of charges and malice -- but neither argument has merit.

First, while Defendants are undoubtedly entitled to present their contrary view to a jury, the evidence in Plaintiff's factual summary supports an inference that Alletto and Burge fabricated evidence which was presented to prosecutors to secure probable cause for Plaintiff's prosecution. That alone is sufficient to show that both Alletto and Burge "commenced" or "continued" Plaintiff's prosecution. *See, e.g., Ewing v. O'Brien,* 60 F. Supp. 2d 813, 818 (N.D. Ill. 1999) (allegations

---

[12] Nor is the fact of fabrication cumulative of Urbon's report. Evidence that Burns and Alletto fabricated the arson finding would have eviscerated the only evidence at Plaintiff's trial that there was even any criminal act. That is, without the fabrication, the prosecution could not have proceeded. Urbon's report, noting that the cause of the fire was "undetermined" due to the damage to the building, is qualitatively different from knowledge that each of the bases on which Burns and Alletto found the fire to be an arson were completely bogus. As such,

32

that detectives "lied at all stages of the proceedings, causing the prosecutors to charge Ewing with the murders and to proceed to trial on the charges" sufficient to satisfy malicious prosecution elements); *see also Myett v. Heerdt,* No. 12 CV 09464, 2017 WL 75738, at *16 (N.D. Ill. Jan. 9, 2017) (where police officers provided prosecutor with false reports, they cannot hide behind prosecutor's decision to charge); *Cannon v. Burge,* No. 05 C 2192, 2006 WL 273544, at *13 (N.D. Ill. Feb. 2, 2006), *aff'd,* 752 F.3d 1079 (7th Cir. 2014) (where defendants individually and in conspiracy suppressed exculpatory evidence and fabricated evidence, sufficient to satisfy the "commencement" or "continuance" prong of malicious prosecution claim).

Specifically, there is testimony that Alletto met with the ASAs prosecuting Plaintiff and presented the fabricated opinion that the fire was an arson. PSOAF ¶ 31. Likewise, Burge was actively involved in the fix against Plaintiff: a jury could infer (based on the evidence and the Baxter inferences) that he observed Plaintiff's beating; knew about the coercion of Gramont and Glassco; agreed to OFI's fabricated arson finding; and failed to inform the prosecution of any of the Defendants' misconduct. *Id.* ¶¶ 37-44. Burge also was responsible for the other Defendants withholding exculpatory evidence in the New File that would have precluded Plaintiff's prosecution. *Id.* ¶¶ 58-67. Finally, Burge declined to deny any of this, instead asserting a privilege. There is no basis for summary judgment on this claim either.

Finally, on the issue of malice, while Defendants are free to argue at trial that Alletto's arson finding was "erroneous" and not fabricated, the evidence establishes the opposite: Alletto knew in 1988 that the bases on which he found the Hermitage fire to be an arson were bogus. As such, whether Alletto was wrong or whether he intentionally fabricated his findings is a question of fact

---

Urbon's report did not serve the same function, and therefore the evidence of fabrication is in no way

33

and credibility that a jury must decide. *Bianchi v. McQueen,* 2016 IL App (2d) 150646 at 80 (finding that plaintiffs sufficiently alleged malice where they alleged defendants "intentionally fabricated inculpatory evidence and concealed exculpatory evidence").

## VI.    Defendants Are Not Entitled To Qualified Immunity

As is clear from the half-hearted nature of Defendants' arguments, this is obviously not a qualified immunity case. The facts may be disputed, but the surrounding law is well-settled. Plaintiff's constitutional rights to exculpatory evidence and the prohibition against fabricating inculpatory evidence were already well established at the time of Hermitage fire investigation. *See Steidl v. Fermon,* 494 F.3d 623, 632-33 (7th Cir. 2007) ("the duty to disclose [exculpatory material] was clearly established as of 1979 and 1980"); *Fields v. Wharrie,* 740 F.3d 1107, 1114 (7th Cir. 2014) ("it was established law by 1985 (indeed long before)…that a government lawyer's fabricating evidence against a criminal defendant was a violation of due process.").[13]

Stretching to try to manufacture a legal issue where there is in fact none, Defendants contend that "there is no case law imposing supervisory liability based solely on awareness of a plaintiff's arrest and prosecution and not of the specific constitutional violations alleged." Def. Mem. at 15. But Plaintiff is not seeking to impose liability on that basis, and for all of the reasons identified above, has established that Burge violated Plaintiff's constitutional rights. Likewise, Defendants' claim that "there was no governing case law holding that incorrect or mistaken expert testimony could be the basis of a due process violation" (*id.* at 15) mischaracterizes and improperly

---

"cumulative" of Urbon's report. *See Tillman v. Burge,* 813 F. Supp. 2d 946, 963-64 (N.D. Ill. 2011).

[13]  Other Courts of Appeal have reached the same conclusion. *See Brown v. Miller,* 519 F.3d 231, 237 (5th Cir. 2008) (denying qualified immunity where analyst's laboratory report "had no scientific basis" and was "materially inaccurate"); *Gregory v. City of Louisville,* 444 F.3d 725, 740 (6th Cir. 2006) (denying qualified immunity where expert forensic examiner intentionally fabricated fact that plaintiff's hairs matched hairs at crime scene when they

34

recasts the evidence against Alletto. As already discussed, there is ample evidence to show that

Alletto knew he was falsifying his findings, and that fabrication is a constitutional violation.

In any event, the conclusory and under-developed nature of Defendants' qualified immunity

arguments is alone a sufficient justification to reject it. *E.g., Ortiz v. City of Chicago,* No. 09 CV 2636,

2010 WL 3833962, at *13 (N.D.Ill. Sept. 22, 2010).

## Conclusion

For all of the foregoing reasons, Defendants' motion for summary judgment should be

denied.

Respectfully submitted,

/s/ Jon Loevy
One of Attorneys for Plaintiff

Arthur Loevy
Jon Loevy
Michael Kanovitz
Russell Ainsworth
Gayle Horn
Elizabeth Mazur
Roshna Bala Keen
Sarah Grusin
Joel Feldman
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
(312) 243-5900

---

did not); *Pierce v. Gilchrist,* 359 F.3d 1279, 1285-86 (10th Cir. 2004) (forensic analyst violated guarantee of due process by fabricating lab results to falsely state that hairs from plaintiff matched hairs found at crime scene).

**CERTIFICATE OF SERVICE**

I, Jon Loevy, an attorney, hereby certify that on January 14, 2017, I filed the foregoing via the Court's CM/ECF system and thereby served a copy on all counsel of record.


/s/ Jon Loevy