IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| JAMES KLUPPELBERG, | ) | |
| | ) | |
| Plaintiff, | ) | 13 CV 3963 |
| | ) | |
| v. | ) | JUDGE LEFKOW |
| | ) | |
| JON BURGE et al., | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

**PLAINTIFF'S MOTION TO APPLY COLLATERAL ESTOPPEL**

Now Comes Plaintiff, James Kluppelberg, by and through his counsel, Loevy & Loevy, and respectfully requests that this Court estop the City from contesting that it had a policy of concealing material exculpatory and/or impeachment evidence. In support, Plaintiff states:

**Introduction**

James Kluppelberg was wrongfully convicted of murder arising out of a fire at 4448 S. Hermitage that occurred on March 24, 1984. Meanwhile, a month later, on April 28, 1984, Jerome Smith and Talman Hickman were shot and killed in front of a housing project at 706 E. 39th Street. The permanent retention files for these two cases have been very close to each other for the past 33 years.

With respect to the Smith Hickman murders, the Chicago Police Department investigated the murders, and a man named Nate Fields was prosecuted, convicted, and sent to death row. He was ultimately exonerated and, just as in Kluppelberg, the City managed to locate a "street file" relating to the 1984 investigation many years after the criminal proceedings had ended. As was also true for Kluppelberg's street file, the Fields file contained very important exculpatory materials that had been concealed from Fields for decades.

Following their respective exonerations, Fields and Kluppelberg both filed lawsuits, both represented by undersigned Plaintiff's counsel. *See Fields v. City of Chicago*, No. 10 C 1168 (Kennelly, J.). Both Kluppelberg and Fields alleged that their constitutional rights had been violated by (a) the individual detectives who withheld information, as well as by (b) the City itself, for maintaining a street file policy and practice that caused the constitutional violations.

The Kluppelberg and Fields cases progressed on parallel tracks. To prove the *Monell* claims for both cases, Plaintiff's counsel retained the same expert (Michael Brasfield); deposed the same FRCP 30(b)(6) witness designated by the City (James Hickey); defended against the opinions of the same City defense expert (Jeffrey Noble); and otherwise examined the same policies and practices.

As the Court may recall, there was an issue of conflicting trial dates between this case and *Fields*. As it turned out, *Fields* went first.[1] *Fields* was tried over the course of five weeks, during which time both sides presented extensive *Monell* evidence and the testimony of four *Monell* experts. At the conclusion of the trial on December 15, 2016, the jury found for Fields on the *Monell* claim, and others too, and awarded $22 million in compensatory damages, as well as punitives.

It was of course the City's prerogative to litigate *Fields* (and this case as well) rather than settle. But when litigants try cases unsuccessfully, collateral estoppel imposes certain very real consequences. Having already litigated the street file *Monell* claim and lost, the law now prevents the City from re-litigating the same issue that was decided against it. All of the elements of issue preclusion are easily met here, and there is no need to repeat another trial on

---

[1] The City undoubtedly believed its chances of success were far higher in *Fields*. The case was a re-trial, having already been tried previously without success by Fields, a former El Rukn gang member.

2

the same question. Indeed, applying estoppel here will promote the twin goals of efficiency and finality.

Plaintiff acknowledges that the City remains free at trial to contest whether the withheld Kluppelberg street file contains truly exculpatory information, as well as whether the City's street file practice was in fact the moving force behind Kluppelberg's injury. But the City should not be permitted to litigate anew whether there was a street file policy and practice problem during the time period at issue.

**Relevant Background**

*Plaintiff's* **Monell** *Claim*

As already mentioned above, Plaintiff was wrongfully convicted of arson-murder in 1989. The fire at issue occurred on March 24, 1984 at 4448 S. Hermitage ("Hermitage Fire"). An initial investigation of the Hermitage Fire by both Area Three Violent Crimes and the Bomb and Arson Unit led Area Three to close the case as "non-criminal" "accidental fire deaths." Ex. 1, Tuider Supp. Report at City-Klup 564.

The initial investigation uncovered several leads, and information about "dangerous wiring," that were placed on unofficial to-from memos and handwritten notes. These documented leads were never memorialized on an "official" General Progress Report ("GPR") or supplementary report. Worse yet, those "unofficial" documents were placed in an Area Three street file, which was buried in the Chicago Police Department ("CPD") warehouse and concealed from the Plaintiff. Indeed, there is no dispute among the parties that the street file, (which has alternatively been referred to as the "New File" in this litigation) was not turned over to either the prosecutor or Plaintiff at any point during Plaintiff's criminal proceedings. Dckt. 547, Def. SOF at ¶60.

3

It is Plaintiff's position in this litigation that the concealment of the Area Three street file in his case was hardly an isolated incident, but instead done pursuant to the policy of the City of Chicago in the 1980s (and beyond) to withhold material exculpatory and/or impeachment evidence. To prove as much, Plaintiff amassed substantial evidence, including the testimony of the City's Fed. R. 30(b)(6) expert, James Hickey, and of Plaintiff's expert, Michael Brasfield. Hickey testified about the City's practice of using street files, which came to light during litigation in the early 1980s; the Special Orders that were implemented by the City to allegedly fix the problem; and the resulting confusion and response to those Orders. Ex. 2, Hickey Dep. (July 29, 2014) at 143:15-148:2.

In *Kluppelberg,* Brasfield not only examined the underlying litigation that exposed the street files problem and the City's response, but also conducted an in-depth analysis of 164 Area Three homicide files that were in the CPD warehouse alongside Plaintiff's street file. He found that the CPD maintained these Area Three files in a similar manner to Plaintiff's street file: For example, in the Area Three files, just as in Plaintiff's street file, Brasfield found that detectives recorded information on "unofficial" forms (such as to-from memorandums and handwritten notes) that was never memorialized on a supplementary report; the information on those "unofficial" forms was relevant and critical to the criminal investigation; the files often referenced documents that obviously existed at one point in time but were no longer included among the existing official file; and the files contained incomplete inventories that did not reflect the actual contents of the files. Ex. 3, Brasfield Report, at 41-59.

Based on this evidence, Plaintiff claimed that the City maintained an unconstitutional policy of withholding relevant investigative material from criminal defense attorneys and their clients, including Kluppelberg.

4

*Fields'* **Monell** *Claim and Verdict*

The facts in *Fields* are strikingly similar to those in Plaintiff's case. On April 28, 1984 – just a month after the Hermitage Fire – Talman Hickman and Jerome Smith were shot to death outside of a public housing complex in Chicago. *Fields v. City of Chicago*, No. 10 C 1168, 2014 WL 477394, at *1 (N.D. Ill. Feb. 6, 2014). After the case went cold, Fields was arrested and then convicted of the double homicide in 1986 and sentenced to death. *Id*. at *1-*2.

That conviction was overturned and Fields was retried in 2009, resulting in his acquittal. *Id*. He then filed his Section 1983 case, which is the subject of this motion.

During discovery in Fields' civil case, like here, the City of Chicago for the first time located a street file for the case; that is, "a file of over a hundred pages of police reports concerning the Smith/Hickman murders," which "was located in a nondescript filing cabinet [in the basement] at the Area 1 police station, along with files relating to other murders." *Id*. at *7. Fields' street file, plaintiff argued, was no anomaly. On that score, Fields evaluated 429 homicide files hidden in a basement, which covered two time periods – from 1983 to 1989, and 1999 to 2009 – and CPD Areas One through Four [hereinafter "Basement Files"]. *See* Ex. 4, Appendix to Brasfield's Expert Report (listing all of the homicide files reviewed); Ex. 5, Brasfield Testimony, *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.), Nov. 29, 2016 [hereinafter "Brasfield Test."], at 115-17 (analyzed hundreds of files from basement of Area 1). Fields' expert, Michael Brasfield (notably the same expert Kluppelberg has disclosed here) found that the Basement Files were consistent with Fields' street file. Ex. C, Brasfield Test. at 128.[2] For example, the Basement Files – like the street file in Fields' specific case – contained

---

[2] In addition to examining the basement files for their contents, Brasfield also compared the basement files to the permanent retention file where the permanent retention was available, and to the public defender's file, where the public defender's file was available, to determine whether information was indeed withheld from the official file. Ex. 5, Brasfield Test. at 156-73.

5

to-from memos, and handwritten notes that were not memorialized on the official General Progress Report form or otherwise documented in a supplementary report. *Id*. at 127-28.

In support of Fields' *Monell* claim, he also presented testimony from the City's Fed. R. Civ. P. 30(b)(6) witness, James Hickey. Just as he did in deposition testimony in Plaintiff's case, Hickey testified at Fields' trial about the City's use of "street files" and its (inadequate) response to the problem. In particular, Hickey testified that after the George Jones prosecution in 1982, the City was "put on notice that there was a problem with the way it was handling" the storage, preservation and disclosure of homicide files, including that "pertinent information developed in the course of investigations wasn't making it into official police reports," and was instead being stored in memos and notes that were "outside the official system." Ex. 6, Hickey Test., *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.), Nov. 23, 2016 [hereinafter "Hickey *Fields* Test."] at 11-12, 13-14, 18; *id*. at 16 (Hickey personally observed "multiple files" where he saw that "sometimes solid investigative work in the early days, first couple days of an investigation did not make it into the official report."). Hickey explained that following the Jones prosecution, he "personally visited each of these six detective areas" in order to "get a grasp of what was out there," and he ultimately concluded that "we are talking about the same phenomenon" at each of the six CPD areas. *Id.* at 17.

Hickey acknowledged that the street files practice was engrained. *Id.* at 21. And he described the same City policies at issue here – the 1982 Teletype, Special Orders 83-1, 83-2, and 86-3 – and the same single 3-hour training in 1983 on those Orders. *Id.* at 20-21, 24-25, 27, 35-36. Hickey acknowledged that in some instances, detectives did not comply with the requirements of the Special Orders, including using the proscribed GPR form to take notes and keeping an inventory of the material in the investigative file. *Id.* at 27-28, 33. Finally, Hickey

6

conceded that he was not aware of any audits monitoring compliance with the Special Orders. *Id.* at 35.

In November 2016, Fields' case went to trial. There the City was capably defended by attorneys from Dykema Gossett, an experienced litigation firm that has been defending the City in countless section 1983 cases.

Fields' *Monell* claim was submitted to the jury. In the instructions, the jury was told that to succeed on Fields' *Monell* claim, Fields had to prove:

1. Material exculpatory and/or impeachment evidence in the possession of the Chicago Police Department was concealed from the prosecutor, and the evidence was not otherwise available to the plaintiff through the exercise of reasonable diligence . . . .

2. At the time of the concealment, it was the policy of the City of Chicago to conceal material exculpatory and/or impeachment evidence . . . .[3]

3. The policy as described in paragraph 2 caused the concealment of material exculpatory or impeachment evidence in the plaintiff's criminal case.

4. The plaintiff was damaged as a result.

Ex. 7, Jury Instructions, *Fields v. City of Chicago*, No. 10 C 1168, "Fifth claim – 'policy' claim against the City of Chicago," at 14-15.

On December 15, 2016, the jury found for the plaintiff and against the City on Fields' *Monell* claim. Ex. 8, Verdict Form, *Fields v. City of Chicago*, No. 10 C 1168. The Court then entered judgment against the City. Ex. 9, Dckt No. 1175, Judgment, *Fields v. City of Chicago*, No. 10 C 1168. The City has moved for post-trial relief, but that judgment stands.

---

[3] The jury was instructed that it could find a policy from any of the following: (a) an express policy; (b) a widespread practice; (c) a decision or statement made by the Superintendent of the CPD; or (d) training. Ex. 7, Jury Instructions, *Fields v. City of Chicago*, No. 10 C 1168, at 14-15.

7

**Argument**

I.  **Collateral Estoppel Applies to the Jury's Determination that the City Had a Policy to Withhold Material Exculpatory and/or Impeachment Evidence**

Collateral estoppel, also known as issue preclusion, bars a party from re-litigating the same issue that was necessary to the findings in a prior final judgment. *Abbott Laboratories v. Dev. L.P.*, No. 00 C 1725, 2000 WL 1263462, at *2 (N.D. Ill. June 28, 2000). "[T]he doctrine promotes important goals: it allows a party only one opportunity to litigate an issue thereby conserving the time and resources of the parties and the court; promotes the finality of judgments;" and "preserves the integrity of the judicial system by eliminating inconsistent results." *DeGuelle v. Camili*, 724 F.3d 933, 936 (7th Cir. 2013).

Generally, issue preclusion is appropriate if: (1) the issue sought to be litigated is the same as the one involved in the prior action; (2) that issue was actually litigated in the first action; (3) the determination of the issue was essential to the final judgment in the first action; and (4) the party against whom estoppel is invoked had a full and fair opportunity to litigate the issue in the first action. *See Chicago Truck Drivers v. Century Motor Freight*, 125 F.3d 526, 530 (7th Cir. 1997). Each of those criteria has been met.

  A.  **Each of the Four Prongs of Estoppel Are Met**

First, the issue to be litigated in Plaintiff's case is the same as that which was litigated in *Fields*: whether the City had a policy of withholding material exculpatory and/or impeachment evidence. Indeed, the Defendants' own proposed jury instructions make that clear. *See* Ex. 10, Dckt No. 441-1, Defendants' Proposed Jury Instructions, at No. 21 (proposing that for the *Monell* claim, Plaintiff must prove that: "At the time, the City of Chicago had a policy of knowingly failing to disclose material exculpatory and/or impeachment evidence to prosecutors, and/or fabricating evidence.").

The identity of issues in Plaintiff's case and *Fields* are remarkable: both involve a homicide that occurred in the Spring of 1984; both involve an initial investigation in 1984, which resulted in no arrests, and a subsequent investigation that led to the plaintiffs' wrongful convictions; and both involve claims that a street file that was created during the initial investigation, and which contained to-from memos and handwritten notes, among other documents, was withheld. Because of the temporal and subject matter similarity of the underlying cases, Plaintiff's and Fields's *Monell* claims are also identical in all material respects: They involve the City's policy on withholding street files created by Area Violent Crimes Units in the 1980s and beyond.

Should the City point to minor and non-consequential distinctions to try to contend that the underlying facts of *Fields* and Plaintiff's case are insufficiently "identical," such an argument should be rejected. For example, the City may attempt to maintain that although both cases involve homicide files, because *Fields* analyzed homicide files found in the basement of Area One and Plaintiff has analyzed homicide files found in the CPD warehouse, *Fields* is not dispositive. Likewise, the City may try to differentiate between Plaintiff's case, which involved Area Three files, and *Fields*, which involved files from all of Areas One, Two, Three and Four. Under applicable law, neither argument withstands scrutiny.

To the contrary, the collateral estoppel inquiry looks at whether the issues are the same in all relevant respects, not in every single respect possible. *See Matter of Magnafici*, 16 B.R. 246, 254 (Bankr. N.D. Ill. 1981) (rejecting claim that estoppel should not apply because "Magnafici was employed by a national banking institution" because that "minor difference" "is not germane to the issue of collateral estoppel). That is certainly the case here. All that matters is that the City

9

had an unconstitutional policy or practice; the underlying proof need not be identical, so long as it is sufficient to demonstrate that the City's policy or practice existed.

Regardless, the evidence in *Fields* covered Areas One through Four, including Area Three, and encompassed the time period of Plaintiff's investigation, arrest, and conviction, spanning 1983 to 1989 (and continuing on to 2009). Indeed, Brasfield's conclusions were not geographically limited. Moreover, the City had an opportunity to challenge the "representativeness" of the file sample through its own statistical expert at the *Fields* trial, Judith Roberts, but the jury rejected such a complaint. Finally, any criticisms of the file review simply do not address Fields' other evidence of a city-wide policy. Specifically, Fields also presented evidence of (a) an express policy; (b) an action of a policymaker; and (c) a failure to train and supervise detectives. To that end, the jury heard from Brasfield, Hickey, and the City's expert, Jeffrey Noble (all of whom would likewise testify in Kluppelberg's trial) and concluded that the City in fact had a policy of withholding exculpatory material. Indeed, under Judge Kennelly's instructions, the City could only win if the jury found that *the City* itself had the offending policy and practice.

Second, there can be no serious dispute that the issue – whether the City had a policy of withholding evidence – was actually litigated in *Fields*. The case went to trial on that matter and the jury returned a verdict necessarily finding that such a policy existed. *See In re Tapper*, 123 B.R. 594, 601 (Bankr. N.D. Ill. 1991) ("The situation most clearly contemplated by the 'actually litigated' standard is 'the resolution of a dispute following a full trial on the merits.'") (quoting *In re Dvorak*, 118 B.R. 619, 624 (Bankr. N.D. Ill. 1990)).

Third, and for the same reason, a determination that the City had a policy of concealing exculpatory or impeachment evidence was essential to the final judgment in *Fields* – a finding of

10

liability against the City on plaintiff's *Monell* claim. To that end, the jury in *Fields* was instructed that to impose liability on the plaintiff's "policy" claim, the plaintiff had to prove "each of the following things by a preponderance of the evidence." Ex. 7, *Fields* Jury Instructions, at 14. One of those "things" was that "[a]t the time of the concealment, it was the policy of the City of Chicago to conceal material exculpatory and/or impeachment evidence." *Id*. Again, the time of concealment in Fields began in 1984 and continued through Fields' 1986 conviction and on through his exoneration in 2009. As such, the finding that Plaintiff seeks to estop the City from relitigating here was necessary to the judgment in *Fields*.

Fourth, and finally, the City had a full and fair opportunity to litigate its policy in the *Fields* Section 1983 case. During the five-week *Fields* trial, the City presented testimony from its competing experts, including Jeffrey Noble, the same expert proffered in this case, and James Hickey, its Rule 30(b)(6) designee. Those witnesses attempted to counter Fields' *Monell* claims regarding the City's policy and practice of withholding exculpatory and impeachment evidence; the City's deficient training to ensure exculpatory and impeachment evidence was placed on an official report; and the City's failure to supervise, including to conduct audits to ensure compliance with the Special Orders that purported to outlaw street files. To that end, just as he opined in this case, Noble testified that the City's series of Special Orders went further than any other police department policies in place at the time, and exceeded generally accepted police practices. Ex. 11, Noble Test., *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.), Dec. 8, 2016, at 93, 98-99. City *Monell* experts Roberts and Bernard Murray both challenged Brasfield's file review: Roberts opined that the hundreds of files Brasfield reviewed were not statistically representative of the City homicide files as a whole, while Murray, a former prosecutor, reviewed several of the same files as Brasfield, and their corresponding State's Attorney's files,

11

to argue that CPD had fulfilled their obligations by disclosing investigative materials to the prosecutors. Ex. 12, Roberts Test., *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.), Dec. 8, 2016, at 35, 42-43; Ex. 13, Murray Test., *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.), Dec. 7, 2016, at 72-73, 76-77. In short, the City had every opportunity – not to mention incentive – to litigate each of the *Monell* theories Kluppelberg advances; there simply is no new issue or testimony that will be presented in Kluppelberg's case.

### B. The Fact That The Fields Verdict Has Not Yet Been Appealed Does Not Defeat Collateral Estoppel

While the City may well decide to appeal the *Fields Monell* verdict, "[e]xhaustion of appellate remedies is not a normal requirement of issue preclusion, and a final judgment has preclusive effect even though it is pending on appeal." *Kadish v. Kmart Corp.*, No. 05 C 4874, 2005 WL 3077605, at *2 (N.D. Ill. Nov. 14, 2005); *see also Amcast Indus. Corp. v. Detrex Corp.*, 45 F.3d 155, 160 (7th Cir. 1995) ("It is true as we have noted that exhaustion of appellate remedies is not a normal requirement of *res judicata* or collateral estoppel. A final judgment by a district court has preclusive effect even though the judgment is pending on appeal."); *Prymer v. Ogden*, 29 F.3d 1208, 1213 n.2 (7th Cir. 1994) ("[I]t is clear that the court has adhered to the general rule in American jurisprudence that a final judgment of a court of first instance can be given collateral estoppel effect even while an appeal is pending."); *Williams v. C.J.R.*, 1 F.3d 502, 504 (7th Cir. 1993) ("What is sure is that a judgment final in the trial court may have collateral estoppel effect even though the loser has not exhausted his appellate remedies."); *Abbott Labs.*, 2000 WL 1263462, at *4 ("Unlike Graco, Abbott and Tokyo Tanabe lost on both the claim construction issues and the infringement issue, and they can and have appealed. Although that appeal has not yet been decided, the law in the Seventh Circuit is clear that exhaustion of appellate remedies is not a normal requirement of issue preclusion, and a final

judgment by a district court has preclusive effect even though the judgment is pending on appeal."). As a result, each of the four prerequisites for the application of preclusion has been met.

### C. There is No Other Reason, Much Less a Persuasive One, Not to Apply Estoppel

Because Plaintiff is seeking to apply non-mutual, offensive collateral estoppel in this litigation, sometimes satisfying the ordinary prerequisites is not enough. Courts also look at whether the use of collateral estoppel may "create an incentive for potential plaintiffs 'to adopt a wait and see attitude, in the hopes that the first action by another plaintiff will result in a favorable judgment'" or whether its application will be "unfair to a defendant." *Petit v. City of Chicago*, No. 90 C 0950, 2001 WL 914457, at *5-6 (N.D. Ill. Aug. 13, 2000) (quoting *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 330 (1979). As to "unfairness," the courts have examined whether "(1) the defendant may have been sued in the first action for 'small or nominal damages' for which 'he may have [had] little incentive to defend vigorously'; (2) the 'judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant'; or (3) 'the second action affords the defendant procedural opportunities . . . unavailable in the first action that could readily cause a different result." *Id.* (quoting *Parklane Hosiery*, 439 U.S. at 330-31).[4] None of these factors cut against applying collateral estoppel here.

---

[4] One court has also stated that collateral estoppel should not be applied "when the issue is of general interest and has not been resolved by the highest appellate court that can resolve it." *Abbott Lab.*, 2000 WL 1263462, at *2. For that proposition, *Abbott Laboratories* cited to *Chicago Truck Drivers, Helpers and Warehouse Union (Indep.) Pension Fund v. Century Motor Freight, Inc.*, 125 F.3d 526, 531 (7th Cir. 1997). But *Century Motor Freight* did not hold that this was a stand-alone criteria foreclosing the application of collateral estoppel. To the contrary, *Century Motor Freight* held that under the Restatement (2d) of Judgments, "an issue is not precluded if it is 'one of law and treating it as conclusively determined would inappropriately foreclose opportunities for obtaining reconsideration of the legal rule upon which it was based.'" *Century Motor Freight*, 125 F.3d at 531 (quoting Restatement § 29 Comment i (emphasis removed). *Century Motor Freight* held that "[t]his consideration is 'especially pertinent . . . when the

First, there is no dispute that Plaintiff has vigorously litigated this case, including his *Monell* claim. Far from adopting a "wait and see attitude," he has conducted extensive fact and expert discovery on the matter, including numerous depositions and serving expert and rebuttal reports.

Second, it would not be "unfair" to apply collateral estoppel here. The City was sued as a defendant in the *Fields* matter, and just as it did here, aggressively contested the *Monell* allegations. The City had every incentive to do so as the *Fields* case itself posed the likelihood of a large verdict – a potential that was realized when the jury awarded the Plaintiff $22 million in compensatory damages. Likewise, the City was well aware that a verdict against it on the *Monell* claim in *Fields* could have application to other "street files" cases it is litigating.

Moreover, there are no other verdicts inconsistent with the finding in *Fields* nor does the City have any additional procedural opportunities available to it in this litigation that it did not have in *Fields*. Many of the witnesses are the same in the two cases, including the same Rule 30(b)(6) witness on behalf of the City (Hickey) and the same experts on behalf of the Plaintiff (Brasfield) and City (Noble). As such, far from being "unfair," applying estoppel here would fulfill one of the very purposes of that doctrine: "promoting judicial economy by preventing needless litigation" and presentation of the same evidence presented in *Fields*. *Parklane Hosiery*, 439 U.S. at 326.

Indeed, there is no reason to re-litigate the same evidence to prove the exact same point litigated to conclusion in Fields. That the City does not like the result is no reason to take a second bite at the apple. Rolling the dice and hoping for a different result does not advance any

---

issue is of general interest and has not been resolved by the highest appellate court that can resolve it.'" *Id*. (quoting Restatement § 29 comment i). Because whether or not the City had a policy of withholding material exculpatory or impeachment evidence is a question of fact – and not law – the *Century Motor Freight* concern is inapplicable.

14

legitimate interest of the judicial system, much less judicial economy. How many times must the City's street files policy be deemed unconstitutional before it must accept that pronouncement? Under the law, once is sufficient.

Of course, that there is no unfairness to estopping the City from litigating the question of whether it had a policy of withholding material exculpatory or impeachment evidence in the 1980s does not mean that Plaintiff wins his *Monell* claim here. The City is still entitled to litigate whether Plaintiff suffered a constitutional injury in the first instance; and whether the City's policy was the "moving force" behind that injury. But the City has already had its day in Court on the issue of whether a policy existed, and there is no reason not to bind the City to the finding in *Fields*.

## Conclusion

For all the reasons stated above, Plaintiff respectfully requests that this Court estop the City from contesting that it had a policy of concealing material exculpatory and/or impeachment evidence.

Respectfully submitted,

/s/ Gayle Horn
One of Attorneys for Plaintiff

Arthur Loevy
Jon Loevy
Michael Kanovitz
Russell Ainsworth
Gayle Horn
Elizabeth Mazur
Roshna Bala Keen
Sarah Grusin
Joel Feldman
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
(312) 243-5900

**CERTIFICATE OF SERVICE**

  I, Gayle Horn, an attorney, hereby certify that on February 7, 2017, I filed the foregoing via the Court's CM/ECF system and thereby served a copy on all counsel of record.

/s/ Gayle Horn