# In The Matter Of:

## JAMES KLUPPELBERG

### vs.

### JON BURGE

# BONNIE KLUPPELBERG HILEMAN

**May 14, 2015**

**Urlaub Bowen & Associates, Inc.**
Certified Shorthand Reporters
Video Conference Center
312-781-9586
Fax 312-781-9228
info@urlaubbowen.com
www.urlaubbowen.com

```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
                   EASTERN DIVISION

JAMES KLUPPELBERG,              )
                                )
              Plaintiff,        )
                                )
       vs.                      )    No. 13 CV 3963
                                )
JON BURGE, LEONARD ROLSTON      )
#11935, JOHN SCHMITZ            )
#14634, WILLIAM FOLEY           )
#8108, WILLIAM KELLY            )
#3644, DETECTIVE URBON          )
#15400, THOMAS PTAK #6029,      )
MICHAEL DUFFIN #13596,          )
GEORGE JENKINS #11828,          )
DETECTIVE NELSON #16164,        )
DETECTIVE VEGA #3464,           )
DETECTIVE W. MICEK #4645,       )
DETECTIVE GUEST #10600,         )
DETECTIVE L. TUIDER #5648,      )
FRANCES BURNS, WILLIAM          )
ALLETTO, as-of-yet UNKNOWN      )
EMPLOYEES OF THE CITY OF        )
CHICAGO and THE CITY OF         )
CHICAGO,                        )
                                )
              Defendants.       )
```

        The deposition of BONNIE KLUPPELBERG

HILEMAN, taken pursuant to the Federal Rules of

Civil Procedure, before Pauline Strohl, Certified

Shorthand Reporter No. 084-001253, at 550 East

Devon, Suite 150, Itasca, Illinois, on Thursday,

May 14, 2015, commencing at 10:00 a.m.

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 2

APPEARANCES:

LOEVY & LOEVY, by
MS. ROSHNA BALA KEEN
(312 North May Street, Suite 100
Chicago, Illinois  60607
312.243.5900
Roshna@loevy.com)

    appeared on behalf of the plaintiff;

THE SOTOS LAW FIRM, PC, by
MS. ELIZABETH A. EKL
MS. JACLYN L. McANDREW
(550 East Devon Avenue, Suite 150
Itasca, Illinois  60143
630.735.3303
Eekl@jsotoslaw.com)
jmcandrew@jsotoslaw.com

    appeared on behalf of the defendant
    police officers;

JONES DAY, by
MR. THOMAS F. RYBARCZYK
(77 West Wacker Drive, Suite 3500
Chicago, Illinois  60601
312.782.3939
Tfrybarczyk@jonesday.com
    appeared on behalf of the defendant,
    City of Chicago.

    * * * * * * *

Page 3

I N D E X
                              PAGE
Witness:
    BONNIE KLUPPELBERG HILEMAN

    Examination by:
    Ms. Ekl              3
    Mr. Rybarczyk        176
    Ms. Keen             185

    E X H I B I T S
                          PAGE
Number    Description    Marked/Referenced
1    handwritten document 1/22/92    99
2    document dated 12/28/97    102, 121, 187
3    affidavit of Bonnie Kluppelberg    177
4    document dated 7/29/09    181

    (Exhibits attached/scanned.)

    - - - - -

    (Witness sworn.)

    BONNIE KLUPPELBERG HILEMAN,
called as a witness herein, having been first duly
sworn, was examined and testified as follows:
    EXAMINATION
BY MS. EKL:
    Q.    For the record this is the deposition

Page 4

of Bonnie Kluppelberg being taken in the case of
Kluppelberg versus Burge.  Case number 13 CV 3963
that was filed in the Northern District of
Illinois.  Ms. Kluppelberg --
    A.    Hileman.
    Q.    I was just going to ask you.  Has your
name changed since --
    A.    Yeah, long time ago.
    Q.    Could you please state and spell your
first and last name?
    A.    Bonnie, B-o-n-n-i-e, Hileman,
H-i-l-e-m-a-n.
    Q.    Could you tell me all of the former
names that you've gone by over the course of your
life?
    A.    Sure.  Bonnie Reed Fitzpatrick
Kluppelberg Hileman.
    Q.    So Bonnie Reed.  And how do you spell
Reed?
    A.    R-e-e-d.
    Q.    And Fitzpatrick?
    A.    Yes.
    Q.    How do you spell that?
    A.    F-i-t-z-p-a-t-r-i-c-k.

Page 5

    Q.    Ms. Hileman, have you ever been deposed
before?
    A.    Not that I know of.
    Q.    Have you ever sat in a room like this
where you had a court reporter taking down what you
say while someone asks you questions?
    A.    A courtroom, that's all.
    Q.    Before we start I'll just kind of go
over some general ground rules to keep in mind as
we go through it.  Obviously I'm going to start off
asking you some questions today.  And I haven't
introduced myself yet.
        My name is Elizabeth Ekl.  I
represent the individual officers who have been
sued in this lawsuit.  This is my associate Jaclyn
McAndrew and I will let everyone else introduce
themselves?
    MR. RYBARCZYK:  Tom Rybarczyk on behalf of
the city of Chicago.
    MS. KEEN:  And I'm Roshna.  We met once.  I
represent James Kluppelberg.
BY MS. EKL:
    Q.    So I'll ask you questions here today
and then the other attorneys will have an

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 6

opportunity when I'm done to ask you some questions as well. We'll probably be here for a few hours. So we will plan on taking some breaks throughout the day. Obviously everyone will need some breaks. But if at any time you need a break, if you need to use the restroom or just need to get some air or something, let me know and we can certainly accommodate you. The only thing that I would ask is that you wait, if I've asked a question, until after you answer it and then ask for the break. Okay?

A. Sure.

Q. Also in normal conversation a lot of times people anticipate, you may anticipate what my question is going to be. And I would just ask so that we have a complete record, that you wait until I finish the question even if you know where I'm going before you answer it. Okay?

A. Yes.

Q. Another thing, because there is a court reporter taking down everything that both of us say, it's important that you answer audibly so that you say either yes or no instead of saying uh-hum or uh-uh or nodding your head. Those things don't

Page 7

translate very well into a transcript. And we just want to make sure we get everything down accurately. Okay?

A. Yes.

Q. Finally if there's anything that I ask you that you don't understand, if I ask it in a confusing way, which could happen, or if you just maybe didn't hear me and want me to repeat it, just let me know. And I can certainly do that. I can ask it another way or ask it again if you need me to.

A. Okay.

Q. All right. You said that you have testified in court before, correct?

A. Yes.

Q. How many times have you testified in court?

A. Once.

Q. And what case was that?

A. Bob, against Bob.

Q. Who's Bob?

A. The officer that was involved in this case.

Q. You're talking about the correctional

Page 8

officer from Cook County?

A. Yes.

Q. Have you also provided testimony on more than one occasion in Mr. Kluppelberg's underlying criminal case?

A. I don't remember.

Q. And just for the record, are you represented by any counsel here today, any attorneys representing you?

A. No.

Q. What if anything did you do to prepare for today's deposition, meaning did you review any documents? Did you talk to anyone about the deposition?

A. I talked to her one time, but other than -- I have no documents. They're all gone. I mean it's been years.

Q. And just for the record you're pointing to Ms. Keen, Roshna?

A. Yes, Roshna. Hi, Roshna.

Q. When did you speak to Roshna?

A. Last week.

Q. And where were you when you had that conversation?

Page 9

A. In her office.

Q. How long did that conversation last?

A. Not long.

Q. Would you say more than an hour? Less than an hour?

A. Maybe an hour.

Q. Was anyone else present for the conversation between you and Roshna?

A. No.

Q. And what if anything did she ask you or say to you and what did you say in response during that conversation?

A. Just general questions. Do I have any paperwork because I would need it for this? Just general questions. Nothing particular.

Q. When you were served with the deposition subpoena to appear here today, you were also served with a subpoena to bring whatever documents you had related to James, correct?

A. Yes.

Q. So did she ask you if you had documents that were responsive to that subpoena?

A. Yes. I don't.

Q. I think we had asked you to prepare a

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 10

letter.  You don't need to do that now that you're here and you're under oath.  We have taken care of that.

A.  No problem.  Okay.

Q.  Did she ask you questions about anything that you remember having taken place during the point in time when James was arrested and when he was going through the trial?

A.  Repeat that.

Q.  Sure.  Did she ask you questions about -- I'll break it down a little bit.  Did she ask you questions about the time period around when James was arrested?

A.  Yes.

Q.  What questions did she ask you?

A.  If I remember about the car fires.  Which I really don't.

Q.  Did she show you any documents to help you remember?

A.  No.

Q.  Did she ask you anything else specifically about James' interaction with any police officers?

A.  Just if I remembered the incidents

Page 11

about when he was arrested.

Q.  What did you tell her?

A.  They called and asked if he could look at some photos of supposedly people that were running from the cars.  The guy that was running from the car when the car arson.  And that -- let me think here.  They asked him to look at pictures so that he could identify the guy that he supposedly saw running from the car.

And he said he couldn't come in because we were working on a job.  They said that's okay, we can come to the job site.  So they came to the job site with no pictures.  And handcuffed him and took him away.

Q.  I'll ask you some more specific questions about that time period in a little bit.  I just kind of want to get a general idea of what you talked to Ms. Keen about.  Any other topics that you can remember?

Did she ask you about the time period during his trial, did she ask you anything about that time period?

A.  Just general questions.  I mean nothing specific.  I mean I was at every trial date.

Page 12

Q.  Can you think of any other topics that she asked you about?

A.  The lawyer.  I didn't like the lawyer. It was his choice.

Q.  You're talking about James' lawyer?

A.  Yes.

Q.  And that was Mr. Weinberg?

A.  Yes.

Q.  Before we get into some of those specifics, probably a lot of the same things that she asked you, I want to ask you a few background questions.  Okay?

A.  Okay.

Q.  Are you currently married?

A.  No.

Q.  Who were you previously married to?

A.  Tom Fitzpatrick.

Q.  And during what dates were you married to Tom Fitzpatrick?

A.  October 9th, 1971, through April 15th, 1988.

Q.  Who were you married to after Tom Fitzpatrick?

A.  James.

Page 13

Q.  That would be James Kluppelberg?

A.  Yes.

Q.  And the person that you know to be the plaintiff or the person who is suing in this lawsuit, correct?

A.  Yes.

Q.  When were you married to James?

A.  August 16th of '88 and until -- now there's a good question.  I think -- it would be a guess.  I don't know.

Q.  Do you know approximately what year?

A.  2002 or 2001.

Q.  So was James still incarcerated at the time that you and him divorced?

A.  He was incarcerated when we got married and when we got divorced.

Q.  Were you married to anyone after James?

A.  Yes.

Q.  Who was that?

A.  Allie Hileman.

Q.  Can you spell his first name?

A.  A-l-l-i-e.

Q.  And that's the same last name that you currently hold, correct?

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 14

A. Yes.

Q. When did you marry Allie?

A. National Mourning Day. September 11th, 2002.

Q. When did you divorce?

A. I think four years ago. I think.

Q. Where do you currently live?

A. 3302 South Western Avenue. But I have two addresses actually.

Q. What is your other address?

A. 67 Cherry Lane, Bourbonnais. My daughter and my parents.

Q. So do you split time between the two addresses?

A. Yes.

Q. Which address does your daughter live?

A. Bourbonnais.

Q. Does anyone else live with you and your daughter at the Bourbonnais address?

A. My grandchildren.

Q. Anyone else?

A. No.

Q. And 3302 South Western Avenue, is that Chicago?

Page 15

A. Yes.

Q. And you said you live there with your parents?

A. I live upstairs from my parents. My boyfriend lives there.

Q. What's your boyfriend's name?

A. Sean Eilert.

Q. How do you spell Sean's last name?

A. It's S-e-a-n, E-i-l-e-r-t.

Q. And what are your parents' names?

A. Ersie Reed and Rondal Reed, R-o-n-d-a-l. E-r-s-i-e.

Q. How long have your parents lived at that address at 3302 Western?

A. My parents moved every 3 to 4 months before my mom got disabled. I've actually been at that address for 20 years. My parents move in and out.

Q. Got you. And they live below you you said?

A. Yes. She's in a wheelchair.

Q. At some point in time did you live with James Kluppelberg's sister?

A. No.

Page 16

Q. Have you ever lived with any of James Kluppelberg's relatives?

A. No. I do see them every day.

Q. Who specifically do you see every day?

A. His -- both, two of his sisters which are Victoria and Theresa.

Q. How would you describe your relationship with Victoria and Theresa?

A. They're family. I take my niece to school every morning.

Q. And your niece, is that their daughter?

A. It's Vickie's daughter. And one daughter is in college in a job corps and I pick her up every week and take her back and, yeah, very interactive.

Q. So is it fair to say that you're still pretty close to James' family?

A. I'm their aunt.

Q. How would you describe your current relationship with James?

A. Distant.

Q. When was the last time that you spoke to James?

A. Last week.

Page 17

Q. And did you speak to him in person or over the phone?

A. He's in Florida.

Q. I'm sorry. He's in Florida?

A. Uh-hum.

Q. I'm sorry. Is that yes?

A. Yes. I'm sorry.

Q. That's okay. I'll probably have to remind you a few times. So you spoke to him over the phone, is that correct?

A. Yes, I did.

Q. What did the two of you talk about?

A. He's on a vacation.

Q. Did you talk to him at all about your deposition here today?

A. I told him I was contacted and I was coming today.

Q. And did you discuss anything about your testimony here today?

A. No.

Q. What did he tell you when you told him that you were contacted about coming here?

A. He knew I was coming.

Q. Did he say anything to you about

Urlaub Bowen & Associates, Inc. 312-781-9586

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 18

getting in contact with his lawyer, Ms. Keen?

A.   That if I needed any help with anything, that I should contact her.

Q.   How was it that you ended up meeting with Ms. Keen?  Did you call her or did she call you?

A.   I think he just had her call me.  I think.  So if I needed any information or anything.  Because I had to find the papers and he knew that and like I said, I don't have them.

Q.   Did you talk to him about the fact that you had been served with a document subpoena?

A.   Long time ago.

Q.   What did he tell you about that?

A.   He knew that you were going to contact me.  We don't talk that much about it.

Q.   How often would you say that you talk to James over the phone?

A.   When he first got out, a lot.  Now, not so much.

Q.   What do you mean by a lot?  Was that once a week, once a day?

A.   He did a job for me.  I was working on some electric stuff.  He came and did that job for

Page 19

me.  And he did a couple things.  I call him if I need questions because my boyfriend now works construction.  And so if I have questions, I call him.

Q.   What changed that caused you to go from talking to him a lot to not talking to him very frequently?

A.   He's my ex and my boyfriend doesn't like that.

Q.   Anything else?

A.   No.

Q.   Let me take you back a little bit.  In or around 1986 at that point in time were you working as a secretary for your father's construction company?

A.   Yes.

Q.   And what was the name of your father's construction company?

A.   Chicago Standard.  I think it was Chicago Standard.  He was Reed's Painting.  He was Mackinac.  He was Chicago Standard.  I think Chicago Standard in '96.

Q.   I'm talking about 1986.

A.   '86, it should be Chicago Standard

Page 20

because we also owned a hardware store which was also Chicago Standard.

Q.   Where was Chicago Standard located?

A.   35th Street.

Q.   And was there actually a storefront or was that a --

A.   Yes, hardware store.  Office in the back.

Q.   And just again if you could just let me finish my question.  I know you know what I'm going to ask you, but just so we have a complete record.

A.   Okay.  I'll slow down.

MS. KEEN:  We have plenty of time today.  Slow down and listen to what she's asking.

A.   I got you.

BY MS. EKL:

Q.   Does Chicago Standard still exist today or by any name?

A.   Yes.

Q.   What is the current name of that company?

A.   Chicago Standard.

Q.   And is it still owned by your father or is it owned by someone different?

Page 21

A.   It was owned by me until I had an accident.  And now my boyfriend owns it.

Q.   And how long did you own Chicago Standard?

A.   Maybe 15 years.

Q.   When did your boyfriend start owning it?

A.   Five years ago, I think.

Q.   What were your duties when you worked as a secretary in 1986 for your father?

A.   To run the hardware store.  To type all contracts.  To answer all phones.

Q.   Did you ever go out to any job sites and perform any duties?

A.   Only with James.

Q.   When did you first meet James?

A.   1986.

Q.   Do you remember what month?

A.   No.

Q.   And when you refer to James, when you talk to James do you call him James or do you use another name?

A.   Yes.  No.  James.

Q.   Where specifically were you when you

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 22

met James?

A. Hardware store.

Q. And how was it that you met him?

A. Safer Foundation.

Q. What's Safer Foundation?

A. It's an organization through the prison system that they hire -- get people who have been arrested; have records, jobs. And they called and asked if we had any openings and we had hired James.

Q. When you hired James was he actually incarcerated at that point in time?

A. Yes.

Q. Was he in a work release program?

A. Yes.

Q. And what was his position within the company when he was hired?

A. Carpenter.

Q. Do you remember approximately what month James started working for the company?

A. I don't remember.

Q. Do you know how it was that he got the job other than Safer Foundation calling? Did he have to fill out any applications or have an

Page 23

interview or anything like that?

A. Yes.

MS. KEEN: Objection, foundation.

BY MS. EKL:

Q. And how is it that you know that that's how he had to apply for the job?

A. I took the call.

Q. Were you the person that actually interviewed him?

A. Yes, myself and my father.

Q. What correctional facility, if you know, was he housed in at the point in time when he first started working for your company?

A. Damen and Roosevelt.

Q. Was that the Metro Community Correctional Facility?

A. Yes, yes.

Q. How long did James work for the construction company?

A. Well, he started in '86. And he went to prison January 12th of '88. He was working for us then and also for himself.

Q. So did he work continuously for you between 1986 and '88?

Page 24

A. Yes.

Q. And then also work for himself on the side?

A. Yes.

MS. KEEN: Wait for her so the record is clear.

A. Okay. Slow down.

BY MS. EKL:

Q. Do you know as you sit here today what James' work schedule was back in 1986 for your company?

A. Whenever we had a call.

Q. So did he hold regular hours or was it just on an as-needed basis that he worked?

A. We always had a 24-hour service, which we still do. But it's as like plumbing calls are by emergencies a lot of them. We actually work for a real estate, that whenever they have any type of calls when people move out, we clean, remodel, whatever we need to do for that. And heating calls, shoveling snow, whatever we have to do. So it's as needed.

Q. And you said there were some occasions when you would work alongside James. Could you

Page 25

describe for me some of those occasions?

A. The day he was arrested, he was working on frozen pipes in a basement in a bar where his mother lived. And we were replacing pipes and thawing pipes.

Q. Why was it that you were helping him on that particular job?

A. I'm very knowledgeable in plumbing stuff and I do most material runs. And so I help.

Q. When you say you do the material runs, is that that you're actually going out and purchasing the materials to be used on jobs?

A. Yes.

Q. Where was this bar located where there were frozen pipes?

A. 51st and Hermitage.

Q. And so did his mom then live above the bar?

A. Yes.

Q. What was his or what is his Mom's name?

A. Dolores. She's passed.

Q. Was that the only time that you had worked alongside James or were there other occasions?

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 26

A.  Other occasions.

Q.  Could you describe some of the other occasions?

A.  He had a job at AJ's hotdog stand on 34th and Damen remodeling some things there.  He had a contract to do some remodeling at a hotdog stand on 79th by Harlem.  Just different jobs.

Q.  And in relation to those hotdog stands and the remodeling, what job duties did you have or why were you assisting him in those jobs?

A.  Material runs.

Q.  Was James the only one that you would do that for or were there other people that you would help out doing material runs?

A.  My father.  That was my specialty.

Q.  At some point in time after James started working for your company, did you develop a personal relationship with him?

A.  Repeat that.

Q.  Sure.  Did you develop, well first a personal relationship with James after he started working for your company?

A.  Yes.

Q.  Did that evolve into more of a romantic

Page 27

relationship?

A.  Yes.

Q.  When was it that it evolved into a romantic relationship?

A.  Six months later maybe.

Q.  Six months after he started?

A.  Yes.

Q.  Do you know when you first started dating James what his -- whether or not he had any relationships with any other women at that point in time?

A.  He said no.

Q.  Did you later learn anything different?

A.  Oh, yeah.

Q.  What did you find out?

A.  He was in an ongoing relationship with Dawn Gramont.

Q.  And your romantic relationship with James, did that start sometime prior to James' arrest that you had described taking place when you were on the job site with him?

A.  I don't understand that.

Q.  Sure.  Let me back up.  You described an instance when you were with James at 51st and

Page 28

Hermitage dealing with the frozen pipes, correct?

A.  Yes.

Q.  You said that on that occasion some police came out to talk to James?

A.  Yes.

Q.  Did that take place at a point in time when you were already in a romantic relationship?

A.  Oh, yes.  We were already living together.

Q.  Where were the two of you living at that point?

A.  3302 South -- no.  3351 South Bell.

Q.  When James was working for the company through the work release program, was it your understanding that he would come to work and then he would have to return to the correctional facility at night after work?

A.  Yes.

Q.  Did you ever, other than working, seeing him at work, did you ever visit him when he was at the Metro Community Correctional Center?

A.  I don't remember.  I dropped him off, but I don't remember if I visited.

Q.  Did the two of you ever exchange any

Page 29

type of letters or other correspondence when he was residing at the Metro Community Correctional Center?

A.  I don't think so.

Q.  Did you ever speak to him on the phone there?

A.  Yes.

Q.  How frequently would you talk to him on the phone?

A.  Every day.

Q.  At some point did you learn why it was that he was being housed at the Metro Community Correctional Center?

A.  Yes.

Q.  And how was it that you learned that?

A.  He told me.

Q.  What did he tell you?

A.  Burglary.

Q.  Did he tell you anything specifically about the burglary in terms of what had happened or what took place?

A.  I'm sure.

MS. KEEN:  Objection, foundation.

BY MS. EKL:

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 30

Q.    Do you remember where this conversation took place?

A.    We lived together.

Q.    Do you remember when it took place?

A.    No.

Q.    Did he ever tell you whether or not he was actually guilty of that burglary?

A.    Yes.

Q.    What did he tell you?

A.    That he actually did it.

Q.    Did he ever tell you about any other burglaries that he committed other than the one that he was being housed for at the Metro Community Correctional Center?

A.    No.

Q.    When was James released from the Metro Community Correctional Center?

A.    Now that I don't remember.

Q.    Did the two of you start living together immediately upon his release?

A.    Yes.

Q.    That was at that Bell address?

A.    Yes.

Q.    When you lived with James at 3351 South

Page 31

Bell, were your parents also living at that residence?

A.    No.

Q.    Was there anyone else there that was living with you and James?

A.    No. Wait. My girlfriend. Sorry. And my daughter.

Q.    What's was your girlfriend's name?

A.    Deborah Halderman.

Q.    Deborah Holderman?

A.    H-a-l-d-e-r-m-a-n, Halderman.

Q.    How does Deborah spell her first name?

A.    Debbie. I don't know.

Q.    Fair enough. How old was your daughter when you lived at 3351 South Bell with James?

A.    12.

Q.    You mentioned during that time period James also had his own business that he was working for occasionally?

A.    Yes.

Q.    What was the name of that business?

A.    I don't know.

Q.    Does the name West Town Construction refresh your recollection?

Page 32

A.    Ring a bell. Could have been. I really don't know. Sounds familiar.

Q.    Did you ever work at any point in time for James' company?

A.    Yes.

Q.    What was your position?

A.    Materials. I did material runs.

Q.    So were you sort of his assistant?

A.    Yes.

Q.    Were there other things that you did other than material runs when you were helping out James with his own business?

A.    No.

Q.    What was the nature of his own business?

A.    Construction.

Q.    How long did James operate his own business, if you know?

A.    Up until January 12th, 1988.

Q.    Other than operating that business and working for the company that you had with your father, can you think of any other jobs or companies that James worked for from the time that you met him until January of 1988?

Page 33

A.    The security company.

Q.    Was that ELA Security?

A.    I do not know.

Q.    When did he start working for the security company?

A.    Somewhere around Christmas.

Q.    Do you know how he got that job?

A.    Applied.

Q.    And if you know what were his duties working at the security company?

A.    Just security. I wouldn't know.

Q.    Did he ever talk to you about that job?

A.    Just about seeing the guy run from the car. Nothing -- it's security.

Q.    Do you remember how long he worked for the security company before January of 1988?

A.    No.

Q.    Did he ever tell you what sites he was working on?

A.    On Lake Street or something.

Q.    Do you know what kind of a company that was on Lake Street?

A.    A high-rise I think.

Q.    And what sort of hours did he work when

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 34

he worked for the security company?

MS. KEEN: Objection, foundation.

BY MS. EKL:

Q. If you know?

A. I don't remember.

Q. Did James ever share with you any concerns -- well, first off, did he tell you whether or not he was happy with that security job?

A. Yes.

Q. What did he tell you about that?

A. He liked it.

Q. Do you remember anything more specific that he said about why he liked it or anything like that?

A. No.

Q. Did he ever share with you any concerns that he would lose that job?

A. No.

Q. Now you've mentioned that he told you about some car fires that occurred on that job, correct?

A. Yes.

Q. When did he first tell you about a car fire that took place on the job?

Page 35

A. I don't remember exactly when he told me. Just he told me. I think the day, the same day I guess.

Q. The same day that the fire happened?

A. I guess, yes, I would think.

Q. And at that point in time the two of you were still living together on Bell?

A. Yes.

Q. What do you remember him telling you about that fire?

A. That he had saw someone running from the car.

Q. Was it your understanding that he was generally working security at the location where the car was located?

A. Yes.

Q. And when you say he said he saw someone running from the car, did he tell you that he saw the person whom he believed started the fire running from the car?

A. Yes.

Q. Did he describe that person to you?

A. I don't remember.

Q. Do you remember him describing the race

Page 36

of that person?

A. I don't remember.

Q. Did James tell you anything about what he did once he saw the car fires take place?

MS. KEEN: Objection, foundation. Calls for speculation. You can answer. You can answer.

A. Okay.

MS. EKL: She's going to make some objections throughout the course of the deposition. It's for the record. A judge will later on look and see to make a decision --

A. What was the question?

MS. EKL: Sure. If you could read it back, please?

(question read)

A. Called 911.

BY MS. EKL:

Q. Did he tell you that he then spoke to the police once the police officers arrived at the scene?

A. Yes.

Q. Did he tell you what he said to the police officers?

A. I don't remember.

Page 37

MS. KEEN: Objection, foundation. Sorry, Bonnie.

A. That's okay.

BY MS. EKL:

Q. This conversation with James, was this the conversation all that took place the night of the car fires once he returned home?

A. Yes.

Q. Was anyone else present for the conversation?

A. No.

Q. Did James tell you whether there were any other witnesses to those car fires other than himself?

A. No.

Q. Did he tell you about any plans to talk to any police officers in the future about the car fires?

A. No.

Q. Is there anything else about your conversation with James on the night of the car fires that you can recall as you sit here today?

MS. KEEN: I'm just going to object to the characterization of the date of that conversation.

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 38

You can answer.

A.    Not that I remember.  It's a long time ago.

BY MS. EKL:

Q.    And just to be clear because I want to make sure.  Ms. Keen has posed an objection.  That I am understanding you correctly, it's your belief that you had that conversation with James the night of the car fires when he returned home, correct?

MS. KEEN:  Objection.  Misstates her prior testimony and lacks foundation.  You can answer.

A.    Yes.

BY MS. EKL:

Q.    That's what I'm checking.  Now on or about January 12th of 1988, do you recall that James accompanied two detectives from the Chicago Police Department to the police station to talk about the car fires that we were just describing?

A.    I remember the incident.

Q.    Do you remember that he accompanied two detectives to the police station?

A.    He was taken.  Not accompanied.

Q.    So were you present when he was approached by some detectives?

Page 39

A.    Yes.

Q.    Can you tell me what you remember about that?  First off, where were you when this took place?

A.    We were working in the basement on the frozen pipes.

Q.    Approximately what time of day was that?

A.    Evening.

Q.    And if you could walk me through what you remember about the police officers arriving and what took place?

A.    They called.  They said they wanted him to come in.  He told them he was working on some frozen pipes.  He couldn't.  They said, well, we can come with the pictures and show you the pictures there.  And he said okay this is the address.

They came.  He came out of the basement.  They proceeded to just put handcuffs on him and put him in the car.  I asked could I go.  They said no.  I said well, I'm going to follow you.  And they left and had him for hours.  I went to the police station.  I was there and waited and

Page 40

waited.

Q.    Do you remember when it was that you and James started working on that job at the bar on the frozen pipes?

A.    That week.

Q.    On that particular day do you remember what time it was that you started working on that job?

A.    All day.  But we took breaks.

Q.    How long were the breaks that were taken throughout the day before the police arrived?

A.    We went home and ate.

Q.    And was that back to your address on Bell?

A.    Yes.

Q.    What time did you go home to eat?

A.    In the evening.

Q.    Do you remember approximately what time?

A.    No.

Q.    Do you remember how long that was before the police came out?

A.    Not long.

Q.    Other than going home to eat, was there

Page 41

anything else that you did during the breaks?

A.    Sure.

Q.    What was that?

A.    We had sex.

Q.    You said that the police, once you arrived back at the bar and were working on the pipes, that the police had called James.  How was it that they called him?  And what I'm getting at is what phone line did you call him on?

A.    Cell phone I guess.  I don't remember exactly.  I just know they called and they came.

Q.    Was it your recollection that James had a cell phone back in January of 1988?

A.    You know, I don't remember.  I know we had pagers.  I remember pagers.  That was a long time ago.

Q.    When you said that the police wanted him to come in to look at some pictures, how was it that you knew that that's what they told him on the telephone?

A.    He told me.

Q.    James told you?

A.    Yes.

Q.    And did he tell you why it was that he

Urlaub Bowen & Associates, Inc.   312-781-9586

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 42

wasn't willing to take a break to go and look at the pictures?

A.   Because we were working in the basement.  He was all muddy.

Q.   And it was during that conversation that you had with James that he also told you that the police said that they can bring pictures out to him, correct?

A.   Yes.

Q.   And he told you that he was willing to do that, correct?

A.   Yes.

Q.   And did he tell you that he was willing to do that because he had information about what the offender from the car fires looked like?

A.   I guess.

Q.   When the police officers arrived, how many officers were there?

A.   Two.

Q.   Do you remember what they looked like?

A.   No.

Q.   Do you remember anything at all about what they looked like?

A.   No.

Page 43

Q.   Did either of them provide you with their names?

A.   I'm sure.  But I don't remember.

Q.   Were the two of you in the basement when they got there?

A.   Yes.

Q.   You said that they handcuffed James.  Where did that take place?

A.   Outside.

Q.   So tell me what happened from the time the police officers got there until James went outside and they handcuffed him?

A.   They asked if he could come outside.

Q.   Was he willing to do that?

A.   Yes.

Q.   Were you present when he had a conversation with them outside?

A.   They don't let you stand by him.

Q.   So where were you?

A.   Back by my car.

Q.   So you didn't actually hear what took place between the officers and James?

A.   No.

Q.   Could you see what was taking place or

Page 44

did you just learn after the fact?

A.   No, I could see.  I was standing there.

Q.   What did you see take place?

A.   He walked up.  And they asked if they could talk to him so I walked away.  And I was standing there.  They simply turned him around and handcuffed him and put him in the back seat.

Q.   Did you see the officers pat James down at all at that point in time?

A.   I don't remember.

Q.   Did you see any kind of struggle between James and the police officers?

A.   No, not at all.

Q.   Did you see the officers physically abuse him in any way before putting him into the car?

A.   No.

Q.   Did you ever hear James say that he did not want to go with the police officers to the station?

A.   No.

Q.   At what point in time did you ask the officers whether or not you could go with?

A.   When they handcuffed him.

Page 45

Q.   What did you think was happening at that point?

A.   He was under arrest.

Q.   What did you think he was being arrested for?

A.   No idea.

Q.   Did James ever say anything to you about -- did James ever tell you that he had started the car fires?

A.   No.

Q.   When the officers told you that you could not go with, did you ever make any offer to take James to the station yourself?

A.   He was handcuffed.  They wouldn't allow that.

Q.   Did you ask?

A.   No.  I asked if I could go with.  They said no.

Q.   You said you ended up following the police officers?

A.   Yes, I did.

Q.   How did you do that?

A.   In my car.

Q.   What kind of car did you drive at the

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 46

time?

A.   I don't remember.

Q.   At any point in time prior to James being put in that squad car, did you observe any injuries on James' body?

A.   When he was put into --

Q.   Yes, any time prior to that that day?

A.   No.

Q.   Did you hear the police officers telling James that they needed him to come down to the station to look at photographs?  I'm sorry.  Strike that.

While you were outside and James was outside with the officers, at any point during that time period did you hear them ask him to come to the station to look at photographs?

A.   No.  That's why they came there was to bring the photos for him to look at.

Q.   What station did you go to after you saw James driving away with the officers?

A.   11th and State.

MS. KEEN:  Wait for her to finish her question even though you know where she's going just so that she doesn't have to take on two people

Page 47

at once.  You're doing fine though.

BY MS. EKL:

Q.   Did the officers tell you that that's where they were taking James?

A.   Yes.

Q.   Did they tell you specifically that James was under arrest?

A.   No.

Q.   Did you think that he was under arrest?

A.   Yes.

Q.   What happened when you arrived at 11th and State?

A.   I waited.

Q.   And where did you wait?

A.   Inside the lobby at the police station.

Q.   When you arrived there did you talk to anyone?

A.   The desk sergeant.

Q.   What did you say to the desk sergeant?

A.   I asked him what was going on.  Could I talk to him?  He said no.  He's being questioned.

Q.   Was it your belief when you were waiting that James would eventually be released and you could take him home?

Page 48

A.   Yes.

Q.   Is that why you waited?

A.   Yes.

Q.   Do you remember approximately what time it was that you arrived at the police station?

A.   No.

Q.   How long did you stay there?

A.   Hours.

Q.   This was in the evening?

A.   Yes.

Q.   At any point while you were at the police station that evening and the evening that he was first taken there, did you see James?

A.   I don't remember.

Q.   Where did you go once you left the police station?

A.   Home.

Q.   Before arriving home did you make any phone calls?

A.   Don't remember.

Q.   When you were at the police station did you call any lawyers on behalf of James?

A.   I think Weinberg.  I must have talked to him.  I don't know.  I can't remember.  It's too

Page 49

long.

Q.   So are you guessing when you say that you think you might have called Weinberg that first evening when you went to the station?

A.   I had to have because he -- because James had court the next day, I think.  It's a long time.  I'm very old.  I think he came to court the next day.  I don't -- I think.  It's a guess.

Q.   Did you contact Weinberg from the police station or did you contact Weinberg from your home?

MS. KEEN:  Objection.  Calls for speculation.

A.   I don't remember.

BY MS. EKL:

Q.   But you do recall that at some point you left the station and you went home, correct?

A.   Yes, I did do that.

Q.   Before January 12th of 1988 had you met Mr. Weinberg?

A.   No.

Q.   Had you ever heard of Mr. Weinberg?

A.   Yes.

Q.   How had you heard of Mr. Weinberg?

A.   It was James' lawyer I guess.

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 50

Q. And do you know what types of cases Mr. Weinberg had previously represented James in?

A. No.

MS. KEEN: Objection, assumes facts not in evidence.

BY MS. EKL:

Q. Had you ever spoken to Mr. Weinberg prior to January 12th of 1988?

A. No.

Q. Did you have Mr. Weinberg's phone number?

A. I don't know how I got that number.

Q. When was the next time that you spoke to James?

A. I don't remember.

Q. Do you remember James calling you at home at some point the evening that he was arrested?

A. I didn't leave until after 12:00 o'clock. Other than that I don't remember. If he called the house, I don't remember. I really don't.

Q. Do you remember James calling you at the house and telling you that he had just

Page 51

confessed to starting some fires?

MS. KEEN: Objection. Assumes facts not in evidence. Lacks foundation. Calls for speculation.

A. No.

BY MS. EKL:

Q. Do you remember him telling you to contact Mr. Weinberg for him?

MS. KEEN: Same objections.

A. He must have, but I don't remember.

BY MS. EKL:

Q. Do you think that James was the one that provided you with Mr. Weinberg's phone number?

MS. KEEN: Objection, calls for speculation.

A. Him or his mother.

BY MS. EKL:

Q. After leaving the police station did you contact James' mother and let her know what was going on?

A. Yes.

Q. And when specifically did you do that?

A. Sometime that night I guess.

Q. What did you tell her?

A. They took -- well, she knew they took

Page 52

James. We were at her house.

Q. Was she present when they took him?

A. She was probably home. We were in the basement.

Q. Well, do you remember seeing her outside when they took James?

A. No.

Q. When you left the police station, did you go back to his mother's residence --

A. No.

Q. -- before going home or did you go directly home?

A. Home.

Q. Did his mother come to the Bell residence?

A. No.

Q. Do you remember having a three-way phone conversation with James and Mr. Weinberg?

A. Yes.

Q. And when did that take place?

A. I don't know.

Q. Was that the evening of his arrest?

A. I don't remember.

Q. What do you remember James saying

Page 53

during the course of that conversation?

A. That they were charging him.

Q. And did he say what they were charging him with?

A. I don't remember.

Q. Do you remember him saying they were charging him with murder?

A. No, I don't remember that.

Q. What do you remember Mr. Weinberg saying to James during that conversation?

A. It will be okay. That's all he said the whole time.

Q. Were any arrangements made for Mr. Weinberg to go to James' location during the course of that conversation?

A. Always.

Q. What do you mean by that?

A. Every conversation with that lawyer, he was going to come. He was going to come. He's going to look. He's going to come. Never did anything.

Q. Okay. We'll talk about some of the later conversations. I'm just talking about the very first one when he was first contacted, was

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 54

there any discussion about when he would next see James?

A. I don't remember.

Q. At some point did you learn that James was being charged with murder?

A. Yes.

Q. And did you learn that it was a murder that resulted or that was the result of a fire having been started?

A. Yes.

Q. Did you learn that there were multiple people that died in that fire?

A. Yes.

Q. When was it that you learned what it was he was being charged with?

A. That week.

Q. How would you describe James' demeanor during that phone conversation with you and Weinberg?

A. I don't remember. Long time.

Q. Is there anything else as you sit here today that you can remember about that phone conversation between you and James and Mr. Weinberg on the evening of his arrest?

Page 55

A. Just that Weinberg kept saying the same thing, everything will be okay. That's all.

Q. When did you next see James?

A. Court.

Q. Was that for bond court?

A. Yeah.

Q. I'm sorry. Is that yes?

A. Yes. I said yes real low.

Q. Sorry. I just want to make sure the court reporter heard.

A. She heard me.

Q. Where was bond court?

A. 26th and Cal.

Q. And how did you learn that James was going to be in bond court at 26th and Cal?

A. I called.

Q. Who did you call?

A. The police station.

Q. When did you call the police station?

A. Through the night.

Q. Did you go to 26th and Cal with anyone?

A. I don't know. Don't remember.

Q. And when you say 26th and Cal, just so the record is complete, you're talking about 26th

Page 56

and California Street, correct?

A. Yes.

Q. That's the Cook County court system?

A. Yes.

Q. When you arrived at 26th and California where did you first see James?

A. In the courtroom.

Q. And was that when he was in front of the judge?

A. Yes.

Q. Do you remember whether or not his mother was present in the courtroom?

A. I don't remember.

Q. Was Mr. Weinberg there?

A. I don't remember.

Q. Do you remember anything that was said when James was in front of the judge?

A. They just read off the charges and his background.

Q. So is it at that point that you learned that he had been charged with killing the six people?

A. Yes.

Q. On that 4448 South Hermitage?

Page 57

A. Yes.

Q. What was your reaction when you heard that?

A. I couldn't believe he did it. That they were saying that he did it.

Q. Had you ever known prior to that point in time James to start any fires, even if it was fires that didn't result in injury to any people?

A. Only on accident.

Q. What kind of accidental fires were you aware of that James had started?

MS. KEEN: Objection. Misstates her prior testimony.

A. Snakes.

BY MS. EKL:

Q. Are you talking about like the firework type snakes?

A. No. There was snakes in our backyard and I was petrified. And he was killing the snakes because there was like a flat rock wall that was just infested with snakes. And I couldn't go out the back door. They even tried to get in the back door. Yeah, snakes. So he was trying to save me.

Q. So how did he kill the snakes with

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 58

fire?

A.   Well, he was burning the rocks.  So that's how that happened.

Q.   Other than seeing him start that fire, did you ever see him --

A.   No.

Q.   -- or did he ever tell you about starting any other fires?

A.   No.  Sorry.

Q.   When you heard the charges announced against James -- well, prior to hearing about the charges against James, had you ever heard about this fire at 4448 South Hermitage?

A.   No.

Q.   Had you ever read anything in the newspaper about a fire taking place in 1984 that involved the death of a woman and her children on Hermitage?

A.   No.

Q.   How would you describe James' demeanor when he was in court before the judge during bond court?

A.   Upset.

Q.   And what led you to believe he was

Page 59

upset?

A.   Just that he looked upset.

Q.   Was he crying?

A.   Not at that point, but he was upset.

Q.   Is there anything else about his physical demeanor or his physical being that stands out in your mind about James when he was in bond court?

MS. KEEN:  Objection to form.

BY MS. EKL:

Q.   Do you understand my question?

A.   No.

Q.   Okay.  Was there anything unusual about James other than the fact that he was in bond court when you saw him that morning?

MS. KEEN:  Objection to form.

A.   Well, they had said something about that he needed to be -- go into the hospital.

BY MS. EKL:

Q.   Who said that?

A.   Must have been Weinberg, the lawyer.  Somebody.  Somebody said it.

Q.   Do you remember hearing anyone say why it was he needed to go to the hospital?

Page 60

A.   That he had something on his back, that he had swollen, his arms, his back from an incident.

Q.   And from where you were sitting could you hear what they were saying about what the incident -- what they were saying about the incident?

A.   No, not exactly.

Q.   Bond court at 26th Street, is it one of the Cook County courtrooms where there is a plastic glass wall in between --

A.   No.

Q.   -- the audience and --

A.   No, not bond court.  Regular court was.

Q.   Okay.  So how close were you to James during the point in time when he was in front of the court?

A.   Not that far.

Q.   Were you able to observe any of the injuries that Mr. Weinberg was describing from where you were sitting in bond court?

A.   Well, I think they actually kind of showed, you know, different things, the judge.  And the judge said he had to go to the hospital.  I do

Page 61

remember that.

Q.   But I'm just asking specifically what you remember seeing.  Do you remember as you sit here today seeing any injuries on James in bond court?

A.   You know what, it's been a long long time.  I don't remember.  I remember he had to go to the hospital, I remember.  But me personally, do I remember seeing it?  No.  But I must have because I was -- like I said I was at all court.

And I do remember he had to be taken to the hospital.  But they never took him.  The judge said take him and they didn't take him anyway.

Q.   How do you know that they didn't take him?

A.   Because I visited every visit.

Q.   So when was the first time that you visited James after seeing him in bond court?

A.   The first visit.  He had a visit every week.

Q.   So were you allowed to see him once a week?

A.   Yes.

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 62

Q. Did you ever see him more frequently than once a week?

MS. KEEN: Slow down, Bonnie.

A. I want to get the questions out there. Okay.

BY MS. EKL:

Q. Were there ever times when you saw him more than once a week?

A. Uh-hum.

Q. I'm sorry. Is that a yes or a no?

A. Oh, yes.

MS. KEEN: You can't control your speed by not giving verbal responses. You still have to do that.

A. Okay. Yes.

BY MS. EKL:

Q. When was it that you saw him more than once a week?

A. Okay. I got to know the Court bailiff quite well. How many years were we there? Three years. We had conjugal visits in the courtroom.

Q. Did these more frequent visits and the conjugal visits take place after some time had passed after James was arrested?

Page 63

A. Yes.

Q. So that was after you had been able to form a relationship with one of the judge's bailiffs?

A. Yes.

Q. Before we get to that, I want to ask you, were you at any point in time on the evening of January 13th into January 14th ever interviewed by the police?

A. No, not that I remember because I don't think so, no.

Q. Do you remember ever telling the police that James told you that he liked to start fires?

A. I don't remember that.

Q. Did you tell the police that James never mentioned fires to you, but that he had a sexual problem and likes to screw anything that walks?

A. Oh, yeah.

Q. When do you remember telling them that?

A. I don't remember.

Q. Was that an accurate statement?

MS. KEEN: Wait, I'm sorry. Just object to form as to whether it's an accurate statement.

Page 64

Whether that fact is accurate or whether it's accurate that she told the police that.

BY MS. EKL:

Q. Fair enough. Was the statement that you made to the police that James had a sexual problem and likes to screw anything that walks, was that an accurate statement in your opinion?

A. In my opinion he had a problem with cheating, yes.

Q. Were there times when you learned that James was with you, living with you and you learned that he had been sleeping with other women?

A. Yes.

Q. And one of those women you mentioned earlier was Dawn Gramont?

A. Yes.

Q. But as you sit here today, do you have any recollection of when it was that you told that to the police?

A. No, I don't.

Q. Do you have any recollection of the description of any officers that you may have talked to?

A. I don't remember. I think one had a

Page 65

moustache. That's about as far as I know.

Q. Did any police officers ever mistreat you during the course of the proceedings involving James and his murder charges?

A. No.

Q. During the first visit that you had with James, do you remember where that took place?

A. Visiting room, I think. I don't remember if I saw him on 11th and State or not. That I seem to remember him being behind bars and talking to him. I don't -- but it's just, it's so long, I don't.

Q. The visiting room, was that located in the Cook County Jail?

A. Yes.

Q. Is that a location where there is other inmates and other visitors that are also present at the same time?

A. Yes.

Q. Do you remember how long you met with James during that first conversation?

A. 30 minutes.

Q. Is that the standard amount that you're allowed to visit?

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 66

A.   That's it.

Q.   Was anyone else present in the immediate area of you and James when you had that first conversation?

A.   I don't think so.

Q.   What do you remember him telling you about what had transpired that led to his arrest, if anything?

A.   That Dwayne was lying.

Q.   When you say Dwayne who are you referring to?

A.   Dwayne Glassco.

Q.   Is that G-l-a-s-s-c-o?

A.   I don't know.

Q.   Did you know who Dwayne Glassco was prior to James' arrest?

A.   Yes.

Q.   How did you know Dwayne?

A.   He worked for me part time.  And I know Dawn Gramont very well.  And I know all her kids. And he's the father of the first three.

Q.   So did you know Dawn before you knew Dwayne?

A.   Yes.

Page 67

Q.   When did you first meet Dawn?

A.   At his mother's.

Q.   At whose mother's?

A.   James' mother's.

Q.   When was that?

A.   After he started working for me.

Q.   What was your understanding about her relationship with James at that point?

A.   Baby Mama, that's all.

Q.   So you knew that he had a child with Dawn, but didn't know that they had an ongoing relationship.  Is that fair?

A.   That's fair.

MS. KEEN:  Just objection to form.  Is the he James or Dwayne?

A.   He is James.  She already asked that.

MS. KEEN:  Okay.  I just want to make sure I was clear I guess.

BY MS. EKL:

Q.   I believe you said, correct me if I'm mischaracterizing, that you had a close relationship with Dawn, correct?

A.   Very close.

Q.   How was it that you and Dawn ended up

Page 68

forming a close relationship?

A.   I took care of her kid.

Q.   Which kid was that?

A.   James.

Q.   That was James Jr.?

A.   Yes.

Q.   When did you take care of James Jr.?

A.   From the time I started living with James.  He would come and stay with us.  Go home whenever he wanted to.  Come back whenever he wanted to.

Q.   How old was James Jr. during that time period?

A.   I think about a year and a half.

Q.   What was your understanding about James and Dawn's relationship during that time period prior to James' arrest?

A.   Just the mother of his child.

Q.   And then how was it that you came to know Dwayne?

A.   He started working for me on jobs here and there.

Q.   When did he start working for you?

A.   Don't remember.

Page 69

Q.   What sort of jobs would he do for you?

A.   Painting.

Q.   Did you form any sort of a personal relationship with Dwayne?

A.   No.

Q.   And by personal I don't mean necessarily romantic.

A.   I know.

Q.   But did you have a friendship with Dwayne?

A.   No.

Q.   How would you describe your relationship with Dwayne at that point?

A.   Acquaintance.

Q.   Now when you first spoke to James in the jail, you said that he said that -- I'm sorry. When you first spoke to James in the jail you said that James told you that Dwayne had lied, correct?

MS. KEEN:  Objection.  Misstates her prior testimony.  You can answer.

A.   Yes.

BY MS. EKL:

Q.   Did he explain to you what he meant by that?

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 70

A.   That's why he was there, because what Dwayne lied.

Q.   Did he tell you how he knew that Dwayne had lied?

A.   Because they were holding him on the case.  So he said Dwayne lied to the police and that's why they were holding him.

Q.   Did he tell you what it was that Dwayne told the police?

A.   That he saw him enter the building and was carrying newspapers and that he started a fire.

Q.   Did James tell you how it was that he knew Dwayne had said these things to the police?

A.   No.  I guess the police told him.  I don't know.

Q.   Is it fair to say that James was angry with Dwayne at that point?

A.   I'm sure.

Q.   Did he tell you that he was angry?

A.   No.

Q.   Do you remember him telling you anything else about what was going on with these criminal charges or do you remember anything else about that conversation?

Page 71

A.   No, just general stuff.  Like I said that Dwayne lied and that's all.  Dawn and James were fighting.  James left.  Came back.  That's all.  He told me it was just incidents that were happening that night.

Q.   Did he talk to you then about what had happened the night of the fire?

A.   That's what Dwayne said.

Q.   Let me back up.  I just want to make sure we have a clear record.  So when you were talking to James in the jail, and this is after he's arrested during that first conversation, was it during that conversation that he told you about what happened the night of the fire?

A.   What Dwayne said.

Q.   But did he also tell you what actually happened the night of the fire?

A.   That him and Dawn were fighting because Dawn and Dwayne and Michelle were doing drugs.  And he doesn't -- he never did drugs.  And he left and went for a walk because they were arguing.  And came back and that's all.  And then supposedly Dwayne said that he smelled like smoke.  But that was all.

Page 72

Q.   And did he tell you that that all took place the night of the big fire where the people, the six people were killed in the building?

A.   Yeah.

Q.   And so what he was telling you was that he had walked around and came back to the building to Dawn's house, that that was actually truthful, correct?

A.   That he was just walking around and that -- and came back because he had like walked off his being mad with Dawn.

Q.   Did he tell you anything else about the fire in terms of maybe who he thought might have started the fire?

A.   No.

Q.   Did he tell you anything about why he thought Dwayne might be lying about him?

A.   Because they were holding him.

Q.   But did he tell you what reason Dwayne would have for telling a lie like that to the police?

MS. KEEN:  Objection.  Calls for speculation.  Lacks foundation.

A.   Dwayne was being charged with a forgery

Page 73

and to give testimony against James, he was going to get less charges.

BY MS. EKL:

Q.   And did James tell you how he knew that?

A.   No.

Q.   Was that something that he said the police told him?

A.   I don't know.  I don't know where he came up with that.

Q.   Did you have knowledge at that point that Dwayne was being held on another case?

A.   No.

Q.   Did James ask you to do anything during that conversation?

A.   Talk to Dwayne.

Q.   What were you supposed to tell Dwayne?

A.   Just ask him what was going on; why he was doing that.

Q.   Did you agree to go talk to Dwayne?

A.   Yeah, I mean --

Q.   After that initial conversation with James, did you in fact then go talk to Dwayne?

A.   I think so.

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 74

Q. Do you have a memory of talking to Dwayne?
A. No.
Q. What makes you think that you did talk to him?
A. Because I tried to do everything I could to help in that case. So I would think that if he asked me to do it I probably did.
Q. Is it fair to say that you were in love with James at that point?
A. Without a doubt.
Q. You didn't want to see him locked up, correct?
A. No.
Q. You wanted to have him back home with you, right?
A. Definitely.
Q. You believed that he was innocent?
A. Yes.
Q. So that's why you were trying to help him get out; get off of this case, correct?
A. Right.
Q. In addition to perhaps talking to Dwayne, do you remember at some point going to the

Page 75

police department to get some police reports?
A. Yes.
Q. When did you do that?
A. The first week that he was locked up.
Q. Where did you go to get the police reports?
A. I don't remember. I got the fire reports that said it was an accidental fire. I got any report that I could from prior to him being arrested, because they were totally different from when he got arrested.
Q. Do you remember, did you go to one of the police departments to get the records?
A. I think it was something to do with the fire department, city hall maybe. I don't remember. I don't remember exactly where I went, but...
Q. Were these police reports or were they fire department reports or both?
A. Fire department reports. I don't remember if it was police, but definitely fire department.
Q. What did you do with the reports once you got them?

Page 76

A. Must have sent them to him. I don't know.
Q. When you say him, who are you referring to?
A. James.
Q. Did you ever provide a copy of them to James' attorney, Mr. Weinberg?
A. Of course.
Q. But do you specifically remember also giving James a copy?
MS. KEEN: Objection, it misstates her prior testimony and calls for speculation.
A. I don't remember.
BY MS. EKL:
Q. Other than remembering that the report said that the fire was accidental, is there anything else more specific that you can remember about the reports that you read?
A. No accelerant used.
Q. Anything else?
A. There was no office of fire investigations at that time. They were all classes. People just in class. No department at all.

Page 77

Q. How did you learn that?
A. Through court.
Q. Okay. I want to make sure. I'll ask you about what you learned later. But I'm just talking about from those reports that you got, what did you learn from the reports?
A. I don't remember all the things that were on there. But it had it stamped accidental fire. And it said no accelerant used for sure.
Q. Do you remember seeing any reports that dealt with whether or not there were any other suspects that were looked into?
A. No.
Q. You don't remember or you didn't see that?
A. I don't remember.
Q. Were there times throughout the course of James' case when you would have conversations with Mr. Weinberg?
A. Yes.
Q. And were those to try to help give him information that might assist in James' defense?
A. Yes.
MS. KEEN: You've got to slow down so I can

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 78

make an objection. I'm sorry. Form. But she's answered.

A. Sorry.

MS. KEEN: No, no, you're doing fine.

A. You're not fast enough.

MS. KEEN: I was never good at that game.

A. It's you. You got to be faster.

BY MS. EKL:

Q. What sort of information do you remember providing to Mr. Weinberg that you thought might help James' defense?

MS. KEEN: Objection, lack of foundation.

A. The fire investigation things, that was the major part, the major thing that I gave him.

BY MS. EKL:

Q. Did you talk to Dawn at some point about what she knew about the night of the fire?

MS. KEEN: Objection, foundation, form.

A. I always talked to Dawn.

BY MS. EKL:

Q. But specifically did you have any conversations with her about what happened the night of the fire?

MS. KEEN: Objection to form. Vague as to

Page 79

time frame.

A. No.

BY MS. EKL:

Q. You never did?

A. Not that I can remember. I mean it's been a long time and lots of stuff between me and Dawn.

Q. Did you know a person by the name of Michelle Britton?

A. Yeah.

Q. How did you know Michelle Britton?

A. Michelle Britton went to court. Well, first she contacted me and told me could I pay her and she wouldn't go to court. I said I'm not paying you for nothing. I'm not a part of any of that. I don't know what's going on.

She went to court and told the state's attorney that I called her and offered her money not to go to court. So the state's attorney comes to me and said don't ever talk to my witnesses. I've got nothing to do with that.

Q. Before that happened did you know Michelle before this conversation took place about where she accused you of offering her money?

Page 80

A. I know her family.

Q. How did you know her family?

A. James was locked up with her brother, Tommy Britton. And Tom, I guess James knew him for a long time. And then James asked if when he got out of jail, could he get house arrest at my house so he came to my house. And I ended up knowing the whole family.

Q. When you say James asked if he could go on house arrest at your house, are you referring to Tom Britton?

A. Yes.

Q. James asked you if Tom Britton could do his home confinement at your house?

A. My house.

Q. And then he did in fact do that?

A. Yeah.

Q. That's how you got to know the Britton family?

A. Yeah.

Q. How would you characterize your relationship with Michelle Britton prior to James' arrest?

A. I really don't know Michelle Britton

Page 81

other than that. That's about the extent of Michelle Britton. In fact I just found out within the last 6 months one of my best friends used to date her. I'm like, oh, really. He's my roofer. I'm like you were with Michelle Britton. Strange. It's a little neighborhood.

Q. Did you know that Michelle Britton dated Dwayne Glassco?

A. Oh, yeah, that I knew. That was why she was in the house. They were living in the attic.

Q. How did you learn that? How did you learn that Michelle and Dwayne were living in the attic?

A. Through this whole case.

Q. Was it in court or did James or someone else tell you?

A. In court. In court. Like I said I made every court call.

Q. Did you talk to Michelle at all about what happened the night of the fire?

A. No.

Q. In the course of trying to get information to try to help James' defense, did you

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 82

ever try to figure out whether or not you could help prove that Dwayne's statements were false?

A. No.

Q. Did you ever talk to anyone about whether or not it was possible for James to see what he claimed he saw out of the window at Dawn's house?

MS. KEEN: Objection to form.

MS. McANDREW: You mean Dwayne.

MS. EKL: I'm sorry.

A. That came out in Court.

MS. KEEN: You said whether it was possible for James to see.

BY MS. EKL:

Q. Let me rephrase that. Just so that the record is clear, let me ask the question again. In the course of your trying to assist James in his defense, did you ever learn whether or not it was possible for Dwayne to see what he claimed he saw the night of the fire?

A. Yes, I did.

Q. And did you learn that in court or did you learn that by kind of doing your own investigation and by talking to people?

Page 83

A. Through the public defenders that were hired after we fired Weinberg and in court.

Q. Did you ever have any conversations with Dawn Gramont about her interactions with the police officers?

A. Yes.

Q. And when did you talk to her about that?

A. The day she was taken to the court to give whatever that is, in the court, her testimony.

Q. Did you learn that Dawn had provided testimony before the Grand Jury?

A. Yes. That's what I was talking about.

Q. And so did you talk to her that day about the fact that she had provided testimony to the Grand Jury?

A. Yes.

Q. Did she tell you after the fact or that she was going to be going to give testimony?

A. After the fact.

Q. Where did your conversation with her take place?

A. I don't know if it's her mom's or my house, one of the two. She was upset.

Page 84

Q. Who was present for that conversation besides just you and Dawn?

A. His mother might have been there.

Q. What do you remember her telling you about that?

A. Two police officers picked her up on the way to court. Told her that if she didn't say exactly what they wanted her to say, that when she got home her kids would be in the same condition as the kids that were in the fire.

Q. And so did she tell you what happened after they said that to her?

A. She went to the Grand Jury. She said whatever they wanted her to say. And then when she came home, she called and said everything was a lie because she was threatened with her kids' lives.

Q. Did she tell you that they had physically abused her?

A. No.

Q. When you were having the conversation with her, you were physically present with her, correct?

A. Yes.

Q. Did you see any injuries on Dawn?

Page 85

A. Not that I remember.

Q. When you say that she called and said that everything was a lie, who was it that she made the call to?

A. I don't remember who she called. But I know she did call and tell them that everything was a lie because they forced her to say what they wanted her to say.

Q. Was Mr. Weinberg present for any of that conversation?

A. No, not present.

Q. Was he contacted about that conversation?

A. Could have been.

Q. Do you know whether or not Mr. Weinberg advised Dawn to contact anyone about the fact that she had been threatened?

A. I don't know.

Q. Do you know if James' mom advised Dawn to contact anyone about the fact that she had been threatened?

MS. KEEN: Objection, lack of foundation.

A. I don't remember. I do know she did definitely call.

Urlaub Bowen & Associates, Inc.  312-781-9586

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 86

BY MS. EKL:

Q.   Were you present when she called?

A.   Yes.

Q.   What do you remember hearing her say?

A.   Exactly that.  That she was threatened to say whatever they wanted her to say because of the fact that her kids would be hurt while she was gone.

Q.   Did Dawn tell you that she was upset because she was afraid that she was going to be responsible for James being prosecuted for these murders?

A.   No.

Q.   Were you ever present for any conversations between Dawn and Mr. Weinberg?

A.   No.

Q.   Do you know if Mr. Weinberg ever represented Dawn?

A.   No.

Q.   Prior to James' arrest had Mr. Weinberg ever represented you?

A.   No.  Didn't know him.

Q.   Other than asking you to talk to Dwayne, did James ever ask you to do anything else

Page 87

to help assist him in his defense?

A.   No.

Q.   Did James ever tell you after he initially arrived in jail about any problems that he had while he was in the jail?

MS. KEEN:  Objection to form.

A.   I don't think so.

BY MS. EKL:

Q.   Did James ever tell you about any problems with any gang members in jail?

A.   No.

Q.   Is there anything else you can remember about any conversations that you had with Dawn about what took place the night of the fire?

MS. KEEN:  Objection to form.  Vague as to time frame.

A.   We had a lot of conversations.  Not really.  Not anything particular.

BY MS. EKL:

Q.   When you say you had a lot of conversations, did you have a lot of conversations specifically about what happened that night?

A.   No.

Q.   How many times do you think that you

Page 88

talked to Dawn about what happened the night of the fire?

MS. KEEN:  Objection.  Assumes facts not in evidence.

A.   I don't know.  Dawn lived with me for years.

BY MS. EKL:

Q.   When did Dawn live with you?

A.   Up until she moved into the nursing home and passed.

Q.   So when did she first start living with you, approximately?

A.   Nine years ago.

Q.   At what point did you learn that James had been cheating on you with Dawn?

A.   Shortly after it happened.  His mother set up the dates.  She would call and say she needed him to come over so he could go out with Dawn.

Q.   Is it fair to say then that sometime after James was locked up, you and Dawn kind of reconciled things and became friends again?

A.   Yeah.

Q.   Is that why then it led to her living

Page 89

with you in the last nine years?

A.   Yes, she had nobody else.

Q.   Was Dawn sick then before she died?

A.   Cancer.  She was in a nursing home.

Q.   Did you care for her?

A.   Yes, I was there all the time.

Q.   Did she ever talk to you about James in those last nine years?

A.   Yes.  She didn't want him to get out.

Q.   Didn't want him to get out?  Why was that?

A.   She was afraid of him.

Q.   Why was she afraid of him?

A.   Because -- I don't know.  Just because I guess when she went to court for that thing.

Q.   Did she ever tell you about her relationship with James?  And specifically just did she ever describe for you how it was to be in a relationship with James?

MS. KEEN:  Objection, form.

A.   She didn't have to.  No.

BY MS. EKL:

Q.   Did she tell you about any times when James was physically abusive to her?

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 90

MS. KEEN: Objection, assumes facts not in evidence.

A. No.

BY MS. EKL:

Q. Was James ever physically abusive to you?

A. Put a snake in my car.

Q. When did he do that?

A. Mother's Day. That's okay. I made him get it out.

Q. Do you know why he did that?

A. Because I'm afraid of snakes. And he didn't want me to leave. So he put a snake in my car.

Q. Did he ever physically, did he ever hit you?

A. Accidentally.

Q. When was that?

A. We were talking.

Q. And when was that?

A. We were laying in bed. We were talking and he went to punch the pillow. And as he went to punch the pillow, I turned and he hit me in the mouth.

Page 91

Q. Do you remember when that took place?

A. No. It was an accident. Believe me.

Q. Did you have to get any kind of medical care for that?

MS. KEEN: Objection to the relevance of this.

A. I think stitches.

BY MS. EKL:

Q. Where did you go to get the stitches?

A. University of Illinois, I guess. Don't remember for sure, but that's usually where I went.

Q. Were you questioned at that time -- did you have to answer questions to anyone at the hospital about whether or not --

A. No.

Q. -- it was intentional or not intentional?

A. No. It was nothing. Like I said it was an accident truthfully.

Q. Were there any times that you felt that James intentionally hit you?

A. No.

MS. KEEN: Objection. Assumes facts not in evidence, especially given her prior testimony.

Page 92

She's answered.

A. Sorry.

MS. EKL: I'm curious though. How can something when I'm asking if something happened, how does that assume a fact not in evidence?

MS. KEEN: So read back the last question and I'll explain my objection for you.

(From the record above the reporter read the following: "Question. Were there any times that you felt that James intentionally hit you?")

MS. KEEN: I mean I guess maybe it's partly the way that you asked it. You seemed to be distinguishing between accidental versus intentional. And she said that the only time there was any sort of physical contact was this one accidental time.

So that's why I objected to it because it implied that there were other times. And you wanted her to distinguish between them being intentional and accidental. So that's my objection.

BY MS. EKL:

Q. All right. How would you describe

Page 93

James' relationship with Dwayne Glassco before January of 1988?

MS. KEEN: Objection, lacks foundation.

A. Don't know.

MS. KEEN: Calls for speculation.

BY MS. EKL:

Q. And I need to go back. I think I didn't follow up. And I apologize if I'm just forgetting. But you mentioned that you knew that Dwayne and Michelle were living in Dawn's attic, correct?

A. Yes.

Q. At what point did you learn that?

MS. KEEN: Objection, asked and answered.

A. The trial.

MS. EKL: During the trial. Okay. I just wanted to make sure. You know, actually it might be a good time to go off now and then if we take an hour or take 45 minutes or whatever, but then in that course of that time we'll hit 12:30.

MS. KEEN: I'm fine with however you want to do it. I mean if you want to go right up until and then that would make us require less of a break, that's fine, too.

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 94

MS. EKL: Let's go off the record for a second.

(Discussion off the record.)

(recess)

BY MS. EKL:

Q. Before we move forward, I want to go back and follow up on a couple of questions that I asked you earlier. Okay. We were talking earlier about James' security job at the end of 1987.

A. Okay.

Q. When did he stop working for that security firm, if you know?

MS. KEEN: Objection, calls for speculation.

A. I don't remember.

BY MS. EKL:

Q. Do you know why he ended his job with the security company?

A. No.

MS. KEEN: Objection, lacks foundation. Calls for speculation.

A. Sorry.

BY MS. EKL:

Q. At any point in time did James ever tell you that he had to give the security company

Page 95

a polygraph test; that he had to submit to a polygraph test?

A. I really don't remember that.

Q. I'd asked you some questions about bond court that you went to the day after James was arrested. Do you recall during that first bond court that you went to, if the court at that point in time specifically talked about what James was being charged with?

MS. KEEN: Objection, asked and answered and lacks foundation.

A. They always do. I don't remember exactly, but they always do.

BY MS. EKL:

Q. Do you remember that at that first bond court that they arraigned him or that he was in bond court in relation to the car fires?

A. I don't remember.

Q. And that he was being charged at that point in time with the arsons related to the car fires?

A. I think everything.

Q. We also talked a bit about your first conversation with James in the Cook County Jail.

Page 96

Do you recall generally that we were talking about that earlier?

A. Yes.

Q. And just to make sure that I'm clear because I'm not sure if the record is clear, the very first conversation that you recall having with James, was that in that visiting room or was that somewhere else?

A. See, I don't know. I can't remember. I do remember like him being in a room with bars and talking to him. But then it's did I dream that? I don't know. I don't remember. I don't remember exactly.

Q. Other than having a vague recollection of talking to him behind some bars, is there anything that you think -- do you remember any conversation that you think took place when he was in that position behind some bars?

A. It would have been to call his lawyer. That would be the only thing he would want me to do. And I did call the lawyer so obviously that's what the conversation was. I don't know.

Q. But as you sit here today you don't have a specific recollection that that's even an

Page 97

accurate memory. Is that fair?

A. No, I don't. Like I said it could have been a dream that I remembered him behind the bars and talking to him. Because I do remember that, but I don't know.

Q. Did you ever go visit James during any of the times that he was arrested previous to the car fires?

MS. KEEN: Objection, assumes facts not in evidence.

A. I seen him. He worked with me from the work release center.

BY MS. EKL:

Q. You were aware that he was arrested for burglary, correct?

A. Yes.

Q. Did you go visit him at the jail or at the police when station when he was arrested for burglary?

A. Did not know him.

Q. But just in terms of trying to put in context your conversations with him, you do have a specific recollection of being on the phone at the same time as James and Mr. Weinberg, correct?

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 98

A.   Yes.

Q.   And you believe that that was the night of his arrest, correct?

MS. KEEN:  Objection.  Asked and answered.

A.   I don't remember.

MS. KEEN:  Calls for speculation.  Did you answer?

A.   Yes.  I don't remember exactly.

BY MS. EKL:

Q.   Was that before or after you saw James in bond court?

MS. KEEN:  Objection, calls for speculation.

A.   I really don't remember.  I mean I would love to remember these things for you, but I just don't.  It's been a long time.

BY MS. EKL:

Q.   Before lunch I also asked you some questions about going to visit Dwayne Glassco.  And you said that you believe you did go visit Dwayne Glassco with Dawn Gramont, correct?

A.   Yes.

Q.   But you said that you didn't recall as you sit here today the contents of the conversation with Dwayne, is that correct?

Page 99

A.   Correct.

MS. EKL:  Let's go ahead and mark this as Deposition Exhibit Number 1.

(Deposition Exhibit No. 1 marked)

BY MS. EKL:

Q.   I'm showing you a document that's Bates stamped EP Subpoena 5997.  And it's been marked Hileman Exhibit Number 1.  Do you recognize this document?

A.   It's my signature.

Q.   Your signature where it says Bonnie Fitzpatrick Kluppelberg?

A.   Yes.

Q.   Other than your signature do you recognize the rest of the handwriting on this page?

A.   It's not mine.

Q.   Do you recall signing your name to this page after this was written?

A.   No.

Q.   If you could take a minute and read through this.  And then let me know after you read it whether or not it refreshes your recollection about any conversation you had with Dwayne Glassco.

A.   I do remember a conversation about

Page 100

this, but I don't know about this letter.

Q.   So this refreshes your memory about a conversation with Dwayne?

A.   Yeah.

Q.   What do you recall now as you sit here?

A.   Just that if I would bond him out, which I didn't do.

Q.   What do you mean by that?

A.   I did not bond him out.

Q.   What did he ask you to do and what did you say in response?

A.   To bond him out and he would disappear.

Q.   So Dwayne asked you during the conversation that you had with him whether or not you would bond him out and he told you that if you did that, that he would disappear?

A.   Yes.

Q.   And then he wouldn't testify against James?

A.   James, yes.

Q.   Do you know whose handwriting is on this Deposition Exhibit Number 1?

A.   Probably Dawn's.

Q.   Do you know how Dawn spells her last

Page 101

name?

A.   G-r-a-m-o-n-t.

Q.   Do you see here where it's spelled G-r-e-y-m-o-n-t?

A.   Yeah, I do.

Q.   Do you have any reason to know why Dawn would misspell her name?

A.   No, I have no idea of that.  Couldn't have been her, huh?

Q.   Is this statement accurate?

A.   Pretty much.

Q.   Is there anything in here that's inaccurate?

A.   No.  It's pretty much it.

Q.   Do you remember why it was that you signed this piece of paper?

A.   I don't remember even signing the paper with any of this on it.  I don't remember.

Q.   Back in 1992 were you taking any kind of elicit drugs during that time period?

A.   Never.

Q.   Taking anything that would affect your memory?

A.   No.

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 102

Q.    Back in 1992?

A.    No.  Actually now I'm actually diagnosed with early dementia, early Alzheimer's or just entirely too much stress.  No memory.  So...

MS. EKL:  Let's go ahead and mark this Deposition Exhibit Number 2.

(Exhibit No. 2 marked)

BY MS. EKL:

Q.    Before I ask you any questions about that, do you remember earlier today I asked you some questions about any conversations you had with Dawn following James' arrest to determine whether or not she had any information that might be helpful to him.  Do you remember me asking questions like that?

A.    Yeah, probably.

Q.    First off do you recognize Deposition Exhibit Number 2?

A.    I forgot about that.  Yeah, I remember all that now.

Q.    Do you remember actually this document?

A.    No.

Q.    Do you know what this document is?

A.    No.

Page 103

Q.    Do you see at the bottom where it says -- well, first off just for the record it's a document that is Bates stamped EP Subpoena 5994.  Would you agree with me that this document is dated December 28th of 1997?

A.    Yes.

Q.    And that at the top it says James R. Kluppelberg, senior?

A.    Yes.

Q.    And it purports to be a letter to whom it may concern?

A.    Yes.

Q.    Do you see at the bottom where it says if any more information is needed, please call me at 773-927-7495?

A.    Yes.

Q.    Was that your phone number back in 1997?

A.    Could have been.

Q.    Were you living at 3302 South Western Avenue at that time?

A.    Yes.

Q.    Does that refresh your recollection as to whether or not you prepared this document?

Page 104

A.    I probably didn't.

Q.    Probably did not you said?

A.    I don't do a lot of typing.

Q.    Do you see at the top where it says Chicago Standard Decorating?

A.    Yes.

Q.    Does that appear to be a fax header?

A.    Could be.

Q.    Did you have a fax machine that you used at Chicago Standard?

A.    Yes.

Q.    Decorating?

A.    Yes.

Q.    And was the phone number to that fax to your recollection 773-927-7551?

A.    Yes, that was it.

Q.    Do you have any idea as you sit here today why it was that this document was typed up?

A.    No, I don't.

Q.    Did you fax this document to someone back in February of 1998?

A.    Must have been Weinberg.  That's the only one I would think of that we did.  That is my girlfriend, Debbie.

Page 105

Q.    So Debbie Halderman that's the person that used to live with you?

A.    Uh-hum.

Q.    Is that a yes?

A.    Yes.

Q.    In this document, if I could direct your attention to about the middle of the page, the line, the words start "questioned it".  But the first sentence, it says "Dawn had called me and told me that the window in the attic was boarded up and that Dwayne had lied about seeing out that window", do you see that line?

A.    Right there.

Q.    Is that a yes?

A.    Yes.

Q.    Is that an accurate statement that Dawn had called you and told you that the window in the attic was boarded up?

A.    I don't remember but it was.

Q.    But what was?

A.    The window was boarded up.

Q.    How do you know that?

A.    They said that in court.

Q.    But you don't have any personal

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 106

knowledge of that?

A.   No.

MS. KEEN:  Objection to form.  Vague as to whether you're saying she currently has no personal knowledge or she ever had any personal knowledge of that.

BY MS. EKL:

Q.   Did you ever have any personal knowledge as to whether or not --

A.   Personal, no.

Q.   Let me just get the question out. Sorry.  So we have a complete record.  Did you ever have any personal knowledge as to whether or not that window was boarded up?

A.   No.

Q.   Had you ever been to Dawn Gramont's house that was located near 4448 South Hermitage?

A.   No.

Q.   So you obviously had not been inside of her house then to look out any windows of her house, correct?

A.   Correct.

Q.   It also says in here and this is about a third of the way down, the line that starts the

Page 107

leg work myself, but the first sentence reads, "I did go to the police department and got copies of any reports from the March 24, 1984, case and to the fire department for the same information".  Do you see that sentence?

A.   Uh-hum.

Q.   Is that a yes?

A.   Yes.

Q.   Does that refresh your recollection that you actually went and got police reports as well as reports from the fire department?

A.   No.

Q.   Do you have any reason to believe that that is not accurate?

A.   No.  I did a lot of things.

Q.   You mentioned earlier that you learned that there were some allegations made against you that you had offered Michelle drugs in exchange for not providing testimony.  Do you recall testifying to that earlier?

A.   Money.

Q.   Money.  Okay.  Did you ever confront Michelle about the fact that you were being accused of having offered her money?

Page 108

A.   I wasn't allowed to talk to Michelle. Remember?

Q.   So when they told you not to talk to her, did you then stop talking to her?

A.   Yes.

Q.   At any point between the time that you met James until the end of his trial, at any point during that time were you ever selling drugs?

A.   Yes.

Q.   When were you selling drugs?

A.   After he got arrested.

Q.   Was that sometime then in 1988?

A.   After he got arrested, yes.

Q.   For how long a period of time did you sell drugs?

A.   Until I went to jail.

Q.   And what kind of drugs were you selling?

A.   Cocaine.

Q.   What was the purpose in you selling drugs or selling cocaine?

A.   Survival.

Q.   Is that to earn money?

A.   To survive.  He was taken away.  I had

Page 109

no way to survive.  I mean I had a job, but I also had kids.

Q.   Were you also taking any of the cocaine during that time period?

A.   Never.

Q.   When were you arrested?

A.   June 28th, 1991, I think.

Q.   Were you convicted of that?

A.   Yes.

Q.   And did you have to serve any time?

A.   Yes.

Q.   How much time did you have to serve?

A.   Three and a half years.

Q.   Did you serve the full three and a half years or did you get day for day credit?

A.   I got eight years.  I did three and a half.  You said how much did I serve.

Q.   Okay.  I just wanted to make sure that we were understanding each other.

A.   No, I was sentenced to 8 years and I served three and a half.

Q.   When were you released from that incarceration?

A.   December 23rd, 1994.

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 110

Q.   And what institution were you incarcerated in?
A.   Dwight and Dixon and work release.
Q.   And was that for manufacturing or delivering of controlled substance?
A.   Delivering.
Q.   Other than that conviction, did you have any other felony convictions from the time that James got arrested until today?
A.   Yes.
Q.   What other felony convictions?
A.   Cocaine.  Crack actually.
Q.   When was that?
A.   Six or seven years ago.
Q.   Did you have to serve more time for that offense?
A.   Probation.
Q.   Were you charged with possession or with --
A.   Delivery.  You said manufacturing.  But delivery.
Q.   How many months or years probation did you get --
A.   Two years.

Page 111

Q.   I'm sorry.  Can you just let me finish so we have a complete record.  I know you know where I'm going, but if you could just wait.
A.   Okay.
Q.   Let me ask it again just so the record is clear.  How many years probation did you serve?
A.   24 months.
Q.   Did you successfully complete that probation?
A.   Yes.
Q.   When was that conviction, specifically what year?
A.   I think 2006.  I don't know.
Q.   When were you released from probation?
A.   2008.
Q.   Any other convictions?
A.   Yes.
Q.   What was that?
A.   Cocaine.  Crack.  Cocaine.  Same thing.
Q.   Again was that possession with intent to deliver?
A.   No.  I don't know what that was.  It wasn't mine.  I don't even know what the charge was, truthfully.

Page 112

Q.   And what were you sentenced to in connection with that offense?
A.   Probation.
Q.   For how long?
A.   Two years.  Maybe one was a year one.  I don't know.  I don't remember exactly.
Q.   When were you convicted of that second offense?  Or actually I guess the third offense.
A.   I don't remember.
Q.   Was it sometime after 2008?
A.   That could have been the 2008 case.  I don't remember exactly.  I really don't.  It's in there.
Q.   Any other convictions?
A.   Not that I remember.
Q.   Did you have any convictions out of DuPage County?
A.   That was the eight years.
Q.   The eight years you mean --
A.   That I got eight years.  I did three and a half.
Q.   So the one from 1991, that was out of DuPage County?
A.   Yes.

Page 113

Q.   And the other two, were they out of Cook County?
A.   Yes.  No.  Yeah.  I'm sorry.
Q.   That's okay.  I want you to correct if something --
A.   No.  It's Cook County.  Cook County is a big area.
Q.   After you had the conversation with James where he told you about the fact that he thought that he was locked up because of something that Dwayne had said, you continued to have visits with him, correct?
A.   Yes.
Q.   And throughout those additional visits did he continue to tell you things about the evidence that he believed the State had against him?
A.   I'm sure he did.  I just don't remember.
Q.   Do you remember anything that he told you about the evidence that the State had against him?
MS. KEEN:  Objection, lacks foundation.
A.   Just the same thing over and over, with

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 114

the case. It's just the same stuff. Same stuff I heard in court. We would talk about what happened in court.

BY MS. EKL:

Q. And did you continue to try to assist him in his defense?

MS. KEEN: Objection form.

A. I did everything already.

BY MS. EKL:

Q. So was there anything else that you did other than what we've already talked about to try to assist him in his defense?

A. That's why he divorced me.

Q. Is that a no?

A. No, I didn't do anything else.

Q. And when you say that's why he divorced you, what do you mean by that?

A. His answer was I wasn't doing anything to help him in his case anymore, so he divorced me.

Q. What did he want you to continue to do to help him?

A. I don't know. I don't know. He got out, I guess, so help him with his paperwork. I don't know.

Page 115

Q. Well, when you say that's why he divorced you, did you have a conversation about him wanting a divorce?

A. That's what he said. I went there to visit him, me and James. And he said that he feels that it would be better if we got divorced because I'm just not helping him with his case.

Q. How did you feel when he said that to you?

A. Have a nice visit with your son because I'm not coming back.

Q. Did you feel like he was using you?

MS. KEEN: Objection, form.

A. Mad.

BY MS. EKL:

Q. When did that conversation take place?

A. 15 years later.

Q. 15 years after you had married him?

A. Yes.

Q. Was it shortly after that that paperwork was filed for the divorce?

A. Yes.

Q. Who filed the paperwork for the divorce?

Page 116

A. He did.

Q. During any point in time did James ever ask you to do anything to assist in his defense that you felt was illegal?

A. I don't know what you mean by that.

Q. Well, did he ask you to try to get any witnesses to change their testimony?

A. No.

Q. Did he ask you to try to fabricate any evidence?

A. No. Weinberg assured him they had no evidence whatsoever and he would never be convicted.

Q. Were you present for any of the conversations between James and Weinberg?

A. Three-way calls.

Q. When did those take place?

A. All the time.

Q. Those were at a point in time when James was in jail but before his trial?

A. Yes.

Q. What do you recall being said during the course of those conversations?

MS. KEEN: Objection, foundation.

Page 117

A. Just what I just said. You don't have to worry. They have no evidence against you. They're not going to find you guilty. There is no way because they have nothing.

BY MS. EKL:

Q. Do you remember James telling Weinberg to look into certain things?

A. Yes.

Q. And what things do you remember him telling Weinberg to look into?

A. To go to the house and check out the foundation, the foundation lines on the house. They didn't match what they were saying.

Q. At some point in time did you tell Weinberg that your father knew about foundations?

A. I don't remember, but I'm sure I did because my dad did.

Q. What was the purpose in telling that to Weinberg?

A. When he fired Weinberg and the public defenders took over, James told them to go check out the foundations. It proved that the house on either side sat back far and the one in the middle where the fire happened was actually inside. So in

Urlaub Bowen & Associates, Inc. 312-781-9586

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 118

order to see the back door that Dwayne said he saw, they had to see through the building to see the door. Proved that.

Q. That was something that James was telling Weinberg to look into, correct?

A. The whole time.

MS. KEEN: Objection, form and lacks foundation.

BY MS. EKL:

Q. Was that something that James told Weinberg to look into?

A. Yes. Sorry.

MS. KEEN: Objection -- you've got to wait. Objection, lack of foundation and form. She's answered.

BY MS. EKL:

Q. And just to try to help assist with the foundation again, when James told Weinberg that was something he wanted him to look into, was it during a time when you were on a three-way phone call between Weinberg and James?

MS. KEEN: Objection, form, foundation. You can answer.

A. Yes.

Page 119

BY MS. EKL:

Q. And do you remember when it was that that conversation took place?

MS. KEEN: Objection to form.

A. Almost all the conversations James kept telling him to go and check things out. And he just did nothing.

BY MS. EKL:

Q. And specifically the conversation where James told Weinberg to check out the foundation, was that sometime after his arrest when he was locked up in the Cook County Jail, but before his trial?

A. Yes.

Q. Did James also tell Weinberg that he believed that Dwayne Glassco was lying?

A. Yes.

Q. And did he tell Weinberg that he believed that Glassco had been offered something in exchange for his testimony?

A. Yes.

Q. What do you remember about specifically what James said about that?

MS. KEEN: Objection, lack of foundation and

Page 120

form.

A. That Dwayne was offered probation on the forgery case opposed to getting time.

BY MS. EKL:

Q. And this conversation that took place about Dwayne Glassco, again did that occur during a three-way phone conversation between you and Weinberg and James?

A. Yes.

Q. And was that during a time period after he was arrested while he was in Cook County Jail, but before his trial?

A. Yes.

Q. That was again something that James was asking Weinberg to look into, correct?

A. Yes.

Q. During any phone conversation again that you were on with James and Weinberg between the time he was arrested and the time of his trial, did you hear James talking to Weinberg about the fact that police reports indicated that the fire had been -- was accidental?

MS. KEEN: Objection, foundation, form.

A. Don't remember but it had to have

Page 121

happened because I got the reports. And gave them to Weinberg and James.

BY MS. EKL:

Q. What other things can you recall James asking Weinberg to look into other than what we've just talked about?

MS. KEEN: Objection, foundation, form. Calls for speculation.

A. That's pretty much it. Just, you know, to go and check, investigate. Talk to people. And it was just all -- and he didn't. Can I say one thing? I think this letter was because -- this one, was because he was firing Weinberg. The one letter is because he was firing Weinberg. That's why we wrote the letter.

BY MS. EKL:

Q. So you're talking about Deposition Exhibit Number 2?

A. I think so.

Q. And you think that the reason why that letter was written was because it was to support --

A. The reason we were firing, right, because, yeah.

Q. Sorry. I just need to get the question

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 122

out for the record.  So now as you sit here are you recalling that Deposition Exhibit Number 2 was written to support his motion to fire Weinberg?

A.    I think so.

Q.    How many times do you think you visited James in jail from the time he was arrested until August of 1988?

A.    Once a week.

Q.    Do you remember during any of those conversations whether they were just with James or whether they were with James and Weinberg having any discussion about other fires that had taken place in the same area as the building that burned the children and the mother?

MS. KEEN:  Objection, foundation.  Calls for speculation.

A.    No.

BY MS. EKL:

Q.    Prior to James' incarceration, other than working construction and doing the plumbing, what other types of things did he do in his spare time?

MS. KEEN:  Objection, lack of foundation.  Calls for speculation.  And form.

Page 123

A.    As far as what?

BY MS. EKL:

Q.    Was he a person who liked to watch movies?  Did he read books?  Did he read magazines, newspapers?  Did he play sports?  What kind of things did he do in his spare time?

MS. KEEN:  Objection, form.

A.    We did a lot of things with my kids. In the winter we went sledding.  My kids were on speed teams.  We went roller skating.  He was always tinkering with things and building things.

BY MS. EKL:

Q.    Would you say that James was a person who kept up with current events in the news?

MS. KEEN:  Objection, form.  Lack of foundation.  Calls for speculation.

A.    We worked most of the time.

BY MS. EKL:

Q.    Did the two of you ever talk about things that were going on in the news?

A.    No.

Q.    Did you get a regular newspaper back in 1988?

A.    No.

Page 124

Q.    Did you know a person by the name of the Donna Filomina?

A.    Don't remember.

Q.    Do you know someone by the name of Roy Cooper?

A.    Not that I remember.

Q.    Do you remember someone by the name of Roy Cooper being involved in some burglaries with James Kluppelberg?

A.    No.

MS. KEEN:  Objection, assumes facts not in evidence.  Calls for speculation.

BY MS. EKL:

Q.    How about Martin Flores, did you know someone by the name of Martin Flores?

A.    Yes.

Q.    How did you know Martin Flores?

A.    James's brother-in-law.

Q.    Who is Martin Flores married to?

A.    Was married to Laura.

Q.    Do you know when he was married to Laura?

A.    No.

Q.    Do you know where Martin Flores

Page 125

currently lives?

A.    Uh-hum.

Q.    Where is that?

A.    In the grave.

Q.    When did he pass?

A.    I don't know.  Before I was involved.

Q.    So did you ever actually meet Martin Flores?

A.    No.

Q.    Did you ever hear about any criminal activity that James engaged in with Martin Flores?

MS. KEEN:  Objection, assumes facts not in evidence.  Calls for speculation.  Form.

A.    No.

BY MS. EKL:

Q.    Do you know someone by the name of Randy Johnson?

A.    I've heard that name.  Don't remember though.

Q.    Did you know him to be someone that was associated with James Kluppelberg?

A.    No.

Q.    Do you know whether or not James and Randy Johnson ever engaged in any criminal activity

Urlaub Bowen & Associates, Inc.  312-781-9586

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 126

together?

MS. KEEN: Objection, form.

A. No idea.

BY MS. EKL:

Q. Do you recall that James' criminal trial took place in or around July of 1989?

A. Yes.

Q. And you said you attended the criminal trial?

A. Yes.

Q. Did you attend each day of the criminal trial?

A. Yes. It was only one day.

Q. Did you attend the trial with anybody else?

A. I don't remember.

Q. Do you recall if James' mother attended the trial?

A. I don't remember.

Q. Was it during James' criminal proceedings that you came to know Judge Morgan's deputy, Officer Anderson?

A. Through the whole trial.

Q. So the pretrial proceedings as well as

Page 127

the trial, correct?

A. Correct.

Q. How did you first meet him?

A. I asked -- I asked if I could visit him, James.

Q. What did he tell you?

A. First it was up to the judge. And then it was not up to the judge.

Q. At some point did it become up to the deputy whether or not you were allowed to visit James?

A. It came up to the money.

Q. How did you learn that it came up to the money?

A. James.

Q. What did James tell you?

A. James told me for $150 he'll call me into court and we can have a visit. It wasn't on court days.

Q. Where were you when James told you that?

A. On the phone.

Q. And did he tell you who it was that you were to pay the $150 to?

Page 128

A. The bailiff.

Q. What was the name of that bailiff?

A. You just said it I guess. Anderson. Was that his name, Anderson? I think. I don't remember. The judge's chief bailiff.

Q. Did you in fact pay Deputy Anderson money in order to see James?

A. Yes.

Q. How many times did you do that?

A. Numerous.

Q. And each time that you paid him money did he allow you to see James in the courtroom when it wasn't in use?

A. In the jury room.

Q. In the jury room. Okay. Is that a yes?

A. Yes.

Q. You said that at least some of those visits were conjugal visits?

A. Yes.

Q. Were all the visits conjugal visits?

A. Yes.

Q. How long were you allowed to visit James on those occasions in the jury room?

Page 129

MS. KEEN: Objection, form.

A. I don't remember.

BY MS. EKL:

Q. Did you ever pay Deputy Anderson in drugs in exchange for allowing you to visit James?

A. No.

Q. When you said numerous times, can you estimate approximately how many times you paid the deputy and you were allowed to see James?

MS. KEEN: Objection, calls for speculation.

A. I have no idea how many times.

BY MS. EKL:

Q. Would you say it was more than ten times?

MS. KEEN: Objection, calls for speculation.

A. Yes.

BY MS. EKL:

Q. More than 20 times?

MS. KEEN: Objection, calls for speculation.

A. I don't know.

BY MS. EKL:

Q. Do you remember when it was that you were first allowed, what month it was that you were first allowed to start having these visits with

Urlaub Bowen & Associates, Inc. 312-781-9586

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 130

James that were conjugal?

A.   No.

Q.   This was before his trial, correct?

A.   Yes.

Q.   Did James ever tell you how it was that he found out that you could pay off the deputy in order to be able to see him?

A.   No.

Q.   Following James' trial he was convicted, correct?

A.   Yes.

Q.   And his sentencing hearing was delayed for a period of time, is that correct?

A.   Because he fired his lawyer.

Q.   So he was not sentenced immediately after his trial, correct?

A.   I don't think so.

Q.   And between the time that he was convicted and before he was sentenced, he continued to be housed within the Cook County Jail, correct?

A.   He escaped one time.

Q.   And that was going to be my next question.  Until he escaped he was housed in the Cook County Jail, correct?

Page 131

A.   Yes.

Q.   How was it that he escaped from the Cook County Jail?

A.   Changing the mittimus papers on the Court papers.

Q.   How was that done?

MS. KEEN:  Objection, calls for speculation and form.

BY MS. EKL:

Q.   Do you know how that was done?

A.   Bob.

Q.   So let's back up a little bit.  Who's Bob?

A.   Bob Velasquez.

Q.   And was Bob Velasquez another officer that worked at the Cook County Jail?

A.   In receiving.

Q.   Was Bob Velasquez someone that you knew?

A.   Yes.

Q.   How did you know Bob?

A.   The bar on 35th and California.

Q.   What was the name of that bar?

A.   Larry's.

Page 132

Q.   How did you know him from the bar?

A.   He was there a lot of times and I was there.

Q.   When did you first meet Bob?

A.   I don't know exactly when.

Q.   Was it before James was arrested or was it sometime while he was incarcerated?

A.   Sometime while he was incarcerated.

Q.   Before James' escape how often did you see Bob at the bar?

A.   I saw Bob outside the bar and at the bar.

Q.   Where did you see him outside the bar?

A.   His house.

Q.   For what reason did you see him at his house?

A.   Cocaine.

Q.   Were you selling him cocaine?

A.   Yes.

Q.   How frequently would he buy cocaine from you?

A.   A few times a week I guess.

Q.   Do you remember when this started?

A.   No.

Page 133

Q.   Would you say it was months before his trial?

A.   I'm sure.

Q.   Was there anyone else that was present when you would sell cocaine to Bob?

A.   His girlfriend.

Q.   What was her name?

A.   I don't remember.

Q.   How did the agreement come about in which Bob was going to assist James in escaping from Cook County Jail?

A.   I don't remember exactly how it came about.  But just that he could change the mittimus papers.

Q.   And did he tell you that in the course of the conversation with him?

A.   Yes.

Q.   Where were you when you had that conversation?

A.   Probably at his house.

Q.   Was his girlfriend present for that conversation?

A.   I don't know.  I don't remember.

Q.   Did he tell you how it was that he

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 134

could change mittimus papers?

A. He could writ James into court and when he got out of court, he can change the mittimus papers to say that the arson fires were SOL'd and he had a bond on the other case.

Q. Did he tell you that he wanted you to give him anything in exchange for doing that?

A. He owed me a lot of money.

Q. How much did he owe you?

A. A few thousand.

Q. So was there an agreement that if he would change the mittimus papers that you would forgive what he owed you?

A. Yes.

Q. Did you at some point let James know that this was taking place?

A. Yes.

Q. When did you do that?

A. On a visit.

Q. Was this a visit then after his conviction while he was awaiting his sentencing?

A. I guess. I don't remember exactly when.

Q. What did you tell James when you had

Page 135

the conversation with him?

A. That Bob could actually change the mittimus papers and that he could get a bond to get out.

Q. Did you tell anyone else about this arrangement other than James?

A. His mother.

Q. What did you tell her?

A. I wasn't going to bond him out.

Q. So did you tell her that you had an arrangement with the deputy and that he was going to make it so that a bond could be posted for James?

A. Yes.

Q. And that once that was done that she was going to need to post money in order for him to be able to escape from Cook County Jail?

A. Yes.

Q. Do you happen to remember what date it was that this took place?

A. No.

Q. When the bond sheet was filled out, did you ever actually see the bond sheet?

A. No.

Page 136

Q. Do you recall that it was sometime around October 7th of 1989?

MS. KEEN: Objection, calls for speculation.

A. No.

BY MS. EKL:

Q. Do you remember how much bond was required to be posted in order for James to be released?

A. 1,200.

Q. At the point in time when this arrangement was made, you were aware of the fact that James had been convicted of killing the six people, correct?

A. Yes.

Q. Did you think that he was guilty at that point?

A. No.

Q. Did you know that the assistant state's attorney was going to try to seek the death penalty against him?

A. No.

Q. Were you concerned that he was going to at a minimum be locked up for the majority of his life?

Page 137

A. Yes.

Q. And that was something that you didn't want to see happen, correct?

A. Correct.

Q. Because you still loved James at that point, correct?

A. Yes.

Q. Was there any concern on your part that the judge who would be sentencing James was prejudiced against James?

A. Definitely.

Q. Why did you think that?

A. After the first day of trial, I sat in the courtroom waiting for my visit after court. And the stenographer said to the judge, so you're leaving on vacation after the trial. And she goes the trial's done.

I'm not going to think about anything on my vacation. And it was only the first day of trial. Only nobody really testified. So how did you already make the decision the trial is done? So...

Q. Was it before or after you heard that conversation that you started having the

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 138

discussions with Bob about trying to get James out?

MS. KEEN: Objection, asked and answered.

A. I don't remember exactly when.

BY MS. EKL:

Q. Once Bob agreed to create the mittimus, was there a plan created between you and James' mom and James about what would take place once the bond was posted?

MS. KEEN: Objection, form, foundation.

A. No.

BY MS. EKL:

Q. Well, was there a plan that James' mom would come and post the bond, correct?

A. Yes.

MS. KEEN: Objection, form, foundation. That's okay, Bonnie.

BY MS. EKL:

Q. Was there a discussion that you had with James about where he was going to go once the bond was posted?

A. No.

Q. Did you have a discussion with James' mom about where James would go once the bond was posted?

Page 139

A. No.

Q. Where did you think James was going to go once the bond was posted?

A. I had no idea.

Q. Did you tell him that he couldn't come home?

A. Yes.

Q. And why did you tell him that?

A. I had a boyfriend.

Q. What was your boyfriend's name at the time?

A. Tom O'Brien.

Q. Was Tom O'Brien aware of this plan?

A. No.

Q. At some point in time did Bob tell you that he in fact created the fake mittimus that would allow bond to be posted?

A. Yes.

Q. Where were you when he told you that?

A. I don't remember.

Q. Did you then share that information with James?

A. Yes.

Q. Did you also share it with his mom?

Page 140

A. Yes.

Q. Where were you when you shared it with James?

MS. KEEN: Objection, asked and answered.

A. Probably on a visit.

BY MS. EKL:

Q. And again that would be a visit in the Cook County Jail?

A. Yes.

Q. Was that at a time when you were visiting him in the visiting room or was it when you were in one of the jury rooms?

A. I would say probably in the visiting room.

Q. Where were you when you had the conversation with his mom?

MS. KEEN: Objection, asked and answered.

A. Her house.

BY MS. EKL:

Q. Did she tell you anything about what she planned to do in terms of bonding him out or what she planned to do after you told her that the mittimus was going to be created?

MS. KEEN: Objection, asked and answered.

Page 141

A. No. I gave her the money. She went and bonded him out.

BY MS. EKL:

Q. Did you say you gave her the money?

A. Oh, yes.

Q. So I thought you said that you weren't going to pay the money?

A. I wasn't going to bond him out, no.

Q. So you gave her the money to bond him out, but you didn't want to be the person to physically go to the jail to do it?

A. Right.

Q. Why was that?

A. Yeah, you have to sign papers. I'm not putting my name on -- no. No.

Q. Where did you get the money to bond James out?

A. Selling drugs.

Q. At some point in time did you learn that she did in fact take the money and post bond for James?

A. Yes.

Q. How did you learn that?

A. He called me.

Urlaub Bowen & Associates, Inc. 312-781-9586

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 142

Q.    James called you?
A.    Yes.
Q.    Where were you when he called you?
A.    Work.
Q.    And do you remember what day that was?
A.    No.
Q.    Was it shortly after the mittimus had been created as far as you knew?
A.    Yes.
Q.    What did James tell you when he called you?
A.    Just what is he going to do?  I said James, you cannot be with me because they're going to be looking for you.  As soon as your court date comes up, they're going to be looking for you.  You cannot come here.
Q.    Was that because you knew that if he was found at your house, you would be in big trouble with the law?
A.    Yes.
Q.    For having a person who was convicted of killing six people hiding out in your house after escaping from the Cook County Jail?
A.    Right.

Page 143

MS. KEEN:  Objection to form.
BY MS. EKL:
Q.    So after he initially said that to you, what was the next thing you said?
MS. KEEN:  Objection, calls for speculation.
BY MS. EKL:
Q.    After you told him you can't come here, what did he say to you?
MS. KEEN:  Same objection.
A.    We went for a ride to Indiana.  And somehow my boyfriend found out and actually called his uncle, who was a cop, and told his uncle that I was being held by gun point.  And when we came back from Indiana, the police stopped me in the van, him and I.  Searched the van.
        Found bullets that Tom O'Brien actually put in the back door because we were taking them to the farm in Indiana.  And charged me with live ammo and let James go.  And he had already told them that he was out on a fake bond.  But they couldn't hold him because they had all the paperwork that he had a legal bond.
BY MS. EKL:
Q.    So first off, why did you and James go

Page 144

to Indiana?
A.    To talk.
Q.    Where in Indiana?
A.    My parents had a farm at that time.  And now they have a house out there.
Q.    When you went out to the farm what did you talk about?
A.    What he's going to do.
Q.    And what did he tell you?
A.    Join the circus.
Q.    Where was he planning on joining the circus?
A.    His sister worked for the circus.  Her boyfriend actually ran the concession for popcorn and stuff.  So he was going to Florida to work the circus.
Q.    Which sister was this?
A.    Laura.
Q.    Did he tell you that he had already talked to Laura about doing this?
A.    Um-hum.
Q.    I'm sorry.  Is that yes?
A.    Oh, yes.
Q.    Thank you.  When was he planning on

Page 145

going to Florida in comparison to when you were having this conversation?
MS. KEEN:  Objection, form.
A.    He did leave for Florida.
BY MS. EKL:
Q.    But I'm saying when you're having the conversation, he hadn't left for Florida yet, right?
A.    No.
Q.    So when after your conversation was he planning on going down there?
MS. KEEN:  Objection.
MS. EKL:  Days or weeks?
MS. KEEN:  Objection, form and calls for speculation.
A.    Days.
BY MS. EKL:
Q.    Was his plan or did he tell you that his plan was to stay working with the circus and to not come back to Illinois?
MS. KEEN:  Objection, form.
A.    He didn't really say that, but he couldn't come back.  He knew that.
BY MS. EKL:

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 146

Q. When you were driving back to Illinois from Indiana after you had the conversation, what car were you driving?
A. My van.
Q. And in addition to the police finding these bullets or the ammunition in your car, did they also find anything else?
A. Yes.
Q. What else did they find?
A. A sheriff's badge.
Q. And where was the sheriff's badge located within the car?
A. Somewhere in the dash.
Q. Before the police searched the car, were you aware that the sheriff's badge was in the car?
A. Yes.
Q. Where did the sheriff's badge come from?
A. Bob Velasquez.
Q. Did you get the badge for James?
A. No.
Q. Why did you have the badge?
A. I don't even know. Bob gave it to me.

Page 147

I don't know.
Q. Why did you have it in the car?
A. Because I was in the car when Bob gave it to me and I forgot to take it out.
Q. When you said that James told the police that the mittimus was fake, did I mishear you?
A. Yes. Tom O'Brien told the police that the mittimus was fake.
Q. Okay.
A. The bond papers were fake.
Q. Got you. But despite that they still released James, correct?
A. Yes.
Q. Did they initially take both of you to the station?
A. Yes.
Q. Were you the only one charged or did both of you get charged?
A. I got charged.
Q. Do you know if he got charged?
A. No.
Q. No, you don't know or no, he didn't?
A. No, he did not get charged. They told

Page 148

me when they did come and question me about James being out, they said that they were going to charge me with aiding and abetting. I said then charge the 8th District because they let him go. I didn't see him after that. So you let him go. Not me. You kept me.
Q. You had this conversation --
A. After I was arrested with the live ammo I had that conversation with them.
Q. After your arrest -- well, did you and James leave the station together?
A. No.
Q. Or did you have to stay there and he got to go?
A. I had to get bonded out. And I got transferred to another police station.
Q. Do you know what James did after that stop?
A. Went to Dawn's I think.
Q. How do you know that?
A. Because when I got bonded out, he called me all night crying.
Q. Where were you when he called you?
A. Home.

Page 149

Q. And did he tell you where he was?
A. Dawn's.
Q. What did he say to you during that conversation?
A. He didn't want to leave. He didn't want to be without me. Couldn't I leave with him? Just a bunch of stuff.
Q. At some point did you learn that he in fact did leave to start heading down to Florida?
A. Yes.
Q. How did you learn that?
A. I met him at the hotel on Cicero and he was leaving from there to go.
Q. When did you meet him at the hotel on Cicero?
A. I don't know when. Just I met him there. That's all.
Q. Was it within a day or days of you being bonded out on the charge for the ammunition?
A. Yes, yes, I think the next day.
Q. And did you have another conversation with James at the hotel?
A. Yes.
Q. What did he say to you or what did you

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 150

say to him?

A.   That he said that he would have to leave.  And I kept telling him, you can't call me because you know they're going to be watching me because you escaped.  And he kept just even though when he left he kept calling and calling and calling.  And he said he couldn't do it.  He had to turn himself in.  So that's what he did.

Q.   Well, initially when he left the hotel in Cicero, was it your understanding that he then started driving down to Florida?

A.   He went with his sister and her boyfriend.

Q.   And which sister was he with during that?

A.   Laura.

Q.   After James left town with Laura, did you receive any calls from any law enforcement officials?

A.   Yes.

Q.   Who called you?

A.   They picked me up.

Q.   How many officers?

A.   Two.

Page 151

Q.   Were the two officers that picked you up the same two officers that picked James up initially when he was first charged or were these completely different officers?

A.   Different officers.

Q.   Where did they take you?

A.   For a joy ride.

Q.   What do you mean by that?

A.   They just drove around for hours and hours driving around, driving around.  I don't know where.  I was asleep.

Q.   Did you have any conversation with them during the drive?

A.   Uh-hum.

Q.   What did they say to you and what did you say to them?

A.   They told me wait until you get to the county, one of those dikes are going to get you.  I said I'm just as big as they are.

Q.   Were they asking you if you knew where James went?

A.   Not really.

Q.   They weren't asking you that?

A.   No, because they were just trying to

Page 152

scare me into saying -- no.  They didn't really talk to me.  I slept.  I was tired.  I went to sleep.

Q.   At any point did you provide them with any information about where they could find James?

A.   No, because I didn't know where to find him.

Q.   Did you have any conversations with James after seeing him in the hotel before he was again brought back to Cook County Jail?

A.   Yes.

Q.   When did you have a conversation with him?

A.   He called me.

Q.   How much time was that after you saw the two officers?

A.   I don't know.  He called me constantly and I kept telling him, you can't call me, James.

Q.   So had he even called you from the time you saw him in the hotel and before you were picked up by the officers?

A.   Uh-hum.

Q.   I'm sorry.  Was that yes?

A.   Yes.

Page 153

Q.   Was he giving you updates on where it was that he was traveling or where he was?

A.   No.

Q.   Did you tell the officers that James had been calling you?

A.   No.  Probably not.

Q.   And again was that because you didn't want to get in trouble, but you also still cared for and loved James, correct?

A.   Exactly.

MS. KEEN:  Objection, form.

BY MS. EKL:

Q.   And you didn't want him to get caught, correct?

A.   Correct.

Q.   You said at some point you thought that James had turned himself in?

A.   He did.

Q.   What led you to believe that?

A.   He called and told me where he was at.

Q.   How do you know that?

A.   I was on the phone with him when the police got there.

Q.   Okay.  So tell me how that happened?

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 154

So you were having a conversation with James?

A. Yes.

Q. And then the police arrived?

A. Yes, because he had called them.

Q. So he told you that he had called them?

A. Yes.

Q. And did he say that he called you after he called the police?

A. Yes.

Q. Were you able to hear any interaction between James and the police when they arrived at wherever he was located?

A. I don't remember.

Q. Do you know where he was when he was arrested?

A. Macon, Georgia, in a hotel.

Q. Macon?

A. Something in Georgia. I thought it was Macom. What is it?

Q. Could it have been Macon, M-a-c-o-n?

A. Could be.

Q. Did you have any other conversations with James when he was in Georgia?

A. He called me all the time. He called

Page 155

me constantly.

Q. After you heard that James had been arrested in Georgia and before he returned to Cook County Jail, sometime in that time frame did you have any conversations with him when he was locked up in Macon County, Georgia?

A. Yes.

Q. What do you remember about what he said to you and you said to him during those conversations?

A. That was when he cut up his arms.

Q. What did he tell you about that?

A. He said he got like a hundred stitches.

Q. Did he tell you that he was trying to kill himself?

A. Yeah.

Q. Tell me what you remember about that conversation?

A. That's basically what the conversation was. He couldn't do this. He's going to spend the rest of his life in prison. So...

Q. Did you learn that he had to be taken to the hospital as a result of cutting his arms?

A. Yeah.

Page 156

Q. And is that where he told you he had to get a bunch of stitches?

A. Yes.

Q. Had you known James to cut himself at any point in time prior to this occasion in Macon County, Georgia?

MS. KEEN: Objection, form. Go ahead.

A. Only one other time.

BY MS. EKL:

Q. When was that?

A. When we were dating.

Q. Do you remember approximately what year that was?

A. '86.

Q. Tell me what happened that led to that incident?

A. I was -- got home. I was still with my husband. And he called and said he wanted me to come over. And I told him I couldn't come. And he said, but I need to see you. And I said I can't come. That I'm home.

And then he called me back and said that he had cut himself. He didn't say deliberately. He didn't say whatever. But he said

Page 157

he had cut himself and he needed to go to the hospital.

Q. Did you come home at that point?

A. I went and took him to the hospital.

Q. Where was he cut during that occasion?

A. Just on his arm. Don't remember where.

Q. Did he tell you that he had intentionally hurt himself at any point in time in that 1986 incident?

A. No, he didn't say deliberately cut. He just said he got cut so...

Q. Did you believe that he had tried to deliberately hurt himself?

MS. KEEN: Objection, form, foundation. Calls for speculation.

A. No, not really.

BY MS. EKL:

Q. Did you think it was an accident?

A. It could have been. Tried to believe it was.

Q. Did he tell you how it happened?

A. I don't remember.

Q. Did you think he was trying to -- did you think that he cut himself in order to try to

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 158

get you back away from your husband and to come see him?

MS. KEEN: Objection to form. Calls for speculation.

A. I thought maybe.

BY MS. EKL:

Q. You're aware that James lost part of his finger, correct?

A. Yes.

Q. Did he ever tell you how it was that he lost his finger?

A. A machine.

Q. That was when he was a child, correct?

A. Young man.

Q. Young man?

A. Uh-hum.

Q. I'm sorry. Is that a yes?

A. Yes.

Q. Was he still in school when he lost his finger?

MS. KEEN: Objection, calls for speculation. Lacks foundation.

A. I wasn't around then and I thought I was told he was at work.

Page 159

BY MS. EKL:

Q. Did he ever hear about any injury -- well, strike that.

Did James ever tell you that when he was a child he inflicted injuries to try to avoid having to go to school?

A. No.

Q. Before James went down to Macon County Jail, were you aware of him being in contact with any other women other than you and Dawn and his mother and his sister?

MS. KEEN: Objection, form.

A. No.

BY MS. EKL:

Q. Were you aware of him being in contact with a 14-year-old girl?

MS. KEEN: Objection, assumes facts not in evidence. Calls for speculation. Form.

A. No.

BY MS. EKL:

Q. Did you hear that he had been corresponding with a 14-year-old girl from the Cook County Jail?

MS. KEEN: Objection, assumes facts not in

Page 160

evidence. Calls for speculation. Form.

A. No.

BY MS. EKL:

Q. At some point did you become aware that James returned to Chicago?

A. Yes.

Q. And when he was returned, he was brought back to the Cook County Jail, correct?

A. Yes.

Q. And once he was brought back, did you continue to visit him there?

A. Yes.

Q. Were the circumstances surrounding his escape to your knowledge investigated by an investigator from the Cook County Jail?

MS. KEEN: Objection, lacks foundation.

A. Yes.

BY MS. EKL:

Q. And how do you know that?

A. They brought me into the Cook County Jail.

Q. Who is they?

A. Whoever was investigating.

Q. Did they interview you about what you

Page 161

knew about the circumstances surrounding the escape?

A. Yes.

Q. And ultimately was anyone charged in relation to that escape?

A. Yes.

Q. Who was that?

A. Bob Velasquez.

Q. And I think earlier today you mentioned that you had testified in a case against Bob?

A. Yes.

Q. Was that a trial or some other proceeding?

A. Grand Jury I think. I think.

Q. To your knowledge did James' escape receive any media attention?

A. Yes.

Q. Do you remember seeing articles in the Chicago Tribune related to the escape?

A. I don't do newspapers.

Q. Did you see it on the TV news?

A. TV.

Q. Do you recall that James was sentenced to life without parole on or about March 22nd of

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 162

1990?

A. That I don't remember.

Q. Do you remember that he was sentenced to life without parole even if you don't know the date?

A. Yes. And two fourteen-year sentences.

Q. And during his incarceration in the Department of Corrections did you continue to visit with him?

A. Yes.

Q. How often did you visit with him in the Department of Corrections?

A. At first every two weeks. After that --

Q. Did that eventually change?

A. It got -- because too much stuff going on. And I went on vacation.

Q. And during that initial time period were you still married to him?

A. Yes.

Q. Did you have any discussion with James about the fact that you had a boyfriend and were seeing someone else even though you were married to him at the point in time when he escaped from Cook

Page 163

County Jail?

A. Yes.

Q. How did James react to that?

MS. KEEN: Objection, form.

A. He didn't really say anything. I mean it's -- he had life with no parole. I mean, I was still there. So that's pretty much it.

BY MS. EKL:

Q. You said that eventually James asked for a divorce because you weren't helping him on his case, correct?

A. Correct.

Q. While he was in the Department of Corrections were there things for a period of time that you continued to do to try to assist him in trying to get his case reversed?

A. Not really.

Q. Did you reach out to anyone to try to seek help, seek assistance in getting James' case reversed?

MS. KEEN: Objection, form.

A. I don't think so. I don't remember. My biggest thing was I took care of his kid.

BY MS. EKL:

Page 164

Q. That was James junior?

A. Uh-hum.

Q. Is that a yes?

A. Yes.

Q. Did you consider yourself to be James junior's mother?

A. No.

Q. When James was locked up in the Department of Corrections, did you continue to believe that he was innocent?

A. Yes.

Q. Do you still believe that he's innocent?

A. Yes.

Q. You paused. Is there something that gives you pause?

MS. KEEN: Objection to the characterization of that as a notable pause. Objection to characterization of that in the record. She answered as she did all her other questions. What's the question?

(question read).

MS. KEEN: Objection form as well.

A. You want to say something?

Page 165

BY MS. EKL:

Q. No. You smirked when you said that and I was just wondering if there was more to your answer?

MS. KEEN: I'm objecting to that as a smirk. That's argumentative and an unfair characterization of her facial expressions. She's made various I think facial movements throughout this deposition and none of them have been remarked on except this one, rather self-servingly. And so I make an objection to that. And I disagree with that characterization.

BY MS. EKL:

Q. Without trying to characterize the look on your face, is there something more you have to say about that?

MS. KEEN: About what? Object to form.

BY MS. EKL:

Q. I asked you whether or not you still believed that James is innocent.

A. Yes.

MS. KEEN: Objection, asked and answered.

MS. EKL: I haven't finished my question.

MS. KEEN: Sorry.

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 166

BY MS. EKL:

Q.    Do you still believe with the same amount of certainty or as you did before that James is innocent or is there something that makes you think -- have some doubt as to that?

A.    No, not really.

Q.    All right.  Do you have any fear of James as you sit here today?

A.    No.

Q.    Do you know why it was that Dawn was fearful of James in her final days?

MS. KEEN:  Objection, calls for speculation. Misstates the witness' prior testimony.

A.    The Grand Jury statement.

BY MS. EKL:

Q.    Did you become aware that Dawn later recanted that statement or said that that statement wasn't truthful?

A.    Of course.

MS. KEEN:  Objection to form.

BY MS. EKL:

Q.    Do you know whether or not James was aware that she made the later statements that her Grand Jury wasn't truthful?

Page 167

MS. KEEN:  Objection to form.  Unclear as to which later statements are referred to in the question.

A.    A lot of things went on between Dawn and James.  Dwayne's three kids are the oldest three and then there's James and just a lot of back and forth things.  And I was with Dawn up until the last five minutes of her life.

BY MS. EKL:

Q.    Did she tell you at any point in time in the last year of her life or even sometime when you were living with her what her belief was about James' innocence or guilt?

MS. KEEN:  Objection, asked and answered.

A.    Last she was confused because she was so sick.  I don't know.  She was just afraid because of the Grand Jury statement.  I think -- that's my opinion that she just was afraid because that sent him away for a long time.  And then she tried to change it, but they wouldn't let her.

BY MS. EKL:

Q.    Did she tell you at any point near the end that at the point in time when she testified before the Grand Jury that she did believe that

Page 168

statement to be true?

A.    She didn't want to face him.  That was her answer.  In court when the judge -- okay, when they were in court and they asked for Dawn's Grand Jury statement, because it was never turned over in court, the state's attorney said that there was a fire in the court reporter's house.  And that those documents burned.

And the judge said that due to the fact that Dawn takes her time answering questions, she finds that the Grand Jury statement was true and fact.  That what she's saying on the witness stand is all lies.  But there was no Grand Jury statement, so what was she basing that on?

Q.    But as far as your conversations with Dawn at the end, did she tell you that anything she said before the Grand Jury was truthful?

MS. KEEN:  Objection, asked and answered.

A.    No.

BY MS. EKL:

Q.    In addition to you visiting James after he was locked up in the Department of Corrections, are you aware of any other family members visiting him?

Page 169

A.    Yeah.

Q.    What other family members?

A.    His ex-wife.

Q.    Which one?

A.    Donna.  That's why he divorced me.

Q.    He divorced you for Donna?

A.    Oh, yeah.

Q.    How do you know that?

A.    Because he told me.  She's going to help him with his paperwork.

Q.    And what did you think that he meant by help him with his paperwork?

A.    Help him do the processing and stuff. He didn't tell me that that was happening.  The sheriff told me.  Because the sheriff goes, oh, you've been here a few times this month.  I go, no, I haven't.  Oh, yes, Kluppelberg.  No, Donna.  Oh, sorry.  Yeah.

Q.    So did she purport as far as you knew to be his wife at the same time that you did?

MS. KEEN:  Objection, calls for speculation.

A.    I don't know, but we had the same last name.  And a lot of times they called me Donna for some reason.  So it's like -- but, yeah, the

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 170

sheriff had actually made the mistake saying I was there so many times, you know, that month visiting. And it was actually Donna and I knew I wasn't there.

BY MS. EKL:

Q.   Did you ever reach out to anyone in the media to try to get them to help James' case?

A.   They came to the house.

Q.   Who was that?

A.   The media.

Q.   Do you remember who from the media?

A.   Uh-um.

Q.   Is that yes or no?

A.   No.  Sorry.

Q.   Do you remember what news agency the person was with?

A.   No, I don't.

Q.   Do you remember a person by the name of Maurice Posley?

A.   I don't remember the name.

Q.   But did you in fact speak to a reporter?

A.   Yes.

Q.   When was that?

Page 171

A.   I don't know.  I don't remember the time.  Just he came to the house on Western and asked me questions.

Q.   And when the reporter came to your house, was it when you were still married to James or was it after that?

MS. KEEN:  Objection, calls for speculation.

A.   I don't remember if I was still married.

BY MS. EKL:

Q.   Was it after James was in the Department of Corrections?

A.   Yes.

Q.   What if anything did they ask, did that reporter ask you?

MS. KEEN:  Objection, calls for speculation.

A.   Did I know anything about the incident.

BY MS. EKL:

Q.   Did you tell the reporter that James had admitted to you to starting the fire?

A.   Yes, I did.

Q.   Why did you say that?

A.   He cheated on me, one last time.

Q.   Who did he cheat on you with?

Page 172

A.   Donna.

Q.   What exactly did you tell the reporter?

A.   That he told me.

Q.   That he told you what?

A.   That he did it.

Q.   Did you tell the reporter anything more specific?

A.   No.  Just that he told me he did it.

Q.   Even though James had cheated on you, why did that cause you to tell the reporter that James had admitted to killing six people?

A.   I spent 15 years, a lot a lot of money. I went to prison because I sold drugs because of a lot of stuff.  And then he's going to tell me on a visit that I'm divorcing you.  And then I find out from the sheriff that he was cheating on me from prison.  That kind of gets you.

Q.   Was there any truth to the statement that James had told you that he set the fire?

A.   No.

Q.   How would you describe your current relationship with James today?

MS. KEEN:  Objection, asked and answered.

A.   Friends.

Page 173

BY MS. EKL:

Q.   How often do you see him?

MS. KEEN:  Objection, asked and answered.

A.   Not that often now.  When he first got out a few times, but not that often.

BY MS. EKL:

Q.   In your opinion how is James doing these days?

MS. KEEN:  Objection, form.

A.   Very good.

BY MS. EKL:

Q.   And what do you base that on?

A.   He's held a job for a long time.  He's got a good relationship with his son and his grand kids.  And he's actually contacted a daughter that he didn't even know he had and he's got a good relationship with her.  And he's doing quite well.

Q.   Are you aware that James has listed you as a reference in his resume that he's given to potential employers?

A.   That's because I told you he worked for me on doing different jobs, electrical jobs and stuff.

Q.   Has anyone contacted you to ask you

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 174

questions about him in regard to a potential job?

A.    No.

Q.    When did you first learn that James was filing this lawsuit?

A.    After he was released.

Q.    How did you learn about it?

A.    It's all over the news that people who get incarcerated and are not guilty, they get paid. That's no secret.

Q.    How did you find out specifically about James' lawsuit?

A.    I don't know.  I just -- I just knew there was going to be one.  That's not anybody told me.  It's just there had to be.  He was incarcerated for 25 years, 24 and something. Believe me, it was a lot.

Q.    Did he ever talk to you about his lawsuit?

A.    No.

Q.    To this day other than having a conversation with him about coming to the deposition, have you had any conversation with him at all about his lawsuit?

A.    No.

Page 175

Q.    Did he tell you that he had to provide a deposition in this case?

A.    His daughter, I saw his daughter that lived in Texas when she came here.  We had lunch. And because that was the first time I met her.  And she said she came for a deposition, I guess.

Q.    Who is that?

A.    I don't know her name.  It's just long lost daughter.

Q.    You had lunch with her.

A.    Yes, with this bratty kid.  What is her name?  Sarah.  Is it Sarah?  What is the kid's name?

Q.    Are you talking about Sarah Brobst?

A.    Sarah.  See, I said Sarah.

Q.    I didn't depose her by the way.

A.    Samantha.  I know Samantha.

Q.    Let's get back on track.  The poor court reporter is probably having a hard time.  Has James promised you anything in relation to his lawsuit?

A.    No.

Q.    Has he talked to you about giving you any money to pay you back for all the things that

Page 176

you did for him over the years?

A.    No.  But I think he owes me a lot.

Q.    Do you expect that if James were to get a lot of money from his lawsuit, that he would give you some?

A.    No.  Would I want some?  Yes, after everything I went through, yes.  But, no, he hasn't promised me anything, no.

Q.    Has he told you anything about what he plans to do with any money that he may receive?

A.    No.

MS. EKL:  Let's take a break.  I'm pretty close.  I might be done or I might have a couple more questions.  And then I'll let Mr. Rybarczyk ask his questions and we'll get you out of here.

(recess)

MS. EKL:  I thank you very much for your time.  I have no further questions.  Thanks.

A.    Wow.

MS. EKL:  There's still a few from Mr. Rybarczyk.

EXAMINATION

BY MR. RYBARCZYK:

Q.    How are you doing, Bonnie?

Page 177

A.    Hi.

Q.    I'm going to show you what's going to be marked Exhibit 3.

(Exhibit No. 3 marked)

Q.    If you could take a second and just sort of look over this document.  Are you finished reading it?

A.    Uh-hum.

Q.    Have you seen this document before?

A.    Yes.

Q.    And when did you see this document?

A.    I don't know exactly when.

Q.    Do you see at the end of the document it has a signature on the right-hand side.  Do you recognize that signature?

A.    Mine.

Q.    Are the statements that you read within the document, are those accurate statements?

A.    Yes.

Q.    Do they fairly -- today do you have a memory of these statements?

A.    Yes.

Q.    And this is a truthful statement?

A.    Yes.

Urlaub Bowen & Associates, Inc.  312-781-9586

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 178

Q.   Earlier Ms. Ekl was asking you some questions about your relationship with Mr. Kluppelberg. I'm sorry, James is I think what you were calling him. And you were talking a little bit about an incident where he was cut in 1987, is that correct? You said he had cut himself in 1987?

A.   He had gotten cut.

Q.   He had gotten cut. Now do you know if that resulted in any sort of scar?

MS. KEEN: Objection, lacks foundation. Calls for speculation.

A.   Small. I think it was only a couple stitches.

BY MR. RYBARCZYK:

Q.   Now did you know did Mr. Kluppelberg have any other sort of scars on his arms?

A.   I don't think so.

Q.   Earlier you testified about having a conversation with a sheriff's officer, do you recall testifying about that?

A.   Bob?

Q.   No, sorry. Having a conversation with a sheriff's officer after Mr. Kluppelberg escaped

Page 179

jail?

A.   Yes.

MS. KEEN: Objection, misstates her prior testimony.

BY MR. RYBARCZYK:

Q.   And during that conversation with the Cook County Sheriff's officer, did you assist in any sort of investigation of Bob?

MS. KEEN: Objection, assumes facts not in evidence and misstates her prior testimony. You can answer.

A.   Okay. Actually they took me to the county jail and asked me all kinds of questions. And then they took me to a restaurant on I think 67th and Pulaski. Had me call Bob and come there. I think that was the address.

BY MR. RYBARCZYK:

Q.   And did you go to the restaurant?

A.   Yes.

Q.   Did anyone accompany you to the restaurant?

A.   Sheriffs I think because they arrested him.

Q.   Was the restaurant called Huck Finns?

Page 180

A.   I think. I don't know. It's the corner, there's a restaurant.

Q.   That's okay. It was on Pulaski?

A.   Yes.

Q.   You were also asked earlier by Ms. Ekl if you had ever told the reporter whether James had confessed to you regarding the fires. Do you remember that?

A.   Yes.

Q.   Do you also remember at any point talking to any of James' lawyers before he was let out of jail?

A.   Public defender or Weinberg?

Q.   Sorry. Scratch that. I should give you a better foundation. Do you recall talking to any of James' lawyers in and around 2008?

A.   Yes.

Q.   And what do you recall about that conversation?

MS. KEEN: Objection, calls for speculation.

A.   I have no idea.

BY MR. RYBARCZYK:

Q.   Do you know where the conversation took place?

Page 181

A.   2008. Different people came to my house. Different, you know -- so I don't remember.

Q.   Do you recall ever telling a lawyer that worked for James that James junior had received a letter from James senior, your ex-husband, regarding a confession?

A.   No.

Q.   I'm going to show you a document. Mark this Exhibit 4.

(Exhibit No. 4 marked)

Q.   You can take a chance and read the whole thing if you'd like. Or if you want to look at the last page, that's actually what I'm going to ask you about. On page Bates stamped -- sorry. Second to the last page 231.

Now I'll represent to you that this is a letter that was produced by Sarah Brobst who you said you had lunch with recently and this purports to be from her father, James.

A.   Okay. Who sent the letter to James. Okay. I don't understand who sent the letter to James. I don't understand that part.

Q.   Okay. So you don't recall having a conversation -- this doesn't refresh your

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 182

recollection as to any sort of conversation you had with one of James' lawyers?

A. Uh-um.

MS. KEEN: You have to answer verbally.

A. I'm sorry. No.

BY MR. RYBARCZYK:

Q. So this statement that "Bonnie, my ex and Dawn, your brother's mother, they told them out of hate and spite that I had sent a letter." I, I believe is James Kluppelberg, sent a letter to James telling him I was guilty.

MS. KEEN: Wait, what is the --

A. No.

MS. KEEN: What's the question?

BY MR. RYBARCZYK:

Q. Did you ever make that statement?

A. No. Because James lived with me. The kid lived with me up until he was 18. No.

Q. So you're not aware of any letter that James junior received?

A. No. He didn't open any letters his dad sent anyway. He never opened any letters. We went to see him. And he was really mad after about the divorce because of the fact that that was his only

Page 183

contact with his dad was me. And if you are divorcing me, why would I bring your kid to see you?

Q. Now did Dawn ever learn this information?

MS. KEEN: Objection, foundation. Calls for speculation and form.

A. Not that I know of.

BY MR. RYBARCZYK:

Q. Did you ever have a conversation with Dawn about this?

A. Letter? No, not at all. First I heard about any letter.

Q. Finally we've seen a name before and I just want to run it past you. Do you know a person named Anita Kluppelberg?

A. No.

Q. No? Not familiar with that name?

A. No. They do have a half sister, but I don't know her name.

Q. I want to talk to you just briefly -- sorry -- I have one other question on when you were talking to Jim, James, sorry, when he was in Macon, Georgia, back in 1989, you had said you were on the

Page 184

phone with him when he was arrested by the authorities?

A. Yes.

Q. Was anyone with you when he was on the phone with them?

A. No.

Q. And finally I wanted to ask you one other question. We were talking again about your statement to Mr. Posley about Mr. Kluppelberg's alleged confession. Why do you think he's innocent?

MS. KEEN: Objection to the form of that question and mischaracterizes the witness' prior testimony. I believe she wasn't able to identify the name of the reporter.

MR. RYBARCZYK: I'll scratch that.

BY MR. RYBARCZYK:

Q. Earlier you had testified that you had spoken to a reporter at some time after Jim was incarcerated, correct?

A. Yes.

Q. Earlier you had testified that that reporter -- that you had told that reporter that Jim had confessed to setting the fire, correct?

Page 185

A. Yes.

Q. And you earlier testified that you were confident that Jim had not set the fire, is that correct?

A. Correct.

Q. Why do you have that belief?

A. That he didn't do it?

Q. Right.

A. Just don't believe he did it. I mean with the time that I was with him and even now, I don't think he could just deliberately hurt someone. I don't.

MR. RYBARCZYK: Okay. That's all I have.

MS. KEEN: I have very brief, just following up on a couple of questions.

EXAMINATION

BY MS. KEEN:

Q. You gave some testimony when Beth was asking you questions about a conversation you had with James Kluppelberg after James had been arrested regarding Dwayne lying about what he had seen. Do you recall that series of questions and answers?

A. Yes, I do.

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 186

Q. What I wanted to ask you is, as you sit here today do you know when that conversation between you and James took place?

A. Right after he was first arrested.

Q. You saw James multiple times right after he was arrested, correct?

A. Yes, every visiting.

Q. And is it fair to say that you don't have an exact memory of the date and time that you had that conversation?

A. Definitely do not.

Q. Is it possible that you had that conversation with James more than a couple of weeks after the date that he was arrested?

MS. EKL: Objection. Calls for speculation.

MS. KEEN: You can answer.

A. It could have been any time. My memory just kind of goes in spots sometimes.

BY MS. KEEN:

Q. Okay. So you know you had a conversation with Mr. Kluppelberg regarding Dwayne lying.

A. Yes.

Q. Is it fair so say that you can't state

Page 187

with certainty when it is in relation to Mr. Kluppelberg's January 12th arrest that that conversation took place?

A. Yeah.

Q. You were asked whether you recall stating to the police something to the effect that James Kluppelberg liked to start fires. Do you recall that question?

A. Yeah, I do remember the question. But I don't recall saying that.

Q. Do you believe that that's the kind of thing you would have told a police officer about James Kluppelberg? In other words, do you believe you would have told a police officer that James Kluppelberg liked to start fires?

A. No.

MR. RYBARCZYK: Objection.

MS. EKL: Objection, calls for speculation.

A. No, the police were already proved in court that they lied.

BY MS. KEEN:

Q. You were asked a question about Exhibit 2. I believe the question was did you prepare this document and I believe your answer was

Page 188

no.

A. Correct.

Q. Is it your belief that you were not the person to type this document?

A. Yes.

Q. But based on your review of all of the document including the fax header at the top, your name down at the bottom and your friend's notary seal, do you have any reason to dispute that you were involved in the preparation --

A. Oh, yes, I was involved. It's all right.

Q. You were asked some questions about three-way calls that you had with Mr. Kluppelberg and the attorney, Marshall Weinberg.

A. Yes.

Q. My question to you is do you have any reason to dispute that -- or strike that.

Are you able to say one way or the other whether James and Marshall Weinberg may have had conversations on the phone that you were not part of, could you say that one way or the other?

MR. RYBARCZYK: Objection, speculation.

A. Yes, they did not have -- but he would

Page 189

come to court and go in the back and talk to James. That was the only time James saw him was when he would come to the courtroom; walk in the back; have a conversation with James. And then that was the extent of their contact.

Q. When Mr. Weinberg and James Kluppelberg would have conversations in court in the back, you were not present for those, correct?

A. No.

Q. My final question is towards the end of today's deposition you were asked some questions about whether you expected to receive any money if James were to be awarded any money in this lawsuit. Do you remember those questions?

A. Yes.

Q. Whatever your beliefs about whether -- whether it would be fair to reimburse you for all that you've put into James, is it fair to say that you're testifying here under oath truthfully regardless of whether James ever recovers any money in this lawsuit? That was a long question. Do you want me to ask that again?

A. No. He didn't promise me nothing. I expect nothing. And everything I said was truth.

BONNIE KLUPPELBERG HILEMAN, 05/14/2015

Page 190

MS. KEEN:  I have no other questions.

MS. EKL:  I have nothing further.  Thank you. Let's go off the record and I'll explain signature.

(Discussion off the record.)

THE WITNESS:  I'll waive it.

MS. EKL:  Signature is waived.  Thank you.

- - - - -

(The proceedings adjourned at 2:51 p.m.)

Page 191

REPORTER'S CERTIFICATE

I, Pauline Strohl, do hereby certify that BONNIE KLUPPELBERG HILEMAN was duly sworn by me to testify the whole truth, that the foregoing deposition was recorded stenographically by me and was reduced to computerized transcript under my direction, and that the said deposition constitutes a true record of the testimony given by said witness.

I further certify that the reading and signing of the deposition was waived by the deponent.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Chicago, Illinois, this 17th day of June 2015.

*Pauline Strohl*

Illinois CSR No. 084-001253

Urlaub Bowen & Associates, Inc.  312-781-9586